# EXHIBIT A

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                FOR THE COUNTY OF LOS ANGELES

3

4    DEPARTMENT 106           HON. LARRY P. FIDLER, JUDGE

5                    -OOo-

6    THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                  )

7             PLAINTIFF,       )
                                  ) NO. BA455469

8         VS.                   )
                                  )

9                                    )
                                  )

10   PAUL TURLEY,                )
                                  )

11            DEFENDANT.      )
     _____)

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              FRIDAY, MAY 3, 2024

15

16

17   APPEARANCES:

18   FOR THE PEOPLE:    LOS ANGELES DISTRICT ATTORNEY
                       BY:  DAYAN MATHAI, DEPUTY

19                         KAREN NISHITA, DEPUTY
                     211 WEST TEMPLE, SUITE 200

20                     LOS ANGELES, CALIFORNIA 90012

21   FOR THE DEFENDANT:   LAW OFFICE OF ROBERT C. MOEST
                       BY:  ROBERT C. MOEST

22                     2530 WILSHIRE BOULEVARD
                     SANTA MONICA, CALIFORNIA 90403

23

24

25

26

27   VOLUME 1              TRACI THOMAS, CSR 9620
    PAGES 1/83-300, INCL.   OFFICIAL REPORTER

28

2

M A S T E R   I N D E X

VOLUME 1


SESSIONS

|                          | PAGE |
|--------------------------|------|
| FRIDAY, MAY 3, 2024      |      |
| A.M. SESSION             | 6    |
| P.M. SESSION             | 33   |

3

```
1              M A S T E R   I N D E X

2                    VOLUME 1


3


4            CHRONOLOGICAL INDEX OF WITNESSES


5                                              PAGE

6     TURLEY, PAUL, (CALLED BY THE PEOPLE)
        DIRECT EXAMINATION BY MR. MATHAI          28
7       DIRECT EXAMINATION (RESUMED) BY MR. MATHAI 33

8     GLUCK, BENJAMIN, (CALLED BY THE PEOPLE)
        DIRECT EXAMINATION BY MR. MATHAI          69
9
```

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

M A S T E R   I N D E X

VOLUME 1


ALPHABETICAL INDEX OF WITNESSES

PAGE

**GLUCK, BENJAMIN, (CALLED BY THE PEOPLE)**
  DIRECT EXAMINATION BY MR. MATHAI          69


**TURLEY, PAUL, (CALLED BY THE PEOPLE)**
  DIRECT EXAMINATION BY MR. MATHAI          28
  DIRECT EXAMINATION (RESUMED) BY MR. MATHAI    33

5

```
1                  M A S T E R   I N D E X

2                        VOLUME 1

3

4                        EXHIBITS

5

6    PEOPLE'S    DESCRIPTION              ID    EV   REFUSED
     EXHIBITS
7
8    1           PHOTOCOPY OF CHECK       51

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1    HEARING.

2              I KNOW YOU HAVE OTHER WITNESSES, I THINK,

3    THAT ARE IN THE COURTROOM.  I THINK WE HAVE TO START

4    WITH --

5         MR. MATHAI:  WE DON'T HAVE ANY OTHER WITNESS IN

6    THE COURTROOM.  BUT WE DO HAVE A WITNESS POTENTIALLY

7    FOR THIS AFTERNOON.

8         THE COURT:  LET'S GO AHEAD AND START.

9         MR. MATHAI:  YES.

10             PEOPLE CALL PAUL TURLEY.

11        THE COURT:  ALL RIGHT.

12

13                 PAUL TURLEY,

14          CALLED BY THE PEOPLE, AS A WITNESS,

15           WAS SWORN AND TESTIFIED AS FOLLOWS:

16

17        THE CLERK:  YOU DO SOLEMNLY STATE THAT THE

18   TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW

19   PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE

20   TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU, GOD?

21        DEFENDANT TURLEY:  I DO.

22        THE CLERK:  PLEASE, STEP FORWARD AND BE SEATED IN

23   THE WITNESS STAND.

24             SIR, PLEASE, ADJUST THE MICROPHONE

25   COMFORTABLY IN FRONT OF YOU.

26        THE DEFENDANT:  I GUESS IT'S OKAY.

27        THE CLERK:  PULL IT A LITTLE CLOSER SO WE CAN

28   HEAR YOU.

1          SPEAKING INTO THE MICROPHONE, PLEASE,

2   STATE AND THEN SPELL YOUR FULL NAME FOR RECORD, SIR.

3          DEFENDANT TURLEY:  PAUL TURLEY, T-U-R-L-E-Y.

4          THE COURT:  THANK YOU.

5              YOU MAY PROCEED.

6          MR. MATHAI:  THANK YOU.

7

8                  DIRECT EXAMINATION

9   BY MR. MATHAI:

10         Q     MR. TURLEY, YOU'VE HEARD OUR DISCUSSION

11  HERE IN COURT.  I'M GOING TO ASK YOU SOME QUESTIONS

12  ABOUT THAT.  BUT BEFORE I -- ABOUT SOME OF THOSE

13  SUBJECTS.  BUT BEFORE I DO, I WANT TO LAY SOME

14  FOUNDATION OF STUFF YOU'VE PREVIOUSLY TESTIFIED OR TOLD

15  US ABOUT, BUT JUST BRIEFLY TO LAY THE GROUNDWORK FOR

16  THE LATER QUESTIONS.

17             CAN YOU TELL US, WHAT IS -- WHAT WAS YOUR

18  RELATIONSHIP WITH MUNIR UWAYDAH BEGINNING BACK IN THE

19  EARLY 2000'S?

20         A     HE WAS MY BUSINESS PARTNER.

21         Q     OKAY.  AND DID YOU JOIN WITH HIM IN

22  STARTING A MEDICAL CORPORATION CALLED FRONTLINE MEDICAL

23  ASSOCIATES?

24         A     YES.

25         Q     AND THAT PARTNERSHIP, WAS IT WITH

26  MR. UWAYDAH OWNING -- I'M SORRY.

27             WELL, WHO OWNED THE -- MR. UWAYDAH OWNED

28  THE MAJORITY OF THE FRONTLINE AND ASSOCIATES?

1          A     YES.

2          Q     AND YOU WERE THE MINORITY OWNER?

3          A     YES.

4          Q     AND YOU'VE TESTIFIED PREVIOUSLY AND YOU'VE

5 GIVEN PROFFERS ABOUT THAT RELATIONSHIP AND HOW MUCH

6 CONTROL YOU ACTUALLY HAD.

7          CAN YOU TELL US, JUST IN BRIEF TERMS, HOW

8 MUCH CONTROL DID YOU HAVE OVER FRONTLINE MEDICAL

9 ASSOCIATES?

10        A     I DIDN'T HAVE ANY CONTROL OF IT.

11        Q     OKAY.  AND WAS IT -- ON THE ISSUE OF

12 CONTROL, WERE YOU SUPPOSED TO HAVE SOME CONTROL?

13          WHEN I SAY WERE YOU SUPPOSED TO HAVE, I

14 MEAN AS IT WAS LAID OUT ON PAPER.  WAS IT LAID OUT ON

15 PAPER AND IN LEGAL DOCUMENTS THAT YOU WOULD -- YOU WERE

16 SUPPOSED TO HAVE SOME CONTROL OVER THE PROPERTY, OVER

17 THE COMPANY?

18        A     IT WAS JUST A 51/49 PERCENT CORPORATION.

19 I MEAN, THERE WAS NO OPERATION AGREEMENT OR ANYTHING

20 LIKE THAT.  I GUESS IN MY NAIVETY I THOUGHT THAT I

21 WOULD HAVE CONTROL, BUT I DIDN'T.

22        Q     AND HOW LONG DID YOU -- WELL, LET ME JUST

23 ASK YOU THIS.

24          DID YOU CONTINUE WORKING WITH MUNIR

25 UWAYDAH FOR MANY YEARS ALL THROUGHOUT THE 2000'S AND

26 PAST 2010?

27        A     YES.

28        Q     AND WERE YOU INVOLVED IN NOT JUST

1    FRONTLINE MEDICAL ASSOCIATES BUT MANY BUSINESS ENTITIES

2    THAT WERE ASSOCIATED WITH MUNIR UWAYDAH?

3         A      I WAS INVOLVED INITIALLY WITH FIRSTLINE

4    MEDICAL.

5         Q      OKAY.  THAT WAS ANOTHER MUNIR UWAYDAH

6    ENTITY?

7         A      I MEAN, I THINK IT WAS THE SAME

8    ARRANGEMENT INITIALLY, YES.

9         Q      OKAY.  DID MUNIR UWAYDAH HAVE A -- HAVE --

10   OR DOES HE HAVE, PRESENT TENSE, A PRACTICE OF OR A

11   MODUS OPERANDI OF PUTTING OR ASKING OTHER PEOPLE TO PUT

12   THEIR NAMES ON BUSINESSES AND PROPERTY THAT HE, IN

13   FACT, OWNS AND CONTROLS?

14        A      I MEAN, I PURCHASED PROPERTIES IN MY NAME.

15        Q      MY QUESTION IS MORE GENERAL THAN THAT.

16               DID YOU OBSERVE THAT HE ASKED PEOPLE IN

17   GENERAL, OTHER PEOPLE, TO PUT THEIR NAMES ON PROPERTY

18   AND BUSINESSES THAT HE, IN FACT, OWNED AND CONTROLLED?

19        A      I DON'T -- I DON'T KNOW EXACTLY WHAT

20   PROPERTY -- YOU KNOW, IF THERE ARE OTHER PROPERTIES

21   THAT SOMEBODY ELSE'S NAME WAS PUT ON THAT HE CONTROLLED

22   OR OWNED.

23               AS FAR AS BUSINESSES, I MEAN, HE MAY.  I

24   DON'T KNOW 100 PERCENT SURE WHAT -- WHO OWNED WHAT.  I

25   KNOW THAT HE -- I BELIEVE THAT HE HAD SOME CONTROL OF

26   DIFFERENT ENTITIES.  BUT WHO ACTUALLY OWNED THEM, I

27   DON'T -- I DON'T KNOW.

28        Q      OKAY.  WELL, JUST AS A -- JUST AS AN

1    EXAMPLE, YOU'VE HEARD OF GOLDEN STATE PHARMACEUTICALS?

2         A    YES.

3         Q    WHO OWNED THAT?

4         A    I DON'T KNOW WHO WAS THE OWNER ON PAPER OF

5    THAT COMPANY.

6         Q    WELL, WHO OWNED IT IN REALITY?

7         A    I MEAN, I -- IT WAS MY SUSPICION THAT HE

8    HAD CONTROL OR OWNERSHIP OF IT.

9         Q    THAT SUSPICION, WHAT IS IT BASED ON?

10        A    JUST THE FACT THAT IT WAS -- IT WAS WHERE

11   PHARMACEUTICALS WERE SENT FOR PATIENTS TO BE TREATED.

12        Q    WHO MADE DECISIONS REGARDING WHAT HAPPENED

13   AT GOLDEN STATE PHARMACEUTICALS?

14        A    WELL, AS FAR AS I KNOW, PROBABLY MUNIR

15   UWAYDAH.  I DON'T KNOW WHO OWNED THAT COMPANY.  I MEAN,

16   IT MAY BE PREVIOUSLY IN PROFFERS I STATED SOMEBODY THAT

17   OWNED SPECIFICALLY.  BUT I DON'T REALLY RECALL WHO --

18   WHO OWNED THAT -- WHO OWNED THAT COMPANY.

19        Q    OKAY.  SO WELL, THEN, LET ME JUST ASK YOU.

20   WHAT DID YOU TELL US IN THE PROFFERS ON THAT SAME

21   QUESTION ABOUT WHO OWNED AND CONTROLLED THOSE BUSINESS

22   ENTITIES, SUCH AS GOLDEN STATE PHARMACEUTICALS?

23        A    I DON'T REMEMBER WHO I SAID OWNED IT.  I

24   BELIEVE THAT I SAID MUNIR UWAYDAH CONTROLLED IT.

25        Q    OKAY.  SO JUST --

26        A    BUT I DON'T KNOW IF IT WAS MARISA.  I

27   DON'T KNOW IF IT WAS SOMEBODY ELSE.  I DON'T KNOW WHOSE

28   NAME WAS ON THAT COMPANY AS AN OWNER.

1          Q      WHAT DID YOU TELL US ABOUT MUNIR UWAYDAH

2    IN OUR PROFFERS BACK IN 2018?  WHAT DID YOU TELL US

3    ABOUT MUNIR UWAYDAH'S PRACTICE OF PUTTING HIS NAME OR

4    PUTTING OTHER PEOPLE'S NAMES -- SORRY.  -- PUTTING

5    OTHER PEOPLE'S NAMES ON BUSINESSES OR PROPERTY THAT HE

6    ACTUALLY CONTROLLED?  WHAT DID YOU TELL US?

7          A      I DON'T REMEMBER SPECIFICALLY WHAT I TOLD

8    YOU.  BUT YES, THAT WAS HIS PRACTICE.

9          Q      OKAY.  AND DID YOU, IN FACT, OBSERVE THAT

10   IN MULTIPLE INCIDENTS?

11         A      I OBSERVED IT IN MY OWN CASE.

12         Q      DID YOU OBSERVE IT WITH ANYBODY ELSE?

13         A      I DON'T RECALL SEEING PAPERWORK OR

14   ANYTHING TO THE EFFECT OF WHO OWNED WHAT CORPORATION AS

15   IT WAS FILED OR ESTABLISHED.

16         Q      OKAY.

17         THE COURT:  YOU KNOW WHAT?  WE'RE GOING TO GO

18   AHEAD AND TAKE OUR RECESS AT THIS TIME.

19              YOU MIGHT WANT TO GIVE HIM A COPY OF THE

20   PROFFER SO HE CAN TAKE A LOOK AT IT OVER THE NOON HOUR.

21         MR. MATHAI:  SURE.

22         THE COURT:  THANK YOU.

23

24              (THE NOON RECESS WAS TAKEN UNTIL 1:30 P.M.

25              OF THE SAME DAY.)

26

27

28

```
1    CASE NUMBER:        BA455469-01

2    CASE NAME:          PEOPLE' VS. PAUL TURLEY

3    LOS ANGELES, CA     FRIDAY, MAY 3, 2024

4    DEPARTMENT 106      HON. LARRY P. FIDLER, JUDGE

5    APPEARANCES:        (AS HERETOFORE NOTED)

6    REPORTER:           TRACI THOMAS, CSR NO. 9620

7    TIME:               P.M. SESSION

8

9         THE COURT:  BACK ON THE RECORD.

10              YOU MAY PROCEED.

11              I CAN GIVE YOU UNTIL ABOUT 3:00 O'CLOCK

12   TODAY.  I HAVE A BUNCH OF STUFF TO GET DONE.

13        MR. MATHAI:  OKAY.  THANK YOU, YOUR HONOR.

14        THE COURT:  ALL RIGHT.

15        MR. MATHAI:  MAY I PROCEED?

16        THE COURT:  YES.

17        MR. MATHAI:  OKAY.

18

19              DIRECT EXAMINATION (RESUMED)

20   BY MR. MATHAI:

21        Q     MR. TURLEY, I'M GOING TO ASK YOU SOME

22   SPECIFIC QUESTIONS ABOUT WHAT YOU SAID EARLIER, THAT IS

23   THAT YOU PUT YOUR NAME ON PROPERTIES AND BUSINESSES

24   THAT WERE ACTUALLY OWNED AND CONTROLLED BY MUNIR

25   UWAYDAH.

26              IS THAT CORRECT?

27        A     YES.

28        Q     WHAT COMPANIES DID YOU PUT YOUR NAME ON
```

```
1    THAT FIT THAT DESCRIPTION?

2         A     OTHER THAN -- ARE YOU REFERRING TO

3    FRONTLINE?

4         Q     OTHER THAN FRONTLINE.

5         A     OTHER THAN FRONTLINE, FIRSTLINE, WHATEVER

6    THE NAMES OF THOSE COMPANIES WERE, THE LLC'S THAT HELD

7    THOSE PROPERTIES, NOTRE DAME.  I THINK, SIGNAL, I

8    BELIEVE, WAS ONE.  STRONGHOLD, I THINK.  AND I'M NOT --

9    CONNEMARA I THINK.  I THINK.

10        Q     CONNEMARA WAS ONE OF THEM?

11        A     THAT'S ALL I REMEMBER.

12              YES.

13        Q     WHAT ABOUT WICKLOW?

14        A     YES.

15        Q     AND 5007, LLC?

16        A     I DON'T RECALL SPECIFICALLY THAT ONE, BUT

17   I MIGHT HAVE.

18        Q     OKAY.  LET ME JUST GO OVER SOME OF THOSE

19   YOU MENTIONED.

20              SIGLO, S-I-G-L-O?

21        A     YES.

22        Q     STRONGHOLD?

23        A     YES.

24        Q     AND THEN WICKLOW, W-I-C-K-L-O-W?

25        A     YES.

26        Q     NOTRE DAME?

27        A     YES.

28        Q     AND CONNEMARA, C-O-N-N-E-M-A-R-A?
```

```
1                 A      YES.

2                 Q      ARE THOSE ALL -- ALL THOSE COMPANIES I

3      JUST MENTIONED, ARE THOSE ALL HOLDING COMPANIES?

4                 A      THE PROPERTIES WERE TRANSFERRED TO THOSE

5      PROPERTIES -- TO THOSE COMPANIES, YES.

6                 Q      AND WHEN YOU SAY "PROPERTIES," WHICH

7      PROPERTIES ARE YOU TALKING ABOUT?

8                 A      THERE WAS FOUR PROPERTIES, I BELIEVE.  I

9      DON'T KNOW THE EXACT ADDRESSES.

10                Q      OKAY.  LET ME GIVE YOU SOME ADDRESSES, AND

11     TELL ME IF THESE ARE THE PROPERTIES YOU'RE REFERRING

12     TO.

13                       5509 OCEAN FRONT WALK.  5007 OCEAN FRONT

14     WALK.  1316 BEVERLY GROVE PLACE.  AND 34 GALLEON

15     STREET.

16                       DO YOU RECOGNIZE THOSE ADDRESSES?

17                A      YES.

18                Q      AND HOW DO YOU RECOGNIZE THOSE ADDRESSES?

19                A      THOSE WERE THE PROPERTIES THAT I -- I WAS

20     THE STRAW BUYER FOR.

21                Q      WHAT DO YOU MEAN WHEN YOU SAY YOU WERE A

22     STRAW BUYER?

23                A      THAT I -- I MEAN, I AGREED TO ALLOW

24     DR. UWAYDAH TO USE MY CREDIT IN ORDER TO SECURE A LOAN

25     TO PURCHASE THOSE PROPERTIES.

26                Q      OKAY.  AND DID YOU -- SO WAS YOUR NAME PUT

27     ON THOSE PROPERTIES AS A RESULT OF WHAT YOU DID?

28                A      I KNOW MY NAMES WERE ON THE LOANS, YES.
```

1      Q      OKAY.  AND WHAT ABOUT THE TITLES?

2      A      I'M ASSUMING INITIALLY THEY WERE ON THERE,

3   YES.

4      Q      OKAY.  AND THAT -- WHAT YOU DID WHEN YOU

5   SAY YOU DID THAT AS A STRAW BUYER, DID YOU KNOW THAT

6   THAT WAS FRAUDULENT?

7      A      MAYBE IN THE BACK OF MY MIND.  BUT I -- I

8   DIDN'T DO IT TO DEFRAUD ANYONE.

9      Q      WELL, DID YOU DO IT TO --

10            WELL, DO YOU KNOW WHY MUNIR UWAYDAH ASKED

11   YOU TO PUT YOUR NAME ON THOSE LOANS AND ON THOSE

12   TITLES?

13      A      HE TOLD ME THAT HE HAD -- HE HAD POOR

14   CREDIT.  AND HE ASKED ME IF I WOULD DO THAT.

15      Q      OKAY.  AND YOU KNEW THAT THAT WAS -- YOUR

16   PUTTING YOUR NAMES ON THOSE THINGS WAS A LIE.

17            CORRECT?

18      A      YES.

19      Q      IT WASN'T YOUR MONEY THAT WAS BEING USED

20   TO PAY ANYTHING FOR THE PURCHASE OF THOSE PROPERTIES.

21            IS THAT CORRECT?

22      A      YES.

23      Q      WHOSE MONEY WAS IT?

24      A      I BELIEVE IT WAS MUNIR UWAYDAH'S MONEY.

25      Q      OKAY.  AND YOU KNEW THAT -- YOU KNEW THAT

26   THAT -- SO WAS UWAYDAH SAYING HE HAD BAD CREDIT WAS --

27            DID YOU RECOGNIZE THAT AS AN EFFORT TO

28   AVOID UWAYDAH'S NAME BEING ON ANY PROPERTIES TO AVOID

1    CREDITORS AND/OR LAW ENFORCEMENT?

2         A      NOT INITIALLY.  YOU KNOW, I HAD NO IDEA

3    WHY OTHER THAN WHAT HE TOLD ME, THAT HE HAD POOR

4    CREDIT.  AND MY UNDERSTANDING WAS THAT THOSE PROPERTIES

5    WERE GOING TO BE TAKEN OUT OF MY NAME AND THE LOANS

6    REFINANCED VERY QUICKLY.  BUT THAT DIDN'T HAPPEN.

7         Q      WELL, ISN'T IT TRUE THAT YOU INTENDED TO

8    POSSIBLY GET A TAX BENEFIT BY PUTTING YOUR NAME ON

9    THOSE LOANS AND THOSE TITLES?

10        A      I HAD MULLED THAT THOUGHT OVER IN THE

11   BEGINNING, YES.  AND -- BUT I NEVER DID THAT.

12        Q      BUT ISN'T IT TRUE THAT THAT WAS PART OF

13   YOUR MOTIVATION FOR PUTTING -- FOR AGREEING TO DO THAT

14   IS SO THAT YOU POSSIBLY COULD GET A TAX BENEFIT?

15               ISN'T THAT TRUE?

16        A      THAT WAS ONE OF MY MOTIVATIONS, SURE.

17        Q      AND THAT WOULD BE FRAUDULENT.

18               CORRECT?

19        A      IT WOULD BE, YES.

20        Q      OKAY.  AND SO THESE PROPERTIES THAT I

21   MENTIONED, 1316 BEVERLY GROVE, THAT'S IN BEVERLY HILLS.

22               CORRECT?

23        A      YES, I -- YEAH.

24        Q      AND THAT'S A HIGH VALUE PROPERTY.

25               AM I RIGHT?

26        MR. MOEST:  OBJECTION.  VAGUE.

27        THE COURT:  I'M SORRY?

28        MR. MOEST:  OBJECTION.  VAGUE.  HIGH VALUE

1    PROPERTY.

2          THE COURT:  SUSTAINED.  SUSTAINED.

3                REPHRASE IT.

4          Q     BY MR. MATHAI:  IS THAT A MULTI-MILLION

5    DOLLAR PROPERTY?

6          A     YES.

7          Q     34 GALLEON STREET, IS THAT A PROPERTY IN

8    MARINA DEL REY?

9          A     YES.

10         Q     IS THAT A MULTI-MILLION DOLLAR PROPERTY?

11         A     PROBABLY TODAY, YES.

12         Q     5007 OCEAN FRONT WALK AND 5509 OCEAN FRONT

13   WALK, ARE THOSE BOTH IN MARINA DEL REY?

14         A     YES.

15         Q     AND ARE THOSE ESSENTIALLY RIGHT ON THE

16   BEACH AND MULTI-MILLION DOLLAR PROPERTIES, EACH OF

17   THEM?

18         A     YES.

19         Q     OKAY.  SO OVER WHAT PERIOD OF TIME DID YOU

20   ACT AS A STRAW BUYER FOR UWAYDAH ON THESE FOUR

21   PROPERTIES THAT WE'VE MENTIONED?

22         A     I DON'T HAVE THE DATES IN FRONT OF ME.

23   BUT WHENEVER THEY WERE INITIALLY PURCHASED.

24         Q     OKAY.  BUT JUST IN GENERAL, SO THE COURT

25   UNDERSTANDS, WAS IT ALL AT ONCE THAT YOU MADE THOSE

26   PURCHASES --

27         A     NO.

28         Q     -- OR THAT THE PURCHASES WERE MADE?  OR

1    WAS IT OVER THE COURSE OF SEVERAL YEARS?

2          A       IT WAS OVER THE COURSE OF A FEW YEARS.  I

3    DON'T KNOW EXACTLY HOW MANY YEARS.

4          Q       OKAY.  AND WHAT WAS YOUR -- WHAT WAS YOUR

5    MOTIVATION FOR ENGAGING IN THAT CONDUCT?

6          A       HE WAS MY BUSINESS PARTNER.  WE WERE

7    STARTING THIS NEW COMPANY THAT I HAD HOPED TO BE

8    SUCCESSFUL.  AND HE ASKED ME TO DO THAT.

9                  HE TOLD ME THAT HE HAD HAD A BANKRUPTCY,

10   BAD CREDIT, AND THAT'S WHAT I DID INITIALLY.  AND THEN

11   I KIND OF CONTINUED TO DO THE OTHER -- THE OTHER THREE

12   PROPERTIES.

13         Q       OKAY.  FOR THE SAME REASON?

14         A       YEAH, TO BE HELPFUL TO HIM AND TO -- YEAH.

15         Q       WELL, AND YOU ALSO ENGAGED -- ISN'T IT

16   TRUE OVER THE COURSE OF TIME YOU ENGAGED IN CRIMINAL

17   ACTIVITY WITH MUNIR UWAYDAH?  I'M SPECIFICALLY TALKING

18   ABOUT ILLEGAL CAPPING OF PATIENTS.  YOU WERE ENGAGED IN

19   THAT ACTIVITY WITH MUNIR UWAYDAH AS WELL.

20                 CORRECT?

21         A       YES.

22         Q       AND YOU KNEW THAT WAS WRONG?

23         A       YES.

24         Q       AND WHAT WAS YOUR MOTIVATION FOR DOING

25   THAT?

26         A       PRETTY MUCH THE NATURE OF THE BUSINESS AND

27   TO KEEP THE BUSINESS SUCCESSFUL.

28         Q       AND BY SUCCESSFUL, YOU WERE MAKING A LOT

```
1     OF MONEY AS A RESULT OF CAPPING.

2               CORRECT?

3        A    I MEAN, I -- ME, PERSONALLY?

4        Q    THE BUSINESS WAS.

5        A    YES.

6        Q    OKAY.  DO YOU RECALL DURING OUR PROFFER

7     SESSIONS YOU WERE ASKED, GIVEN ALL THE ACTIVITY YOU HAD

8     ENGAGED WITH WITH MUNIR UWAYDAH OVER THE COURSE OF

9     MANY, MANY YEARS, DO YOU RECALL BEING ASKED WHAT YOUR

10    OVERALL MOTIVATION WAS FOR REPEATEDLY ENGAGING IN

11    FRAUDULENT OR CRIMINAL ACTIVITY WITH MUNIR UWAYDAH?

12              DO YOU RECALL THAT?

13       A    NOT SPECIFICALLY, NO.

14       Q    OKAY.  DO YOU RECALL TELLING US DURING THE

15    PROFFER THAT YOU WERE MADE PROMISES BY MUNIR UWAYDAH

16    AND THAT THAT IS WHAT MOTIVATED YOU TO CONTINUE

17    CONDUCTING YOURSELF IN FRAUDULENT AND CRIMINAL

18    ACTIVITY?

19       A    I -- I HAVE SAID THAT, YEAH.  I BELIEVED

20    THAT I WAS ENTITLED TO 49 PERCENT OF THE -- OF THE

21    PROFITS FROM THE COMPANY.

22       Q    OKAY.  BUT THAT'S FRONTLINE.

23              CORRECT?

24       A    YES.

25       Q    OKAY.  AND THESE PROPERTIES WE'RE TALKING

26    ABOUT, THOSE HAVE NOTHING TO DO WITH FRONTLINE

27    BUSINESS, DO THEY?

28       A    NO.
```

```
1           Q       AND CONNEMARA, WICKLOW, NOTRE DAME, ET
2    CETERA, THOSE COMPANIES HAD NOTHING TO DO WITH
3    FRONTLINE.
4                   CORRECT?
5           A       NO.  CORRECT.
6           Q       AND YOU FRAUDULENTLY PUT YOUR NAME AS THE
7    PRESIDENT OF THOSE HOLDING COMPANIES, DIDN'T YOU?
8           A       YES.
9           Q       AND SO WHEN I ASKED YOU A QUESTION ABOUT
10   YOUR MOTIVATION FOR ENGAGING IN CRIMINAL ACTIVITY, WHAT
11   YOU JUST DESCRIBED WITH THOSE PROPERTIES AND THE
12   HOLDING COMPANIES, THAT HAD NOTHING TO DO WITH A
13   49 PERCENT POSSIBLE OWNERSHIP YOU HAD IN FRONTLINE, DID
14   IT?
15          A       NO, IT DID NOT.
16          Q       OKAY.  SO LET ME ASK YOU AGAIN.
17                  WAS ANY -- WELL, LET ME START BY ASKING
18   YOU, DID YOU PROFIT FROM THE ACTIVITY THAT YOU'VE
19   DESCRIBED HERE, FRAUDULENTLY PUTTING YOUR NAME ON THOSE
20   HOLDING COMPANIES AND THESE PROPERTIES?
21          A       NO.
22          Q       DID YOU PROFIT?
23          A       NO.
24          Q       YOU WERE RECEIVING A LARGE SALARY WHEN YOU
25   WORKED AT FRONTLINE.
26                  CORRECT?
27          A       I WAS RECEIVING $30,000 A MONTH.
28          Q       OKAY.  WAS THAT -- AND THAT'S A PRETTY
```

1    LARGE SALARY.

2              CORRECT?

3         A    IT'S NOT AS MUCH AS I HAD MADE IN THE

4    PAST, BUT YEAH, IT WAS COMFORTABLE.

5         Q    WAS PART OF THAT SALARY CONDITIONED ON YOU

6    ENGAGING IN FRAUDULENT ACTIVITY SUCH AS WE'VE DESCRIBED

7    HERE WITH REGARDS TO THESE PROPERTIES, THE CAPPING, THE

8    PUTTING YOUR NAME ON BUSINESSES?

9         A    IT WAS AS FAR AS THE CAPPING, YES.  BUT AS

10   FAR AS THE PROPERTIES, NO.

11        Q    OKAY.  SO LET ME ASK YOU AGAIN.

12             WHAT WAS YOUR MOTIVATION FOR ENGAGING IN

13   THAT CONDUCT, PUTTING YOUR NAME ON HOLDING COMPANIES AS

14   ITS PRESIDENT, AS THE PRESIDENT OF THOSE COMPANIES OR

15   PUTTING YOUR NAME ON LOANS THAT YOU DID NOT ACTUALLY

16   OWN?

17        A    MY MOTIVATION WAS TO KEEP DR. UWAYDAH, YOU

18   KNOW, HAPPY, SATISFIED SO THAT THE BUSINESS, THE

19   FRONTLINE MEDICAL BUSINESS, WHICH I WAS ENGAGED IN,

20   WOULD HOPEFULLY CONTINUE TO PROSPER.

21        Q    DID DR. UWAYDAH GIVE YOU ANY PROMISES AS

22   TO WHAT MAY BE COMING TO YOU IF YOU ENGAGED IN THIS

23   ACTIVITY WITH HIM?

24        A    REGARDING THE PROPERTIES?

25        Q    YES, SPECIFICALLY REGARDING THE PROPERTY.

26        A    NO.

27        Q    WELL, WHAT ABOUT THE OTHER CRIMINAL

28   ACTIVITIES OR FRAUDULENT ACTIVITIES THAT HE WAS ENGAGED

1    IN?

2           A      AS FAR AS -- AS FAR AS FRONTLINE, AGAIN, I

3    WAS 49 PERCENT OWNER.  I MEAN, I WAS EXPECTING TO GET

4    49 PERCENT OF THE PROFITS.

5           Q      OKAY.  AND WHEN YOU SAY "PROFITS," WHAT DO

6    YOU MEAN?

7           A      I MEAN WHATEVER WAS LEFT OVER AFTER THE

8    OVERHEAD WAS PAID.

9           Q      OKAY.  ARE YOU TALKING ABOUT THE MONTHLY

10   REVENUES THAT FRONTLINE WAS MAKING AS A BASIS, BASED ON

11   HEALTH CARE, PROVIDING HEALTH CARE TO PATIENTS?

12          A      YES.

13          Q      OKAY.  ARE YOU INCLUDING IN YOUR ANSWER

14   PROFITS MADE BY LIENS BEFORE THE WORKERS' COMP BOARD?

15          A      YES.

16          Q      OKAY.  SO WERE YOU EXPECTING 49 PERCENT OF

17   PROFITS FROM LIENS THAT FRONTLINE WAS ARGUABLY ENTITLED

18   TO?

19          A      YES.

20          Q      OKAY.  ISN'T IT TRUE, DR. TURLEY, THAT YOU

21   TOLD US DURING THE PROFFERS THAT MUNIR UWAYDAH PROMISED

22   YOU A PORTION OF THE PROFITS FROM THE LIENS THAT

23   FRONTLINE HELD?

24          A      I MEAN, I WAS ENTITLED TO 49 PERCENT.  I

25   DON'T KNOW ANY OTHER PROMISE.

26          Q      WELL, THEN JUST ANSWER MY QUESTION.

27                 ISN'T IT TRUE THAT MUNIR UWAYDAH MADE YOU

28   A PROMISE ABOUT GETTING A PORTION OF THE LIENS, THE

```
1     MONEY FROM THE LIENS THAT FRONTLINE WAS CLAIMING?

2          A     IF I SAID THAT IN MY PROFFER, THEN YES,

3     IT'S TRUE.

4          Q     OKAY.  AND, WELL, WHETHER OR NOT YOU SAID

5     IT IN THE PROFFER, LET ME ASK YOU, AS YOU SIT HERE

6     TODAY, IS IT TRUE THAT DR. UWAYDAH PROMISED YOU A

7     PORTION OF THE PROFITS THAT WOULD BE GARNERED FROM THE

8     PROSECUTION OF THOSE LIENS THAT WERE HELD BY FRONTLINE

9     OR ANY ASSOCIATED BUSINESS ENTITY TO FRONTLINE?

10         A     BY FRONTLINE, YES.

11         Q     OKAY.  WHAT ABOUT BUSINESSES ASSOCIATED

12    WITH FRONTLINE, LIKE FIRSTLINE, U.S. HEALTH, ET CETERA?

13         A     FIRSTLINE, YES.  U.S. HEALTH, NO.

14         Q     OKAY.  SO ISN'T IT TRUE THAT YOU WERE

15    MOTIVATED TO ENGAGE IN FRAUDULENT ACTIVITY BECAUSE YOU

16    BELIEVED THAT IT MIGHT RESULT IN YOU GETTING MILLIONS

17    OF DOLLARS IN PAYMENTS AS A RESULT OF THOSE ACTIVITIES?

18         A     YES.

19         Q     OKAY.  AND YOU TOLD US THAT IN THE

20    PROFFER.

21               CORRECT?

22         A     YES.

23         Q     AND SPECIFICALLY, ISN'T IT TRUE THAT

24    DR. UWAYDAH TOLD YOU THAT THERE WAS ALMOST A BILLION

25    DOLLARS WORTH OF LIENS THAT POTENTIALLY YOU COULD

26    BENEFIT FROM?

27         A     YES.

28         Q     AND SO WAS IT YOUR BELIEF THAT YOU HAD
```

1    SOME KIND OF CLAIM TO 49 PERCENT OF THAT NUMBER, OF

2    ALMOST A BILLION DOLLARS?

3          A     YES.

4          Q     SO IS IT FAIR TO SAY THAT THAT LARGE

5    AMOUNT OF MONEY MOTIVATED YOU TO ENGAGE IN FRAUDULENT

6    ACTIVITY TO KEEP MUNIR UWAYDAH HAPPY IN THE HOPES THAT

7    IF HE WAS SUCCESSFUL, YOU WOULD -- YOU HAD THE

8    POTENTIAL TO EARN ALMOST UP TO $500 MILLION?

9          A     YES.

10         Q     AND IS THAT WHY YOU, WHEN DR. UWAYDAH

11   ASKED YOU TO FRAUDULENTLY PUT YOUR NAME ON PROPERTIES

12   THAT YOU KNEW YOU WEREN'T GOING TO PAY FOR AND YOU KNEW

13   YOU WEREN'T GOING TO OWN THE -- REALLY OWN THE LOAN OR

14   REALLY OWN THE TITLE, THAT YOU AGREED TO DO THAT?

15         A     YES.

16         Q     AND SO SPECIFICALLY, LET ME ASK YOU ABOUT

17   THESE FOUR PROPERTIES.

18               JUST SO WE'RE CLEAR, WHAT YOU JUST SAID,

19   IS THAT STATEMENT TRUE AS IT APPLIES TO THESE FOUR

20   PROPERTIES THAT I ENUMERATED FOR YOU, 5509 OCEAN FRONT

21   WALK, 5007 OCEAN FRONT WALK, 1316 BEVERLY GROVE PLACE,

22   AND 34 GALLEON STREET?

23               IS YOUR STATEMENT TRUE AS IT RELATES TO

24   YOUR CONDUCT AND THOSE FOUR PROPERTIES?

25         A     YES.

26         Q     DID YOU, IN FACT, NOT ONLY GIVE YOUR NAME

27   TO THE PAPERWORK THAT WAS REQUIRED TO PURCHASE THOSE

28   PROPERTIES AND SECURE THOSE LOANS, BUT DID YOU PRESENT

1    YOURSELF AS A TRUE OWNER OF THOSE PROPERTIES TO THE

2    WORLD AS IF YOU REALLY OWNED AND CONTROLLED THOSE

3    PROPERTIES?

4         A    ONLY ON ONE OCCASION, ON ONE PROPERTY.

5         Q    TELL US ABOUT THAT.

6         A    THE BEVERLY -- THE BEVERLY GROVE PROPERTY.

7    THERE WAS A LAWSUIT FROM ONE OF THE NEIGHBORS INVOLVING

8    SOME TREES OR SOMETHING THAT WERE CUT DOWN.  AND I --

9    IN THAT ARBITRATION, WHATEVER IT WAS, YES, I PRESENTED

10   MYSELF AS THE OWNER.

11              I BELIEVE THERE WAS ANOTHER INCIDENT WITH

12   THE SAME PROPERTY WHEN THERE WAS A DISPUTE WITH A

13   NEIGHBOR OVER THE PLACEMENT OF A WALL.

14        Q    OKAY.  AND SO JUST SO WE'RE CLEAR, WHEN

15   YOU SECURED THE LOANS AND MADE THE PURCHASE UNDER -- AS

16   A STRAW BUYER FOR THESE PROPERTIES, YOU KNEW THAT THAT

17   MEANT YOUR NAME WAS GOING TO GO ON THE TITLE OF THOSE

18   PROPERTIES.

19              CORRECT?

20        A    INITIALLY, YES.

21        Q    I'M SORRY?

22        A    INITIALLY, YES.

23        Q    WHAT DO YOU MEAN "INITIALLY"?

24        A    WELL, I KNEW AS I PURCHASED THEM, YES, MY

25   NAME WOULD BE ON THE TITLE.  BUT AGAIN, I WANTED THOSE

26   PROPERTIES OUT OF MY NAME, MY NAME OFF THE LOAN AS SOON

27   AS POSSIBLE.

28        Q    OKAY.  SO --

```
1                    YES, I AM ASKING YOU, YOU UNDERSTOOD THAT
2      THAT WOULD BE -- AS A RESULT OF YOUR CONDUCT, THAT YOUR
3      NAME WOULD APPEAR ON THE TITLE AND BE RECORDED WITH THE
4      COUNTY AS THE TRUE OWNER.
5                    CORRECT?
6           A    YES.
7           Q    AND YOU KNEW THAT YOU WERE NOT, IN FACT,
8      THE TRUE OWNER.
9                    CORRECT?
10          A    CORRECT.
11          Q    IN FACT, YOU KNEW THAT YOU WERE NOT GOING
12     TO ENJOY THE -- ANY PRIVILEGES OF OWNERSHIP OR CONTROL
13     OF THOSE PROPERTIES.
14                   CORRECT?
15          A    CORRECT.
16          Q    AND DID YOU, IN FACT -- DID YOU EVER ENJOY
17     ANY OWNERSHIP RIGHTS OR CONTROLLING RIGHTS IN ANY OF
18     THOSE PROPERTIES?
19          A    NO.
20          Q    DID YOU EVER LIVE AT ANY OF THOSE
21     PROPERTIES?
22          A    NO.
23          Q    DID YOU EVER, YOU, YOURSELF RENT OUT THOSE
24     PROPERTIES FOR ANY PROFIT?
25          A    NO.
26          Q    DID YOU EVER EARN ANY PROFIT FROM ANY OF
27     THOSE PROPERTIES?
28          A    NO.
```

1  Q    DID YOU EVER CONTROL THE PROPERTIES IN ANY

2  WAY, SUCH AS EXERCISING OR EXECUTING A LEASE ON THOSE

3  PROPERTIES?

4  A    NO.

5  Q    WHAT ABOUT THE TAXES THAT WERE OWED FOR

6  THOSE PROPERTIES?  WHO PAID THOSE?

7  A    I DON'T KNOW.

8  Q    IT WASN'T YOU?

9  A    IT WASN'T ME.

10  Q    OKAY.  WHAT ABOUT ON YOUR TAXES?  YOU WERE

11  LISTED ON SEVERAL LOANS ON MULTI-MILLION DOLLAR

12  PROPERTIES, AND THAT AFFECTED YOUR TAXES.

13  CORRECT?

14  A    I NEVER CLAIMED ANY OF THAT INTEREST

15  THAT'S DEDUCTIBLE OR ANYTHING LIKE THAT ON MY TAXES.

16  Q    SO YOU, YOURSELF DID NOT PAY ANY TAXES ON

17  THESE PROPERTIES?

18  A    NO.

19  Q    AND DO YOU KNOW WHO DID?

20  A    NO.

21  Q    OKAY.  WHO PAID THE MORTGAGE?

22  A    I DON'T KNOW.

23  Q    WELL, YOUR NAME WAS ON THE MORTGAGE.

24  A    THAT'S CORRECT.

25  Q    WHAT ADDRESS DID YOU GIVE WHEN YOU

26  PURCHASED THOSE PROPERTIES?

27  A    I DON'T HAVE THE PAPERWORK IN FRONT OF ME.

28  I'M ASSUMING MY PERSONAL RESIDENCE.

1        Q      OKAY.  SO MORTGAGE BILLS WOULD COME TO

2   YOUR PERSONAL RESIDENCE.

3              RIGHT?

4        A      NO.

5        Q      WHERE WOULD THE BILLS GO?

6        A      I DON'T KNOW.

7        Q      OKAY.  BUT YOUR -- I'M SORRY TO BELABOR

8   THIS.  BUT YOUR NAME IS ON THE MORTGAGE LOAN, YOUR NAME

9   IS ON THE TITLE, SO I ASSUME YOUR SOCIAL SECURITY

10  NUMBER WAS ASSOCIATED WITH THESE LOANS.

11             CORRECT?

12       A      I WOULD ASSUME SO, YES.

13       Q      SO WHAT ABOUT PROPERTY TAXES?

14       A      I NEVER PAID THEM.  I NEVER RECEIVED A

15  PROPERTY TAX BILL.

16       Q      OKAY.  DO YOU KNOW WHO PAID THEM?

17       A      I DO NOT.

18       Q      OKAY.  SO WAS THIS PART AND PARCEL OF THE

19  AGREEMENT THAT YOU HAD WITH UWAYDAH, THAT YOU WOULD

20  GIVE YOUR NAME AND YOUR PERSONAL INFORMATION TO SECURE

21  THE LOAN AND PUT YOUR NAME ON THE TITLE AND APPEAR TO

22  THE PUBLIC AS THE TRUE OWNER, YET YOU WOULD NOT BE

23  BOTHERED WITH PROPERTY TAXES, INCOME TAXES, PAPERWORK,

24  ET CETERA?

25             IS THAT PART OF THE AGREEMENT?

26       A      YES.

27       Q      AND DID -- ISN'T IT TRUE THAT YOUR WIFE

28  MADE MORTGAGE PAYMENTS ON SOME OF THESE PROPERTIES OR

1    ALL OF THESE PROPERTIES?

2         A      NOT THAT I KNOW OF, NO.

3         Q      OKAY.  WHO PAID YOUR MORTGAGE AT THE HOUSE

4    THAT YOU LIVE IN WITH YOUR WIFE AND FAMILY?

5         A      COULD YOU REPEAT THAT, PLEASE.

6         Q      WHO PAYS THE MORTGAGE OF THE PROPERTY

7    WHERE YOU LIVE WITH YOUR WIFE AND FAMILY?

8         A      I DO.  MY WIFE AND I DO.

9         Q      OKAY.  THE PAYMENT FOR THOSE -- FOR YOUR

10   HOUSE WHERE YOU LIVE, DOESN'T IT COME FROM ANY OTHER

11   SOURCE OTHER THAN YOUR OWN INCOME?

12        A      FROM MY WIFE'S INCOME.  SHE WORKS FOR

13   CASH, AND SHE'S BEEN PAYING THE MORTGAGE IN CASH.

14        Q      THAT'S WHAT I MEAN, YOU OR YOUR WIFE'S

15   INCOME.

16        A      YES.

17        Q      AND IS THAT -- IS THE SAME TRUE FOR THE

18   TIME PERIOD OF -- YOU KNOW, IN PRIOR YEARS?  SAY, FOR

19   EXAMPLE, 2009, 2010, THROUGH 2015, HAS THAT ALWAYS BEEN

20   TRUE, YOU AND YOUR WIFE PAY YOUR OWN MORTGAGE?

21        A      YES.

22        Q      OKAY.  IS THERE ANY OTHER REASON FOR ONE

23   OF DR. UWAYDAH'S COMPANY TO PROVIDE YOU MONEY FOR

24   MORTGAGE PAYMENTS?

25        A      NO.

26        MR. MATHAI:  I WANT TO SHOW YOU WHAT I'D LIKE TO

27   MARK, YOUR HONOR, NOW AS PEOPLE'S --

28        THE COURT:  FOR THIS PURPOSE IT WOULD BE

1    PEOPLE'S 1 FOR THIS HEARING.

2         MR. MATHAI:  OKAY.  SO DO I NEED TO SAY ANYTHING

3    SPECIAL --

4         THE COURT:  LET US KNOW WHAT IT IS.

5         MR. MATHAI:  PEOPLE'S 1 IS A PHOTOCOPY OF A CHECK

6    OR A CHECK -- THE FRONT AND BACK OF A CHECK FROM FIRST

7    FINANCIAL CREDIT UNION.

8              MAY I MARK THIS PEOPLE'S 1?  AND I'LL

9    WRITE A "P1" ON THE BACK.

10        THE COURT:  YES.

11

12             (MARKED FOR IDENTIFICATION PEOPLE'S

13             EXHIBIT 1, PHOTOCOPY OF CHECK.)

14

15        MR. MOEST:  MAY I SEE THAT BEFORE --

16        THE COURT:  YES.

17        MR. MOEST:  IT'S ONE OF THOSE FORMALITIES I'D

18   LIKE TO OBSERVE.

19             OKAY.

20        Q     BY MR. MATHAI:  BEFORE I SHOW YOU THIS,

21   ARE YOU FAMILIAR WITH AN ENTITY CALLED, "L.A. HEALTH

22   PARTNERS MEDICAL GROUP"?

23        A     YES.

24        Q     TELL US ABOUT THAT ENTITY.

25        A     ALL I KNOW IS THAT WAS ANOTHER MEDICAL

26   CORPORATION THAT UWAYDAH HAD FORMED.

27        Q     OKAY.  WAS THAT A UWAYDAH CONTROLLED

28   MEDICAL COMPANY?

```
 1            A     YES.

 2            Q     WHAT WAS YOUR ASSOCIATION WITH THAT

 3     COMPANY?

 4            A     I -- I DON'T REMEMBER.  AS FAR AS I KNOW,

 5     IT DIDN'T DO ANY BILLING OR ANYTHING THAT I WAS AWARE

 6     OF.  I DON'T KNOW.

 7            Q     OKAY.  DID YOU, IN FACT, HAVE YOUR NAME ON

 8     BANK ACCOUNTS ASSOCIATED WITH THAT ENTITY?

 9            A     I MAY HAVE.

10            Q     OKAY.  AND IS THAT SOMETHING THAT YOU DID

11     FOR DR. UWAYDAH, PUT YOUR NAME ON BANK ACCOUNTS AS

12     WELL?

13            A     IF MY NAME IS ON THAT ACCOUNT, THEN YES.

14            Q     WELL, IF IT IS OR ISN'T, DID YOU DO THAT

15     FOR DR. UWAYDAH IN MORE THAN ONE INSTANCE?

16            A     I DON'T RECALL EXACTLY WHAT BANK ACCOUNTS

17     I HAD MY NAME ON.

18            Q     OKAY.  LET ME SHOW YOU PEOPLE'S 1.

19                  DO YOU RECOGNIZE THAT DOCUMENT?  OR WHAT

20     IS SHOWN IN THAT DOCUMENT?

21            A     I MEAN, I -- THAT'S MY SIGNATURE.  AND

22     IT'S MADE OUT TO MY WIFE.

23            Q     OKAY.

24            A     SO --

25            Q     THIS IS A CHECK MADE OUT TO YOUR WIFE.

26     AND YOU SAID THAT'S YOUR SIGNATURE ON THE SIGNATOR

27     LINE.

28                  IS THAT CORRECT?
```

1        A       YES.

2        Q       WHAT ABOUT THE REST OF THE CHECK?  IS THAT

3   YOUR HANDWRITING?

4        A       IT'S NOT MY HANDWRITING.  I BELIEVE THAT'S

5   MY WIFE'S HANDWRITING.

6        MR. MATHAI:  OKAY.  MAY I APPROACH THE COURT?

7        THE COURT:  YES.

8        Q       BY MR. MATHAI:  NOW, THAT COPY, PHOTOCOPY

9   OF THAT CHECK, THAT'S -- THE MEMO LINE THERE SAYS IT'S

10  FOR MORTGAGES, PLURAL, IN 2009.

11             CORRECT?

12        A       YEAH.  I JUST --

13        THE COURT:  "NOV," NOVEMBER.

14        Q       BY MR. MATHAI:  I'M SORRY.

15             NOVEMBER, 2009.

16             IS THAT CORRECT?

17        A       IS THAT WHAT IT SAYS?  THEN --

18        Q       LET ME SHOW IT TO YOU.

19             DO YOU SEE THE MEMO LINE?

20        A       YES.  NOVEMBER, 2009, MORTGAGES, YES.

21        Q       IS THAT'S YOUR WIFE'S HANDWRITING?

22        A       MY SIGNATURE AND HER HANDWRITING.

23        Q       OKAY.  AND SO DID YOU CONTROL A BANK

24  ACCOUNT FOR L.A. HEALTH PARTNERS MEDICAL GROUP?

25        A       I MIGHT HAVE BEEN THE SIGNATOR ON THAT

26  ACCOUNT, BUT I NEVER CONTROLLED THE ACCOUNT.

27        Q       DID YOU, IN FACT, WRITE A CHECK FOR

28  $28,448.81 TO YOUR -- OR SIGN A CHECK MADE OUT TO YOUR

1    WIFE THAT PURPORTED TO BE FOR MORTGAGES IN 2000 --

2    NOVEMBER OF 2009?

3         A    THAT'S MY SIGNATURE, AND THAT'S HER

4    HANDWRITING.  WHAT THAT CHECK IS FOR OR ABOUT, I HAVE

5    NO IDEA.

6         Q    OKAY.  SO ISN'T IT TRUE --

7              WELL, ISN'T IT TRUE THAT SINCE YOUR NAME

8    WAS ON THE LOANS FOR THESE MULTI-MILLION DOLLAR

9    PROPERTIES AND SINCE YOUR NAME WAS ON THE TITLE, THAT

10   YOU KEPT UP THE APPEARANCE THAT IT WAS YOUR LOAN BY

11   ACTUALLY WRITING CHECKS TO PAY OFF -- PAY DOWN THE

12   PRINCIPAL ON THOSE LINES?

13        A    IF THERE WERE SOME CHECKS THAT WERE MADE

14   INITIALLY TO, IN EFFECT, DO WHAT YOU JUST DESCRIBED,

15   THAT MAY BE POSSIBLE.

16             BUT I'M NOT -- I DON'T RECALL THAT.  I

17   DON'T REMEMBER THAT.  IF THERE WERE, I THINK THERE WERE

18   VERY FEW.  IT CERTAINLY DIDN'T CONTINUE VERY LONG.

19        Q    JUST TO PUT A FINE POINT ON IT, THIS

20   AMOUNT THAT'S IN THIS CHECK IS MORE THAN YOU WOULD NEED

21   TO PAY THE MORTGAGE ON YOUR PERSONAL HOME WHERE YOU

22   LIVE.

23        A    YES.

24        Q    AND SO THIS -- THIS IS A HUGE AMOUNT OF

25   MONEY FOR -- AND PURPORTS TO BE FOR MULTIPLE

26   MORTGAGES -- CORRECT?  -- ACCORDING TO WHAT IT SAYS

27   HERE?

28        A    YES.

1      Q      NOW, GOING TO THAT LAWSUIT THAT YOU

2  DISCUSSED, THAT HAD TO DO WITH THE BEVERLY HILLS

3  PROPERTY, 1316 BEVERLY GROVE PLACE.

4              CORRECT?

5      A      YES.

6      Q      YOU SAID YOU REPRESENT -- YOU PUT YOURSELF

7  OUT AS THE TRUE OWNER OF THAT PROPERTY.

8              WHO REPRESENTED YOU IN THAT LAWSUIT?

9      A      TATIANA ARNOLD.

10     Q      AND SHE'S AN ASSOCIATE OF DR. UWAYDAH'S,

11  OR WAS?

12     A      YES.

13     Q      AND DID SHE KNOW WHEN SHE REPRESENTED YOU

14  IN THAT ARBITRATION THAT THE TRUE OWNER OF THE PROPERTY

15  WAS MUNIR UWAYDAH?

16     A      I WOULD BE VERY SURPRISED IF SHE DIDN'T

17  KNOW THAT, YES.

18     Q      WELL, DID YOU MAKE IT CLEAR OR DID YOU

19  PLAY THE ROLE WITH HER AS WELL THAT YOU WERE THE TRUE

20  OWNER?

21     A      I PLAYED THE ROLE THAT I WAS THE OWNER OF

22  THAT PROPERTY FOR THAT ARBITRATION.

23     Q      OKAY.  DID YOU TELL US DURING THE PROFFERS

24  THAT YOU BELIEVE SHE KNEW THAT UWAYDAH WAS THE TRUE

25  OWNER, AND SHE WAS PLAYING A ROLE AS WELL?

26     A      YES.

27     Q      AND AGAIN, IF YOU PUT YOURSELF OUT AS A

28  TRUE OWNER, THAT WAS A LAWSUIT THAT WAS BROUGHT AGAINST

1    A NEIGHBOR PURPORTEDLY BY YOU.

2                CORRECT?

3        A        THAT WAS -- THAT WAS A LAWSUIT BROUGHT

4    AGAINST ME BY A NEIGHBOR, YES.

5        Q        OKAY.  AGAINST YOU BY THE NEIGHBOR?

6        A        YES.

7        Q        AND DID THAT END UP RESOLVING?

8        A        YES.

9        Q        SO LET ME ASK YOU DIRECTLY.

10                WITH REGARDS TO THE TITLE OF THESE

11    PROPERTIES, BASED ON WHAT YOU'VE JUST TESTIFIED TO IN

12    THIS COURT, DO YOU ACKNOWLEDGE THAT YOU DID NOT HAVE --

13    YOU DID NOT HAVE CLEAN TITLE TO THOSE PROPERTIES?

14        MR. MOEST:  OBJECTION.

15        DEFENDANT TURLEY:  I DIDN'T OWN THE PROPERTIES IF

16    THAT'S WHAT YOU'RE REFERRING TO.

17        Q        BY MR. MATHAI:  OKAY.  SO IF IT SAID -- IF

18    THE DOCUMENT -- IF THE DEEDS AND THE TITLES THAT ARE

19    RECORDED WITH THE GOVERNMENT SAY THAT YOU WERE THE TRUE

20    OWNER OF IT, THOSE WOULD BE FALSE.

21                CORRECT?

22        A        YES.

23        Q        NOW, I WANT TO DIRECT YOUR ATTENTION TO

24    2010.

25                AT THAT TIME, 2010, WERE YOU THE OWNER ON

26    PAPER, AS WE'VE DISCUSSED, OF THESE FOUR PROPERTIES?

27        A        I DON'T RECALL THE EXACT DATES.

28        Q        JUST TO GIVE YOU SOME PERSPECTIVE ON TIME,

1    ARE YOU FAMILIAR OR DO YOU REMEMBER THE DATE, THE

2    APPROXIMATE DATES THAT MUNIR UWAYDAH FLED FROM THE

3    UNITED STATES AND WENT TO LEBANON?

4         A    YES.

5         Q    WAS THAT IN THE SUMMER OF 2010?

6         A    YES.

7         Q    OKAY.  USING THAT AS A REFERENCE, DID YOU

8    OWN THESE PROPERTIES OR DID YOU PURPORT TO OWN THESE

9    PROPERTIES THAT WE'VE DESCRIBED, THESE FOUR PROPERTIES,

10   PRIOR TO MUNIR UWAYDAH GOING TO LEBANON IN THE SUMMER

11   OF 2010?

12        A    YES.

13        Q    NOW, ARE YOU AWARE OF WHY DR. UWAYDAH LEFT

14   THE UNITED STATES AND WENT TO LEBANON?

15        A    I AM AWARE OF WHAT I WAS TOLD.

16        Q    BY HIM?

17        A    BY HIM, YES.

18        Q    OKAY.  WHAT DID HE TELL YOU AS TO HIS

19   REASON FOR LEAVING THE UNITED STATES AND GOING TO

20   LEBANON?

21        A    HE TOLD ME THAT HE DIDN'T -- DIDN'T TRUST

22   THE GOVERNMENT, THAT HE WAS AFRAID OF BEING ARRESTED OR

23   SOMETHING ALONG THOSE LINES.

24        Q    AND THIS CONVERSATION SPECIFICALLY --

25             I TAKE IT YOU HAD MULTIPLE CONVERSATIONS

26   WITH HIM ABOUT THAT?  OR ARE YOU TALKING ABOUT ONE

27   PARTICULAR CONVERSATION?

28        A    YES, ABOUT --

1          Q      ABOUT WHY HE --

2          A      I MEAN, IT WAS RELATED TO THE MURDER AND

3   KELLY SOO PARK BEING ARRESTED AND THAT TURMOIL.

4          Q      AND IT WAS AT THAT TIME THAT HE LEFT?

5          A      YES.

6          Q      ISN'T IT TRUE THAT HE ALSO KNEW OF AN

7   INVESTIGATION INTO FRAUD, INTO HIS MEDICAL CLINICS AND

8   OTHER ASSOCIATED ENTITIES?

9          A      I DON'T KNOW IF HE KNEW THAT SPECIFICALLY.

10   I MEAN, I WASN'T AWARE OF THAT UNTIL I WAS TOLD BY THIS

11   KAREN THOMPSON.

12          Q      THAT'S THE DETECTIVE INVESTIGATING THE

13   MURDER.

14                 CORRECT?

15          A      MY -- YES.

16          Q      OKAY.  SO BUT ISN'T IT TRUE THAT YOU

17   YOURSELF WENT TO LEBANON IN 2010?

18          A      YES.

19          Q      AND WHEN DID YOU GO?

20          A      I BELIEVE OCTOBER OF 2010.

21          Q      OKAY.  AND WHY DID YOU GO?

22          A      I WENT TO DISCUSS EVERYTHING IN PERSON

23   WITH HIM.  THAT WAS MY INTENTION FOR GOING.

24          Q      OKAY.  AND YOU WENT BECAUSE YOU WERE THE

25   PURPORTED BUSINESS PARTNER TO UWAYDAH AND FRONTLINE.

26                 CORRECT?

27          A      CORRECT.

28          Q      AND THERE WAS A LOT OF RELATED ENTITIES

```
1    AND BUSINESSES THAT HE WAS CONCERNED ABOUT.

2              CORRECT?

3        A    I'M -- YES.

4        Q    WELL, THERE WERE A LOT OF ASSETS THAT HE

5    WAS CONCERNED ABOUT?

6        A    I KNOW THERE WAS DISCUSSION OF CARS, I

7    THINK THE HOUSES, THE BUSINESS.  THAT WAS THE MAIN

8    FOCUS.

9        Q    AND WHAT WAS UWAYDAH'S CONCERN WHEN YOU

10   WENT --

11             YOU WENT THERE TO MEET HIM.

12             CORRECT?

13       A    YES.

14       Q    SO HE FLED IN THE SUMMER OF 2010.  YOU

15   WENT IN OCTOBER OF 2010.

16       A    YES.

17       Q    WHERE DID YOU GO?  BEIRUT?

18       A    YES.

19       Q    AND WHERE DID YOU MEET HIM?

20       A    IN THE HOTEL LOBBY, HOTEL RESTAURANT.

21       Q    OKAY.  AND WHAT DID YOU DISCUSS WITH HIM?

22       A    EVERYTHING THAT HAD TRANSPIRED AND AS FAR

23   AS BRINGING -- YOU KNOW, BRINGING THE BUSINESS BACK --

24   BACK INTO BUSINESS.

25       Q    OKAY.  DID YOUR DISCUSSION INCLUDE THESE

26   PROPERTIES THAT WE'VE BEEN DISCUSSING HERE TODAY, THE

27   FOUR PROPERTIES THAT I'VE ITEMIZED FOR YOU?

28       A    THERE MIGHT HAVE BEEN SOME DISCUSSION
```

1    ABOUT SOME OF THAT, YEAH.

2           Q      WELL, ISN'T IT TRUE THAT PART OF YOUR

3    DISCUSSION --

4                  WELL, LET ME JUST ASK YOU, WAS THERE ANY

5    CONCERN VOICED BY DR. UWAYDAH ABOUT LAW ENFORCEMENT OR

6    CREDITORS GETTING ACCESS TO ASSETS THAT HE HAD AN

7    INTEREST IN?

8           A      I DON'T RECALL THAT CONVERSATION OTHER

9    THAN REGARDING THE ACCOUNTS RECEIVABLES.

10          Q      OKAY.  ISN'T IT TRUE THAT YOU TOLD US

11   DURING THE PROFFER THAT UWAYDAH WAS CONCERNED ABOUT LAW

12   ENFORCEMENT INVESTIGATION?

13          A      YES.

14          Q      WELL, ISN'T IT ALSO TRUE THAT YOU TOLD US

15   THAT IN 2010 YOU SIGNED PAPERWORK, SPECIFICALLY GRANT

16   DEEDS, WHICH PURPORTED TO HAVE AN IMPACT ON ONE OR MORE

17   OF THESE PROPERTIES THAT WE'VE BEEN TALKING ABOUT HERE?

18          A      YES.  WAS THAT 2010 OR 2011?  I DON'T --

19          Q      I'M ASKING YOU.  DO YOU REMEMBER --

20          A      I DON'T REMEMBER EXACTLY WHEN.

21          Q      OKAY.  LET ME ASK YOU THIS WAY.

22                 DID YOU AT SOME POINT IN TIME HAVE

23   CONVERSATIONS WITH MUNIR UWAYDAH ABOUT THESE PROPERTIES

24   AND LAW ENFORCEMENT'S INVESTIGATIONS IMPACTING THE

25   PROPERTIES?

26          A      YES.

27          Q      WELL, I MEAN, THAT'S WHY WE'RE HERE,

28   DR. TURLEY.  SO WHY DON'T YOU TELL US ABOUT THAT.

1          A       I WANTED THE PROPERTIES OUT OF MY NAME, SO

2     THEY WERE -- I AGREED, YOU KNOW, TO TRANSFER --

3     TRANSFER THE PROPERTIES TO THESE HOLDING COMPANIES.

4          Q       OKAY.  SO WHOSE IDEA WAS IT TO TRANSFER

5     THE PROPERTIES TO HOLDING COMPANIES?

6          A       MUNIR UWAYDAH'S.

7          Q       OKAY.  AND HAD YOU VOICED -- PRIOR TO

8     THAT, HAD YOU VOICED TO HIM A CONCERN THAT YOUR NAME

9     WAS ON THESE FOUR PROPERTIES THAT WE'VE BEEN TALKING

10    ABOUT?

11         A       I HAD VOICED MY CONCERN FROM ALMOST THE

12    BEGINNING BECAUSE I WANTED NOTHING -- I DIDN'T WANT MY

13    NAME ON THEM.

14         Q       OKAY.  WHAT WAS YOUR CONCERN EXACTLY?

15         A       I DIDN'T -- I DIDN'T HAVE OWNERSHIP, LIKE

16    WE'VE DISCUSSED.  I DIDN'T HAVE ANY CONTROL.  YOU KNOW,

17    IT WAS, I MEAN, A DRAG ON MY CREDIT ESSENTIALLY.  I

18    JUST WANTED MY HANDS -- I DIDN'T WANT TO BE -- I'VE

19    NEVER BEEN INVOLVED IN IT, BUT I JUST WANTED IT FREE

20    AND CLEAR.

21         Q       OKAY.  SO YOU SAID UWAYDAH CAME UP WITH

22    THE IDEA TO PUT THE PROPERTIES IN THE HOLDING

23    COMPANIES.  BUT WHO CONTROLLED THE HOLDING COMPANIES?

24         A       WELL, I DIDN'T.  SO HE DID.

25         Q       OKAY.  BUT WHOSE NAME WAS ON THE HOLDING

26    COMPANIES?

27         A       MY NAME.

28         Q       SO YOU TOOK THE PROPERTIES IN WHICH YOUR

1    NAME SHOWED UP ON TITLE, AND INSTEAD YOU PUT THE

2    PROPERTIES AS BEING HELD BY A HOLDING COMPANY.  BUT YOU

3    WERE THE OWNER OR PRESIDENT OR -- ON PAPER THE

4    CONTROLLING AGENT OF THESE HOLDING COMPANIES.

5                 CORRECT?

6         A     YES.

7         Q     SO WHEN WE TALKED ABOUT -- SPECIFICALLY

8    WE'RE TALKING, AGAIN, ABOUT 5007, LLC.  THAT WAS A

9    HOLDING COMPANY THAT YOU PUT THE PROPERTY 5007 OCEAN

10   FRONT WALK INTO.

11                CORRECT?

12        A     I DON'T REMEMBER THAT NAME SPECIFICALLY.

13   BUT IF MY NAME IS ON THE PAPERWORK, THEN YES, THEN I

14   DID DO THAT.

15        Q     OKAY.  AND 5509 OCEAN FRONT WALK, DID YOU

16   TRANSFER THAT FROM YOUR NAME TO BEING HELD BY

17   CONNEMARA, A HOLDING COMPANY, WHICH YOU WERE THE

18   PRESIDENT OF?

19        A     I RECOGNIZE THAT, YES.

20        Q     OKAY.  SO ON PAPER, IF ANYONE LOOKED INTO

21   CONNEMARA, THEY WOULD SEE THAT YOU WERE ASSOCIATED WITH

22   IT AS A PRESIDENT OR A MANAGER.  BUT IN REALITY IT WAS

23   MUNIR UWAYDAH THAT EXERCISED CONTROL OVER CONNEMARA.

24        A     YES.

25        Q     AND THAT WAS TRUE AT THE TIME YOU

26   TRANSFERRED THAT PROPERTY, 5509 OCEAN FRONT WALK, INTO

27   CONNEMARA AS A OWNER?

28        A     YES.

1          Q      NOW, 1316 BEVERLY GROVE PLACE, DID YOU

2    TRANSFER OWNERSHIP BY GRANT DEED OF THAT PROPERTY INTO

3    A HOLDING COMPANY CALLED NOTRE DAME?

4          A      YES.

5          Q      AND WHO WAS THE PRESIDENT OR MANAGER OF

6    NOTRE DAME ON PAPER?

7          A      ME.

8          Q      AND WHO ACTUALLY CONTROLLED IT IN REAL

9    LIFE?

10          A      UWAYDAH.

11          Q      AND 34 GALLEON STREET IN MARINA DEL REY,

12    DID YOU PUT THAT PROPERTY, TRANSFER IT BY GRANT DEED

13    INTO A HOLDING COMPANY CALLED WICKLOW?

14          A      YES.

15          Q      AND WERE YOU ON PAPER THE PRESIDENT OR

16    CONTROLLER OR MANAGER OF WICKLOW?

17          A      YES.

18          Q      AND WHO WAS REALLY BEHIND IT?

19          A      UWAYDAH.

20          Q      AND SO THIS ARRANGEMENT YOU JUST TESTIFIED

21    TO, WAS THAT ALL UWAYDAH'S IDEA?

22          A      YES.

23          Q      IT WASN'T YOUR IDEA?

24          A      IT WASN'T MY IDEA.

25          Q      AND WHAT WAS THE BENEFIT TO YOU, IF ANY,

26    OF MAKING THOSE TRANSACTIONS?

27          A      THERE WAS NO BENEFIT TO ME SPECIFICALLY

28    OTHER THAN I LOOKED AT IT AS A PROCESS OF GETTING THESE

```
 1    OUT OF MY NAME.

 2            MR. MATHAI:  JUST ONE MOMENT.

 3            THE COURT:  ALL RIGHT.

 4            MR. MATHAI:  I'M SORRY, YOUR HONOR.

 5            THE COURT:  THAT'S OKAY.

 6            MR. MATHAI:  ONE OF THE WITNESSES THAT WE

 7    INTENDED TO CALL ON THIS SAME SUBJECT THAT WE'RE

 8    INQUIRING NOW IS BENJAMIN GLUCK, WHO PREVIOUSLY

 9    REPRESENTED PAUL TURLEY.

10            HE TESTIFIED WITH REGARDS TO THESE SAME

11    SIMILAR QUESTIONS AT THE CIVIL HEARING.  WE HAVE THE

12    TRANSCRIPT.  WE WOULD LIKE TO CALL HIM.

13            HE'S ACTUALLY HERE NOW AND WOULD LIKE TO

14    ADDRESS THE COURT AS TO OUR CALLING HIM BUT ALSO ASKING

15    IF WE COULD TAKE HIM OUT OF ORDER.

16            THE COURT:  YOU CAN TAKE HIM OUT OF ORDER IF YOU

17    WANT.

18            MR. MATHAI:  OKAY.  SO WE'D LIKE TO DO THAT NOW

19    BECAUSE I THINK I CAN COVER IT RATHER QUICKLY.

20            THE COURT:  OKAY.

21            MR. MATHAI:  AND THEN GET BACK TO PAUL TURLEY.

22            AND WE'RE GOING TO TRY TO LIMIT HIS

23    QUESTIONING, JUST SO THE COURT KNOWS, TO THIS SUBJECT.

24    THERE ARE A LOT OF OTHER THINGS, OF COURSE.  BUT WE'RE

25    GOING TO TRY AND JUST GET TESTIMONY ABOUT THESE

26    PROPERTIES AND WHAT HE KNOWS ABOUT THEM.

27            THE COURT:  OKAY.

28            MR. MATHAI:  MR. TURLEY, CAN I ASK YOU TO STEP
```

1    DOWN FOR A FEW MINUTES.

2         DEFENDANT TURLEY:  CAN I STEP OUT TO THE

3    RESTROOM?

4         THE COURT:  YES.  OF COURSE.

5         MR. MATHAI:  WE'RE ONLY GOING TO GO FOR ANOTHER

6    HALF AN HOUR.  IF YOU WANT TO USE THE RESTROOM, GO

7    AHEAD.

8         THE COURT:  HE'S A BIG BOY.  IF HE WANTS TO USE

9    THE RESTROOM, HE CAN LEAVE.

10        MR. MATHAI:  THAT'S TRUE.

11             YOUR HONOR, MR. GLUCK IS HERE.  I DID TELL

12   YOUR HONOR WHAT WE INTEND TO DO.  HE WANTS TO ADDRESS

13   THE COURT BEFORE WE CALL HIM.

14        THE COURT:  OKAY.

15        MR. DROOKS:  GOOD AFTERNOON, YOUR HONOR.  MARK

16   DROOKS OF BIRD MARELLA FOR MR. GLUCK.

17        THE COURT:  OKAY.

18        MR. DROOKS:  SO MR. GLUCK IS HERE TO TESTIFY.

19   OBVIOUSLY, HE HAS -- MUCH OF WHAT HE WILL TESTIFY TO

20   WAS AT LEAST AT ONE POINT PRIVILEGED.  THERE ARE REALLY

21   TWO ISSUES HERE.

22             ONE, AS THE COURT PROBABLY KNOWS ALREADY,

23   MR. GLUCK HAS GIVEN A SUBSTANTIAL AMOUNT OF TESTIMONY

24   IN A PRIOR PROCEEDING.  THAT WAS BASED UPON TWO THINGS.

25             ONE, MY UNDERSTANDING IS THAT MR. TURLEY

26   HAS ALREADY EXECUTED A COMPLETE WAIVER OF BOTH THE

27   ATTORNEY-CLIENT PRIVILEGE AND MR. GLUCK'S OBLIGATIONS

28   UNDER THE BUSINESS AND PROFESSIONS CODE.

```
 1                THE COURT:  OKAY.

 2                MR. DROOKS:  WITH RESPECT TO MR. UWAYDAH, THE

 3     COURT FOUND THAT THE WAIVER EFFECTED BY THE CLAIMS

 4     BROUGHT AGAINST MY FIRM AND MR. GLUCK AT THE TIME

 5     CONSTITUTED A WAIVER OF THE PRIVILEGE FOR PURPOSES OF

 6     THE FIRM'S SELF-DEFENSE.

 7                THE COURT:  OKAY.

 8                MR. DROOKS:  THERE IS AN ISSUE AS TO WHETHER OR

 9     NOT THAT WAIVER APPLIES OUTSIDE OF THAT PROCEEDING NOW

10     THAT IT'S OVER AND WE HAVE PREVAILED, WHETHER WE STILL

11     HAVE -- WHETHER THE WAIVER REMAINS IN EFFECT FOR

12     PURPOSES OF SELF-DEFENSE SO THAT MR. GLUCK CAN REPEAT

13     THE SAME TESTIMONY ON THE STAND.

14                     AND WE WOULD ASK YOUR HONOR TO ADDRESS

15     THAT ISSUE.  OBVIOUSLY, IF YOU ORDER MR. GLUCK TO

16     TESTIFY, HE'S PREPARED TO DO SO.  AND WE HAVE GIVEN

17     NOTICE TO MR. TURLEY'S COUNSEL THAT THESE ISSUES WOULD

18     ARISE.

19                THE COURT:  OKAY.

20                MR. DROOKS:  SECONDARILY, IF THE GOVERNMENT

21     INTENDS TO GO BEYOND MR. GLUCK'S PRIOR TESTIMONY, THEN

22     WE WOULD NEED SOME TYPE OF FINDING THAT THERE WAS A

23     WAIVER.

24                THE COURT:  OKAY.

25                MR. MOEST:  I WILL SAY I DID NOT RECEIVE THAT

26     NOTICE.  I DON'T KNOW IF YOU SENT IT TO MR. SEPE.

27                MR. GLUCK:  WE SENT IT TO MR. SHOHET WHO WAS

28     APPEARING ON THIS MATTER.
```

1        MR. MOEST:  OKAY.  I WASN'T SURE WHO THE COUNSEL

2    WAS YOU WERE REFERRING TO.

3        MR. GLUCK:  WE SENT THE COURT'S PRIOR WRITTEN

4    ORDER AS WELL AS THE TRANSCRIPT OF THE PRIOR TESTIMONY,

5    OF THE PRIOR PROCEEDING WHERE THE COURT FOUND A WAIVER,

6    AND MR. SHOHET WAS PRESENT.  HE WAS THE ONE WHO

7    CROSS-EXAMINED ME.

8        THE COURT:  ALL RIGHT.

9            DR. TURLEY, ARE YOU WILLING TO WAIVE ANY

10    PRIVILEGE YOU HOLD AS FAR AS BENJAMIN GLUCK OR THE LAW

11    FIRM THAT HE'S ASSOCIATED WITH?  YOU'RE THE HOLDER OF

12    THE PRIVILEGE.

13        DEFENDANT TURLEY:  NO.

14        MR. MATHAI:  HE ALREADY HAS WAIVED.

15        MR. GLUCK:  THAT WAS PART OF THE PLEA PROCESS.

16        THE COURT:  WELL, IN THAT CASE I DON'T NEED TO

17    ASK YOU.  I WOULD HAVE CAUTIONED YOU, REMEMBER YOU'RE

18    TO BE COOPERATING WITH THE DISTRICT ATTORNEY IN THIS

19    MATTER.

20        MR. MOEST:  I FIGURED HE JUST WANTED TO TALK TO

21    ME BEFORE HE SAID YES.

22        THE COURT:  ALL RIGHT.  THE COURT WILL FIND

23    THERE'S A WAIVER IN EFFECT.  AND YOU MAY TESTIFY.  I

24    WILL ORDER YOU TO TESTIFY.

25        MR. MATHAI:  AND JUST SO WE'RE CLEAR, WE ARE

26    LIMITING OUR QUESTIONING OF MR. GLUCK TO AN AREA

27    REGARDING THESE PROPERTIES, HIS KNOWLEDGE OF THEM,

28    OWNERSHIP OF THEM, AND CONTROL AND OWNERSHIP OF THEM.

```
 1                    WE DO BELIEVE MR. TURLEY HAS WAIVED HIS
 2      PRIVILEGE.  WE BELIEVE THAT MR. UWAYDAH HAS ALSO WAIVED
 3      HIS PRIVILEGE.  AND TO THE EXTENT THAT HE HASN'T, WE
 4      BELIEVE THAT WHAT MR. GLUCK IS TESTIFYING TO WOULD FIT
 5      INTO THE CRIME FRAUD EXCEPTION.
 6           THE COURT:  ALL RIGHT.  HAS HE ALREADY TESTIFIED
 7      TO THIS IN THE CIVIL MATTER?
 8           MR. MATHAI:  YES.
 9           THE COURT:  OKAY.  HAVE YOU?
10           MR. GLUCK:  I HAVE, YOUR HONOR.  AND I ACTUALLY
11      HAVE A TRANSCRIPT OF THAT TESTIMONY.
12           THE COURT:  IN THAT CASE THAT WAIVER, I THINK,
13      APPLIES IN THIS CASE AS WELL.
14           MR. GLUCK:  WE'RE NOT SURPRISED BY THAT RULING,
15      JUST WANTED TO --
16           THE COURT:  I UNDERSTAND.
17           MR. GLUCK:  WE WANTED AN ORDER.
18           MR. MATHAI:  WE'LL CALL BENJAMIN GLUCK.
19
20                      BENJAMIN GLUCK,
21              CALLED BY THE PEOPLE, AS A WITNESS,
22              WAS SWORN AND TESTIFIED AS FOLLOWS:
23
24           THE CLERK:  YOU DO SOLEMNLY STATE THAT THE
25      TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW
26      PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE
27      TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU, GOD?
28           THE WITNESS:  YES.
```

1          THE CLERK:  THANK YOU.  SIR, STEP FORWARD AND BE

2     SEATED IN THE WITNESS STAND.

3              PLEASE, ADJUST THE MICROPHONE COMFORTABLY

4     IN FRONT OF YOU.  SPEAKING INTO THE MICROPHONE, PLEASE,

5     STATE AND THEN SPELL YOUR FULL NAME FOR THE RECORD.

6          THE WITNESS:  IT IS BENJAMIN NATHAN GLUCK,

7     B-E-N-J-A-M-I-N, N-A-T-H-A-N, G-L-U-C-K.

8          THE COURT:  THANK YOU.

9              YOU MAY PROCEED.

10         MR. MATHAI:  THANK YOU.

11

12                   DIRECT EXAMINATION

13    BY MR. MATHAI:

14         Q      MR. GLUCK, YOU ARE, OBVIOUSLY, FAMILIAR

15    WITH THE FACTS OF THIS CASE.

16              CORRECT?

17         A      UP TO A CERTAIN DATE, YES.

18         Q      OKAY.  IN FACT, YOU REPRESENTED DR. PAUL

19    TURLEY WHEN HE WAS A CHARGED DEFENDANT IN THIS CASE FOR

20    SEVERAL YEARS.

21              CORRECT?

22         A      CORRECT.

23         Q      AND FROM THE -- SPECIFICALLY FROM EVEN

24    BEFORE THE INDICTMENTS WERE UNSEALED IN 2015 THROUGH

25    WHEN YOU LEFT THE CASE IN 2000 -- THE END OF 2018.

26              CORRECT?

27         A      CORRECT.

28         Q      AND I WANT TO -- AT SOME POINT IN TIME DID

1    YOU ALSO REPRESENT DR. MUNIR UWAYDAH?

2          A    YES.

3          Q    AND I KNOW WE SAID THIS ON THE RECORD

4    BEFORE YOU WERE CALLED JUST NOW, BUT IT'S YOUR

5    UNDERSTANDING THAT BOTH DR. TURLEY AND DR. UWAYDAH HAVE

6    WAIVED THEIR ATTORNEY-CLIENT PRIVILEGE WITH YOU, AND

7    YOU HAVE TESTIFIED IN OTHER PROCEEDINGS ON A MULTITUDE

8    OF SUBJECTS CONCERNING THAT REPRESENTATION.

9          CORRECT?

10          A    YES.  EXCEPT THAT MY UNDERSTANDING IS THAT

11    DR. TURLEY EXECUTED A FULL WAIVER OF ALL RIGHTS, ALL

12    OBLIGATIONS AS PART OF HIS PLEA.

13          DR. UWAYDAH, THE WAIVER WAS NARROWER, AND

14    IT WAS IN CONNECTION WITH A LAWSUIT THAT HE FILED

15    AGAINST ME, AND THERE WERE FINDINGS THERE.  BUT I -- I

16    DON'T KNOW THAT THAT'S A COMPLETE WAIVER AS TO ANYTHING

17    HE EVER -- AS TO EVERYTHING ABOUT THE REPRESENTATION.

18          Q    I UNDERSTAND.

19          BUT JUST SO WE'RE CLEAR, WAS ONE OF THE

20    MAIN ISSUES IN THE CIVIL LAWSUIT WHETHER OR NOT MUNIR

21    UWAYDAH WAS AN ALTER EGO TO FRONTLINE MEDICAL

22    ASSOCIATES AND OTHER BUSINESS ENTITIES ASSOCIATED WITH

23    FRONTLINE?

24          A    YES.  THAT WAS THE SUBJECT OF A BENCH

25    TRIAL DURING THE SUMMER OF 2023.

26          Q    OKAY.  AND IN THAT LITIGATION AS TO THAT

27    ISSUE, DID YOU TESTIFY?

28          A    I DID.

1          Q       OKAY.  AND SO THAT'S WHY I WANT TO ASK YOU

2    SOME QUESTIONS ON THAT SAME SUBJECT HERE.

3               IN YOUR EXPERIENCE OF REPRESENTING

4    DR. UWAYDAH, DID YOU OBSERVE HIM TO HAVE CONTROLLING

5    INTEREST AND OWNERSHIP INTEREST IN ENTITIES, BUSINESS

6    ENTITIES, WHEREIN OTHER PEOPLE'S NAMES ACTUALLY

7    APPEARED ON THE SECRETARY OF STATE DOCUMENTS AND OTHER

8    LEGAL DOCUMENTS AS OWNERS OR PRINCIPALS?

9          A       YES.

10         Q       IS ONE OF THOSE ENTITIES --

11               WELL, I WANT TO ASK YOU ABOUT A COUPLE OF

12    THOSE ENTITIES TODAY.  WELL, ARE YOU FAMILIAR WITH A

13    BUSINESS ENTITY CALLED MEDCONSULT S.A.L.,

14    M-E-D-C-O-N-S-U-L-T, AND THEN THE ABBREVIATION S-A-L?

15         A       YES.

16         Q       HOW ARE YOU FAMILIAR WITH THAT ENTITY?

17         A       IT CAME UP A NUMBER OF TIMES IN MY

18    REPRESENTATION.  AND IT WAS LISTED ON A SPREADSHEET OF

19    ENTITIES THAT DR. UWAYDAH CAUSED TO BE SENT TO ME

20    DURING THE REPRESENTATION, WHICH HAPPENS TO BE AN

21    EXHIBIT IN THE BENCH TRIAL.

22         Q       OKAY.  AND DID YOU -- BASED ON THAT

23    SPREADSHEET AND YOUR INTERACTIONS WITH MUNIR UWAYDAH,

24    DID YOU FORM A CONCLUSION AS TO WHO CONTROLLED

25    MEDCONSULT, S.A.L.?

26         A       YES.

27         Q       AND WHO IS THAT?

28         A       ALONG WITH ALL OF THE ENTITIES ON THE

```
1    SPREADSHEET, MY CONCLUSION WAS THAT THEY WERE ALL
2    CONTROLLED BY MUNIR UWAYDAH.
3         Q     AND DID YOU SEE HIM ACTUALLY EXERCISE ANY
4    CONTROL OVER MEDCONSULT?
5         A     DID I SEE HIM?
6         Q     DID YOU OBSERVE ANY CONTROLLING BEHAVIOR
7    THAT HE HAD OVER MEDCONSULT?
8         A     AS I TESTIFIED DURING THE BENCH TRIAL,
9    THERE WAS AT LEAST ONE TRANSACTION WHERE MEDCONSULT
10   GAVE UP ITS RIGHTS FOR SOMETHING THAT WOULD MAKE --
11   MEDCONSULT GAVE UP ITS RIGHTS IN ORDER TO BENEFIT MUNIR
12   UWAYDAH PERSONALLY IN A WAY THAT WAS CONSISTENT WITH MY
13   CONCLUSION.
14        Q     OKAY.  DID MUNIR UWAYDAH EVER ASK YOU TO
15   DO ANYTHING, ASK YOU TO DO ANYTHING AS HIS COUNSEL,
16   THAT WOULD BENEFIT MEDCONSULT?
17        A     I BELIEVE HE ASKED ME TO FIND COUNSEL FOR
18   THEM, FOR MEDCONSULT.
19        Q     DID YOU DO SO?
20        A     YES.
21        Q     OKAY.  AND WHO WAS THAT COUNSEL?
22        A     I -- IT WAS THE LAW FIRM OF HALPERN,
23   HALPERN MAY.  THE NAME CHANGED A FEW TIMES.  IT WAS
24   AARON MAY AND GRANT GELBERG.
25        Q     AND WAS THAT -- CAN YOU GIVE US A GENERAL
26   TIME FRAME WHERE HE ASKED YOU TO DO THAT?
27        A     I BELIEVE THAT WAS PROBABLY FAIRLY SHORTLY
28   AFTER THE INDICTMENT WAS UNSEALED AT THE END OF 2015.
```

```
1     IF I REMEMBER CORRECTLY, THERE WERE PROPERTIES THAT

2     WERE FROZEN AROUND THAT TIME.  AND MEDCONSULT FILED

3     CLAIMS THAT WERE --

4          Q     FILED CLAIMS ON THOSE PROPERTIES IN TERMS

5     OF THE SEIZURE?

6          A     YES.  I DON'T KNOW -- I DON'T KNOW IF

7     MEDCONSULT FILED CLAIMS ON -- I DON'T REMEMBER THE

8     EXACT NUMBER, BUT IT WAS AT LEAST ONE PROPERTY.  AND

9     THAT WAS WHAT AARON MAY AND GRANT GELBERG WERE DOING.

10         Q     OKAY.  AND OTHER THAN THAT ASSISTANCE WITH

11    REGARDS TO MEDCONSULT, DID YOU ASSIST MEDCONSULT IN ANY

12    OTHER WAY AS UWAYDAH'S COUNSEL?

13         A     NOT THAT I REMEMBER OFF THE TOP OF MY

14    HEAD.

15         Q     ARE YOU -- I'M GOING TO LIST SOME

16    PROPERTIES NOW TO YOU AND ASK YOU IF YOU'RE FAMILIAR

17    WITH THESE.

18              5509 OCEAN FRONT WALK IN MARINA DEL REY.

19    5007 OCEAN FRONT WALK IN MARINA DEL REY.  1316 BEVERLY

20    GROVE PLACE IN BEVERLY HILLS.  AND 34 GALLEON STREET IN

21    MARINA DEL REY.

22              ARE YOU FAMILIAR WITH ANY OR ALL OF THOSE

23    PROPERTIES?

24         A     I'M FAMILIAR WITH THEM.

25         Q     EACH OF THEM?

26         A     ALL OF THEM.

27         Q     HOW ARE YOU FAMILIAR WITH THEM?

28         A     THOSE WERE ALL PROPERTIES THAT WERE --
```

1    THOSE WERE ALL -- I BELIEVE THOSE WERE ALL PROPERTIES

2    THAT WERE FROZEN UNDER THE 186.11 PROCEDURE.  THEY WERE

3    ALL PROPERTIES THAT WERE ASSOCIATED WITH UWAYDAH.

4        Q     OKAY.  AND WERE THEY IN ANY WAY AT THE

5    TIME, LET'S SAY 2000 -- BETWEEN 2010 AND 2015, WERE

6    THEY IN ANY WAY ASSOCIATED WITH PAUL TURLEY?

7        A     SO I DON'T REMEMBER EXACTLY WHICH, BUT

8    THERE WERE PROPERTIES THAT --

9              SO FOR EXAMPLE, I BELIEVE THE BEVERLY

10   GROVE PROPERTY AT ONE POINT WAS IN PAUL TURLEY'S NAME

11   AND LATER TRANSFERRED, PERHAPS, TO MEDCONSULT.  OR

12   MEDCONSULT HAD A LIEN ON IT OR SOMETHING LIKE THAT.

13             THEY WENT THROUGH VARIOUS -- VARIOUS

14   NAMES.  BUT SOME OF THOSE -- AT LEAST ONE OF THOSE AT

15   LEAST AT ONE POINT IN TIME WAS IN PAUL TURLEY'S NAME.

16       Q     OKAY.  AND DID YOU -- DID YOU EVER GET ANY

17   INSTRUCTION FROM MUNIR UWAYDAH REGARDING ACTIONS ON ANY

18   OF THESE PROPERTIES?

19       A     AT ONE POINT HE ASKED ME TO HELP HIM FIND

20   A PROPERTY MANAGER, WHICH I DID.  I CAN'T REMEMBER IF

21   THAT WAS THE ONE FOR PAUL TURLEY'S NAME.

22       Q     WHEN WAS THAT?

23       A     I THINK -- I BELIEVE IT WAS BEFORE THE

24   INDICTMENTS WERE UNSEALED.  I'M NOT SURE I REMEMBER THE

25   DATE OF THAT, BUT I THINK IT MIGHT HAVE BEEN BEFORE THE

26   INDICTMENTS WERE UNSEALED.

27       Q     OKAY.  WAS IT -- WERE YOU AWARE THAT AT

28   SOME POINT IN TIME THAT MEDCONSULT WAS MAKING A CLAIM

1   OF OWNERSHIP ON THESE PROPERTIES, ANY OR ALL OF THESE

2   PROPERTIES?

3           A     YES.

4           Q     WHEN WAS THAT?

5           A     I BELIEVE THAT WAS AFTER THE INDICTMENT

6   WAS UNSEALED, WHEN -- WHEN THE FREEZES HAPPENED.

7           Q     OKAY.  SO YOU WEREN'T AWARE OF ANY CLAIMS

8   OF OWNERSHIP OF MEDCONSULT BEFORE THE INDICTMENTS WERE

9   UNSEALED IN SEPTEMBER OF 2015?

10          A     I DON'T THINK I WAS.

11          Q     ARE YOU AWARE OF A PURPORTED SETTLEMENT

12  AGREEMENT BETWEEN MEDCONSULT AND UWAYDAH IN WHICH IT

13  PURPORTS THAT MEDCONSULT GOT THE PROPERTIES WAY BACK IN

14  2004?

15          A     I AM AWARE OF THE PURPORTED SETTLEMENT

16  AGREEMENT, YES.

17          Q     HOW DID YOU BECOME AWARE OF THAT?

18          A     SO THAT WAS AT ISSUE IN THE RECENT

19  LITIGATION.  BUT AS CAME OUT DURING THAT LITIGATION AS

20  WELL, I BELIEVE THAT BEFORE THE INDICTMENTS WERE

21  UNSEALED, THE FACT THAT --

22                AND I DON'T REMEMBER IF I KNEW EXACTLY

23  THAT THIS WAS ASSOCIATED WITH MEDCONSULT OR NOT.

24                BUT THE FACT THAT THERE WAS THIS ENTITY

25  THAT HAD CLAIM TO UWAYDAH'S ASSETS WAS -- I KNEW THAT.

26  IT HAD TO -- IT HAD TO DO WITH JUDGMENTS AGAINST HIM,

27  AS I TESTIFIED IN THE OTHER PROCEEDING.

28          Q     OKAY.  DID YOU EVER BECOME AWARE IN YOUR

1    REPRESENTATION OF MUNIR UWAYDAH OF HIM PUTTING HIS NAME

2    ON -- OR PUTTING OTHER PEOPLE'S NAMES ON PROPERTIES

3    THAT HE ACTUALLY OWNED AND CONTROLLED?

4         A    YES.

5         Q    AND DO YOU KNOW IF HE DID THAT WITH

6    REGARDS TO THESE PROPERTIES THAT I'VE LISTED TO YOU?

7         A    I BELIEVE HE DID, YES.

8         Q    OKAY.  AND WHAT DO YOU BASE THAT ON?

9         A    WELL, AS I PREVIOUSLY TESTIFIED,

10   DR. UWAYDAH DID NOT ALLOW ANY ASSETS TO BE IN HIS OWN

11   NAME BECAUSE HE HAD JUDGMENTS AGAINST HIM THAT HE DID

12   NOT WANT TO PAY.  AND SO EVERYTHING, FROM CARS, TO

13   HOUSES, TO BUSINESSES, WAS ALWAYS IN SOMEONE ELSE'S

14   NAME.  AND THAT WAS JUST THE WAY HE LIVED.

15        Q    IF PAUL TURLEY'S NAME APPEARED ON THE

16   LOANS FOR THESE PROPERTIES, BASED ON YOUR EXPERIENCE,

17   DO YOU BELIEVE THAT THOSE WOULD BE ACCURATE, THAT

18   PAPERWORK WOULD BE ACCURATE?

19        A    I'M -- WELL, ARE YOU SAYING IF PAUL

20   TURLEY'S NAME WAS ON, SAY, THE TITLE OF THE HOUSE?

21        Q    YES.

22        A    WOULD THAT BE ACCURATE?

23        Q    OR WOULD IT BE TRUE?

24        A    THAT'S A -- IT'S AN -- IT'S AN ACADEMIC

25   QUESTION.  I THINK THE ANSWER IS LIKE, EVERYTHING ELSE,

26   IF HIS NAME IS ON THE TITLE, HIS NAME IS ON THE TITLE.

27   BUT IS HE ACTUALLY HOLDING IT FOR SOMEONE ELSE?  IN

28   OTHER WORDS, IS HE A BENEFICIAL OWNER VERSUS JUST A

1    NOMINEE OWNER?  PAUL TURLEY WAS A NOMINEE OWNER, NOT

2    THE TRUE OWNER.

3         Q     AND BASED ON YOUR EARLIER ANSWER, WAS THAT

4    CONSISTENT WITH -- YOU SAID DR. UWAYDAH ACTUALLY OWNED

5    THE PROPERTIES YOU BELIEVE.  IS THAT CONSISTENT WITH

6    HIM HIDING HIS NAME FROM THE ASSETS?

7         A     YES, NOT HAVING HIS NAME ON IT.  CORRECT.

8         Q     OKAY.  AND AGAIN, IS THAT -- IN YOUR

9    EXPERIENCE, WAS IT CONNECTED TO UWAYDAH'S INTEREST IN

10   HIDING ASSETS FROM CREDITORS OR PEOPLE HE OWED DEBTS

11   TO?

12        A     YES.

13        Q     OKAY.

14        A     WELL, IF I MAY ELABORATE.

15   THE COURT:  YOU MAY.

16   MR. MATHAI:  YOU MAY.

17   THE WITNESS:  THE ANSWER IS YES AND.

18            AT ONE POINT, AS I TESTIFIED IN THE OTHER

19   CASE, BOTH DR. UWAYDAH -- IN SEPARATE OCCASIONS,

20   DR. UWAYDAH AND MR. TURLEY TOLD ME THAT IT WASN'T ONLY

21   TO PROTECT AGAINST CREDITORS, BUT IT WAS ALSO TO

22   PROTECT AGAINST LAW ENFORCEMENT SEIZURES.

23        Q     BY MR. MATHAI:  OKAY.  LET ME FOCUS IN ON

24   THAT FOR A MOMENT.

25            YOU SAID DR. TURLEY TOLD YOU THAT AS WELL.

26   WHEN DID HE TELL YOU THAT?

27        A     THAT WOULD HAVE BEEN AFTER HE WAS ARRESTED

28   WHEN -- WHEN PAUL TURLEY WAS ARRESTED, BAIL WAS SET

1    VERY, VERY HIGH.  AND ONE OF THE REASONS WHY --

2              WELL, FIRST OF ALL, IT WAS -- I WAS GOING

3    TO SAY RIDICULOUSLY HIGH.  BUT IT WAS VERY, VERY HIGH.

4              BUT THE OTHER PROBLEM WAS HE -- HE HAD NO

5    EQUITY IN HIS HOUSE BECAUSE THEY HAD A DISCUSSION, THEY

6    MEANING HE AND UWAYDAH, HAD A DISCUSSION THAT THEY

7    SHOULD NOT HAVE ANY AVAILABLE EQUITY IN THE HOUSE

8    BECAUSE IT COULD BE SEIZED.

9              AND IN ORDER TO AVOID HAVING ANY EQUITY,

10   THEY PUT LIENS AGAINST IT, WHICH ENDED UP, IRONICALLY,

11   BACKFIRING BECAUSE THAT MEANT IT WASN'T AVAILABLE FOR

12   BAIL.

13             AND SO WE HAD THAT DISCUSSION AFTER HE WAS

14   ARRESTED.  IT WAS PART OF A DISCUSSION ABOUT WHETHER

15   THERE WAS ANY HOPE OF MAKING BAIL.

16        Q    OKAY.  WHEN YOU TALK ABOUT LIENS AGAINST A

17   HOUSE, ARE YOU TALKING ABOUT DR. TURLEY'S PERSONAL

18   HOME?

19        A    YES.

20        Q    AND WERE LIENS PLACED ON HIS HOME PRIOR TO

21   HIS ARREST OR AFTER HIS ARREST, TO YOUR KNOWLEDGE?

22        A    I BELIEVE THEY WERE PRIOR.  AND THAT'S WHY

23   THERE WASN'T ANYTHING AVAILABLE IN HIS HOUSE TO EVEN

24   OFFER FOR BAIL.

25        Q    OKAY.  AND TO YOUR KNOWLEDGE, WAS UWAYDAH

26   INVOLVED IN THE PLACING OF ANY LIENS ON DR. TURLEY'S

27   HOME?

28        A    I DON'T KNOW THE DETAILS OF HOW MUCH HE

1    WAS, QUOTE, INVOLVED.  DR. TURLEY TOLD ME THAT HE HAD

2    DISCUSSED THIS WITH UWAYDAH.  AND THEY HAD AGREED THAT

3    THEY WOULD BOTH DO THIS.  AND UWAYDAH TOLD ME THE SAME

4    THING.

5         Q    DID -- WHAT ABOUT LIENS ON THESE OTHER

6    PROPERTIES THAT WE'VE MENTIONED HERE BEFORE THAT I

7    ITEMIZED FOR YOU?  WAS THERE ANY TALK ABOUT LIENS ON

8    THOSE PROPERTIES?

9         A    I DON'T REMEMBER TALK FROM DR. TURLEY

10   ABOUT THAT.  AS I SAID, UWAYDAH CONFIRMED THE SAME PLAN

11   TO ALWAYS HAVE LIENS ON EVERYTHING SO THAT THERE IS NO

12   EQUITY THAT CAN BE SEIZED.  BUT I DON'T THINK WE

13   DISCUSSED ANY SPECIFICALLY.

14        Q    OKAY.  BUT THAT WAS IN GENERAL AN IDEA

15   THAT WOULD PREVENT LAW ENFORCEMENT FROM BEING ABLE TO

16   BENEFIT FROM THE SEIZURE OF THE PROPERTIES?

17        A    CORRECT.

18        Q    WHAT ABOUT -- LET ME ASK YOU THE

19   SPECIFICS.  ARE YOU FAMILIAR WITH A PERSON BY THE NAME

20   OF ADIB KASSIR?

21        A    I KNOW THE NAME.  I'VE HEARD THE NAME.

22        Q    OKAY.  DO YOU KNOW A PERSON NAMED SAMER

23   BADOUR, S-A-M-E-R, B-A-D-O-U-R?

24        A    THAT NAME IS NOT -- I DON'T THINK -- I

25   DON'T RECOGNIZE THAT NAME.

26        Q    WHAT ABOUT ADEL, A-D-E-L, YAMOUNT,

27   Y-A-M-O-U-N-T?

28        A    I DON'T RECOGNIZE THAT NAME.

```
 1          Q      LET ME ASK YOU, WE TALKED ABOUT

 2    MEDCONSULT.  ARE YOU FAMILIAR WITH -- I WANT TO ASK YOU

 3    ABOUT SOME COMPANIES THAT WERE PURPORTEDLY HOLDING

 4    COMPANIES.  I'M GOING TO JUST NAME THEM OFF.

 5                 WICKLOW, NOTRE DAME, 5007 LLC, AND

 6    CONNEMARA.  ARE YOU FAMILIAR WITH THOSE COMPANIES?

 7          A      YES.

 8          Q      WHAT ARE THEY?

 9          A      I BELIEVE THAT EACH ONE OF THOSE WAS AN

10    OWNER OR PURPORTED OWNER OF ONE OF THE PROPERTIES THAT

11    YOU LISTED EARLIER.  I CAN'T REMEMBER WHICH WAS WHICH.

12                 AND THEY WERE ALL LISTED IN THAT

13    SPREADSHEET THAT I TOLD YOU ABOUT THAT I RECEIVED, WAS

14    KIND OF A TO-DO SPREADSHEET WITH A VERY LONG LIST OF

15    ENTITIES.  AND THEY WERE -- THEY WERE INCLUDED IN

16    THERE.

17          Q      FROM WHERE DID YOU GET THAT SPREADSHEET?

18          A      I THINK -- IT CAME FROM -- I DON'T

19    REMEMBER IF DR. UWAYDAH SENT IT TO ME HIMSELF OR HE HAD

20    SOMEONE, PERHAPS TATIANA ARNOLD, SEND IT TO ME.

21                 AND THE PURPOSE OF SENDING IT TO ME WAS TO

22    GIVE ME INFORMATION ABOUT SOME ENTITIES THAT I NEEDED

23    TO DO SOMETHING WITH.  AND I THINK THEY JUST GAVE ME

24    THE WHOLE DOCUMENT THAT HAD THE ENTIRE CONSTELLATION

25    OF --

26                 IT'S AN EXHIBIT IN THE OTHER CASE.  IT'S

27    LIKE A TO-DO LIST, NEED TO FILE TAXES, NEED TO CLOSE

28    THIS ONE, NEED TO -- WHATEVER.
```

1          Q     AND LET ME JUST ASK YOU, CONNEMARA.  DID

2     YOU EVER KNOW THAT HOLDING COMPANY TO BE OWNED BY

3     MEDCONSULT?

4          A     IT'S ON THE SPREADSHEET, AND IT WOULD --

5     WHATEVER -- I DON'T REMEMBER OFF THE TOP OF MY HEAD

6     WHAT IT SAYS.  BUT EACH ONE OF THOSE ENTITIES --

7                ON THAT SPREADSHEET THAT'S AN EXHIBIT IN

8     THE OTHER CASE, IT SAYS WHO THE OWNER IS OF EACH

9     ENTITY.

10         Q     OKAY.  AND DO YOU RECALL IF YOU EVER GOT

11    INSTRUCTIONS OR HEARD OF PAUL TURLEY TRANSFERRING

12    CONNEMARA TO MEDCONSULT?

13         A     I DON'T KNOW ANYTHING ABOUT THAT.

14         Q     OKAY.  DO YOU BELIEVE THAT PAUL TURLEY WAS

15    A TRUE OWNER OF CONNEMARA?

16         A     AGAIN, AS I SAID EARLIER, MY -- BASED ON

17    MY UNDERSTANDING OF WHAT HAPPENED, HIS NAME -- IF HIS

18    NAME WAS ON IT, IT WAS AS A NOMINEE, NOT AS A -- AS YOU

19    USE THE PHRASE, "TRUE OWNER."

20         Q     OKAY.  WELL, IN TERMS OF, AS A SO-CALLED

21    NOMINEE, IF PROPERTY WAS TRANSFERRED FROM CONNEMARA TO

22    MEDCONSULT, DO YOU BELIEVE IT WAS PAUL TURLEY ENGAGED

23    IN THAT OR MUNIR UWAYDAH?  OR DO YOU HAVE AN OPINION ON

24    THAT?

25         A     WELL, I DON'T KNOW ABOUT WHETHER IT WAS

26    TRANSFERRED OR NOT.  I DO KNOW THAT WHATEVER PAUL

27    TURLEY WAS DOING WITH THESE ASSETS HE WAS DOING IT AT

28    SOMEONE ELSE'S INSTRUCTION.

1          Q      AND THAT'S BASED ON YOUR EXPERIENCE?

2          A      YES.

3          THE COURT:  HOW MUCH MORE?

4          MR. MATHAI:  NOTHING FURTHER AT THIS TIME.

5                 I WANT TO GIVE COUNSEL --

6          THE COURT:  THERE IS NO CROSS-EXAMINATION BECAUSE

7   THIS PART OF THE HEARING IS THE 186.11, OF WHICH

8   MR. TURLEY IS NOT A PARTY TO IT.  HE'S A WITNESS IN IT.

9   THERE ARE NO FURTHER QUESTIONS.

10                YOU ARE EXCUSED.  THANK YOU.

11         THE WITNESS:  THANK YOU.

12         THE COURT:  WE'VE REACHED 3:00.  ARE WE GOING TO

13  RESUME ON MONDAY?

14         MR. MATHAI:  YES, PLEASE.

15         THE COURT:  10:00 O'CLOCK ON MONDAY.

16                DR. TURLEY WILL RETURN.  THANK YOU.

17         MR. MOEST:  THANK YOU, YOUR HONOR.

18         THE COURT:  OKAY.

19

20                (THE MATTER WAS CONTINUED TO FRIDAY,

21                MAY 6, 2024, AT 10:00 A.M. FOR FURTHER

22                PROCEEDINGS.)

23                (THE NEXT VOLUME IS 2 BEGINNING ON PAGE

24                NUMBER 301.)

25

26

27

28

1               SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    FOR THE COUNTY OF LOS ANGELES

3

4     DEPARTMENT 106            HON. LARRY P. FIDLER, JUDGE

5

6     THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                             )
7                    PLAINTIFF              ) NO. BA455469
                                             )
8               VS.                          )
                                             ) REPORTER'S
9     PAUL TURLEY,                           ) CERTIFICATE
                                             )
10                   DEFENDANT.             )
      ─────────────────────────────────────)

11

12

13    STATE OF CALIFORNIA     )
                              )  SS
14    COUNTY OF LOS ANGELES   )

15               I, TRACI THOMAS, OFFICIAL REPORTER OF THE

16    SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE

17    COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT I DID

18    CORRECTLY REPORT THE PROCEEDINGS CONTAINED HEREIN AND

19    THAT THE FOREGOING PAGES 1 THROUGH ^, INCLUSIVE,

20    COMPRISE A FULL, TRUE, AND CORRECT TRANSCRIPT OF THE

21    PROCEEDINGS AND TESTIMONY TAKEN IN THE MATTER OF THE

22    ABOVE-ENTITLED CAUSE ON FRIDAY, MAY 3, 2024.

23

24               DATED THIS 9TH OF MAY, 2024.

25

26

27    ─────────────────────────────
      TRACI THOMAS, CSR NO. 9620
28    OFFICIAL REPORTER

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   FOR THE COUNTY OF LOS ANGELES

3

4      DEPARTMENT 106              HON. LARRY P. FIDLER, JUDGE

5                              -oOo-

6      THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                             )
7                     PLAINTIFF             )
                                             ) NO. BA455469
8              VS.                          )
                                             )
9      PAUL TURLEY,                         )
                                             )
10                    DEFENDANT.            )
       _____)

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                   MONDAY, MAY 6, 2024

14

15

16     APPEARANCES:

17     FOR THE PEOPLE:      LOS ANGELES DISTRICT ATTORNEY
                            BY:  DAYAN MATHAI, DEPUTY
18                               KAREN NISHITA, DEPUTY
                            211 WEST TEMPLE, SUITE 200
19                          LOS ANGELES, CALIFORNIA 90012

20     FOR THE DEFENDANT:   LAW OFFICE OF ROBERT MOEST
                            BY:  ROBERT MOEST
21                          2530 WILSHIRE BOULEVARD
                            SANTA MONICA, CALIFORNIA 90403
22

23

24

25

26     VOLUME 2                    TRACI THOMAS, CSR 9620
       PAGES 301/429-600, INCL.  OFFICIAL REPORTER
27

28

1              M A S T E R   I N D E X

2                    VOLUME 2

3

4                    SESSIONS

5                                              PAGE

6    MONDAY, MAY 6, 2024
         A.M. SESSION                          306
7        P.M. SESSION                          349

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MASTER   INDEX

VOLUME 2

CHRONOLOGICAL INDEX OF WITNESSES

                                                    PAGE

**TURLEY, PAUL, (CALLED BY THE PEOPLE)**
        DIRECT EXAMINATION (RESUMED) BY MR. MATHAI    307
        DIRECT EXAMINATION (RESUMED) BY MR. MATHAI    352
        CROSS EXAMINATION BY MR. MOEST                367
        REDIRECT EXAMINATION BY MR. MATHAI            373
        RECROSS-EXAMINATION BY MR. MOEST              376


**NELSON, MARISA, (CALLED BY THE PEOPLE)**
        DIRECT EXAMINATION BY MR. MATHAI              380
        CROSS-EXAMINATION BY MR. MOEST                404
        REDIRECT EXAMINATION BY MR. MATHAI            406


**DEVANE, SHANNON, (CALLED BY THE PEOPLE)**
        DIRECT EXAMINATION BY MR. MATHAI              407

1          M A S T E R   I N D E X

2                  VOLUME 2

3

4          ALPHABETICAL INDEX OF WITNESSES

5                                              PAGE

6    **DEVANE, SHANNON, (CALLED BY THE PEOPLE)**
          DIRECT EXAMINATION BY MR. MATHAI          407
7

8    **NELSON, MARISA, (CALLED BY THE PEOPLE)**
          DIRECT EXAMINATION BY MR. MATHAI          380
9         CROSS-EXAMINATION BY MR. MOEST            404
          REDIRECT EXAMINATION BY MR. MATHAI        406
10

11   **TURLEY, PAUL, (CALLED BY THE PEOPLE)**
          DIRECT EXAMINATION (RESUMED) BY MR. MATHAI  307
12        DIRECT EXAMINATION (RESUMED) BY MR. MATHAI  352
          CROSS EXAMINATION BY MR. MOEST            367
13        REDIRECT EXAMINATION BY MR. MATHAI        373
          RECROSS-EXAMINATION BY MR. MOEST          376

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

305

```
 1              M A S T E R   I N D E X

 2                    VOLUME 2

 3

 4                     EXHIBITS

 5

 6    PEOPLE'S    DESCRIPTION              ID    EV   REFUSED
      EXHIBITS
 7
      2           5509 DOCUMENTS           308
 8
      3           5509 DOCUMENTS           308
 9
      4           CONNEMARA CORPORATION    308
10                DOCUMENTS

11    5           AGREEMENT                318

12    6           FACTUAL PLEA             319

13    7           PHOTOCOPY OF CHECK       389

14    8           TWO PAGES, PHOTOGRAPHS   415

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

```
 1    CASE NUMBER:        BA455469
 2    CASE NAME:          PEOPLE VS. PAUL TURLEY
 3    LOS ANGELES, CA     MONDAY, MAY 6, 2024
 4    DEPARTMENT 106      HON. LARRY P. FIDLER, JUDGE
 5    REPORTER:           TRACI THOMAS, CSR NO. 9620
 6    TIME:               A.M. SESSION
 7
 8    APPEARANCES:
 9              DEFENDANT PAUL TURLEY, PRESENT WITH
10              COUNSEL, ROBERT MOEST, ATTORNEY AT LAW;
11              DAYAN MATHAI AND KAREN NISHITA, DEPUTIES
12              DISTRICT ATTORNEY, REPRESENTING THE PEOPLE
13              OF THE STATE OF CALIFORNIA.
14
15       THE COURT:  THE DEFENDANT IS PRESENT WITH HIS
16    COUNSEL.  THE DISTRICT ATTORNEY IS PRESENT.  THE
17    WITNESS IS ON THE STAND.
18              YOU MAY PROCEED.
19       MR. MATHAI:  THANK YOU, YOUR HONOR.
20       THE COURT:  CAN I ASK WHY WE'RE STARTING SO LATE?
21       MR. MATHAI:  I'M SORRY?
22       THE COURT:  WHY WE'RE STARTING SO LATE?
23       MR. MATHAI:  WELL, COUNSEL WAS HELD UP A LITTLE
24    BIT.
25              AND THEN WHEN HE GOT HERE, I TOOK A FEW
26    MINUTES WITH HIM TO BASICALLY GIVE HIM SOME NOTICE OF
27    WHERE I WAS GOING WITH THIS EXAMINATION.
28              AND THEN HE WANTED TO TALK TO HIS CLIENT.
```

1          THE COURT:  OKAY.  LET'S PROCEED.

2          MR. MATHAI:  THANK YOU.

3

4                    PAUL TURLEY,

5          CALLED BY THE PEOPLE AS A WITNESS,

6              WAS PREVIOUSLY SWORN AND

7              TESTIFIED FURTHER AS FOLLOWS:

8

9          DIRECT EXAMINATION (RESUMED)

10 BY MR. MATHAI:

11     Q     MR. TURLEY, LAST WEEK YOU WERE TESTIFYING,

12 AND WE WERE ASKING QUESTIONS ABOUT A PROPERTY AT 5509

13 OCEAN FRONT WALK IN MARINA DEL REY.

14          YOU TESTIFIED THAT THAT'S ONE OF THE

15 SEVERAL PROPERTIES THAT YOU HAD USED YOUR CREDIT FOR

16 AND GIVEN YOUR NAME FOR THE LOANS AND THE TITLE BUT

17 THAT YOU DID NOT ACTUALLY OWN THOSE PROPERTIES.

18          IS THAT CORRECT?

19     A     YES.

20     MR. MATHAI:  AND YOUR HONOR, AT THIS TIME I HAVE

21 THREE PACKETS OF INFORMATION.  THE FIRST IS -- HAS A

22 COUNTY SEAL FROM LOS ANGELES COUNTY, AND IT'S STAPLED

23 IN THE TOP LEFT.

24          MAY I MARK THIS AS PEOPLE'S 2, I THINK?

25     THE COURT:  YEAH.  PEOPLE'S 1 WAS THE PHOTOCOPY

26 OF THE CHECK.

27     MR. MATHAI:  OKAY.  PEOPLE'S 2 FOR THIS HEARING.

28

```
 1              (MARKED FOR IDENTIFICATION PEOPLE'S
 2              EXHIBIT 2, 5509 DOCUMENTS.)
 3
 4      MR. MATHAI:  THE NEXT EXHIBIT IS SEVERAL
 5  DOCUMENTS WHICH ARE STAPLED TOGETHER, AND THEY'RE
 6  CLIPPED.  ALL OF THESE DOCUMENTS ARE CLIPPED TOGETHER.
 7              THE TOP ONE IS A FAX TRANSMITTAL SHEET TO
 8  CHASE WITH THE "FROM" LINE SAID M. TURLEY.
 9              MAY I MARK THIS AS PEOPLE'S 3?
10      THE COURT:  YES.
11
12              (MARKED FOR IDENTIFICATION PEOPLE'S
13              EXHIBIT 3, 5509 DOCUMENTS.)
14
15      MR. MATHAI:  AND THE FINAL ONE IS A PACKET OF
16  INFORMATION.  THE TOP PAGE SAYS "ARTICLES OF
17  INCORPORATION," WITH THE NAME "CONNEMARA HOLDINGS."
18              MAY I MARK THIS PACKET AS PEOPLE'S 4?
19      THE COURT:  YES.
20
21              (MARKED FOR IDENTIFICATION PEOPLE'S
22              EXHIBIT 4, CONNEMARA CORPORATION
23              DOCUMENTS.)
24
25      Q    BY MR. MATHAI:  MR. TURLEY, I'M JUST
26  QUICKLY GOING TO SHOW YOU EACH OF THESE PACKETS,
27  PEOPLE'S 2, PEOPLE'S 3 AND PEOPLE'S 4.
28              AND ALL I WANT TO ASK YOU ABOUT, DO EACH
```

1    OF THESE EXHIBITS PURPORT TO BE DOCUMENTS RELATED TO

2    YOUR NAME, YOUR NAMED OWNERSHIP OF THE PROPERTY AT

3    5509, EITHER DIRECTLY OR THROUGH A HOLDING COMPANY

4    NAMED CONNEMARA?

5         A    YES.

6         Q    OKAY.  YOU JUST LOOKED AT PEOPLE'S 2.  CAN

7    YOU TELL US WHAT THAT IS?

8         A    I SEE A GRANT DEED.

9         Q    OKAY.  AND IS THAT ASSOCIATED WITH THE --

10   YOUR PURPORTED OWNERSHIP OF THAT PROPERTY?

11        A    YES.

12        Q    OKAY.  AND MOVE ON TO PEOPLE'S 3.  JUST

13   TELL US WHAT --

14        A    THIS ONE?

15        Q    YES.

16        A    IT'S CHASE BANK DOCUMENTS, AS FAR AS I CAN

17   TELL.

18        Q    LOOKS TO BE RELATED TO THAT PROPERTY AT

19   5509 OCEAN FRONT WALK?

20        A    YES.

21        Q    AND THE FINAL ONE I'M SHOWING YOU MARKED

22   AS PEOPLE'S 4?

23        A    IT APPEARS TO BE ARTICLES OF INCORPORATION

24   FOR CONNEMARA.

25        Q    OKAY.  IN THE STATE OF NEVADA?

26        A    YES.  UH-HUH.

27        Q    OKAY.  AND YOU TESTIFIED THE OTHER DAY

28   THAT WHEN CONNEMARA WAS STARTED, IT WAS STARTED BY YOU

1    WITH YOUR NAME AS ITS PRESIDENT OR CONTROLLING MANAGER.

2              CORRECT?

3         A    I DIDN'T START IT MYSELF.  I MEAN, I

4    SIGNED THE DOCUMENTS.  I BELIEVE MR. GARDENER DID THE

5    PAPERWORK.

6         Q    AND MR. GARDENER IS A LAWYER?

7         A    HE'S A LAWYER.

8         Q    AND HE WAS PAID BY UWAYDAH?

9         A    AS FAR AS I KNOW, YES.

10        Q    OKAY.

11        A    I DIDN'T PAY HIM.

12        Q    AND TO THE EXTENT THAT THESE EXHIBITS,

13   PEOPLE'S 2, 3 AND 4, INDICATE THAT YOU HAD OWNERSHIP OR

14   CONTROL OF THAT PROPERTY AT 5509, WOULD THAT BE --

15   WOULD THOSE INDICATIONS OR STATEMENTS IN THESE

16   DOCUMENTS BE FALSE?

17        A    PLEASE REPEAT THAT.

18        Q    TO THE EXTENT THAT THESE DOCUMENTS IN

19   PEOPLE'S 2, 3, AND 4, INDICATE THAT YOU HAD OWNERSHIP

20   OR CONTROL OF THE PROPERTY AT 5509, WOULD THOSE

21   STATEMENTS BE FALSE?

22        A    YES.

23        Q    AND FOR EXAMPLE, I WANT TO SHOW YOU A PAGE

24   FROM PEOPLE'S 2.  THE THIRD HE PAGE IN ON PEOPLE'S 2

25   PURPORTS TO BE A GRANT DEED.

26              IS THAT CORRECT?

27        A    YES.

28        Q    AND IS THE SIGNATURE IN THE CENTER OF THE

1     PAGE, IS THAT YOUR SIGNATURE?

2          A     YES.

3          Q     NOW, THIS GRANT DEED PURPORTS TO TRANSFER

4     PROPERTY AT 5509 FROM YOU TO CONNEMARA HOLDINGS.

5          A     YES.

6          Q     DID YOU EVER LEGALLY -- WELL, DID YOU EVER

7     TRULY OWN THAT PROPERTY IN ORDER TO GRANT DEED IT TO

8     CONNEMARA?

9          A     IT WAS NEVER MY PROPERTY.

10         Q     AND THIS IS DATED OCTOBER 5TH, 2010.

11    WHERE DID YOU SIGN THIS GRANT DEED?

12         A     I DON'T RECALL.  PROBABLY MR. GARDENER'S

13    OFFICE.

14         Q     AND DID YOU -- WAS THIS DONE -- YOU TOLD

15    US THAT YOU WENT TO LEBANON IN 2010.

16               CORRECT?

17         A     OCTOBER OF 2010, YES.

18         Q     OKAY.  AND WAS THIS DOCUMENT SIGNED BEFORE

19    OR AFTER YOU WENT TO LEBANON?

20         A     I DON'T --

21               WHAT'S THE DATE ON THAT?

22         Q     THE DATE ON THIS IS OCTOBER 5TH, 2010.

23         A     I MEAN, IT MIGHT HAVE BEEN BEFORE, BUT I'M

24    NOT SURE THE EXACT DATES.  OR IT MIGHT HAVE BEEN

25    SOMETHING THAT WAS SIGNED IN LEBANON.

26         Q     OKAY.  AND WAS -- WAS THIS YOUR ACTION IN

27    SIGNING THIS DOCUMENT PART OF A PLAN YOU HAD WITH MUNIR

28    UWAYDAH IN REGARDS TO THE -- THIS PROPERTY?

1        A        IT WAS PART OF THE IDEA TO GET THIS

2    PROPERTY OUT OF MY NAME.

3        Q        OKAY.  BUT YOU TOLD US THAT MUNIR UWAYDAH

4    WAS -- HAD DIRECTED THE PURCHASE OF THIS PROPERTY.

5              CORRECT?

6        A        YES.

7        Q        AND THAT HE WAS ENJOYING THE BENEFITS OF

8    THE PROPERTY.

9              CORRECT?

10       A        YES.

11       Q        WHY DIDN'T YOU JUST TRANSFER THE PROPERTY

12   TO MUNIR UWAYDAH SO HE COULD DO WITH IT AS HE PLEASED?

13       A        I DID WHAT HE INSTRUCTED ME TO DO.  HE

14   WANTED IT TO TRANSFER TO THE HOLDING COMPANIES.

15       Q        ISN'T IT TRUE THAT YOU PREVIOUSLY

16   TESTIFIED WITH REGARDS TO THIS PROPERTY THAT IT WAS THE

17   TRANSFER IN OCTOBER OF 2010 OR THE APPARENT TRANSFER IN

18   OCTOBER 2010 WAS DONE TO HIDE THIS ASSET FROM CREDITORS

19   AND/OR LAW ENFORCEMENT?

20       A        I BELIEVE THAT'S TRUE, YES.

21       Q        YOU BELIEVE WHAT'S TRUE?  THAT YOU DID

22   TESTIFY TO THAT PREVIOUSLY, OR THAT THE STATEMENT

23   ITSELF IS TRUE?

24       A        BOTH.

25       Q        OKAY.  AND DO YOU AGREE, THEN, GIVEN THAT

26   YOUR TESTIMONY THAT THAT IS TRUE, THAT THE TRANSFER OF

27   THIS PROPERTY TO CONNEMARA WAS PART OF A SCHEME TO

28   PROTECT MUNIR UWAYDAH OR PROTECT HIS ASSETS?

1      A      YES.

2      Q      NOW, YOU SAID YOU WENT TO LEBANON MORE

3   THAN ONCE AFTER HE FLED IN 2010.

4             CORRECT?

5      A      YES.

6      Q      AND YOUR TIME IN LEBANON, WAS IT DESIGNED

7   FOR YOU TO MEET DIRECTLY WITH MUNIR UWAYDAH TO DISCUSS

8   THE BUSINESS OPERATIONS HERE IN SOUTHERN CALIFORNIA?

9      A      YES.

10     Q      AND IN ADDITION TO WHAT YOU JUST TESTIFIED

11  TO REGARDING THIS PROPERTY AT 5509 AND HOW IT GOT

12  TRANSFERRED OR APPARENTLY TRANSFERRED TO CONNEMARA

13  HOLDINGS, A HOLDING COMPANY, DID YOU TALK ABOUT OTHER

14  ASSETS THAT NEEDED TO BE TRANSFERRED OR HIDDEN FROM

15  CREDITORS OR LAW ENFORCEMENT IN ADDITION TO THIS

16  PROPERTY?

17     A      YES.

18     Q      AND DID THAT INCLUDE OTHER ASSETS, OTHER

19  REAL ESTATE ASSETS?

20     A      YES.

21     Q      AND I'M JUST -- WOULD THAT INCLUDE THE

22  ASSETS AT 5007 OCEAN FRONT WALK, 1316 BEVERLY GROVE

23  PLACE AND 34 GALLEON STREET?

24     A      YES.

25     Q      DID IT INCLUDE TALK ABOUT OWNERSHIP OF

26  BUSINESSES THAT WERE CONTROLLED BY UWAYDAH OR OTHERS

27  ASSOCIATED WITH UWAYDAH?

28     A      YES.

1          Q       AND SPECIFICALLY, DID YOU DISCUSS WITH

2    MUNIR UWAYDAH IN OCTOBER, 2010, THAT THERE WAS A

3    FRAUD -- AN INVESTIGATION INTO FRAUD RELATED TO

4    FRONTLINE MEDICAL ASSOCIATES?

5          A       YES.

6          Q       NOW, FAST FORWARDING, IN 2015, DID YOU GO

7    TO LEBANON IN THAT YEAR?

8          A       YES.

9          Q       WHAT TIME OF THE YEAR DID YOU GO TO

10   LEBANON?

11         A       JANUARY, I BELIEVE.

12         Q       DID YOU DISCUSS WITH MUNIR UWAYDAH ANY LAW

13   ENFORCEMENT INVESTIGATIONS THAT WERE GOING ON AT THAT

14   TIME?

15         A       YES.

16         Q       WHAT DID YOU DISCUSS?

17         A       THAT THERE WAS A GRAND JURY INVESTIGATION.

18         Q       AND IN CONNECTION WITH THAT DISCUSSION DID

19   YOU TALK TO MUNIR UWAYDAH ABOUT ANY OF THESE REAL

20   ESTATE ASSETS THAT I PREVIOUSLY ASKED YOU ABOUT,

21   INCLUDING 5509 OCEAN FRONT WALK?

22         A       THERE MAY HAVE BEEN SOME DISCUSSION ABOUT

23   THAT.  I DON'T RECALL.  IF I PREVIOUSLY TESTIFIED TO

24   THAT, THEN YES.

25         Q       WELL, THIS PAGE FROM PEOPLE'S 2 THAT I

26   SHOWED YOU BEFORE WHICH PURPORTS TO BE A GRANT DEED, WE

27   SAID IT'S DATED IN OCTOBER OF 2010.

28                 WAS THIS GRANT DEED EVER RECORDED IN 2010?

```
 1          A      I DON'T KNOW.

 2          Q      DO YOU KNOW WHEN IT WAS RECORDED, IF EVER?

 3          A      NO, I DON'T.

 4          Q      IF I TOLD YOU THAT THERE WAS A RECORDING

 5    OF A GRANT DEED IN 2015, WOULD THAT SURPRISE YOU?

 6          A      IT WOULDN'T SURPRISE ME, NO.

 7          Q      DID YOUR WIFE GO TO LEBANON IN 2015?

 8          A      YES.

 9          Q      WAS THERE, IN FACT, A QUITCLAIM DEED

10    SIGNED BY YOUR WIFE IN FEBRUARY OF 2015 ON THIS

11    PROPERTY AT 5509 OCEAN FRONT WALK, A QUITCLAIM DEED TO

12    CONNEMARA HOLDINGS FROM YOUR WIFE, MARIA TURLEY?

13          A      I MEAN, YES.  I DON'T KNOW THE EXACT DATE,

14    IF YOU SHOW ME THE DOCUMENT.  BUT YES, SHE DID DO THAT.

15          Q      IS THAT PART OF THE DISCUSSION THAT YOU

16    HAD WITH MUNIR UWAYDAH AND HER IN LEBANON IN JANUARY OF

17    2015, THAT THAT WAS --

18          A      YES.

19          Q      WAS THAT SOMETHING THAT MUNIR UWAYDAH

20    DISCUSSED WITH YOU AND YOUR WIFE?

21          A      YES.

22          Q      WHAT DID HE SAY ABOUT MARIA TURLEY'S NEED

23    TO QUITCLAIM ANY INTEREST SHE HAD?

24          A      SOMETHING ABOUT THAT SHE WOULD NOT HAVE

25    ANY CLAIM TO THE PROPERTY AS MY WIFE.

26          Q      OKAY.  AND AGAIN, WAS -- WAS THE QUITCLAIM

27    THAT WAS DISCUSSED IN JANUARY, 2015, AND SIGNED IN

28    FEBRUARY OF 2015, PART OF DISCUSSIONS WITH MUNIR
```

```
 1    UWAYDAH OF HIDING ASSETS FROM LAW ENFORCEMENT?
 2         A     YES.
 3         Q     AND SPECIFICALLY WITH KNOWLEDGE THAT THERE
 4    WAS A GRAND JURY INVESTIGATION INTO YOU AND YOUR WIFE
 5    AND MUNIR UWAYDAH'S ACTIVITIES?
 6         A     I'M SURE THAT WAS ALL PART OF IT, YES.
 7         Q     WELL, YOU HEARD BENJAMIN GLUCK TESTIFY THE
 8    OTHER DAY IN THIS COURT.  DID YOU -- WHEN THE
 9    INDICTMENTS WERE UNSEALED, DID YOU DISCUSS OR DO
10    ANYTHING TO ENCUMBER PROPERTIES THAT WERE IN YOUR NAME
11    IN ORDER TO PROTECT THEM FROM BEING SEIZED BY THIS
12    COURT?
13         A     I -- WHEN I TESTIFIED ABOUT MY PERSONAL
14    RESIDENCE, YES, THERE WAS SOMETHING ALONG THOSE LINES.
15    BUT I HAD NOTHING TO DO WITH ANY OF THE OTHER
16    PROPERTIES.
17         Q     OKAY.  AND THE ONE ON YOUR PROPERTY, YOU
18    AGREED TO ALLOW MUNIR UWAYDAH TO PUT A LIEN ON YOUR
19    PERSONAL HOME.
20               CORRECT?
21         A     YES.
22         Q     AND -- BUT THAT LIEN WASN'T IN MUNIR
23    UWAYDAH'S NAME WAS IT?
24         A     NO.
25         Q     WHOSE NAME WAS IT IN?
26         A     I THINK HIS NAME IS HABIB KASSIR.
27         Q     IS THAT A DIFFERENT PERSON THAN ADIB
28    KASSIR?
```

```
 1          A       I NEVER MET HABIB KASSIR.

 2          Q       OKAY.  AND WHEN YOU PROFFERED LATER IN

 3     2018, DID THE SUBJECT OF THAT LIEN ON YOUR PERSONAL

 4     HOME COME UP IN OUR CONVERSATIONS IN YOUR PROFFER?

 5          A       YES.

 6          Q       WHAT DID YOU TELL US AT THAT TIME?

 7          A       THAT I WAS TALKING TO MUNIR UWAYDAH ABOUT

 8     HAVING THAT REMOVED FROM MY PROPERTY.

 9          Q       IN ESSENCE, YOU WERE NEGOTIATING WITH HIM

10     ABOUT CLEARING THAT UP?

11          A       I GUESS YOU COULD SAY NEGOTIATING, YES.  I

12     WAS TELLING HIM THAT, YOU KNOW -- HE KNEW THAT IT

13     WASN'T TRUE AND CORRECT, LEGITIMATE AND TO REMOVE IT.

14          Q       AND DID HE?

15          A       NO.

16          Q       IN FACT, AFTER YOU PROFFERED AND YOUR

17     PROFFER WAS REVEALED IN COURT, WERE YOU SUED OVER THAT

18     LIEN ON YOUR PERSONAL PROPERTY?

19          A       YES.

20          Q       AND WHO WAS THE LAWYER THAT BROUGHT SUIT

21     AGAINST YOU?

22          A       I BELIEVE IT WAS -- I BELIEVE IT WAS DAVID

23     BROWNE.  IT WAS A BROWNE.  I KNOW THAT.

24          Q       OKAY.  DAVID BROWNE.

25                  RIGHT?

26          A       THE LAST NAME WAS BROWNE.  I KNOW THAT.

27          Q       OKAY.  AND SO YOU KNEW IN RELATION TO THAT

28     LIEN ON YOUR PERSONAL PROPERTY THAT IT WAS A FALSE
```

1    LIEN.  IN OTHER WORDS, THE PREMISE OF YOU OWING MONEY

2    TO SOMEBODY AND NOT PAYING THEM AND, THEREFORE, A LIEN

3    WAS PLACED ON YOUR PROPERTY, THAT PREMISE WAS ENTIRELY

4    FALSE.

5            RIGHT?

6        A    YES.

7        Q    AND IN FACT, YOU HAD NO DEALINGS WITH THE

8    NAMED OWNER OF THAT LIEN, MR. KASSIR?

9        A    YES.

10       Q    AND YET YOU WERE SUED FOR THAT.  AND THE

11   LAWYER, DAVID BROWNE, YOU THEN UNDERSTOOD THAT DAVID

12   BROWNE WAS ESSENTIALLY WORKING FOR MUNIR UWAYDAH IN

13   BRINGING THAT LAWSUIT AGAINST YOU.

14           CORRECT?

15       A    YES.

16       Q    NOW, IN 2000 -- FAST FORWARD, AFTER YOU --

17   YOU PROFFERED, YOU ENTERED A PLEA IN THIS COURT.

18           CORRECT?

19       A    YES.

20       MR. MATHAI:  YOUR HONOR, I'D LIKE TO MARK TWO

21   ADDITIONAL EXHIBITS.  ONE IS A PLEA AGREEMENT.  IT'S

22   TITLED, "AGREEMENT BETWEEN THE PEOPLE OF THE STATE OF

23   CALIFORNIA AND PAUL TURLEY."  IT'S FILED DECEMBER 3RD,

24   2018.  IT'S CONFORMED.

25       THE COURT:  PEOPLE'S 5.

26

27           (MARKED FOR IDENTIFICATION PEOPLE'S

28           EXHIBIT 5, AGREEMENT.)

1          MR. MATHAI:  I'M WRITING "PEOPLE'S 5" ON THE

2    BACK.

3               AND PEOPLE'S 6, THE NEXT ONE IN ORDER,

4    WOULD BE A FACTUAL STATEMENT OF PAUL TURLEY, ALSO FILED

5    AND CONFORMED ON THE TOP RIGHT DECEMBER 3RD, 2018.

6          THE COURT:  OKAY.

7

8               (MARKED FOR IDENTIFICATION PEOPLE'S

9               EXHIBIT 6, FACTUAL PLEA.)

10

11        Q    BY MR. MATHAI:  MR. TURLEY, I'M SHOWING

12   YOU PEOPLE'S 5, WHICH IS OUR AGREEMENT.

13               DO YOU RECOGNIZE THAT DOCUMENT?

14        A    UH-HUH.  I DO.

15        Q    AND DID YOU SIGN THAT DOCUMENT ON

16   NOVEMBER 29TH, 2018, AND DOES YOUR DATE AND -- DOES

17   THAT DATE AND SIGNATURE APPEAR ON THE SECOND TO LAST

18   PAGE?

19        A    YES.

20        Q    AND DID YOU INITIAL EACH OF THE PARAGRAPHS

21   ON THIS DOCUMENT TO INDICATE THAT YOU HAD READ THEM,

22   UNDERSTOOD THEM, AND WERE AGREEING TO THOSE TERMS?

23        A    YES.

24        Q    PEOPLE'S 6 IS A FACTUAL PLEA.

25               DO YOU RECOGNIZE THIS DOCUMENT?

26        A    YES.

27        Q    AND DID YOU ALSO DATE AND SIGN THIS

28   DOCUMENT ON DECEMBER 3RD, 2018?

1          A       YES.

2          Q       AND DID YOU INITIAL THE PARAGRAPHS

3    INDICATING THAT YOU READ AND UNDERSTOOD THEM AND AGREED

4    TO THEIR VORACITY IN ORDER TO TELL THIS COURT THAT THEY

5    WERE TRUE?

6          A       YES.

7          Q       OKAY.  NOW, I JUST ASKED YOU A MOMENT AGO

8    ABOUT A LAWSUIT THAT YOU WERE SUED BY DAVID BROWNE FOR

9    A LIEN ON YOUR HOME.

10                 DID YOU BECOME AWARE OF A LAWSUIT IN 2022,

11   2023, BETWEEN FRONTLINE ASSOCIATES AND BENJAMIN GLUCK?

12         A       YES.

13         Q       DID YOU UNDERSTAND WHO WAS REPRESENTING

14   FRONTLINE IN THAT LAWSUIT?

15         A       DAVID BROWNE AND GEORGE SHOHET.

16         Q       OKAY.  SO YOU KNEW WHEN THAT LAWSUIT WAS

17   FILED THAT DAVID BROWNE WAS A LAWYER FOR MUNIR UWAYDAH.

18                 CORRECT?

19         A       YES.

20         Q       AND YOU KNEW THAT GEORGE SHOHET WAS A

21   LAWYER FOR MUNIR UWAYDAH?

22         A       YES.

23         Q       AND IN FACT, THERE WAS ANOTHER LAWSUIT

24   BETWEEN MEDCONSULT FILED IN THE CIVIL COURT IN WHICH

25   YOU WERE NAMED AS A DEFENDANT IN THAT LAWSUIT.

26                 CORRECT?

27         A       I DON'T KNOW ANYTHING ABOUT THAT.

28         Q       A LAWSUIT BETWEEN MEDCONSULT AND YOU OVER

1    THE OWNERSHIP OF THESE PROPERTIES.

2         A     I RECEIVED NUMEROUS PAPERWORK.  I TURNED

3    ALL OF IT OVER TO MR. SEPE, AND HE TOLD ME THAT HE

4    TURNED IT ALL OVER TO YOU GUYS.

5         Q     WELL, YOU'RE AWARE THAT GEORGE SHOHET WAS

6    REPRESENTING MUNIR UWAYDAH IN THAT LAWSUIT.

7              CORRECT?

8         A     I WAS NOT AWARE AT THE TIME, NO.  I HAD NO

9    INTEREST IN IT AT ALL.  MR. SEPE TOLD ME JUST TO IGNORE

10   IT.  I DON'T OWN THE PROPERTIES.  I HAD NOTHING TO DO

11   WITH IT.  SO I DID NOTHING BUT TURN OVER THE DOCUMENTS

12   TO MR. SEPE, AND HE PURPORTED TO TURN THEM OVER TO THE

13   DA'S OFFICE.

14        Q     OKAY.  NOW, YOU WERE SUBPOENAED AS A

15   WITNESS IN THE LAWSUIT BETWEEN FRONTLINE AND BENJAMIN

16   GLUCK.

17              RIGHT?

18        A     YES.

19        Q     AND ISN'T IT TRUE THAT THE SUBPOENA

20   ACTUALLY CAME FROM GLUCK'S LAWYERS?

21        A     YES.

22        Q     AND YOU TOLD YOUR LAWYER, LOU SEPE ABOUT

23   THE SUBPOENA, OR HE RECEIVED THE SUBPOENA ON YOUR

24   BEHALF.

25              CORRECT?

26        A     YES.

27        Q     AND ISN'T IT TRUE THAT HE ADVISED YOU THAT

28   IF YOU -- THAT YOU HAD TO HONOR THE SUBPOENA AND APPEAR

```
1    IN COURT?

2         A     YES.

3         Q     AND DIDN'T -- ISN'T IT TRUE THAT HE

4    ADVISED YOU THAT WHEN YOU GO TO COURT IN RESPONSE TO

5    THAT SUBPOENA TO INFORM THE PARTIES THAT YOU WERE

6    ASSERTING YOUR FIFTH AMENDMENT RIGHT BECAUSE YOU HAD

7    NOT YET BEEN SENTENCED BY JUDGE FIDLER IN THIS COURT?

8         A     THAT'S NOT COMPLETELY ACCURATE.  HE TOLD

9    ME -- HE DID NOT ACCOMPANY ME.  HE TOLD ME TO TAKE THE

10   FIFTH AMENDMENT, PLEAD THE FIFTH.

11        Q     OKAY.  SO HE WASN'T GOING TO BE THERE, BUT

12   HE TOLD YOU WHEN YOU GO THAT YOU SHOULD ASSERT YOUR

13   FIFTH AMENDMENT RIGHT?

14        A     YES.  BUT HE DID NOT TELL ME THAT I HAD TO

15   TAKE THE FIFTH AMENDMENT BECAUSE I WAS NOT SENTENCED.

16        Q     OKAY.

17        A     IN FACT, YOU DIDN'T TELL ME THAT.  BECAUSE

18   I BROUGHT THIS ENTIRE LAWSUIT TO YOUR ATTENTION WHEN I

19   FIRST HEARD OF IT.

20        Q     AND ISN'T IT TRUE --

21        A     AND I ASKED YOU WITH MR. SEPE ON THE

22   RECORD IF IT WOULD BE OKAY IF I PARTICIPATED IN THIS

23   LAWSUIT.

24        Q     AND ISN'T IT TRUE THAT I TOLD YOU THAT YOU

25   SHOULD SPEAK TO YOUR COUNSEL, LOU SEPE, ABOUT THAT,

26   THAT I WAS NOT GOING TO INTERFERE WITH YOUR DECISION TO

27   PARTICIPATE OR NOT PARTICIPATE, THAT IT WAS UP TO YOU

28   AND YOUR LAWYER, LOU SEPE?
```

1      A     YES.  BUT I UNDERSTAND IT NOT NECESSARILY

2   AS A BLESSING TO PROCEED BUT THAT I WAS NOT PROHIBITED

3   FROM PARTICIPATING IN THIS LAWSUIT.

4             AND NO ONE INSTRUCTED ME THAT I HAD TO GO

5   AND ASSERT THE FIFTH AMENDMENT.

6      Q     OKAY.

7      A     IN FACT -- IN FACT, IF I MAY FINISH,

8   MARISA NELSON WAS ALSO TESTIFYING IN THAT COURT.  AND I

9   WAS NOT A WITNESS TO HER TESTIMONY, BUT MY

10  UNDERSTANDING IS SHE WAS NEVER INSTRUCTED THE WAY THAT

11  I WAS INSTRUCTED, THE WAY I WAS PURPORTED TO BE

12  INSTRUCTED.  BECAUSE I WAS INSTRUCTED TO TAKE THE

13  FIFTH, WHICH WAS -- WAS MY INTENTION.  I WAS TOLD BY

14  MR. SHOHET THAT I COULD SELECTIVELY TAKE THE FIFTH.

15  AND THAT'S WHAT I DID.

16     Q     LET ME ASK YOU, ISN'T IT TRUE THAT WHEN

17  YOU ASKED -- WHEN YOU ASKED ME ABOUT IT, THAT I ADVISED

18  YOU TO DISCUSS IT WITH YOUR COUNSEL, THAT I WAS NOT

19  GOING TO GET INVOLVED IN THAT DECISION?

20            BUT I DID TELL YOU THAT IF YOU DO TESTIFY

21  IN ANY PROCEEDING, YOU'RE REQUIRED TO TELL THE TRUTH.

22  ISN'T IT TRUE THAT I TOLD YOU THAT?

23     A     I MEAN, I DON'T HAVE THE RECORDING IN

24  FRONT OF ME.  I'M SURE YOU HAVE THE TRANSCRIPTS OF

25  EXACTLY WHAT WAS SAID.  BUT YES, ANY TESTIMONY THAT I

26  GAVE WOULD BE THE TRUTH.

27     Q     NOW, GOING BACK TO YOUR SIGNATURE ON THESE

28  DOCUMENTS, PEOPLE'S 5 AND PEOPLE'S 6, YOUR AGREEMENT

1    WITH THE PEOPLE AND YOUR FACTUAL PLEA, ISN'T IT TRUE

2    THAT YOU WERE TOLD WHEN YOU SIGNED THESE DOCUMENTS THAT

3    IF ANYTHING WAS UNTRUE IN THAT FACTUAL PLEA OR IN YOUR

4    PROFFERS THAT YOU WERE REQUIRED, AS PART OF YOUR

5    CORPORATION WITH THE PEOPLE, TO INFORM THE PEOPLE THAT

6    IF ANY OF THE STATEMENTS WERE NOT TRUE?

7                    ISN'T THAT CORRECT, YOU WERE SO ADVISED?

8         A      THAT IS ABSOLUTELY TRUE.  AND AT THE TIME

9    THAT I SIGNED IT, EVERYTHING THAT I SIGNED WAS TRUE AND

10   CORRECT.

11        Q      OKAY.  SO ISN'T IT TRUE, MR. TURLEY, THAT

12   YOU WENT TO THE CIVIL COURT, AND BEFORE YOU TESTIFIED,

13   YOU MET WITH DAVID BROWNE ON MULTIPLE OCCASIONS.  AND

14   HE PREPARED YOU FOR YOUR TESTIMONY WHERE YOU WERE

15   SUBPOENAED BY THE OTHER SIDE TO TESTIFY?

16        A      I MET WITH MR. BROWNE ON, I THINK, TWO

17   OCCASIONS.

18        Q      AND YOU HAD EXTENSIVE TALKS WITH HIM ABOUT

19   YOUR TESTIMONY.

20                    CORRECT?

21        A      I REVIEWED MY PLEA AGREEMENT WITH HIM.

22   THAT'S WHAT I REVIEWED.  AND THAT'S BASICALLY ALL WHAT

23   I DID, YES.

24        Q      AND YOU KNEW THAT HE HAD FILED A FALSE

25   LAWSUIT AGAINST YOU ON BEHALF OF MUNIR UWAYDAH WHEN YOU

26   SAT DOWN WITH HIM.

27                    CORRECT?

28        A      I KNEW THAT IT WAS FALSE.  I DON'T KNOW IF

1    HE KNEW THAT IT WAS FALSE.  BUT YES.

2         Q     WELL, YOU KNEW THAT HE WAS EMPLOYED AS A

3    LAWYER FOR MUNIR UWAYDAH.

4         A     YES.

5         Q     AND WHEN YOU SAT DOWN WITH HIM ON MULTIPLE

6    OCCASIONS TO PREPARE FOR YOUR TESTIMONY IN THAT CIVIL

7    PROCEEDING, DID YOU TELL YOUR LAWYER, LOU SEPE, THAT

8    YOU DID SO?

9         A     NO.

10        Q     DID YOU TELL THE PROSECUTION IN THIS CASE

11   THAT YOU WERE SITTING DOWN WITH MUNIR UWAYDAH'S LAWYERS

12   TO TALK ABOUT THE FACTUAL PLEA AND THE COOPERATION

13   AGREEMENT YOU HAVE WITH US?

14             DID YOU EVER INFORM US?

15        A     NO.

16        Q     AND THEN AFTER YOU MET WITH DAVID BROWNE,

17   DID YOU MEET WITH GEORGE SHOHET OR SPEAK WITH GEORGE

18   SHOHET TO PREPARE FOR YOUR TESTIMONY IN THAT CIVIL

19   COURT?

20        A     YES.

21        Q     AND YOU TALKED WITH HIM FOR AT LEAST AN

22   HOUR.

23             CORRECT?

24        A     MIGHT HAVE BEEN A HALF HOUR.  I MEAN, THE

25   NIGHT BEFORE MY TESTIMONY, YES.

26        Q     OKAY.  AND DID YOU EVER TELL LOU SEPE THAT

27   YOU SPOKE WITH ANOTHER ONE OF UWAYDAH'S LAWYERS FOR AT

28   LEAST HALF AN HOUR TO PREPARE FOR YOUR TESTIMONY IN

1    THAT CIVIL PROCEEDING?

2         A      NO.

3         Q      AND DID YOU EVER TELL ANYONE FROM OUR

4    PROSECUTION TEAM IN THIS CASE THAT YOU WERE MEETING

5    WITH UWAYDAH'S LAWYER TO TALK ABOUT OUR FACTUAL -- OUR

6    COOPERATION AGREEMENT AND THE FACTUAL PLEA YOU GAVE IN

7    OUR CASE?

8         A      NO.  BUT I DID INFORM YOU THAT -- THAT I

9    HAD BEEN SUBPOENAED.  AND I ALSO INFORMED YOU THAT I

10   HAD BEEN CONTACTED BY MUNIR UWAYDAH TO POSSIBLY

11   PARTICIPATE IN THIS LAWSUIT.

12        Q      WELL, YOU INFORMED US THAT YOU HAD BEEN

13   CONTACTED BY MUNIR UWAYDAH WHEN THE LAWSUIT WAS FIRST

14   FILED.

15               CORRECT?

16        A      I DON'T KNOW ABOUT -- I BROUGHT YOU EMAILS

17   THAT I RECEIVED FROM MUNIR UWAYDAH.  I SHOWED THEM TO

18   YOU.  I, AGAIN, WAS ASKING FOR YOUR BLESSING.  IF AT

19   THAT TIME IT HAD BEEN MADE CLEAR TO ME THAT THERE IS NO

20   WAY THAT I SHOULD BE INVOLVED IN THIS LAWSUIT, I HADN'T

21   BEEN SENTENCED, THEN THAT'S WHAT I -- THAT'S WHAT I

22   WOULD HAVE DONE.

23               BUT WHATEVER I DID, I MEAN, THERE'S NO

24   LOVE LOST BETWEEN ME AND MR. GLUCK.  AFTER SPENDING

25   25 MONTHS IN MEN'S CENTRAL JAIL WHEN I TOLD YOU, TOO,

26   IF I HAD MR. SEPE, DAY ONE, I WOULD HAVE WALKED IN TO

27   YOU AND PROFFERED.

28        Q      MR. TURLEY, WHEN YOU WENT TO THAT CIVIL

1    COURT, DID YOU TELL THE JUDGE IN THAT TESTIMONY THAT

2    ANY OF THE STATEMENTS YOU HAD MADE IN YOUR FACTUAL PLEA

3    WERE NOT ACCURATE?

4        A        I DON'T RECALL EXACTLY WHAT I -- WHAT I

5    TOLD HER.  BUT I TOLD HER THAT I HAD REVIEWED -- THAT

6    MR. BROWNE HAD SHOWED ME NEW INFORMATION, SPECIFICALLY

7    REGARDING 70 AND 71 OF MY -- MY FACTUAL STATEMENT

8    REGARDING MS. MARISA NELSON, AND I WAS SHOWED TESTIMONY

9    THAT THEY ADMITTED THAT THEY HAD EMBEZZLED FUNDS FROM

10   MULTIPLE ENTITIES, INCLUDING FRONTLINE.

11       Q        OKAY.  BUT YOU --

12       A        SO I --

13               MAY I FINISH?

14               MY STATEMENT IN 70 SAYS THAT, TO THE

15   EFFECT, I'M PARAPHRASING, SOMETHING ABOUT THE ONLY

16   REASON MUNIR UWAYDAH FILED THIS LAWSUIT AGAINST MARISA

17   NELSON WAS TO DISCREDIT HER.  AND I SIGNED THAT.

18               I STILL BELIEVE THAT THE REASON HE FILED

19   THAT LAWSUIT, IN PART, WAS TO DISCREDIT HER.  BUT AFTER

20   REVIEWING THIS TESTIMONY WHERE THEY'RE ADMITTING THAT

21   THEY EMBEZZLED THESE FUNDS, I THOUGHT, WELL, HE HAD A

22   REASON TO FILE THIS LAWSUIT AS WELL.

23       Q        WAS THERE ANY TRUTH TO THE LAWSUIT AGAINST

24   YOU THAT DAVID BROWNE FILED ON THE LIEN ON YOUR HOUSE?

25       A        NO.

26       Q        BUT -- SO YOU KNEW HE FILED A FALSE

27   LAWSUIT AGAINST YOU.  BUT THEN WHEN HE SHOWS YOU

28   DOCUMENTS ABOUT MARISA NELSON, YOU BELIEVED WHAT HE

1   TOLD YOU ABOUT MARISSA NELSON AND NEVER TOLD LOU SEPE

2   OR US WHAT HE SHOWED YOU.

3               CORRECT?

4               IS THAT A CORRECT STATEMENT?

5       A       I READ WHAT I READ.

6       Q       MY QUESTION IS --

7       A       WHETHER IT'S 100 PERCENT TRUE OR ACCURATE

8   OR IT WAS A COMPLETELY FALSE STATEMENT, THAT SHE NEVER

9   ADMITTED THAT, I DON'T KNOW.  THAT'S ALL I WAS SAYING,

10  THAT THERE WAS SOME QUESTION ABOUT THE 100 PERCENT

11  VORACITY OF THAT STATEMENT.

12      Q       WELL, YOU KNEW THAT THAT -- YOUR TESTIMONY

13  WAS IMPORTANT TO DAVID BROWNE AND GEORGE SHOHET.

14      A       MY TESTIMONY WAS IMPORTANT TO ME BECAUSE

15  OF MR. GLUCK.

16      Q       WELL --

17      A       MAYBE IT WAS WRONG TO BE VINDICTIVE.

18      Q       MR. TURLEY, WHAT YOU JUST TESTIFIED TO

19  ABOUT MARISA NELSON, THAT HAS NOTHING TO DO WITH

20  BENJAMIN GLUCK, DOES IT?

21      A       I MEAN, SHE WAS -- SHE WAS A WITNESS IN

22  THAT CASE.  SO THAT CALLS INTO QUESTION HER -- HER

23  TRUTH.

24      Q       WHO BROUGHT THE LAWSUIT AGAINST MARISA

25  NELSON?

26      A       MUNIR UWAYDAH.  I DON'T KNOW SPECIFICALLY,

27  BUT YEAH, MUNIR UWAYDAH.

28      Q       AND BENJAMIN GLUCK WAS THE LAWYER IN THAT

1    CASE.

2              RIGHT?

3         A      I DON'T -- I BELIEVE SO.  BIRD MARELLA.  I

4    DON'T KNOW IF IT'S HIM SPECIFICALLY.

5         Q      OKAY.  SO YOU WENT TO COURT, AND YOU

6    ANSWERED QUESTIONS.  BUT -- ABOUT -- AND YOU TOLD THE

7    COURT ABOUT THOSE PARAGRAPHS IN THE FACTUAL PLEA.

8              CORRECT?

9              YOU ANSWERED QUESTIONS ABOUT THE --

10        A      I JUST BASICALLY SAID THAT, YOU KNOW, AT

11   THE TIME THAT I MADE THEM, I DIDN'T MAKE ANY KNOWINGLY

12   FALSE OR MISLEADING STATEMENTS.

13             AND I HAD REVIEWED ADDITIONAL INFORMATION

14   THAT WASN'T AVAILABLE TO ME AT THE TIME OF THAT

15   PROFFER.  AND BASED ON THAT, THOSE TWO POINTS, 70 AND

16   71, MAY BE CALLED INTO QUESTION.

17        Q      DID YOU TELL JUDGE TRABER THAT YOUR --

18   THAT YOU WERE RUSHED INTO SIGNING THIS FACTUAL PLEA

19   STATEMENT?

20        A      I TOLD HER THE TRUTH, THAT I CAME INTO

21   COURT.  I SAT IN A ROOM OUT THERE FOR 15 MINUTES TO

22   REVIEW IT.  AND I WAS TOLD --

23        Q      MY QUESTION, SIR --

24        A      -- TO SIGN IT.

25        Q      -- IS DID YOU TELL HER THAT YOU WERE

26   RUSHED IN TO SIGNING THIS FACTUAL PLEA.

27        A      I MAY HAVE USED THE WORD "RUSHED."  AND I

28   FEEL THAT -- I MEAN, I CERTAINLY DIDN'T SIT FOR HOURS

1    WITH MR. SEPE AND REVIEW THE STATEMENTS.

2          BUT AGAIN, I'M NOT DISPUTING ANYTHING IN

3    MY FACTUAL STATEMENT.  EVERY STATEMENT THAT I MADE WAS

4    TRUE AND CORRECT AND IS STILL TRUE AND CORRECT TO MY

5    KNOWLEDGE.

6          Q      DID YOU -- AFTER YOU ANSWERED QUESTIONS

7    ABOUT THE FACTUAL STATEMENT, DID YOU TAKE THE FIFTH --

8    DID YOU PLEAD THE FIFTH REGARDING SOME OF THE QUESTIONS

9    YOU WERE ASKED THAT DAY?

10         A      I MEAN, I DON'T RECALL SPECIFICALLY.  BUT

11   THAT WAS MY INTENTION, YES.  AND I DON'T KNOW WHICH

12   QUESTIONS.

13         Q      OKAY.  DID YOU GET ADVICE FROM A LAWYER

14   THAT YOU SHOULD -- WELL, LET ME SAY, THAT YOU COULD

15   SELECTIVELY TAKE THE FIFTH DURING YOUR TESTIMONY?

16         A      MR. SHOHET TOLD ME THAT, YES.

17         Q      WAS MR. SHOHET YOUR LAWYER?

18         A      NO.

19         Q      WHOSE LAWYER WAS HE?

20         A      HE WAS REPRESENTING FRONTLINE, MUNIR

21   UWAYDAH.

22         Q      AND SO DID YOU -- YOU LISTENED TO THE

23   ADVICE OF GEORGE SHOHET, DIDN'T YOU?

24         A      I DID, YES.

25         Q      DID YOU TELL YOUR LAWYER, YOUR LAWYER LOU

26   SEPE, THAT GEORGE SHOHET WAS GIVING YOU LEGAL ADVICE?

27         A      NO.  I TOLD MR. SEPE THAT I WOULD -- THAT

28   I WOULD TAKE THE FIFTH.  AND MR. SHOHET TOLD ME THAT I

```
1    COULD TAKE THE FIFTH SELECTIVELY.  AND THAT'S WHAT I
2    DID.
3         Q     SO IN FACT, THE NEXT DAY YOU WENT BACK
4    TO -- INTO JUDGE TRABER'S COURT, AND LOU SEPE WAS THERE
5    AND ASSERTED THE FIFTH AMENDMENT ON YOUR BEHALF.
6              CORRECT?
7         A     YES.
8         Q     AND BECAUSE OF THAT, THE JUDGE DISMISSED
9    YOU FROM THE CASE, AND YOU WALKED OUT OF THE COURTROOM.
10             RIGHT?
11        A     YES.
12        Q     AND LOU SEPE LEFT THE COURTROOM.
13             RIGHT?
14        A     YES.
15        Q     LEFT THE COURTHOUSE?
16        A     YES.
17        Q     AND WHAT DID YOU DO?  YOU STAYED AND SPOKE
18   WITH GEORGE SHOHET AGAIN.
19             ISN'T THAT RIGHT?
20        A     YES.
21        Q     AND AGAIN, GEORGE SHOHET GAVE YOU LEGAL
22   ADVICE ABOUT YOUR RIGHTS AND HOW YOU CAN ASSERT THEM IN
23   FRONT OF JUDGE TRABER.
24             AM I CORRECT?
25        A     I MEAN, HE BASICALLY JUST TOLD ME THAT HE
26   BELIEVED THAT SHE WAS WRONG, THAT I COULD SELECTIVELY
27   TAKE THE FIFTH AMENDMENT.
28        Q     DID YOU CALL YOUR LAWYER, LOU SEPE, WHO
```

1    HAD JUST LEFT THE COURTHOUSE AND TELL HIM THAT YOU HAD

2    A DESIRE TO GO BACK INTO JUDGE TRABER'S COURT AND

3    CHANGE YOUR MIND AND ANSWER QUESTIONS ON THE WITNESS

4    STAND?

5          A      NO, I DID NOT TELL MR. SEPE.  NO.

6          Q      AND IN FACT, YOU DID THAT.  YOU WENT BACK

7    INTO COURT, AND YOU TOLD JUDGE TRABER THAT YOU CHANGED

8    YOUR MIND AND THAT YOU WANTED TO ANSWER QUESTIONS --

9          A      I NEVER TALKED TO THE JUDGE.

10          Q      WELL, DID YOU TRY AND PASS HER A NOTE?

11          A      I -- I TRIED -- I BELIEVE SO.  I KNOW I

12    TALKED TO THE CLERK.  I DON'T KNOW IF IT WAS A NOTE FOR

13    SURE.  I DON'T REMEMBER A NOTE.  I JUST REMEMBER

14    TALKING TO THE CLERK.

15          Q      WERE YOU AWARE THAT GEORGE SHOHET WENT

16    BACK INTO COURT AND WAS ADVOCATING FOR YOU TO GET BACK

17    ON THE WITNESS STAND AND THAT YOU WANTED TO TESTIFY?

18          A      I DON'T KNOW IF I WAS AWARE OF THAT OR

19    NOT.  BUT MR. SHOHET OFFERED ANOTHER LAWYER, CIVIL

20    LAWYER, DENISE AUBRY, TO, YOU KNOW -- I DON'T KNOW IF

21    IT WAS THAT DAY, ANOTHER DAY.  I WASN'T IN COURT WHEN

22    SHE TESTIFIED ON MY BEHALF.  -- TO ALLOW ME TO -- OR TO

23    TRY TO CONVINCE THE JUDGE TO ALLOW MY TESTIMONY.

24          Q      ISN'T IT TRUE, MR. TURLEY, THAT, IN FACT,

25    BEFORE YOU EVER WENT AND TOOK THE WITNESS STAND IN

26    JUDGE TRABER'S COURT, YOU HAD GONE OVER THIS FACTUAL

27    PLEA, PEOPLE'S 6, AND YOUR AGREEMENT WITH THE PEOPLE IN

28    OUR CASE, PEOPLE'S 5, FOR SEVERAL HOURS WITH EITHER

```
1    DAVID BROWNE OR GEORGE SHOHET BEFORE YOU WENT INTO
2    JUDGE TRABER'S COURT?
3         A      I ONLY WENT OVER MY FACTUAL STATEMENT, NOT
4    THE PLEA.  AND ONLY WITH MR. BROWNE.
5         Q      OKAY.  AND SO YOU KNEW THAT THERE WERE
6    MORE PARAGRAPHS IN THAT FACTUAL PLEA THAT THEY HAD
7    ASKED YOU ABOUT IN THEIR PRIVATE MEETINGS WITH YOU.
8              RIGHT?
9         A      I BASICALLY JUST WENT THROUGH THE FACTUAL
10   STATEMENT.
11        Q      PARAGRAPH BY PARAGRAPH --
12        A      YES.
13        Q      SO YOU KNEW THAT THEY HAD IN THEIR CIVIL
14   CASE IN JUDGE TRABER'S COURT, YOU KNEW THAT THEY HAD AN
15   INTEREST IN THE PARAGRAPHS ON THIS FACTUAL PLEA,
16   PEOPLE'S 6.
17        A      THEY HAD AN INTEREST IN 70 AND 71, YES.
18        Q      WELL, THEY HAD -- THEY SPENT TIME WITH YOU
19   ON ALL THE PARAGRAPHS, NOT JUST 70 AND 71.
20              ISN'T THAT RIGHT?
21        A      WE WENT THROUGH EACH AND EVERY STATEMENT.
22   THERE WAS NOTHING THAT WAS PRODUCED TO ME TO DISPUTE
23   ANY OF MY OTHER FACTUAL STATEMENTS AT ALL.
24        Q      AND IT'S TRUE THAT YOU TESTIFIED ABOUT
25   THOSE TWO PARAGRAPHS IN FRONT OF JUDGE TRABER, YET THEY
26   WANTED YOU TO TESTIFY TO MORE AND ASKED YOU TO COME
27   BACK AND TESTIFY TO MORE PARAGRAPHS IN THIS FACTUAL
28   PLEA.
```

1          ISN'T THAT CORRECT?

2     A     MR. SHOHET NEVER CROSS-EXAMINED ME.  I WAS

3  ONLY ASKED QUESTIONS BY MR. GLUCK'S ATTORNEY.

4     Q     MY QUESTION IS ISN'T IT TRUE THAT THEY

5  TOLD YOU THAT THERE WAS MORE INFORMATION IN THAT

6  FACTUAL PLEA THAT THEY WANTED YOU TO TESTIFY TO.

7  THAT'S WHY THEY WANTED YOU TO RE-TAKE THE STAND AND

8  TESTIFY IN JUDGE TRABER'S COURT.

9     A     NO, THAT'S NOT TRUE.

10     Q     ISN'T IT TRUE THAT GEORGE SHOHET PROVIDED

11  YOU ANOTHER ATTORNEY TO ASSIST YOU IN ORDER TO GET YOU

12  BACK ON THE WITNESS STAND IN JUDGE TRABER'S COURT?

13          ISN'T THAT TRUE?

14     A     HE RECOMMENDED ANOTHER ATTORNEY THAT I

15  TALKED TO, YES.

16     Q     AND HER NAME WAS AUBRY, A-U-B-R-Y.

17          CORRECT?

18     A     LAST NAME, YES.  UH-HUH.

19     Q     AND SHE -- AND GEORGE SHOHET REFERRED YOU

20  TO HER.

21          CORRECT?

22     A     YEAH, HE RECOMMENDED HER AND GAVE ME HER

23  NUMBER.

24     Q     DID YOU SIGN A RETAINER AGREEMENT WITH

25  HER?

26     A     YES, I DID.

27     Q     SHE'S A FAMILY LAW LAWYER.

28          CORRECT?

```
 1          A      I BELIEVE SO.  I'M NOT ENTIRELY SURE.
 2          Q      OKAY.  AND WAS THERE A FAMILY LAW ISSUE IN
 3   THIS CIVIL CASE?
 4          A      NO.
 5          Q      AND YOU MET WITH HER, AND YOU SIGNED A
 6   DECLARATION.  WHO -- WHO CREATED THAT DECLARATION?  DID
 7   YOU WRITE THE DECLARATION?
 8          A      WHAT DECLARATION?
 9          Q      DID YOU FILE A DECLARATION IN FRONT OF
10   JUDGE TRABER?
11          A      I DON'T KNOW, TO BE -- I DON'T REMEMBER.
12   I DON'T RECALL THAT.
13          Q      DID YOU WRITE A DECLARATION FOR THAT
14   LAWYER?
15          A      I DIDN'T WRITE A DECLARATION, NO.
16          Q      DID YOU ASK HER TO WRITE A DECLARATION?
17          A      NOT SPECIFICALLY THAT I REMEMBER OR
18   RECALL.
19          Q      WERE YOU AWARE THAT THAT LAWYER WHO WAS
20   REFERRED TO YOU BY GEORGE SHOHET WENT INTO COURT AND
21   FILED A DECLARATION SAYING THAT YOU SIGNED IT AND THAT
22   YOU WANTED TO, BASED ON THAT DECLARATION, COME BACK AND
23   TESTIFY?
24          A      I KNOW THAT SHE WENT INTO COURT TO
25   ADVOCATE FOR MY TESTIMONY.  BUT THAT'S REALLY ALL I'M
26   AWARE OF.
27          Q      OKAY.  DID YOU EVER TELL THE PEOPLE IN
28   THIS CASE THAT YOU HAD HIRED A LAWYER TO FILE A
```

1   DECLARATION FOR YOU SO THAT YOU COULD TESTIFY ABOUT THE

2   FACTUAL PLEA AND THE AGREEMENT YOU HAD WITH THE PEOPLE

3   IN THIS CASE?

4        A     DO YOU HAVE A COPY OF THIS DECLARATION?

5        Q     I DO NOT.  I'M JUST ASKING YOU DID YOU

6   INFORM THE PEOPLE THAT YOU WERE MEETING WITH THAT

7   LAWYER AND HAVING HER ADVOCATE FOR YOU.

8        A     I HAD NOT INFORMED YOU THAT I HAD HIRED

9   THIS LAWYER, NO.

10        Q     DID YOU TELL LOU SEPE THAT YOU HAD HIRED

11   THIS LAWYER?

12        A     I DID SEND AN EMAIL TO MR. SEPE.

13        Q     DID YOU -- DID YOU --

14              GEORGE SHOHET REFERRED THIS LAWYER TO YOU.

15   WERE THE FEES COVERED BY SOMEBODY ELSE?

16        A     I PAID HER.

17        Q     AND THAT WAS ON -- IN AUGUST OF 2023 THAT

18   YOU WENT TO COURT?

19        A     YES, I BELIEVE SO.  YES.  UH-HUH.

20        Q     AND YOU HAD BEEN IN A COOPERATION

21   AGREEMENT WITH THE PEOPLE IN THIS CASE SINCE 2000 --

22   WHEN YOU ENTERED YOUR PLEA IN 2018.

23              CORRECT?

24        A     YES.

25        Q     AND YOU HAD TESTIFIED -- JUDGE FIDLER

26   CALLED YOU AS A WITNESS IN 2019.  DO YOU RECALL THAT?

27              YOU TESTIFIED A COUPLE OF TIMES IN 2019

28   HERE IN THIS COURTROOM.

```
1          A       YES, I BELIEVE SO.  YES.

2          Q       AND YOU'VE COME INTO COURT ON SEVERAL

3   OCCASIONS AND ASKED THE COURT, WITH THE PEOPLE, TO

4   CONTINUE YOUR SENTENCING.

5                  CORRECT?

6          A       TO WAIVE TIME?  IS THAT WHAT YOU'RE

7   SAYING?

8          Q       YES.

9          A       YES, WITH MR. SEPE.  YES.

10         Q       AND DID YOU WAIVE TIME.

11         A       YES.

12         Q       THEN SUDDENLY, IMMEDIATELY DURING THE TIME

13  WHEN JUDGE -- WHEN JUDGE TRABER WAS CONDUCTING HER

14  COURT TRIAL AND GEORGE SHOHET WANTED YOU TO TESTIFY IN

15  THAT PROCEEDING, AND LOU SEPE CAME IN AND PLED THE

16  FIFTH FOR YOU, IT WAS AT THAT TIME THAT YOU CAME --

17  SHOWED UP IN COURT AND DEMANDED TO BE SENTENCED IN THIS

18  CASE.

19                 RIGHT?

20         A       I DID NOT DEMAND TO BE SENTENCED IN FRONT

21  OF THE JUDGE IN THAT CASE.

22         Q       IN THIS CASE.

23         A       IN THIS CASE AT THAT TIME.

24         Q       ISN'T IT TRUE THAT YOU CAME TO COURT

25  WITHOUT ANY WARNING TO ME, YOU JUST SHOWED UP AND TOLD

26  ME YOU WERE GOING TO DEMAND TO BE SENTENCED THAT DAY?

27                 WE ENDED UP GOING IN THE HALLWAY AND

28  TALKING WITH LOU SEPE ABOUT IT.
```

```
1          A       WE TALKED ABOUT IT, YES.

2          Q       YOU WANTED TO BE SENTENCED THAT DAY.

3          A       I WANTED TO BE SENTENCED LIKE YOU HAD

4    PROMISED ME, LIKE YOU TOLD ME --

5          Q       MY QUESTION --

6          THE COURT:  MR. TURLEY, ANSWER THE QUESTIONS AS

7    ASKED, PLEASE.

8          THE WITNESS:  OKAY.

9          Q       BY MR. MATHAI:  ISN'T IT TRUE THAT YOU

10   DEMANDED TO BE SENTENCED THAT DAY?

11         A       YES.

12         Q       AND THAT WAS BECAUSE YOU WERE GETTING

13   PRESSURE TO TESTIFY THAT SAME MONTH IN FRONT OF JUDGE

14   TRABER, AND LOU SEPE WAS -- HAD TAKEN THE FIFTH FOR YOU

15   BECAUSE OF THIS SENTENCING.

16                 CORRECT?

17         A       NO.

18         Q       ISN'T IT TRUE THAT YOU WANTED TO BE

19   SENTENCED RIGHT AWAY BECAUSE YOU WANTED TO TESTIFY FOR

20   FRONTLINE IN THAT CIVIL CASE?

21         A       I WANTED TO TESTIFY FOR FRONTLINE IN THE

22   CIVIL CASE.  BUT THAT'S NOT MY ONLY REASON FOR WANTING

23   TO BE SENTENCED.

24         Q       OKAY.  SO NOW YOU ADMIT THAT IT WAS PART

25   OF YOUR REASONING FOR WANTING TO BE SENTENCED.

26         A       I DIDN'T WANT TO HAVE A MAYHEM COUNT OVER

27   MY HEAD THAT MR. SEPE CALLED ME YELLING AND SCREAMING

28   AND TELLING ME THAT YOU CALLED HIM AND SAID YOU WERE
```

```
1    GOING TO THROW ME IN PRISON.

2         Q      MR. SEPE TOLD YOU THAT THAT WASN'T TRUE,

3    THAT I NEVER SAID THAT.

4                CORRECT?

5         A      HE TOLD ME THAT YOU SAID THAT.

6         Q      HE THEN LATER HE TOLD YOU THAT THAT NEVER

7    HAPPENED.

8                RIGHT?

9         A      THAT YOU NEVER SAID THAT?

10        Q      CORRECT.

11        A      I GUESS HE SAID THAT THE OTHER DAY, YES.

12        Q      WELL, HE WENT TO JUDGE TRABER AND TOLD

13   JUDGE TRABER THAT I NEVER SAID THAT.

14               CORRECT?

15        A      I BELIEVE SO, YES.

16        Q      OKAY.  SO YOU CAME TO COURT THAT DAY IN

17   AUGUST AND WANTED TO BE SENTENCED.  AND WE TALKED IN

18   THE HALLWAY, AND WE ENDED UP WAIVING TIME THAT DAY.

19               CORRECT?

20        A      YES.

21        Q      THE NEXT TIME YOU CAME TO COURT, IN

22   SEPTEMBER, YOU SHOWED UP WITH WINSTON MCKESSON.

23               CORRECT?

24        A      THAT WAS IN NOVEMBER, THE 17TH, I BELIEVE.

25        Q      OKAY.  IF IT WAS NOVEMBER, THAT'S THE NEXT

26   TIME YOU CAME TO COURT.

27               RIGHT?

28        A      I BELIEVE SO, YES.
```

1    Q    AND YOU DIDN'T GIVE THE PROSECUTION ANY

2    HEADS UP THAT YOU WERE GOING TO FIRE LOU SEPE AND HIRE

3    WINSTON MCKESSON.  YOU JUST SHOWED UP AND INFORMED US

4    THAT DAY.

5         CORRECT?

6    A    I TALKED TO MR. MCKESSON.  AND I DON'T

7    KNOW HOW HE INFORMED YOU OR IF HE DID OR NOT.  I DON'T

8    KNOW.

9    Q    THAT DAY WE MADE CLEAR ON THE RECORD THAT

10   LOU SEPE WAS GOING TO REMAIN YOUR LAWYER AND THAT YOU

11   WERE STILL IN A COOPERATION AGREEMENT WITH THE PEOPLE.

12   THAT WAS NOVEMBER 17TH, 2023.  ALL OF THAT WAS SAID ON

13   THE RECORD HERE IN YOUR PRESENCE.

14        CORRECT?

15   A    YES.  YES.

16   Q    THE JUDGE, THAT DAY, ORDERED YOU TO COME

17   MEET WITH THE PROSECUTION WITH LOU SEPE WITHIN A FEW

18   DAYS.

19        CORRECT?

20   A    CORRECT.

21   Q    AND YOU OBEYED THAT.

22        CORRECT?

23   A    CORRECT.

24   Q    BUT YOU SHOWED UP TO THAT MEETING AT OUR

25   OFFICE, THE PROSECUTION OFFICE, WITH WINSTON MCKESSON.

26   A    YES.

27   Q    AND YOU -- DURING THE COURSE OF THAT

28   MEETING, YOU READ A STATEMENT ON THE RECORD WRITTEN BY

1    WINSTON MCKESSON.

2            CORRECT?

3    A    YES.

4    Q    YOU ATTEMPTED TO HAVE WINSTON MCKESSON

5    JOIN THE MEETING MULTIPLE TIMES, EITHER IN PERSON OR ON

6    THE PHONE.

7            CORRECT?

8    A    YES.

9    Q    AND WHEN IT WAS STATED VERY CLEARLY THAT

10   WINSTON MCKESSON WAS NOT APPOINTED BY THIS COURT TO

11   REPRESENT YOU, THAT LOU SEPE WAS STILL REPRESENTING

12   YOU, YOU REFUSED TO ANSWER ANY MORE QUESTIONS.

13           ISN'T THAT CORRECT?

14   A    THAT'S NOT CORRECT.  I DID ANSWER

15   QUESTIONS.

16   Q    YOU ANSWERED QUESTIONS.  BUT AT ONE POINT

17   YOU ENDED THE INTERVIEW AND SAID YOU REFUSE TO ANSWER

18   QUESTIONS BECAUSE --

19           YOU REFUSED TO ANSWER QUESTIONS, AND THE

20   INTERVIEW WAS TERMINATED.

21           ISN'T THAT TRUE?

22   A    I DON'T RECALL EXACTLY THAT STATEMENT.  IF

23   THAT'S WHAT I SAID -- I MEAN, I -- I JUST WANTED TO

24   HAVE A RULING FROM JUDGE FIDLER REGARDING MR. MCKESSON

25   BEFORE I PROCEEDED.

26           BUT YOU CONTINUED TO ASK ME MULTIPLE

27   QUESTIONS.  THE INTERVIEW, I BELIEVE, LASTED FOR OVER

28   AN HOUR, AND I BELIEVE I ANSWERED ALL OF YOUR

1    QUESTIONS.

2         Q      WE MET ON NOVEMBER 21ST, 2023.

3                CORRECT?

4         A      IF THAT'S THE DATE, YES.

5         Q      AND DURING THAT INTERVIEW, YOU DID ANSWER

6    SOME QUESTIONS.  BUT THEN YOU ENDED THE INTERVIEW AND

7    SAID YOU WANTED IT TO END.

8                CORRECT?

9         A      SOMETHING TO THAT EFFECT, I BELIEVE.

10        Q      OKAY.  BUT IN THE QUESTIONS THAT YOU DID

11   ANSWER AND THE CONVERSATION WE DID HAVE, DID I ASK YOU

12   IF THERE WAS ANYTHING ELSE THAT YOU HADN'T TOLD THE

13   PROSECUTION ABOUT?

14               DO YOU REMEMBER THOSE QUESTIONS?

15        A      I DON'T REMEMBER SPECIFICALLY.  I MEAN, IF

16   YOU HAVE THE TRANSCRIPT -- I MEAN, IF THAT'S WHAT I

17   SAID, THEN I'M SURE THAT'S WHAT I SAID.

18        Q      ISN'T IT TRUE, MR. TURLEY, THAT YOU, PRIOR

19   TO THAT MEETING, YOU HAD GONE WITH GEORGE SHOHET TO A

20   HEARING AT THE DEPARTMENT OF INDUSTRIAL RELATIONS, THE

21   WORKERS' COMPENSATION BOARD, AND YOU TESTIFIED ON

22   BEHALF OF MUNIR UWAYDAH AND FRONTLINE REGARDING LIENS

23   ON FRONTLINE BILLS?

24        A      YES.

25        Q      AND YOU ARE AWARE THAT MUNIR UWAYDAH HAS

26   CLAIMED THAT HE HAS HUNDREDS OF MILLIONS OF DOLLARS IN

27   LIENS, MAYBE ALMOST A BILLION DOLLARS IN LIENS?

28               YOU'RE AWARE OF THAT.

1          RIGHT?

2     A     YES.

3     Q     AND YOU KNEW THAT THAT WAS -- THAT THOSE

4  LIENS GET PROSECUTED IN THE WORKERS' COMP APPEALS

5  BOARD.

6          YOU KNOW THAT.

7          RIGHT?

8     A     I BELIEVE SO, YES.

9     Q     WELL, YOU BELIEVE YOU KNOW, OR YOU DO

10 KNOW?

11    A     IT'S BEEN SO LONG SINCE I PARTICIPATED IN

12 ANY OF THAT THAT I THINK THAT THAT IS CORRECT.  I MEAN,

13 I KNOW IT'S INDUSTRIAL --

14         OKAY.  YES, I AGREE WITH YOU THAT THAT'S

15 THE AGENCY.  I'M NOT TRYING TO --

16    Q     DID YOU TELL THE PROSECUTION THAT YOU WERE

17 ASSISTING GEORGE SHOHET IN HIS CASE FOR MUNIR UWAYDAH

18 TO CLEAR THE LIENS FOR FRONTLINE SO THAT THEY CAN

19 COLLECT ON THOSE LIENS?  DID YOU TELL THE PROSECUTION

20 THAT?

21    A     NO.

22    Q     DID YOU TELL LOU SEPE THAT?

23    A     NO.

24    Q     IN FACT, YOU KNEW THAT THE REASON THAT

25 THAT HEARING WAS TAKING PLACE WAS BECAUSE FRONTLINE HAD

26 BEEN SUSPENDED BASED ON YOUR PLEA IN THIS CASE.

27         CORRECT?

28    A     ALL I KNEW WAS THAT THERE WAS AN ISSUE OF

1   CONTROL OF WHO CONTROLLED FRONTLINE.  AND I'VE SAID IN

2   MY PROFFER AND MY FACTUAL STATEMENT THAT I NEVER HAD

3   ANY CONTROL.

4               THERE WAS NO DETAILS DISCUSSED.

5   MR. SHOHET TOLD ME THAT HE WAS GOING TO SUBPOENA ME IF

6   I DIDN'T AGREE TO GO.  I AGREED TO GO.

7               THERE WAS NO PRIOR MEETING, NO PRIOR

8   DISCUSSION.  IN FACT, THE LAWYER FROM THAT AGENCY, WHEN

9   I WENT BACK TO THEM AND TOLD THEM THAT I COULD NOT

10  TESTIFY PER YOUR INSTRUCTIONS, WHICH WERE FINALLY

11  REALLY MADE CLEAR TO ME, SHE SAID THAT I WAS IN

12  VIOLATION OF MY PLEA AGREEMENT BECAUSE I WAS REFUSING

13  TO COOPERATE WITH THE STATE AGENCY.  AND I TOLD HER

14  THAT THIS IS WHAT I WAS INSTRUCTED BY THE DA, AND I

15  CANNOT TESTIFY.

16       Q    WELL, IN FACT, I NEVER TOLD YOU YOU CANNOT

17  TESTIFY, DID I?

18       A    I MEAN, MR. SEPE -- I MEAN, I -- THAT'S --

19  THAT'S MY UNDERSTANDING, THAT I WAS NOT ALLOWED TO

20  TESTIFY.

21       Q    WELL, LET ME JUST BREAK THAT DOWN.

22               ISN'T IT TRUE THAT I NEVER TOLD YOU THAT

23  YOU CANNOT TESTIFY AT ANY PROCEEDING?

24       A    TO BE HONEST, I'M A BIT CONFUSED BECAUSE

25  I'M NOT 100 PERCENT SURE OF WHAT MY OBLIGATIONS ARE --

26       Q    WELL --

27       A    -- OR NOT.

28       Q    DID YOU TELL -- WHEN YOU WENT TO THE

```
 1   DEPARTMENT OF INDUSTRIAL RELATIONS WORKERS' COMP BOARD
 2   AND TESTIFIED IN SEPTEMBER OF LAST YEAR, DID YOU, IN
 3   FACT, CONTRADICT YOUR FACTUAL STATEMENT TO THIS COURT
 4   OF --
 5             BASED ON YOUR PLEA, DID YOU CONTRADICT
 6   WHAT YOU'VE TESTIFIED IN THIS COURT TO?
 7        A    IN THAT COURTROOM DID I VIOLATE MY FACTUAL
 8   STATEMENT?
 9        Q    YES.
10        A    NO.
11        Q    IN FACT, DIDN'T YOU TELL THE JUDGE IN THAT
12   PROCEEDING THAT MARISA NELSON HAD, IN FACT, EMBEZZLED
13   MONEY FROM FRONTLINE AND THAT YOUR STATEMENT TO US IN
14   THIS PROFFER AND IN THE FACTUAL PLEA WAS NOT ACCURATE?
15        A    THE SAME THING AS I SAID IN THE CIVIL
16   COURT, THAT I WAS SHOWN TESTIMONY, WHETHER IT'S
17   ACCURATE, FALSE OR NOT, THAT SHE ADMITTED TO EMBEZZLING
18   MONEY.
19        Q    DID YOU TESTIFY TO THE JUDGE IN THE
20   WORKERS' COMP BOARD THAT FRONTLINE SHUT DOWN BECAUSE OF
21   MARISA'S EMBEZZLEMENT, A FACT, IF TRUE, WOULD
22   CONTRADICT YOUR FACTUAL PLEA?
23        A    I DON'T KNOW EXACTLY WHAT I TESTIFIED TO.
24   BUT I MEAN, THAT, IN PART, IS ACCURATE.  IF SHE
25   EMBEZZLED A MILLION DOLLARS THAT WAS IN ACCOUNTS TO PAY
26   OVERHEAD, THAT'S WHY FRONTLINE COULDN'T KEEP THE DOORS
27   OPEN.
28        Q    DID YOU EVER GET A COPY OF THESE DOCUMENTS
```

1    THAT DAVID BROWNE SHOWED YOU?

2         A     NOT THAT -- NOT THAT I RECALL, NO.

3         Q     DID YOU ASK FOR THEM?

4         A     NO.

5         Q     DID YOU EVER MAKE AN EFFORT TO INFORM THE

6    PROSECUTION THAT DAVID BROWNE HAD INFORMATION THAT

7    CONTRADICTED YOUR PREVIOUS STATEMENTS?

8         A     NO, I DID NOT.

9         Q     AND YOU LOOKED AT THIS -- YOUR AGREEMENT,

10   AND YOU'VE SEEN THAT IT DOES REQUIRE YOU TO COOPERATE

11   WITH STATE AGENCIES.

12              CORRECT?

13        A     YES, RECENTLY I'VE LOOKED AT THAT.  AND

14   AGAIN, WHEN THE ATTORNEY INFORMED ME OF THAT, I

15   BASICALLY SAID, WELL, I DON'T KNOW WHAT YOU WANT ME TO

16   DO.

17        Q     WELL, YOU WENT BACK AFTER SEPTEMBER.  YOU

18   WENT BACK IN DECEMBER TO FINISH YOUR TESTIMONY.

19              CORRECT?

20        A     YES.

21        Q     AND YOU NEVER TOOK THE FIFTH IN THAT

22   COURTROOM.

23        A     I TOLD THEM THAT I COULD NOT TESTIFY.

24        Q     OKAY.  BUT MY QUESTION IS YOU NEVER TOOK

25   THE FIFTH AMENDMENT.  YOU NEVER ASSERTED THE FIFTH

26   AMENDMENT.

27        A     THE TESTIMONY THAT I DID GIVE WAS MAYBE

28   TEN MINUTES.  AND NO, I DIDN'T.

1        Q      SO YOU ANSWERED QUESTIONS ON GEORGE

2    SHOHET'S QUESTIONING IN SEPTEMBER.  IN DECEMBER YOU

3    WENT BACK AND SAID YOU WOULD NOT ANSWER ANY MORE

4    QUESTIONS UNTIL YOU WERE SENTENCED IN THIS CASE.

5             CORRECT?

6        A      I MAY HAVE SAID THAT, YES.

7        Q      WELL --

8        A      I DON'T -- I DON'T HAVE THE THING.  BUT I

9    TOLD THEM THAT I COULD NOT CONTINUE MY TESTIMONY.

10       Q      DID YOU TELL THE JUDGE IN THAT CASE THAT

11   LOU SEPE WAS NOT YOUR LAWYER AND THAT YOU HAD FIRED

12   HIM?

13       A      I MAY HAVE, YES.

14       Q      OKAY.  WELL, THAT WASN'T A COMPLETELY TRUE

15   STATEMENT, WAS IT?

16       A      NO, THAT WOULD NOT HAVE BEEN COMPLETELY

17   TRUE.  I MEAN, I DID TRY TO FIRE HIM BUT --

18       Q      BUT IN FACT, THAT IS WHAT YOU TOLD THE

19   JUDGE.  AND THEN LATER IN THE HEARING, WHEN THEY WERE

20   DEBATING IT, YOU CLARIFIED THAT JUDGE FIDLER HAD NOT

21   DISCHARGED LOU SEPE, SO LOU SEPE WAS STILL YOUR LAWYER.

22             CORRECT?

23       A      DID I CLARIFY THAT?  IS THAT WHAT YOU'RE

24   SAYING?

25       Q      YES.

26       A      APPARENTLY SO, YES.

27       Q      BUT YOU STILL REFUSED MS. CHANDLER, WHO

28   REPRESENTED THE STATE -- ATTEMPTED TO ASK YOU

1    QUESTIONS, AND YOU REFUSED TO ANSWER.

2          CORRECT?

3      A      CORRECT.

4      Q      AND YOU DIDN'T ASSERT THE FIFTH AMENDMENT.

5    YOU JUST REFUSED TO ANSWER BECAUSE YOU SAID THE

6    ATTORNEY OF YOUR CHOICE WAS NOT AVAILABLE.

7      A      I BELIEVE SO, YES.

8      Q      OKAY.  AND YOU NEVER FINISHED YOUR

9    TESTIMONY IN THAT PROCEEDING.

10          CORRECT?

11     A      CORRECT.

12     THE COURT:  ALL RIGHT.  WE'RE GOING TO GO AHEAD

13   AND BREAK FOR LUNCH AT THIS TIME.  WE'LL COME BACK AT

14   1:30.

15          HOW MUCH LONGER DO YOU HAVE ON THIS

16   HEARING?

17     MR. MATHAI:  I'M PRETTY MUCH DONE WITH -- I THINK

18   JUST A COUPLE OF MORE QUESTIONS OF HIM, AND THEN I'M

19   DONE.

20          AND THEN I HAVE SOME VERY QUICK WITNESSES

21   THIS AFTERNOON.

22     THE COURT:  HOW QUICK IS QUICK?

23     MR. MATHAI:  WELL, I THINK I CAN COMPLETE IT ALL

24   WITHIN AN HOUR.

25     THE COURT:  ALL RIGHT.  THANK YOU.  1:30.

26

27          (THE NOON RECESS WAS TAKEN UNTIL 1:30 P.M.

28          OF THE SAME DAY.)

```
 1    CASE NUMBER:        BA392921-01
 2    CASE NAME:          PEOPLE VS. TYRELL DAVENPORT -01
 3    LOS ANGELES, CA     MONDAY, MAY 6, 2024
 4    DEPARTMENT 106      HON. LARRY P. FIDLER, JUDGE
 5    APPEARANCES:        (AS HERETOFORE NOTED)
 6    REPORTER:           TRACI THOMAS, CSR NO. 9620
 7    TIME:               P.M. SESSION
 8
 9         THE COURT:  ALL RIGHT.  ALL THE PARTIES ARE
10    PRESENT AS HERETOFORE.
11              YOU MAY PROCEED.
12         MR. MATHAI:  THANK YOU.
13         MR. MOEST:  EXCUSE ME, YOUR HONOR.  BEFORE THE
14    TESTIMONY RESUMES, I JUST WANTED TO MAKE A COUPLE OF
15    POINTS.
16         THE COURT:  SURE.
17         MR. MOEST:  ONE IS THAT THE TESTIMONY HAS
18    SEGUED -- THE TESTIMONY ON FRIDAY AND THE BEGINNING OF
19    THIS MORNING IS ALL ABOUT FACTS THAT HAVE BEEN COVERED
20    IN THE FACTUAL STATEMENT THAT WAS SIGNED BY DR. TURLEY
21    AND WAS CONSISTENT WITH HIS PROFFER AND SO ON.
22              AND THIS HAS SEGUED NOW INTO WHAT I
23    IMAGINE TO BE AND BASED ON CONVERSATIONS I'VE HAD WITH
24    MR. MATHAI, ALLEGATIONS THAT DR. TURLEY IS IN BREACH OF
25    HIS COOPERATION AGREEMENT.
26              AND THE PROBLEM I HAVE IS THAT JUST THIS
27    MORNING MR. MATHAI SHOWED ME A LETTER FROM A STAFF
28    PERSON, I BELIEVE IT WAS, WITH THE WORKERS' COMP BOARD
```

1    THAT LISTS SUPPOSED INCONSISTENCIES BETWEEN THE PROFFER

2    AND TESTIMONY THAT WAS GIVEN AT THE WORKERS COMP BOARD

3    AND SHOWED ME A TRANSCRIPT ALSO.  BUT I DON'T HAVE

4    COPIES OF THEM, AND HE HASN'T BROUGHT ME COPIES YET.

5            THIS IS -- IT'S BEEN -- THESE SUPPOSED

6    EVENTS THAT ARE BEING INQUIRED INTO DATE BACK AT LEAST

7    SIX MONTHS, AND THERE'S NEVER BEEN A FORMAL MOTION MADE

8    TO THE COURT OR A FORMAL ITEMIZATION OF THE SUPPOSED

9    BREACHES OF THIS AGREEMENT TO ME OR TO MR. SEPE.  AND

10   EVEN NOW WE SEEM TO BE ON A MOVING TERRITORY.

11           YOU KNOW, THE WRIT WAS ISSUED A MONTH AGO.

12   AND THIS INFORMATION THAT I HAVEN'T BEEN PROVIDED YET

13   SHOULD HAVE BEEN GIVEN AT THAT TIME.  AND IT HASN'T

14   BEEN PROVIDED TO ANYONE YET.  SO I'M, OBVIOUSLY, AT A

15   DISADVANTAGE.

16           DR. TURLEY HAS SURGERY SCHEDULED FOR

17   TOMORROW.  IT'S FOR A SLEEP APNEA CORRECTION.  IT'S

18   NOT -- IT'S A LIFE-THREATENING CONDITION.  HE COULD DIE

19   IN HIS SLEEP IF IT ISN'T FIXED.  HE HAD TO WAIT SEVERAL

20   MONTHS TO GET THE SURGERY SCHEDULED.  HE DIDN'T

21   SCHEDULE IT BECAUSE OF THIS HEARING.  HE SCHEDULED IT

22   BECAUSE HE NEEDS THE SURGERY.

23           AND I AM AVAILABLE ON THE 9TH.  I'M

24   AVAILABLE ON THE 8TH.  DR. TURLEY WOULD COME BACK ON

25   THOSE DAYS, BUT I UNDERSTAND THE COURT IS IN JURY TRIAL

26   ON THOSE DAYS, WHICH I WASN'T AWARE OF.

27           WE WERE HERE FRIDAY -- WE WERE HERE ON THE

28   26TH.  WE WERE HERE ON FRIDAY, WHICH WE THOUGHT WOULD

1    BE THE DAY WHEN SENTENCING WOULD OCCUR.  IT DIDN'T, AND

2    NOW WE'RE HERE FOR ANOTHER DAY.  AND APPARENTLY

3    EVIDENCE -- NEW EVIDENCE IS BEING BROUGHT OUT THAT I

4    HAVEN'T BEEN INFORMED ABOUT IN DETAIL.

5        THE COURT:  IF YOU WANT TIME TO PREPARE AND IF

6    DR. TURLEY IS WILLING TO WAIVE A SMALL AMOUNT OF TIME

7    OR HOWEVER MUCH TIME YOU NEED TO GET READY, I DON'T

8    HAVE A PROBLEM.  WE'RE PROCEEDING BECAUSE I'M UNDER A

9    MANDATE FROM THE COURT OF APPEAL TO GET HIM SENTENCED

10   BY THE 9TH UNLESS THERE IS SOME GOOD CAUSE WHICH HIS

11   WAIVER WOULD BE.  BUT THAT'S UP TO YOU.

12            IF YOU'RE ASKING FOR TIME SO THAT YOU CAN

13   CROSS-EXAMINE HIM, I DON'T HAVE A PROBLEM WITH THAT.

14       MR. MOEST:  NO, I'M NOT ASKING FOR TIME.

15   DR. TURLEY DOES NOT WISH TO WAIVE TIME.

16       THE COURT:  OKAY.  THAT'S FINE.

17       MR. MOEST:  BUT I DON'T THINK IT'S FAIR EITHER

18   FOR THE DA TO PROCEEDED IN THE MANNER HE DID HAVING

19   KNOWN ABOUT THE VIOLATIONS AND NOT HAVING PRESENTED TO

20   THE DEFENSE THE INFORMATION ABOUT THOSE ALLEGED

21   VIOLATIONS BEFORE, LITERALLY, THE SECOND MORNING.  THE

22   SECOND MORNING OF THE HEARING AS WHEN SOME OF THIS CAME

23   OUT.

24       THE COURT:  OKAY.  DO YOU WANT -- IF YOU WANT TO

25   GO FORWARD, I'LL GO FORWARD.  IF YOU WANT TIME, I'LL

26   GIVE YOU TIME.

27            YOU LET ME KNOW.

28       MR. MOEST:  I DON'T AT THIS POINT.

```
1          THE COURT:  THANK YOU.

2                 YOU WANT TO RESPOND, MR. MATHAI?

3          MR. MATHAI:  NO, ONLY THAT I WAS IN DISCUSSIONS

4     WITH LOU SEPE ABOUT ALL OF THIS, AND SO HE WAS AWARE.

5     MR. MOEST JUST CAME ON THE CASE.

6          THE COURT:  ALL RIGHT.  YOU MAY PROCEED.

7          MR. MATHAI:  THANK YOU.

8

9                 DIRECT EXAMINATION (RESUMED)

10    BY MR. MATHAI:

11         Q     MR. TURLEY, BEFORE WE BROKE, YOU WERE

12    TESTIFYING ABOUT YOUR APPEARANCE AT THE WORKERS' COMP

13    APPEALS BOARD IN SEPTEMBER OF LAST YEAR.  AND YOU

14    STATED THAT YOU WENT THERE, AND YOU TESTIFIED UNDER

15    QUESTIONING FROM GEORGE -- BY GEORGE SHOHET.

16                 CORRECT?

17         A     I BELIEVE -- I'M NOT -- YEAH, HE DID ASK

18    ME QUESTIONS.  I'M NOT SURE IF THE OTHER LADY ASKED ME

19    QUESTIONS AS WELL.  DO YOU HAVE A COPY OF THAT

20    TRANSCRIPT?  THAT WOULD BE HELPFUL.

21         Q     I DO.  THIS IS A TRANSCRIPT FROM

22    SEPTEMBER 26TH, 2023.  YOUR TESTIMONY BEGINS ON

23    PAGE 44.

24                 AND YOU SAID EARLIER IN YOUR -- TODAY THAT

25    YOU BELIEVE THAT THE ISSUE THAT YOU WERE TESTIFYING TO

26    IN THAT HEARING WAS ABOUT CONTROL.

27                 CORRECT?

28         A     YES.
```

1         Q       DID YOU -- DID YOU TALK TO GEORGE SHOHET

2    BEFORE YOU WENT AND TESTIFIED IN THAT PROCEEDING?

3         A       I TALKED TO HIM VERY BRIEFLY, YES.  BUT

4    THAT'S WHAT I WAS TOLD, THAT IT WAS REGARDING --

5         Q       HOW DID YOU KNOW WHAT THE ISSUE WAS THAT

6    WAS BEING LITIGATED IN THAT HEARING?

7         A       HE TOLD ME.

8         Q       OKAY.  AND HOW DID HE DESCRIBE IT TO YOU?

9         A       THAT IT WAS -- IT'S AN ISSUE OF WHETHER I

10   HAD CONTROL OVER FRONTLINE.

11        Q       OKAY.

12        A       I BELIEVE THAT MAYBE MEANS SOMETHING

13   DIFFERENT IN THAT COURT COMPARED TO THIS COURT.  BUT I

14   HAVE ALWAYS TESTIFIED THAT I DIDN'T HAVE CONTROL.

15        Q       DID -- DID HE TELL YOU THAT HE WOULD BE

16   ASKING YOU QUESTIONS ABOUT MARISA NELSON AND THE FACTS

17   LEADING UP TO HER -- THE LAWSUIT THAT WAS FILED AGAINST

18   HER BY FRONTLINE BACK IN 2011, I BELIEVE IT WAS?

19        A       NO, HE DID NOT TELL ME THAT.

20        Q       OKAY.  DID HE ASK YOU TO BRING ANY

21   DOCUMENTS WITH YOU TO THAT TESTIMONY?

22        A       NO, NOT THAT I RECALL.  NO.

23        Q       HOW DID -- HOW SOON BEFORE MAY -- I'M

24   SORRY.  -- BEFORE SEPTEMBER OF 2023, WHEN YOU WENT TO

25   COURT, DID YOU KNOW THAT YOU WERE BEING ASKED TO

26   TESTIFY?

27        A       HOW LONG BEFORE THAT?

28        Q       YES.

1          A          I DON'T -- I REALLY DON'T KNOW.  MAYBE A

2   FEW WEEKS.  I'M NOT -- I CAN'T -- I DON'T KNOW.

3   CERTAINLY WASN'T VERY LONG.  AND IT WAS --

4                    YEAH, IT WASN'T -- IT WASN'T LIKE MONTHS

5   OR ANYTHING LIKE THAT.

6          Q          AND YOU SAID THAT HE DIDN'T ASK YOU TO

7   BRING ANY DOCUMENTS.  DID YOU BRING -- DID YOU, IN

8   FACT, BRING ANY DOCUMENTS TO YOUR TESTIMONY IN

9   SEPTEMBER OF 2023?

10         A          NOT THAT I RECALL, NO.

11         Q          DID YOU SUBMIT ANY DOCUMENTS TO MR. SHOHET

12   OR TO ANY OF THE OTHER LAWYERS WITH REGARDS TO YOUR

13   TESTIMONY IN THAT PROCEEDING?

14         A          NOT THAT I RECALL, NO.

15         Q          ISN'T IS TRUE THAT YOU PROVIDED TO THEM OR

16   SUBMITTED A LETTER THAT YOU HAD WRITTEN TO MUNIR

17   UWAYDAH?

18         A          NO.

19         Q          DID YOU, IN FACT, WRITE A LETTER TO MUNIR

20   UWAYDAH IN 2018 AFTER YOU PLED GUILTY IN THIS COURT?

21         A          YES.

22         Q          DID YOU EVER TELL ME, AS THE LEAD

23   PROSECUTOR IN THIS CASE, THAT YOU WROTE THAT LETTER TO

24   MUNIR UWAYDAH?

25         A          NO.

26         Q          DID YOU TELL KAREN NISHITA, WHO IS ALSO

27   ONE OF THE PROSECUTORS ON THIS CASE, THAT YOU WROTE A

28   LETTER TO MUNIR UWAYDAH AFTER YOU PLED GUILTY IN THIS

```
1    CASE?

2         A      NO.

3         Q      DID YOU TELL LOU SEPE, YOUR LAWYER IN THIS

4    CASE, THAT YOU HAD WRITTEN THAT LETTER TO MUNIR

5    UWAYDAH?

6         A      NO.  BUT I WROTE THE LETTER ON HIS -- HIS

7    ADVICE TO DISTANCE MYSELF FROM FRONTLINE.

8         Q      WELL, LET ME ASK YOU ABOUT THAT.

9                YOU SAY THAT LOU SEPE GAVE YOU A -- WHAT I

10   WOULD CHARACTERIZE AS A GENERAL ADMONITION, DO NOT

11   ASSOCIATE WITH MUNIR UWAYDAH.

12               IS THAT RIGHT?

13        A      IT WASN'T MUNIR UWAYDAH -- I MEAN, MUNIR

14   UWAYDAH, OF COURSE, BUT ALSO HE SAID FRONTLINE.

15        Q      WHAT DID HE TELL YOU?  HE SAID DON'T

16   ASSOCIATE WITH THEM.

17               RIGHT?

18        A      JUST DISTANCE YOURSELF COMPLETELY FROM --

19   FROM ANY OF THAT.  SO -- AND I -- THAT'S WHY I WROTE

20   THE LETTER TO RELINQUISH MY SHARES.

21        Q      OKAY.  SO YOU WROTE A LETTER THAT

22   RELINQUISHES YOUR SHARES IN FRONTLINE.

23               RIGHT?

24        A      YES.

25        Q      AND YOU -- YOU SAY -- YOUR TESTIMONY IS

26   THAT YOU DID THAT BASED ON THAT GENERAL ADMONITION FROM

27   YOUR LAWYER, LOU SEPE, TO DISTANCE YOURSELF FROM

28   UWAYDAH AND FRONTLINE?
```

1      A      YES.

2      Q      BUT YOU KNOW, BECAUSE OF THE FACTUAL PLEA

3   YOU GAVE IN THIS CASE AND THE APPROXIMATELY TEN PROFFER

4   SESSIONS THAT YOU GAVE WITH THE PEOPLE IN THIS CASE,

5   THAT YOUR RELATIONSHIP TO FRONTLINE AND YOUR -- HOW

6   MUCH CONTROL YOU HAD OVER FRONTLINE WAS A CRITICAL FACT

7   AND ISSUE IN THIS PROSECUTION.

8          YOU KNEW THAT; RIGHT?

9      A      IN THIS PROSECUTION THAT --

10         CAN YOU REPEAT THAT AGAIN, PLEASE.

11     Q      YOU KNEW THAT YOUR RELATIONSHIP TO

12   FRONTLINE AND YOUR OWNERSHIP AND CONTROL OF FRONTLINE

13   WAS A CRITICAL FACT IN YOUR PROFFER SESSIONS AND IN

14   YOUR FACTUAL PLEA AND IN THE -- IN THIS PROSECUTION.

15         YOU KNEW THAT; RIGHT?

16     A      YES.

17     Q      AND YET, YOU TOOK AN ACTION THAT DEALT

18   DIRECTLY WITH THOSE ISSUES, THAT ISSUE, AND YOU DIDN'T

19   INFORM YOUR LAWYER THAT YOU WROTE THAT LETTER, AND YOU

20   DIDN'T INFORM THE PROSECUTION THAT YOU WROTE THAT

21   LETTER, DID YOU?

22     A      I DIDN'T KNOW THAT I WAS REQUIRED TO.  I

23   WAS JUST TRYING TO DISTANCE MYSELF TO HAVE ANY

24   INVOLVEMENT WITH FRONTLINE.  EVERYTHING I SAID IN THE

25   PROFFER OR MY FACTUAL STATEMENT, EVEN REGARDING SHARES

26   AND WHATNOT, I DIDN'T --

27         I JUST DID THAT, YES.

28     Q      ISN'T IT TRUE THAT YOU HAD TESTIFIED

```
1    BEFORE JUDGE FIDLER THAT THE PAPERWORK RELATED TO
2    FRONTLINE THAT INDICATED OWNERSHIP, SHARES, AND CONTROL
3    OF THE COMPANY WERE ALL DONE AT THE BEHEST OF UWAYDAH,
4    AND SOME OF THOSE DOCUMENTS WERE DONE AFTER HE FLED TO
5    LEBANON AND WERE BACKDATED?
6              ISN'T THAT TRUE?
7         A     I MEAN, I REMEMBER TESTIFYING ABOUT SOME
8    BACKDATING OF DOCUMENTS, BUT I DON'T KNOW SPECIFICALLY
9    WHAT IT WAS.  I KNOW THERE IS SOMETHING IN MY FACTUAL
10   STATEMENT REGARDING A SECRETARY OF STATE FILING.  BUT I
11   DON'T KNOW HOW I COULD BACKDATE A SECRETARY OF STATE
12   FILING.
13        Q     WELL, ISN'T IT TRUE THAT YOU TOLD US THAT
14   YOU DIDN'T REALLY -- YOU DIDN'T HAVE ANY BENEFIT FROM
15   THE 49 PERCENT PURPORTED OWNERSHIP YOU HAD IN
16   FRONTLINE?
17        A     I MEAN, I -- I WAS RECEIVING MY SALARY.
18   LIKE YOU ASKED ME BEFORE, IT WAS -- IT WAS WITH HOPE OR
19   ANTICIPATION THAT I MIGHT AT SOME POINT GET 49 PERCENT
20   OF THESE LIENS OR WHATEVER THAT'S OUTSTANDING.  BUT
21   AGAIN, MR. SEPE TOLD ME THAT ALL OF THAT IS WORTHLESS.
22        Q     OKAY.  SO YOU WROTE THIS LETTER, AND YOU
23   SENT IT TO UWAYDAH.  DID ANYBODY ASK YOU TO
24   SPECIFICALLY WRITE THAT LETTER AT THAT TIME?
25        A     NO.
26        Q     SO YOU TOOK IT UPON YOURSELF TO WRITE A
27   LETTER TO MUNIR UWAYDAH AND RELINQUISH ANY SHARES YOU
28   HAD IN FRONTLINE.
```

```
1                IS THAT RIGHT?

2        A       YES.

3        Q       AND HOW DID YOU KNOW WHERE TO SEND IT?

4        A       I HAD AN ADDRESS FOR HIM.  I SENT IT DHL,

5   AND I DIDN'T KNOW IF HE EVER EVEN GOT THE LETTER OR

6   NOT.

7        Q       AND THEN THAT LETTER BECAME AN ISSUE IN

8   YOUR TESTIMONY IN FRONT OF THE WORKERS' COMP BOARD IN

9   SEPTEMBER OF 2023, DIDN'T IT?

10       A       NO.

11       Q       WEREN'T YOU ASKED QUESTIONS ABOUT --

12  WEREN'T YOU ASKED TO PROVIDE --

13       A       IS IT IN HERE?  I WASN'T ASKED AS FAR AS I

14  KNOW.  I DON'T REMEMBER.

15       Q       WELL, OUTSIDE OF YOUR TESTIMONY WERE YOU

16  ASKED TO PROVIDE INFORMATION REGARDING THAT LETTER TO

17  THE COURT?

18       A       I WASN'T -- NOT THAT I RECALL I WASN'T

19  ASKED, NO.

20       Q       ISN'T IT TRUE THAT YOU WERE ASKED TO

21  PROVIDE THE METADATA --

22       A       THERE WAS SOMETHING ABOUT THAT, YES.

23       Q       OKAY.  SO THAT'S WHAT I JUST ASKED YOU A

24  MOMENT AGO.  WASN'T IT TRUE THAT YOU WERE ASKED TO

25  PROVIDE THE METADATA ABOUT WHEN AND HOW THAT LETTER WAS

26  WRITTEN?

27       A       I DON'T -- I DON'T KNOW -- THERE WAS

28  SOME -- THERE WAS SOME QUESTION REGARDING THAT.  I
```

359

```
 1    DON'T KNOW IF IT WAS ON TESTIMONY OR AFTER THE FACT.  I
 2    DON'T KNOW.
 3          Q      DID YOU EVER, EVER PROVIDE THAT METADATA
 4    TO THE COURT?
 5          A      I DON'T KNOW WHAT --
 6                 WHAT DOES METADATA REFER TO?
 7                 NO.  BUT I DID NOT PROVIDE ANYTHING TO THE
 8    COURT, NO.
 9          Q      YOU WERE INFORMED THAT THERE WAS CONCERN
10    AS TO WHEN YOU WROTE THAT LETTER.
11                 CORRECT?
12          A      HONESTLY, I DON'T REMEMBER THAT.  IF IT'S
13    IN HERE, THEN, YES, I -- PROBABLY.  BUT I MEAN, I DON'T
14    REMEMBER --
15                 I REMEMBER VAGUELY MR. SHOHET AND, I
16    THINK, THE ATTORNEY, SOMETHING, QUESTIONING.  BUT I
17    DON'T -- SOMETHING ABOUT PRODUCING THIS LETTER.
18          Q      WELL, YOU -- OVER THE YEARS YOU'VE HAD
19    LOTS OF COMMUNICATION WITH MUNIR UWAYDAH -- RIGHT?
20    -- EVEN AFTER HE LEFT FOR LEBANON?
21          MR. MOEST:  OBJECTION.  VAGUE AS TO "LOTS OF."
22          THE COURT:  "LOTS OF" IS A VAGUE TERM.
23    SUSTAINED.
24          Q      BY MR. MATHAI:  AFTER HE LEFT FOR LEBANON,
25    YOU HAD CONSISTENT COMMUNICATION WITH HIM.
26          A      YES.
27          Q      AND THAT INCLUDED PHONE CALLS.
28          A      I MEAN, ONCE I WAS INSTRUCTED NOT TO SPEAK
```

1    TO HIM, NO.  ARE YOU TALKING ABOUT PRIOR TO MY ARREST?

2         Q      YES.

3         A      YES, I HAD COMMUNICATION WITH HIM.

4         Q      OKAY.  AND THAT INCLUDED PHONE CALLS?

5         A      YES.

6         Q      EMAILS?

7         A      POSSIBLY, YES.

8         Q      WHAT DO YOU MEAN "POSSIBLY"?  DID YOU

9    HAVE --

10        A      I DON'T REMEMBER ANY EMAILS.  BUT PHONE

11   CALLS, YES.

12        Q      THE LAST 20 YEARS YOU DON'T REMEMBER ANY

13   EMAILS?

14        A      OH, IN 20 YEARS?

15        Q      SINCE 2004.

16               YOU WERE WORKING WITH UWAYDAH.  DID YOU

17   EVER EMAIL HIM?

18        A      I'M SURE I DID, YES.

19        Q      YOU DON'T REMEMBER ANY?

20        A      I DON'T REMEMBER SPECIFICALLY CONTENTS,

21   BUT I'M SURE THAT I DID EMAIL HIM, YES.

22        Q      OKAY.  SO YOU HAD HIS EMAIL?

23        A      I HAD ONE EMAIL.

24        Q      OKAY.  AND WHAT ABOUT TEXT MESSAGES?

25        A      YEAH, THERE'S LOTS OF TEXT MESSAGES.

26        Q      OKAY.  YOU DECIDED AFTER YOU PLED GUILTY

27   IN THIS CASE TO COMMUNICATE WITH MUNIR UWAYDAH.  AND

28   WHY DID YOU SEND A LETTER AND NOT EMAIL IT TO HIM?

1      A      BECAUSE THE EMAILS THAT I HAD DIDN'T WORK,

2    AND I DIDN'T HAVE A PHONE NUMBER THAT WORKED EITHER OR

3    THAT WAS STILL ACTIVE OR WHATEVER THE TERM IS.

4      Q      AND WHY DIDN'T YOU PROVIDE A COPY OF THAT

5    LETTER TO THE PROSECUTION IN THIS CASE?

6      A      I HONESTLY DIDN'T THINK IT WAS ANYTHING

7    THAT WAS -- MATTERED IN ANY WAY.  I WAS BASICALLY DONE

8    WITH MY PROFFER.  I WAS SURRENDERING ANY OWNERSHIP.  I

9    WAS WANTING NOTHING TO DO WITH IT.

10      Q      YOU WENT TO THAT COURT IN SEPTEMBER OF

11    2023, AND YOU WERE TOLD THAT THE ISSUE THERE WAS HOW

12    MUCH CONTROL YOU HAD OVER FRONTLINE.

13            CORRECT?

14      A      I WAS TOLD THAT BY MR. SHOHET PRIOR TO THE

15    HEARING.  IT WAS CONCERNING SOMETHING REGARDING

16    CONTROL.

17      Q      OKAY.  AND I JUST WANT TO MAKE SURE IT'S

18    CLEAR.  YOU NEVER -- YOU KNEW YOU WERE ASKED TO PROVIDE

19    INFORMATION ON WHEN AND HOW THAT LETTER WAS WRITTEN AND

20    HOW IT WAS SENT.  AND YOU NEVER PROVIDED THAT

21    INFORMATION, DID YOU?

22      A      AGAIN, I DON'T KNOW SPECIFICALLY IF I WAS

23    ASKED, WHAT EXACTLY IS IN THIS TRANSCRIPT.  THERE WAS

24    SOME COMMUNICATION REGARDING -- REGARDING THAT

25    BETWEEN -- I DON'T THINK THAT I WAS ASKED THAT DIRECTLY

26    AT ALL.  I MEAN, IF IT'S IN HERE, THEN YES.  BUT I

27    DON'T RECALL THAT.

28      Q      DID --

1      A       AND THAT WAS ACTUALLY AFTER -- AFTER MY

2  TESTIMONY, I BELIEVE.

3      Q       WHEN YOU WENT BACK --

4              YOU TESTIFIED IN SEPTEMBER UNDER GEORGE

5  SHOHET'S QUESTIONING.  WHEN YOU WENT BACK IN DECEMBER,

6  YOU WERE ASKED QUESTIONS BY ALLISON CHANDLER WHO

7  REPRESENTED THE STATE.

8              CORRECT?

9      A       I WENT BACK, MY RECOLLECTION, AND TOLD

10  THEM THAT I WAS NOT ALLOWED TO TESTIFY, CONTINUE

11  TESTIFYING.

12     Q       DO YOU REMEMBER BEING ASKED QUESTIONS BY

13  ALLISON CHANDLER, THE REPRESENTATIVE FROM THE STATE?

14     A       NO.  ON THAT DATE, NO, OTHER THAN THERE

15  WAS SOME REFERENCE THAT IF I'M NOT GOING TO COOPERATE

16  WITH THE STATE AGENCY, THEN I'M IN VIOLATION OF MY PLEA

17  AGREEMENT.

18     Q       AFTER YOU WERE TOLD THAT, DID YOU ANSWER

19  ANY QUESTIONS THAT WERE PROPOSED TO YOU?

20     A       NO, NOT THAT I RECALL.  NO.  MY SOLE

21  PURPOSE FOR GOING THAT DAY WAS TO INFORM THAT HEARING

22  THAT I COULD NOT TESTIFY, SAY I DIDN'T TAKE THE

23  FIFTH --

24              I DIDN'T KNOW I HAD TO SPECIFICALLY SAY I

25  TAKE THE FIFTH, BUT I WENT THERE WITH THE INTENTION OF

26  INFORMING -- AFTER OUR MEETING THAT I WAS, IN ESSENCE,

27  NOT ALLOWED TO TESTIFY.

28     Q       WELL, THAT WAS YOUR -- THAT WAS YOUR

1   CHOICE.

2           RIGHT?

3       A       THAT WAS MY UNDERSTANDING.

4       Q       I DID NOT TELL YOU THAT, DID I?

5       A       I MEAN, IT WAS IMPLIED TO ME.  I DIDN'T --

6   I DON'T THINK YOU USED THOSE WORDS, BUT I THINK I

7   WAS -- IT WAS IMPLIED TO ME THAT I CANNOT -- I SHOULD

8   NOT -- I CANNOT TESTIFY IN ANY KIND OF PROCEEDINGS,

9   WHETHER I'M SUBPOENAED OR NOT.  AND THAT WAS MADE CLEAR

10  TO ME AT THAT DATE OR LATER.

11      Q       BUT YOU KNEW THAT THE -- WHAT WAS AT ISSUE

12  IN THAT CASE WAS LIENS BEING CLAIMED BY FRONTLINE.

13          RIGHT?

14      A       I KNOW THAT THERE'S DISPUTE OF LIENS.

15  THAT PARTICULAR HEARING, AGAIN, I WAS TOLD IT WAS

16  REGARDING CONTROL.  AND I WENT TO ANSWER QUESTIONS

17  ABOUT MY CONTROL OF THE 49 PERCENT OWNER OF FRONTLINE.

18  I DIDN'T HAVE CONTROL.

19      Q       BUT ISN'T IT TRUE, MR. TURLEY, THAT EVEN

20  AS YOU SIT HERE TODAY, YOU BELIEVE THAT IF -- THAT YOU

21  HAVE A RIGHT TO 49 PERCENT OF WHATEVER MONEY FRONTLINE

22  MAKES?

23          ISN'T THAT YOUR BELIEF?

24      A       THAT I CURRENT -- I MEAN, THAT WAS MY

25  BELIEF WHEN I STARTED FRONTLINE.  AND IT'S NEVER --

26  NEVER BEEN THE CASE.  SO NO, IT'S -- IT'S NOT MY

27  BELIEF.

28      Q       WELL, ISN'T IT TRUE THAT IF FRONTLINE

```
1    MAKES MONEY ON THE LIENS THAT YOU BELIEVE YOU ARE

2    ENTITLED TO 49 PERCENT OF WHATEVER MONEY FRONTLINE

3    TAKES?

4         A    I BELIEVED THAT PRIOR, YES.  I DON'T

5    BELIEVE THAT NOW.

6         Q    WELL, I'M NOT ASKING WHETHER YOU THINK IT

7    WOULD BE -- IT WOULD EVER HAPPEN.  I'M TALKING ABOUT

8    MORALLY, ETHICALLY, DO YOU BELIEVE YOU'RE ENTITLED TO

9    THAT MONEY?

10        A    NO.

11        Q    DO YOU BELIEVE THAT IF FRONTLINE MADE

12   MONEY ON A PROCEEDING IN THE WORKERS COMPENSATION BOARD

13   THAT YOU WOULD HAVE ANY CLAIM TO A PORTION OF THAT

14   MONEY?

15        A    NO.  AND THAT'S MY POINT IN WRITING THE

16   LETTER, TOO.  I DON'T WANT ANY CLAIM TO ANY OF THAT.

17        Q    OKAY.  BUT WERE YOU GIVEN ANY PROMISES

18   WHEN YOU WENT TO TESTIFY BY GEORGE SHOHET OR DAVID

19   BROWNE OR ANYBODY ELSE REGARDING WHAT IT WOULD MEAN --

20   WHAT IT COULD MEAN TO YOU IF YOU TESTIFIED IN THAT

21   PROCEEDING?

22        A    NO.

23        Q    IN ANY OF YOUR DEALINGS WITH DAVID BROWNE

24   OR GEORGE SHOHET DID THE SUBJECT OF THE LIEN THAT IS ON

25   YOUR HOUSE COME UP IN YOUR CONVERSATIONS?

26        A    NO.

27        Q    DID YOU RECEIVE ANY PROMISES THAT SHOULD

28   YOU COOPERATE WITH THEM, THAT IS DAVID BROWNE AND
```

```
1      GEORGE SHOHET, OR ANY OF THESE PROCEEDINGS FOR

2      FRONTLINE, THAT IT COULD BE BENEFICIAL TO YOU IN

3      REGARDS TO THE LIEN THAT IS OVER YOUR HOUSE?

4          A     NO.

5          Q     IS THAT A CONCERN FOR YOU THAT THERE IS

6      STILL A LIEN THAT IS BEING -- THAT IS ON YOUR PRIVATE

7      HOME THAT IS CONTROLLED BY MUNIR UWAYDAH?

8          A     YES.

9          Q     IS IT YOUR BELIEF THAT IF YOU -- IS IT

10     YOUR BELIEF THAT MUNIR UWAYDAH COULD WITHDRAW THAT LIEN

11     OR CAUSE THAT LIEN TO BE WITHDRAWN IF HE WANTS TO?

12         A     I BELIEVE THAT HE COULD, YES.

13         Q     DO YOU BELIEVE THAT IF YOU COOPERATE WITH

14     GEORGE SHOHET OR DAVID BROWNE IN ANY OF THOSE

15     PROCEEDINGS THAT MUNIR UWAYDAH WILL POSSIBLY RELIEVE

16     YOU OF ANY BURDEN WITH REGARDS TO THE LIEN ON YOUR

17     PRIVATE HOME?

18         A     I DON'T BELIEVE THAT, NO.

19         Q     DO YOU HOPE FOR THAT?

20         A     IT WOULD BE HOPEFUL, YES.  BUT I DON'T

21     BELIEVE -- I KNOW MUNIR UWAYDAH PROBABLY BETTER THAN

22     ANYBODY.  AND I DON'T -- I DON'T ANTICIPATE THAT OR

23     EXPECT THAT OR ANYTHING LIKE THAT.

24         Q     DID -- AFTER YOU PLED IN THIS CASE, YOU

25     ALSO HAD A CASE IN SAN DIEGO.

26               CORRECT?

27         A     YES.

28         Q     AFTER YOU PLED AND GAVE YOUR FACTUAL PLEA
```

```
 1   IN THIS CASE, DID YOU ATTEND A SESSION OR A COURT

 2   SESSION IN SAN DIEGO WHEREIN YOU SPOKE WITH SHANNON

 3   DEVANE IN COURT OR OUTSIDE OF COURT?

 4        A      I SPOKE TO HER OUTSIDE OF COURT, YES.

 5        Q      AND AGAIN, THIS IS AFTER YOUR PLEA AND

 6   FACTUAL STATEMENT IN THIS CASE, DID YOU TELL SHANNON

 7   DEVANE THAT YOU HOPED TO SPEAK WITH MUNIR UWAYDAH ABOUT

 8   YOUR PLEA AND FACTUAL STATEMENT IN THIS CASE?

 9        A      I DON'T BELIEVE -- I DON'T KNOW WHY I

10   WOULD WANT TO SPEAK TO -- ASK SHANNON IF I COULD SPEAK

11   TO MUNIR UWAYDAH.

12        Q      WELL, YOU KNEW SHANNON WAS A CLOSE

13   ASSOCIATE TO MUNIR UWAYDAH.

14               RIGHT?

15        A      YES, BUT NOT CLOSER THAN ME.  AT LEAST

16   THAT'S WHAT MY BELIEF WAS.

17        Q      OKAY.  ARE YOU DENYING THAT YOU TOLD HER

18   THAT YOU WANTED TO SPEAK WITH UWAYDAH ABOUT THESE

19   ISSUES?

20        A      I DON'T RECALL SAYING THAT AT ALL.  AND

21   HONESTLY, I DON'T KNOW WHY I WOULD ASK HER TO --

22   PARTICULARLY AT A COURT HEARING ABOUT SPEAKING TO MUNIR

23   UWAYDAH.

24        MR. MATHAI:  THANK YOU.

25               NOTHING FURTHER AT THIS TIME.

26        THE COURT:  THANK YOU.

27               CROSS-EXAMINATION.

28        MR. MOEST:  THANK YOU, YOUR HONOR.
```

```
1                        CROSS EXAMINATION

2    BY MR. MOEST:

3         Q      DR. TURLEY, THERE WAS TESTIMONY THAT YOU

4    RECEIVED AN EMAIL FROM UWAYDAH AT SOME POINT ASKING FOR

5    HIS -- FOR YOUR HELP, I BELIEVE.

6                        IS THAT CORRECT?

7         A      YES.

8         Q      AND DO YOU KNOW APPROXIMATELY WHEN YOU

9    RECEIVED THAT EMAIL?

10        A      I HONESTLY -- I MEAN, I COULD GUESS.

11   MAYBE 2020.  I'M NOT SURE EXACTLY.

12        Q      WAS THERE AN EMAIL THAT CONCERNED THE

13   TRIAL THAT WOULD INVOLVE THE ATTORNEY BEN GLUCK?

14        A      YES.

15        Q      AND WAS THAT BEFORE THE TIME THAT YOU WENT

16   TO COURT TO TESTIFY IN THAT TRIAL?

17        A      YES.

18        Q      AND WHEN YOU GOT THAT EMAIL, WHAT DID YOU

19   DO WITH IT?

20        A      I INFORMED MR. SEPE THAT I HAD BEEN

21   CONTACTED TO -- YOU KNOW, ASKED IF I WOULD BE

22   INTERESTED IN PARTICIPATING IN THIS CASE.

23               AND MR. SEPE AND I WENT TO THE DA'S OFFICE

24   AND PRESENTED THE EMAILS TO THEM.  AND MR. SEPE ASKED

25   MR. MATHAI TO PUT ON THE RECORD REGARDING ME

26   PARTICIPATING IN THAT CASE OR HAVING -- BASICALLY THAT.

27        Q      AND WHAT WAS YOUR UNDERSTANDING OF WHAT

28   YOU WERE SUPPOSED TO DO REGARDING PARTICIPATION IN THAT
```

1   CASE?

2       A     MY UNDERSTANDING WAS THAT IF I WAS, YOU

3   KNOW, ASKED TO OR CALLED TO THAT I COULD TESTIFY,

4   PREPARE TO TESTIFY IN THAT CASE.

5       Q     WERE YOU TOLD AT THAT TIME THAT IF YOU

6   RECEIVED A SUBPOENA IN THAT CASE THAT YOU WERE TO

7   NOTIFY ANYONE?

8       A     I DON'T RECALL BEING TOLD THAT.  BUT

9   MR. SEPE RECEIVED THE SUBPOENA, AND HE'S THE ONE THAT

10  SENT IT TO ME AND TOLD ME I HAD TO GO EVEN THOUGH I

11  DIDN'T WANT TO GO.

12      Q     HOW MUCH TIME WENT BY BETWEEN THE TIME YOU

13  RECEIVED THE EMAIL AND THE TIME YOU RECEIVED THE

14  SUBPOENA?

15      A     MONTHS, MAYBE EVEN A YEAR.

16      Q     AND WHEN YOU TALKED TO MR. SEPE ABOUT THE

17  SUBPOENA, WHAT DID HE TELL YOU TO DO?

18      A     HE TOLD ME THAT I HAD TO GO.  HE TOLD ME

19  THAT HE WASN'T GOING TO BE THERE BUT THAT I HAD TO GO.

20  AND HE TOLD ME TO PLEAD THE FIFTH.

21      Q     AND IN FACT, YOU DID PLEAD THE FIFTH, DID

22  YOU NOT?

23      A     I DID SELECTIVELY PLEAD THE FIFTH, YES.  I

24  DIDN'T KNOW -- I'M NOT A LAWYER.  I DIDN'T KNOW -- IF I

25  HAD CLEAR INSTRUCTIONS LIKE I HAD AFTER THIS WORK COMP

26  HEARING THAT I WAS NOT PERMITTED TO TESTIFY IN ANY

27  PROCEEDINGS BEFORE I WAS SENTENCED, I WOULDN'T HAVE

28  EVEN -- I WOULDN'T HAVE EVEN GONE --

1          I GUESS I WOULD HAVE GONE BECAUSE I HAD A

2     SUBPOENA TO GO.  BUT I WAS VERY UNCLEAR ABOUT WHAT I

3     WAS ALLOWED TO DO AND WHAT I WASN'T ALLOWED TO DO.

4          Q     AND UNTIL THE WORKERS' COMP TESTIMONY, YOU

5     WERE NOT UNDER THE UNDERSTANDING THAT YOU WERE NOT

6     SUPPOSED TO TESTIFY IN OTHER PROCEEDINGS?

7          A     NO, I WAS NOT.

8          Q     BUT AFTER THE CONVERSATION HAD OCCURRED

9     AFTER THE WORKERS' COMP HEARING, YOU DID BELIEVE THAT

10    YOU WERE NOT SUPPOSED TO TESTIFY?

11         A     YES.

12         Q     OTHER THAN THE WORKERS' COMP HEARING AND

13    THE CIVIL TRIAL INVOLVING BEN GLUCK, HAVE YOU EVER

14    TESTIFIED IN ANY OTHER PROCEEDING?

15         A     NO.

16         Q     NOW, THIS -- THIS COOPERATION AGREEMENT

17    WAS ENTERED INTO IN 2018.

18               IS THAT RIGHT?

19         A     YES.

20         Q     AND HOW MANY TIMES HAVE YOU MET WITH THE

21    DISTRICT ATTORNEY SINCE 2018?

22         A     I DON'T KNOW, BUT SEVERAL TIMES.

23         Q     WOULD IT BE TEN?  MORE THAN TEN?

24         A     I DON'T THINK MORE THAN TEN.

25         Q     HAS THERE EVER BEEN A TIME WHEN THE

26    DISTRICT ATTORNEY ASKED FOR A MEETING WHEN YOU REFUSED

27    TO HAVE A MEETING?

28         A     NO.

```
 1          Q      HAVE THERE BEEN ANY QUESTIONS THAT THE

 2    DISTRICT ATTORNEY HAS ASKED YOU --

 3                 LET ME ASK YOU.  THERE WAS ONE HEARING.

 4    THERE WAS ONE TIME WHEN THE DISTRICT ATTORNEY WANTED TO

 5    TALK TO YOU, AND THAT WAS WHEN YOU CAME INTO COURT WITH

 6    MR. MCKESSON.

 7                 IS THAT RIGHT?

 8          A      YES.

 9          Q      AND YOU WANTED MR. MCKESSON TO BE YOUR

10    LAWYER.

11          A      YES.

12          Q      AND THAT WAS NOT ALLOWED AT THAT TIME.

13                 IS THAT CORRECT?

14          A      THAT'S CORRECT.

15          Q      AND ON THAT DAY DID YOU, IN FACT, ANSWER

16    QUESTIONS ASKED BY THE DISTRICT ATTORNEY?

17          A      YES.

18          Q      WAS THERE A TIME WHEN YOU STOPPED

19    ANSWERING QUESTIONS?

20          A      WHEN I THOUGHT THAT IT WAS OVER, THAT

21    THEY -- I COULD BE RELEASED.  I ASKED TO BE RELEASED,

22    AND THEY SAID YES.

23          Q      AND THEN WHEN YOU FIRST APPEARED IN COURT

24    WITH ME AND MR. SEPE ON APRIL 26TH, YOU WERE, AGAIN,

25    INTERVIEWED BY THE DISTRICT ATTORNEY.

26          A      YES.

27          Q      AND WERE THERE ANY QUESTIONS -- WAS THERE

28    ANY INDICATION AT THAT TIME THAT THERE WERE ADDITIONAL
```

1    QUESTIONS THAT THE DISTRICT ATTORNEY HAD OF YOU THAT

2    YOU HAD NOT ANSWERED?

3              HAVE YOU EVER NOT ANSWERED A QUESTION?

4        A      I ANSWERED ALL THEIR QUESTIONS.  THEY

5    ASKED FOR PAPERWORK REGARDING YOUR PAYMENT, AND I

6    BELIEVE WE'VE PROVIDED THAT TO THEM.

7        Q      WAS YOUR GOAL IN TESTIFYING IN THE CIVIL

8    CASE TO HELP MANUEL UWAYDAH [SIC]?

9        A      THAT WAS NOT MY GOAL.

10       Q      AND HOW ABOUT IN TESTIFYING IN THE

11   WORKERS' COMP HEARING?  WAS THAT YOUR GOAL?

12       A      NO.

13       Q      WHEN YOU TESTIFIED IN THE CIVIL CASE, WHY

14   DID YOU BELIEVE -- WHY WERE YOU TESTIFYING?

15       A      WELL, I WAS SUBPOENAED, FIRST OF ALL.  AND

16   SECONDLY, I DO HARBOR SOME HOSTILE FEELINGS TOWARDS

17   MR. GLUCK.  YOU KNOW, I FELT THAT I WAS BETRAYED BY HIM

18   IN A SENSE.  AND I WAS ANGRY, AND I WANTED TO BE ABLE

19   TO TELL MY STORY.

20       Q      AND WHAT -- WHY DO YOU SAY YOU WERE

21   BETRAYED BY MR. GLUCK?

22       A      BECAUSE HE REPRESENTED ME FOR SEVERAL

23   YEARS, INCLUDING 25 MONTHS THAT I SPENT IN MEN'S

24   CENTRAL JAIL.  AND THEN WHEN IT APPARENTLY CAME DOWN TO

25   A DISPUTE ABOUT MORE MONEY, ALL OF A SUDDEN IT WAS LIKE

26   I'M WITHDRAWING FROM THE CASE.  YOU NEED TO PLEAD

27   GUILTY.  YOU'RE GOING TO SPEND A HUNDRED YEARS IN JAIL

28   IF YOU DON'T DO THIS.

1          AND YOU KNOW, I ENDED UP HAVING TO GET AN

2     ETHICS ATTORNEY TO TRY TO -- TO COMPEL HIM TO STAY ON

3     THE CASE.  BUT HE WAS -- HE WAS DETERMINED TO WITHDRAW.

4     AND I JUST FELT THAT --

5          Q     HOW MUCH MONEY HAS BEEN PAID TO MR. GLUCK

6     ON YOUR BEHALF?

7          A     MY UNDERSTANDING WAS OVER CLOSE TO

8     TWO-AND-A-HALF MILLION.  AND HE WAS ASKING FOR MORE

9     MONEY, ANOTHER MILLION.

10         Q     AT THE END WHEN HE WITHDREW, HE WAS --

11         A     RIGHT.  HE WAS TELLING ME HE WAS GOING TO

12    WITHDRAW AND THAT I NEEDED TO MAKE A DEAL WITH THE DA.

13              AND THAT'S WHEN --

14         Q     LET ME ASK YOU ABOUT THAT.

15              YOU WERE IN JAIL FOR 25 MONTHS?

16         A     YES.

17         Q     L.A. MEN'S CENTRAL JAIL?

18         A     YES.

19         Q     DURING THAT TIME YOU TALKED TO MR. GLUCK?

20         A     ALMOST DAILY, YES.

21         Q     AND WHAT DID HE SAY ABOUT HOW YOUR CASE

22    LOOKED OR WHAT YOU HAD TO LOOK FORWARD TO IN YOUR CASE?

23         A     HE KEPT ENCOURAGING ME.  HE KEPT TELLING

24    ME HE DIDN'T KNOW HOW THE DA COULD CONTINUE TO PROCEED.

25    HE PAINTED A VERY HOPEFUL AND ROSY PICTURE OF THINGS.

26              AND THEN, YOU KNOW -- THEN IT CHANGED.

27         Q     THEN IT CHANGED WHEN HE DEMANDED EXTRA

28    MONEY AND DIDN'T GET IT?

```
 1        A      YES.

 2        Q      AND WHAT DID HE TELL YOU THEN?

 3        A      THAT HE WAS WITHDRAWING FROM THE CASE.  HE

 4   WAS OWED A LOT OF MONEY, WASN'T BEING PAID.  AND I NEED

 5   TO MAKE A DEAL WITH THE DA, AND HE COULDN'T DO IT.  SO

 6   I HAD TO GET SOMEONE ELSE.

 7        MR. MOEST:  YOUR HONOR, I DON'T HAVE ANY OTHER

 8   QUESTIONS AT THIS POINT.  BUT I WILL RESERVE THE RIGHT

 9   TO CALL MR. TURLEY AGAIN DEPENDING --

10             I UNDERSTAND THERE IS SOME ADDITIONAL

11   EVIDENCE THAT IS GOING TO BE OFFERED BY THE DA.

12        THE COURT:  THAT'S FINE.

13             REDIRECT.

14        MR. MATHAI:  YES.  THANK YOU.

15

16                  REDIRECT EXAMINATION

17   BY MR. MATHAI:

18        Q      MR. TURLEY, ALL THE PROFFER SESSIONS YOU

19   GAVE WITH THE PEOPLE, YOU WERE PUT UNDER OATH, AND

20   THOSE SESSIONS WERE RECORDED.

21             CORRECT?

22        A      YES.

23        Q      AND THERE WAS, I THINK, ON ALMOST ALL OF

24   THOSE PROFFER SESSIONS, THERE WAS ALSO A STENOGRAPHER,

25   LIKE A COURT REPORTER, TAKING DOWN EVERYTHING YOU SAID.

26             CORRECT?

27        A      I REMEMBER THAT AT TIMES, YES.

28        Q      AND WHAT YOU SAID HERE IN OPEN COURT WAS
```

1    ALSO TRANSCRIBED.  THAT MEANS YOUR FACTUAL PLEA

2    STATEMENTS WERE ALSO UNDER OATH AND TRANSCRIBED.

3              CORRECT?

4        A      CORRECT.

5        Q      AND EVEN AFTER YOUR PLEA, EVERY TIME I

6    EVER SPOKE WITH YOU, OTHER THAN IN THE HALLWAY OR HERE

7    IN OPEN COURT, EVERY TIME I SPOKE WITH YOU THOSE

8    SESSIONS WERE RECORDED.

9              CORRECT?

10       A      YES.

11       Q      SO IT'S FAIR TO SAY THAT ALMOST EVERYTHING

12   WE'VE DISCUSSED ABOUT THIS CASE SUBSTANTIVELY ABOUT

13   WHAT YOU KNOW AND WHAT YOU'VE DONE HAS BEEN RECORDED OR

14   TRANSCRIBED IN SOME WAY?

15       A      YES.

16       Q      YOU SAID THAT YOU WANTED TO PARTICIPATE IN

17   THAT TRIAL AGAINST GLUCK BECAUSE YOU HARBORED

18   RESENTMENT AGAINST GLUCK FOR SPECIFICALLY THE TIME YOU

19   SPENT IN CUSTODY.

20             CORRECT?

21       A      YES.

22       Q      BUT AT THE SAME TIME GETTING BACK AT GLUCK

23   WOULD ALSO BENEFIT UWAYDAH.

24             CORRECT?

25       A      I MEAN, IF THE LAWSUIT WAS WON, YES.

26       Q      AND YOU HARBORED THIS RESENTMENT AGAINST

27   GLUCK, BUT YOU DON'T HARBOR THE SAME RESENTMENT AGAINST

28   MUNIR UWAYDAH, DO YOU?

375

```
1          A      I DIDN'T SAY THAT.

2          Q      I'M ASKING YOU.

3          A      I DO HARBOR VERY MUCH RESENTMENT TOWARD

4    DR. UWAYDAH.

5          Q      IN THAT CASE WHERE IT WAS GLUCK VERSUS

6    UWAYDAH, YOU TOOK UWAYDAH'S SIDE, IN ESSENCE.

7                 CORRECT?

8          A      I WENT TO TESTIFY TRUTHFULLY TO THE FACTS.

9    THAT'S ALL.  WHETHER IT HELPED UWAYDAH OR HELPED

10   MR. GLUCK, I MEAN, THAT'S WHAT I DID.

11         Q      BUT YOU TOLD US IN YOUR TESTIMONY EARLIER

12   IN THIS HEARING THAT THE TIME YOU SPENT WITH DAVID

13   BROWNE AND GEORGE SHOHET IN PREPARING FOR THAT

14   TESTIMONY OF FRONTLINE VS. GLUCK, THAT TIME YOU SPENT

15   WAS GOING OVER YOUR FACTUAL PLEA STATEMENT THAT YOU

16   GAVE THIS COURT.

17                CORRECT?

18         A      THAT'S CORRECT.

19         Q      IN YOUR MIND HOW IS THAT FACTUAL PLEA

20   CONNECTED TO YOUR ABILITY TO GET BACK AT BENJAMIN GLUCK

21   FOR THE TIME YOU SPENT IN CUSTODY?

22         A      I -- I REALLY DON'T -- I REALLY DON'T

23   KNOW.  I MEAN, I WASN'T GOING TO DEVIATE FROM MY

24   FACTUAL STATEMENT OTHER THAN THEY SHOWED ME SOME

25   INFORMATION REGARDING MARISA NELSON, CREDIT CARD

26   STATEMENTS, SUPPOSED SWORN TESTIMONY.  THAT WAS IT.

27                THERE'S NOTHING ELSE IN MY FACTUAL

28   STATEMENT, AS I SIT HERE TODAY, THAT I BELIEVE I MADE
```

```
 1    ANY KIND OF MISLEADING OR FALSE STATEMENTS.
 2         Q      ARE YOU AWARE OF WHY GEORGE SHOHET WENT
 3    BACK TO THE COURT, JUDGE TRABER, MULTIPLE TIMES
 4    INSISTING THAT YOU WANTED TO TESTIFY ABOUT OTHER ISSUES
 5    IN YOUR FACTUAL PLEA?
 6         A      I WAS NOT AWARE OF WHAT HE WENT TO COURT
 7    TO ASK FOR OTHER THAN TO ALLOW ME TO TESTIFY.
 8         MR. MATHAI:  THANK YOU.
 9              NOTHING FURTHER.
10         THE COURT:  THANK YOU.
11              RECROSS.
12         MR. MOEST:  YES.
13
14                   RECROSS-EXAMINATION
15    BY MR. MOEST:
16         Q      IN REVIEWING THE FACTUAL STATEMENT WITH
17    EITHER MR. BROWNE OR MR. SHOHET, WERE THERE ANY OTHER
18    ASPECTS OF THAT FACTUAL STATEMENT THAT YOU TOLD THEM
19    WAS -- WERE INCOMPLETE OR INACCURATE OTHER THAN THE
20    ONES REGARDING NELSON?
21         A      NO.  I MEAN, MR. BROWNE QUESTIONED ONE
22    STATEMENT REGARDING BACKDATING SECRETARY OF STATE
23    DOCUMENTS AND JUST MADE A STATEMENT LIKE HOW COULD YOU
24    BACKDATE SECRETARY OF STATE DOCUMENTS.
25         Q      BUT YOU DIDN'T SUGGEST YOUR TESTIMONY WAS
26    WRONG?
27         A      NO.  I -- NO.
28         Q      THE STATEMENT YOU MODIFIED, IT WAS A
```

```
 1    STATEMENT THAT -- IN EFFECT THAT MR. UWAYDAH SUED

 2    NELSON TO DISCREDIT HER TESTIMONY AGAINST UWAYDAH.

 3              IS THAT CORRECT?

 4         A    YES.

 5         Q    AND YOU BELIEVED, IN FACT, THAT THAT IS

 6    STILL TRUE.

 7              IS THAT CORRECT?

 8         A    YES.

 9         Q    SO WHEN YOU AMENDED YOUR -- WHATEVER

10    INFORMATION WAS IN THE PROFFER, IT WASN'T TO TAKE AWAY

11    FROM WHAT YOU HAD ALREADY SAID.  IT WAS JUST TO

12    CLARIFY --

13         A    YES.

14         Q    -- THAT THERE MIGHT HAVE BEEN SOMETHING TO

15    YOU IT.

16         A    YES.

17         Q    BUT YOU STILL BELIEVE THE PRIMARY

18    MOTIVATION FOR UWAYDAH SUING WAS TO DISCREDIT HER?

19         A    YES.

20         MR. MOEST:  NOTHING FURTHER.

21         THE COURT:  THANK YOU.

22              REDIRECT.

23         MR. MATHAI:  NO.  THANK YOU.

24         THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN AT THIS

25    TIME.

26

27              (THE WITNESS LEAVES THE STAND.)

28
```