# EXHIBIT C

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    FOR THE COUNTY OF LOS ANGELES

 3

 4     DEPARTMENT 106              HON. LARRY P. FIDLER, JUDGE

 5                            -oOo-

 6     THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                              )
 7                    PLAINTIFF              )
                                              ) NO. BA455469
 8              VS.                          )
                                              )
 9     PAUL TURLEY,                          )
                                              )
10                    DEFENDANT.            )
       _____)

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                    MONDAY, MAY 6, 2024

14

15

16     APPEARANCES:

17     FOR THE PEOPLE:      LOS ANGELES DISTRICT ATTORNEY
                            BY:  DAYAN MATHAI, DEPUTY
18                               KAREN NISHITA, DEPUTY
                            211 WEST TEMPLE, SUITE 200
19                          LOS ANGELES, CALIFORNIA 90012

20     FOR THE DEFENDANT:   LAW OFFICE OF ROBERT MOEST
                            BY:  ROBERT MOEST
21                          2530 WILSHIRE BOULEVARD
                            SANTA MONICA, CALIFORNIA 90403
22

23

24

25

26     VOLUME 2                    TRACI THOMAS, CSR 9620
       PAGES 301/429-600, INCL.  OFFICIAL REPORTER
27

28
```

```
1                    M A S T E R   I N D E X

2                        VOLUME 2

3

4              CHRONOLOGICAL INDEX OF WITNESSES

5                                              PAGE
```

```
6    TURLEY, PAUL, (CALLED BY THE PEOPLE)
          DIRECT EXAMINATION (RESUMED) BY MR. MATHAI   307
7         DIRECT EXAMINATION (RESUMED) BY MR. MATHAI   352
          CROSS EXAMINATION BY MR. MOEST               367
8         REDIRECT EXAMINATION BY MR. MATHAI           373
          RECROSS-EXAMINATION BY MR. MOEST             376
9

10   NELSON, MARISA, (CALLED BY THE PEOPLE)
          DIRECT EXAMINATION BY MR. MATHAI             380
11        CROSS-EXAMINATION BY MR. MOEST               404
          REDIRECT EXAMINATION BY MR. MATHAI           406
12

13   DEVANE, SHANNON, (CALLED BY THE PEOPLE)
          DIRECT EXAMINATION BY MR. MATHAI             407
14
```

```
15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1

M A S T E R    I N D E X

2

VOLUME 2

3

4

ALPHABETICAL INDEX OF WITNESSES

5

PAGE

6

**DEVANE, SHANNON, (CALLED BY THE PEOPLE)**
        DIRECT EXAMINATION BY MR. MATHAI          407

7

8

**NELSON, MARISA, (CALLED BY THE PEOPLE)**
        DIRECT EXAMINATION BY MR. MATHAI          380

9       CROSS-EXAMINATION BY MR. MOEST            404
        REDIRECT EXAMINATION BY MR. MATHAI        406

10

11

**TURLEY, PAUL, (CALLED BY THE PEOPLE)**
        DIRECT EXAMINATION (RESUMED) BY MR. MATHAI   307

12      DIRECT EXAMINATION (RESUMED) BY MR. MATHAI   352
        CROSS EXAMINATION BY MR. MOEST              367

13      REDIRECT EXAMINATION BY MR. MATHAI          373
        RECROSS-EXAMINATION BY MR. MOEST            376

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

305

```
 1                    M A S T E R   I N D E X

 2                         VOLUME 2

 3

 4                         EXHIBITS

 5

 6    PEOPLE'S    DESCRIPTION              ID    EV  REFUSED
      EXHIBITS
 7
      2           5509 DOCUMENTS          308
 8
      3           5509 DOCUMENTS          308
 9
      4           CONNEMARA CORPORATION   308
10                DOCUMENTS

11    5           AGREEMENT               318

12    6           FACTUAL PLEA            319

13    7           PHOTOCOPY OF CHECK      389

14    8           TWO PAGES, PHOTOGRAPHS  415

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1      THE COURT:  NOW, DO YOU HAVE -- THE WITNESSES YOU

2  PLAN TO OFFER, DO THEY HAVE ANYTHING TO DO WITH

3  MR. TURLEY?

4      MR. MATHAI:  YES.  I INTEND TO CALL MARISA

5  NELSON.

6      THE COURT:  OKAY.

7      MR. MATHAI:  BUT I DO ALSO WANT TO ASK HER ABOUT

8  MEDCONSULT AND HER KNOWLEDGE OF WHAT MR. TURLEY HAS

9  TESTIFIED TO REGARDING THE PAYMENTS ON THE PROPERTIES.

10      THE COURT:  OKAY.

11      MR. MATHAI:  AND THE LAWSUIT THAT SHE'S HAD BY

12  FRONTLINE AND OTHERS.

13          SHANNON DEVANE IS AVAILABLE, ALSO VERY

14  SHORT TESTIMONY ABOUT MEDCONSULT AND CONNEMARA, AMBER

15  WOODLEY, AND THEN THIS ISSUE OF WHAT PAUL TURLEY

16  DISCUSSED WITH HER IN COURT IN SAN DIEGO.

17      THE COURT:  OKAY.  THEN I GUESS YOU WILL REMAIN.

18      MR. MOEST:  I GUESS I'LL NEED TO HEAR WHAT IS

19  SAID.

20      THE COURT:  I IMAGINE YOU WANT TO REMAIN BECAUSE

21  YOU MAY BE ELIGIBLE IF ANY OF THE QUESTIONS GO TO

22  DR. TURLEY'S CREDIBILITY OR ANYTHING TO CROSS-EXAMINE.

23      MR. MOEST:  CORRECT.

24      THE COURT:  OKAY.  LET'S PROCEED.

25          WHO IS YOUR NEXT WITNESS?

26      MR. MATHAI:  MARISA NELSON.

27          AND WITH THE COURT'S PERMISSION -- I

28  CLEARED THIS WITH THE JUDICIAL ASSISTANT.  -- AMY JACKS

1     IS GOING TO LISTEN IN ON MY PHONE.

2          THE COURT:  FINE.  OKAY.

3

4               (RECESS TAKEN.)

5

6          MR. MATHAI:  YOUR HONOR, FOR THE RECORD, AMY

7     JACKS IS ON SPEAKER PHONE ON MY PHONE, AND I'M GOING TO

8     PLACE THE PHONE -- SHE'S GOING TO MUTE HER SIDE, AND

9     I'M GOING TO JUST PLACE MY PHONE NEXT TO THE WITNESS

10    STAND SO SHE CAN HEAR IT.

11         THE COURT:  OKAY.

12              AND THIS ARRANGEMENT IS GOOD FOR YOU,

13    MS. NELSON?

14         THE WITNESS:  YES.

15         MR. MOEST:  WHO IS THIS PERSON.

16         MR. MATHAI:  AMY JACKS IS THE LAWYER FOR MARISA

17    NELSON.

18         MR. MOEST:  OKAY.  THANK YOU.  GOT IT.  THAT

19    HADN'T BEEN SAID THIS AFTERNOON.

20         THE COURT:  ALL RIGHT.  MR. TURLEY IS PRESENT

21    AGAIN.

22              GO AHEAD AND SWEAR THE WITNESS, PLEASE.

23

24                    MARISA NELSON,

25           CALLED BY THE PEOPLE, AS A WITNESS,

26           WAS SWORN AND TESTIFIED AS FOLLOWS:

27

28         THE CLERK:  YOU DO SOLEMNLY STATE THAT THE

1    TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW

2    PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE

3    TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU, GOD?

4         THE WITNESS:  YES.

5         THE CLERK:  PLEASE STEP FORWARD AND BE SEATED IN

6    THE WITNESS STAND.

7              PLEASE ADJUST THE MICROPHONE COMFORTABLY

8    IN FRONT OF YOU.  SPEAKING INTO THE MICROPHONE, PLEASE,

9    STATE AND THEN SPELL YOUR FULL NAME FOR THE RECORD.

10        THE WITNESS:  MARISA NELSON, M-A-R-I-S-A,

11   N-E-L-S-O-N.

12        THE COURT:  THANK YOU.

13             YOU MAY PROCEED.

14        MR. MATHAI:  THANK YOU.

15

16                  DIRECT EXAMINATION

17   BY MR. MATHAI:

18        Q     MA'AM, WERE YOU AT ONE POINT IN TIME A

19   DEFENDANT IN THE CRIMINAL CASE THAT WAS PROSECUTED IN

20   THIS COURTHOUSE AND IN THIS COURTROOM?

21        A     YES.

22        Q     AND AT SOME POINT IN TIME DID YOU ENTER A

23   GUILTY PLEA AND ENTER A COOPERATION AGREEMENT WITH THE

24   PROSECUTION TO COOPERATE UNTIL SUCH TIME THAT YOU CAN

25   BE SENTENCED?

26        A     YES.

27        Q     AND SO FOR THE LAST FIVE OR SIX YEARS HAVE

28   YOU BEEN PARTICIPATING WITH THE PROSECUTION IN THAT

1    COOPERATION AGREEMENT?

2         A    YES.

3         Q    AND DURING THAT TIME, WERE YOU REPRESENTED

4    THE ENTIRE TIME YOUR PLEA, YOUR COOPERATION AGREEMENT

5    AND THE COOPERATION ITSELF, WAS THAT -- WERE YOU

6    REPRESENTED BY AMY JACKS?

7         A    YES.

8         Q    AND DID YOU GIVE A FACTUAL STATEMENT AS

9    PART OF YOUR PLEA HERE IN OPEN COURT UNDER OATH?

10        A    YES.

11        Q    AND DID YOUR PLEA AND THE FACTUAL

12   STATEMENT THAT YOU GAVE REVOLVE AROUND MUCH -- MUCH OF

13   IT REVOLVE AROUND YOUR RELATIONSHIP WITH MUNIR UWAYDAH,

14   AND FRONTLINE MEDICAL ASSOCIATES AND RELATED ENTITIES?

15        A    YES.

16        Q    WHAT WAS YOUR -- I KNOW THERE'S A LOT TO

17   SAY ABOUT ALL OF THAT, BUT IF YOU COULD, JUST SUMMARIZE

18   FOR THE COURT IN GENERAL WHAT WAS YOUR ROLE IN THE

19   ORGANIZATION -- MUNIR UWAYDAH'S WORLD OR HIS

20   ORGANIZATION?

21        A    I INITIALLY WAS HIRED AND STARTED AS A

22   PERSONAL ASSISTANT.  I DID SOME MANAGING OF HIS MEDICAL

23   PRACTICE BACK IN MICHIGAN.  I'M ORIGINALLY FROM OHIO.

24            AND THEN WHEN I CAME OUT HERE, I WAS

25   PRIMARILY HIS PERSONAL ASSISTANT.  AND THEN I SLOWLY

26   BECAME MANAGER.  OR I SLOWLY HAD MY NAME ON DIFFERENT

27   COMPANIES OF HIS.  AND I WOULD BE IN CONTROL OF THE --

28   WELL, I WASN'T IN CONTROL OF THE BANK ACCOUNT, BUT I

1   HAD SIGNER ABILITY ON BANK ACCOUNTS FOR HIM.  SO I

2   WOULD TRANSFER HIS MONEY BACK AND FORTH WHEREVER HE

3   WANTED.

4        Q    OKAY.  AND FAIR TO SAY THAT IN THAT ROLE

5   YOU CONTROLLED LOTS OF BANK ACCOUNTS FOR THE BENEFIT OF

6   MUNIR UWAYDAH?

7        A    YES.

8        Q    GIVE US A ROUGH IDEA HOW MANY BANK

9   ACCOUNTS AT THE HEIGHT OF YOUR WORK WITH UWAYDAH WOULD

10  YOU ESTIMATE THAT YOU HAD YOUR NAME ON FOR HIS BENEFIT?

11       A    AT ANY GIVEN TIME THERE WAS AT LEAST EIGHT

12  TO TEN.  BUT OVERALL THERE WAS OVER 20 COMPANIES I

13  THINK THAT I HAD ESTABLISHED BANK ACCOUNTS OR HAD BEEN

14  ASSOCIATED WITH BANK ACCOUNTS ON BEHALF OF UWAYDAH.

15       Q    AND BASED ON YOUR KNOWLEDGE OF HIM AND

16  YOUR WORK WITH HIM --

17            DID YOU WORK WITH HIM FOR MANY YEARS?

18       A    YES.

19       Q    ABOUT HOW MANY YEARS DID YOU WORK?

20       A    TEN.

21       Q    AND BASED ON YOUR KNOWLEDGE OF HIM AND

22  YOUR WORK RELATIONSHIP WITH HIM, DID YOU OBSERVE THAT

23  THERE WAS A PATTERN OF BEHAVIOR WITH REGARDS TO

24  THESE -- HOW HE CONTROLLED THESE BUSINESS ENTITIES AND

25  BANK ACCOUNTS?

26       A    YES.

27       Q    WAS HE A CONTROLLING PERSON?

28       A    YES.

```
1        Q     DID HE HAVE ULTIMATE CONTROL OVER THE
2    ENTITIES AND THE BANK ACCOUNTS?
3        A     YES.
4        Q     DID HE HAVE THAT CONTROL EVEN IF IT
5    APPEARED THAT OTHER PEOPLE, OTHER PEOPLE HAD CONTROL BY
6    VIRTUE OF THEIR NAME BEING ON THE ENTITY AND/OR THE
7    BANK ACCOUNTS?
8        A     YES.
9        Q     AND WAS THAT TRUE WITH REGARD TO YOUR NAME
10   BEING USED?
11       A     YES.  THERE WAS AN ACCOUNT IN MY NAME
12   ALSO.
13       Q     AND YOU SAID THAT THERE WAS LOTS OF BANK
14   ACCOUNTS.  EACH ONE OF THOSE ENTITIES THAT YOU TALKED
15   ABOUT, WERE THERE OFTEN MULTIPLE BANK ACCOUNTS
16   ASSOCIATED WITH EACH ONE?
17       A     NEAR THE TIME BEFORE I LEFT, I THINK THERE
18   WAS MULTIPLE ACCOUNTS FOR, LIKE, FRONTLINE OR THE
19   MEDICAL PRACTICES.  BUT GENERALLY SPEAKING, MOST OF THE
20   COMPANIES ONLY HAD ONE BANK ACCOUNT.
21       Q     OKAY.  AND DID YOU -- WAS THERE AN ENTITY
22   THAT YOU CREATED OR USED TO FUNNEL MONEY FROM THE
23   VARIOUS ACCOUNTS FOR THE BENEFIT OF MUNIR UWAYDAH?
24       A     THE ACCOUNT THAT WAS CALLED SHERMBECK
25   MANAGEMENT, WHICH IS MY MAIDEN NAME.  MARISA SHERMBECK
26   IS MY MAIDEN NAME.  THAT WAS USED AS THE GO-BETWEEN IF
27   I NEEDED TO TRANSFER MONEY FOR UWAYDAH FROM ONE COMPANY
28   TO ANOTHER.
```

1        Q        DID YOU KNOW OF A MOTIVATION FROM MUNIR

2   UWAYDAH AS TO WHY HE DIDN'T PUT HIS OWN NAME ON

3   ENTITIES HE CONTROLLED OR BANK ACCOUNTS THAT HE

4   BENEFITED FROM OR CONTROLLED?

5        A        THERE'S A COUPLE OF REASONS.  EITHER HE

6   DIDN'T WANT DEBTORS OR CREDITORS TO KNOW THAT HE HAD

7   ANY MONEY.  AND ALSO HE JUST -- HE HAD COMPANIES THAT

8   HE, AS AN M.D., WASN'T ALLOWED TO HAVE.

9        Q        OKAY.  WAS THERE A -- EARLY ON IN YOUR

10  RELATIONSHIP WITH MUNIR UWAYDAH WAS THERE A LAWSUIT

11  BETWEEN HIM AND GE, GENERAL ELECTRIC, REGARDING SOME

12  MEDICAL EQUIPMENT?

13       A        YES.

14       Q        WHAT IMPACT --

15                WHAT HAPPENED IN THAT CASE?

16       A        THERE WAS A JUDGMENT ENTERED AGAINST

17  UWAYDAH FOR A MILLION DOLLARS, AND HE FOUGHT VEHEMENTLY

18  AGAINST THAT.  AND I USED TO SAY THAT HE WOULD SPEND

19  MILLIONS OF DOLLARS JUST TO NOT HAVE TO PAY GE THE

20  MILLION THAT HE OWED.

21                SO HE DID ANYTHING IN HIS POWER TO NOT

22  HAVE ANY MONEY IN HIS NAME SO THAT THEY COULDN'T

23  COLLECT ON THAT.

24       Q        TO YOUR KNOWLEDGE, DID HE EVER PAY THAT

25  MILLION DOLLAR JUDGMENT TO GE?

26       A        NOT THAT I'M AWARE OF.

27       Q        DID YOU SEE -- OVER THE TEN YEARS THAT YOU

28  WORKED FOR HIM, DID YOU SEE THAT HE ACTED IN THAT WAY

1    WITH REGARDS TO HIDING ASSETS OVER THE YEARS?

2        A      YES.  HE NEVER WANTED ANYTHING IN HIS

3    NAME.

4        Q      AND CAN YOU GIVE US EXAMPLES OF HOW THAT

5    PLAYED OUT OR HOW THAT WAS TRUE?

6        A      THERE WERE PROPERTIES THAT WERE PURCHASED

7    IN OTHER PEOPLE'S NAMES, COMPANY NAMES, CARS, AND THEN

8    THE COMPANIES THEMSELVES WITH THE MONEY THAT WOULD GO

9    TOWARDS OTHER THINGS.

10       Q      WITH REGARDS TO THE BANK ACCOUNTS, IS IT

11   FAIR TO SAY THAT THE AMOUNT OF MONEY THAT YOU

12   CONTROLLED FOR THE BENEFIT OF UWAYDAH WAS IN THE

13   MILLIONS?

14       A      YES.

15       Q      WAS IT FAIR TO SAY IT WAS IN THE TENS OF

16   MILLIONS?

17       A      YES.

18       Q      COULD IT HAVE BEEN IN THE HUNDREDS OF

19   MILLIONS?

20       A      IT'S BEEN A LONG TIME SINCE I LOOKED AT

21   NUMBERS, BUT POSSIBLY.

22       Q      OKAY.  SO A LOT OF MONEY THAT YOU HELPED

23   MANAGE?

24       A      YES.

25       Q      AND DID -- YOU MENTIONED IN YOUR PREVIOUS

26   ANSWER THAT HE WOULD HIDE HIS CONTROL OF ASSETS BY

27   PUTTING REAL ESTATE IN OTHER PEOPLE'S NAMES AS WELL.

28            CORRECT?

1          A       YES.

2          Q       ARE YOU AWARE OF ANY PARTICULAR EXAMPLES

3    OF HIM DOING THAT WITH REGARDS TO REAL ESTATE?

4          A       THERE WERE -- NEAR THE END OF MY, KIND OF,

5    TENURE WITH WORKING WITH UWAYDAH, THERE WERE A FEW

6    PROPERTIES THAT HE ACQUIRED.  AND THEY WERE, LIKE, A

7    COUPLE OF PROPERTIES IN MARINA DEL REY THAT HE

8    PURCHASED IN COMPANY NAMES.  AND THEN THERE WAS BEVERLY

9    GROVE PLACE.  AND THEN THERE WAS 5507 AND 5509 OCEAN

10   FRONT WALK.  AND THEN THERE WAS ANOTHER ONE ON OCEAN

11   FRONT WALK.

12         Q       LET ME READ YOU --

13         A       5507.

14         Q       LET ME READ TO YOU SOME ADDRESSES AND ASK

15   YOU IF YOU RECOGNIZE THEM.

16                 5509 OCEAN FRONT WALK IN MARINA DEL REY,

17   5007 OCEAN FRONT WALK IN MARINA DEL REY, 1316 BEVERLY

18   GROVE PLACE IN BEVERLY HILLS, AND 34 GALLEON STREET

19   ALSO IN MARINA DEL REY.

20         A       YES, ALL OF THOSE.

21         Q       ARE THOSE FOUR PROPERTIES THAT YOU

22   RECOGNIZE, BASED ON YOUR EXPERIENCE WITH MUNIR UWAYDAH,

23   AS BEING OWNED AND CONTROLLED BY MUNIR UWAYDAH?

24         A       YES.

25         Q       WERE YOU AWARE THAT THESE PROPERTIES WERE

26   ACTUALLY PURCHASED IN THE NAME OF PAUL TURLEY?

27         A       I DO REMEMBER PAUL TURLEY AS BEING -- NAME

28   BEING ON SOME OF THE REAL ESTATE.  I JUST DON'T

1    REMEMBER SPECIFICALLY IF IT WAS JUST BEVERLY GROVE

2    PLACE OR NOT.

3         Q     OKAY.  AND YOU KNOW --

4               WHO IS PAUL TURLEY?

5         A     WHO IS PAUL TURLEY?

6         Q     YEAH.

7         A     HE WAS AN ASSOCIATE.  HE WAS A CHIRO- --

8    ORIGINALLY A CHIROPRACTOR THAT BECAME PARTNER WITH

9    UWAYDAH FOR FRONTLINE MEDICAL, AMONG A FEW OTHER

10   SMALLER COMPANY.

11        Q     YOU SEE HIM IN THIS COURTROOM TODAY?

12        A     YES.

13        Q     JUST TELL US WHERE HE'S SEATED AND WHAT

14   HE'S WEARING, PLEASE.

15        A     HE'S SITTING OVER ACROSS FROM YOU WEARING

16   A BLUE SHIRT.

17        THE COURT:  INDICATING MR. TURLEY FOR THE RECORD.

18        MR. MATHAI:  THANK YOU.

19        Q     AND WHEN MUNIR UWAYDAH HAD PROPERTIES SUCH

20   AS THE ONES WE LISTED, YOU SAID THAT YOU BELIEVE THAT

21   THEY WERE MUNIR UWAYDAH'S PROPERTY, BUT THEY WERE IN

22   OTHER PEOPLE'S NAMES.

23              WHO PAID FOR THE PROPERTIES -- WHO PAID,

24   LIKE, FOR EXAMPLE, THE DOWN PAYMENT TO GET THE LOANS?

25        A     THE MONEY ULTIMATELY CAME FROM UWAYDAH.  I

26   DON'T REMEMBER SPECIFICS, BUT UWAYDAH FUNDED ALL OF

27   THEM.

28        Q     WHAT ABOUT THE MONTHLY MORTGAGE PAYMENTS?

1        A       UWAYDAH.

2        Q       AND WHO WOULD COORDINATE THOSE PAYMENTS?

3        A       I WAS IN CHARGE OF MAKING SOME MONTHLY

4    MORTGAGE PAYMENTS, AND I THINK SHELLY ROSE KELLY.  AND

5    I DON'T KNOW WHO AFTER THAT WAS.

6        Q       OKAY.  TO YOUR KNOWLEDGE, IF PAUL TURLEY

7    HAD HIS NAME ON A PROPERTY THAT WAS ULTIMATELY

8    CONTROLLED AND OWNED BY MUNIR UWAYDAH, WOULD HE KEEP UP

9    THE APPEARANCE THAT IT WAS HIS PROPERTY AND HIS LOAN BY

10   SENDING IN THE MORTGAGE PAYMENT?

11       A       NOT THAT I CAN RECALL, NO.

12       Q       I WANT TO SHOW YOU WHAT WE PREVIOUSLY

13   MARKED IN THIS CASE AS PEOPLE'S NO. 1 FOR

14   IDENTIFICATION.  THIS IS -- PURPORTS TO BE A CHECK FROM

15   A COMPANY CALLED L.A. HEALTH PARTNERS MEDICAL GROUP.

16               ARE YOU FAMILIAR WITH THAT GROUP?

17       A       YES.

18       Q       HOW ARE YOU FAMILIAR WITH THAT?

19       A       THAT WAS ONE OF THE COMPANIES THAT PAUL

20   TURLEY AND UWAYDAH WERE BOTH OWNERS OF.

21       Q       OKAY.  AND DO YOU RECOGNIZE THE WRITING ON

22   THAT CHECK?

23       A       YES.  IT'S MARIA TURLEY'S.

24       Q       WHAT ABOUT THE SIGNATURE?

25       A       LOOKS LIKE PAUL TURLEY'S.

26       Q       OKAY.  AND DO YOU KNOW MARIA TURLEY?

27       A       YES.

28       Q       WHO IS SHE?

```
1        A     SHE IS PAUL'S WIFE, AND I KNEW HER THROUGH

2    THE COURSE OF WORKING WITH UWAYDAH AND PAUL.

3        Q     OKAY.  AND DID SHE WORK FOR THE

4    ORGANIZATION AS WELL?

5        A     YES.

6        Q     I WANT TO SHOW YOU --

7              IF I MAY MARK ANOTHER EXHIBIT, YOUR HONOR,

8    AS PEOPLE'S, I THINK, 7.

9        THE COURT:  IT IS.

10

11             (MARKED FOR IDENTIFICATION PEOPLE'S

12             EXHIBIT 7, PHOTOCOPY OF CHECK.)

13

14    MR. MATHAI:  IT'S ANOTHER CHECK.

15        Q     SHOWING YOU WHAT I'VE MARKED AS

16    PEOPLE'S 7, THIS IS A --

17             LET ME SHOW COUNSEL.

18             SHOWING YOU PEOPLE'S 7, DO YOU RECOGNIZE

19    WHAT IS SHOWN IN THIS EXHIBIT?

20        A     IT'S A CHECK THAT I WROTE TO KELLY PARK.

21        Q     OKAY.  AND WHY WOULD YOU WRITE --

22             IS IT FOR A LARGE AMOUNT OF MONEY?

23        A     75,000.

24        Q     AND WHY WOULD YOU WRITE A CHECK LIKE THAT

25    FOR KELLY PARK?  WAS THAT A COMMON OCCURRENCE?

26        A     IT WAS COMMON, WHETHER IT WAS A CHECK OR A

27    WIRE TRANSFER, YES.

28        Q     AND WHAT'S THE SCENARIO IN WHICH YOU WOULD
```

1    HAVE TO SEND MONEY LIKE THAT MUCH MONEY TO KELLY PARK?

2         A    KELLY WAS INVOLVED WITH OTHER COMPANIES,

3    INCLUDING THE PHARMACY AND THE COMPOUNDING PHARMACY AS

4    WELL AS, LIKE, A DOG FARM AND AN AVOCADO FARM THAT

5    UWAYDAH HAD.

6              SHE AT ONE POINT WAS -- SHE AND HER SISTER

7    WERE HELPING TO OVERTAKE -- OR TAKE OVER THE BILLING

8    PROCESS FOR GOLDEN STATE AND, I BELIEVE, POSSIBLY

9    FRONTLINE.  SO SHE WAS DOING A LOT OF THINGS AND HAD A

10   LOT OF EXPENSES WITH ATTORNEYS AND WITH JUST EVERYDAY

11   EXPENSES RELATED TO THOSE BUSINESSES.

12        Q    AND IS THIS CHECK IN PEOPLE'S 7 AN EXAMPLE

13   OF KELLY BEING REIMBURSED FOR PAYMENTS OR GETTING AN

14   ADVANCE FOR MONEY THAT SHE WOULD NEED TO MAKE PAYMENTS

15   WITHIN THE ORGANIZATION?

16        A    IT LOOKS LIKE THERE WAS.  IT SAYS 25 DUE

17   AS OF 12/18/09, PLUS 50.  SO THAT, TO ME, SAYS THAT

18   WE -- HE OWED HER 25 AND THEN GAVE AN ADDITIONAL 50 TO

19   PAY EXPENSES.

20        Q    AND WOULD YOU HAVE THESE TYPES OF CHECKS

21   THAT YOU WOULD WRITE TO VARIOUS PEOPLE IN THE

22   ORGANIZATION?

23        A    IT WAS USUALLY A WIRE TRANSFER.

24        Q    OKAY.  WOULD YOU DO THAT WITH PAUL TURLEY?

25        A    WITH PAUL, I USUALLY WOULD JUST -- HE

26   WOULD CALL AND ASK IF IT WAS OKAY FOR HIM TO TAKE HIS

27   MONTHLY PAY.  IT WAS HARD BECAUSE UWAYDAH OFTEN WOULD

28   SAY NO, WE DON'T HAVE ENOUGH MONEY TO GIVE TO PAUL.  SO

1    HE WOULD CALL.  AND THEN WHEN I GOT THE APPROVAL FROM

2    UWAYDAH, I COULD THEN TELL HIM GO AHEAD AND WRITE A

3    CHECK, IN WHICH HE WOULD WRITE A CHECK TO HIMSELF, I

4    BELIEVE, MOST TIMES.

5         Q    OKAY.  AND WITH REGARDS TO THE PROPERTIES,

6    IS IT FAIR TO SAY THAT YOU HAD LOTS OF CONVERSATIONS

7    WITH UWAYDAH ABOUT PAYMENTS THAT WOULD BE NEEDED TO

8    EITHER PAY FOR THE PROPERTIES OR KEEP UP THE

9    PROPERTIES, UPKEEP ON THE PROPERTIES?

10        A    YES.  WE HAD SEVERAL SPREADSHEETS THAT

11   WOULD SHOW, LIKE, HOW MUCH MONEY WAS IN ALL THE

12   ACCOUNTS AT ANY GIVEN TIME AS WELL AS WHAT BILLS, WHAT

13   WAS DUE FOR EACH PROPERTY OR EACH COMPANY.

14        Q    ARE YOU FAMILIAR WITH A COMPANY CALLED

15   MEDCONSULT?

16        A    YES.

17        Q    HOW ARE YOU FAMILIAR WITH THEM OR WHAT DO

18   YOU KNOW ABOUT THAT COMPANY?

19        A    MEDCONSULT WAS A COMPANY THAT CAME TO BE

20   KNOWN AROUND -- EARLY ON, AROUND 2004 I BELIEVE.  AND I

21   REMEMBER HIS -- ONE OF HIS ATTORNEYS -- IT WAS EITHER

22   RICHARD GREEN OR MARK WEISS.  -- CREATED A CONSULTING

23   AGREEMENT FOR UWAYDAH WITH MEDCONSULT HERE IN THE

24   UNITED STATES.

25             AND WHAT I BELIEVED -- WELL, I'LL FINISH

26   THAT LINE OF THOUGHT BEFORE I GO BACK TO WHAT I BELIEVE

27   ABOUT.

28             AND THEN SOON THEREAFTER THERE WAS A

1  SETTLEMENT AGREEMENT, AND UWAYDAH AGREED TO TRANSFER --
2  TO SIGN GUARANTEES ON ALL OF HIS COMPANIES AND ALL OF
3  THEIR COLLECTIONS IN PAYMENT TO MEDCONSULT FOR WHATEVER
4  SETTLEMENT THERE WAS.  I GUESS HE WAS -- MEDCONSULT
5  SAID THAT HE DID NOT ABIDE BY THEIR CONSULTING
6  AGREEMENT.  THEREFORE, HE OWED THEM, LIKE, $10 MILLION
7  OR SOMETHING LIKE THAT.
8            BUT AS I WAS LIVING THROUGH THAT, IT WAS
9  KNOWN THAT MEDCONSULT WAS JUST A WAY FOR UWAYDAH TO
10  SEND MONEY TO LEBANON FIRST AND FOREMOST WITHOUT HAVING
11  TO PAY THE BILLS HERE FIRST BECAUSE HE DID EVERYTHING
12  TO NOT ALLOW THE CREDITORS TO GET FINANCES.
13            OR HE WAITED TO PAY THE OFFICE BILLS LAST
14  BECAUSE HE KNEW THOSE ARE THE ONES THAT WOULDN'T REALLY
15  COME AFTER HIM.
16       Q      DID YOU SEE A LOT OF OVERLAP BETWEEN
17  UWAYDAH'S OPERATIONS AND MEDCONSULT?
18       A      I REALLY ONLY SAW MEDCONSULT WITH THE
19  $50,000 A MONTH.  THAT WAS ALL IT WAS.  I WAS IN
20  COMMUNICATION WITH -- WITH HIS --
21            HIS MOTHER WOULD SOMETIMES CALL OR EMAIL
22  OR SOMETHING AND SAY WHERE IS THE MEDCONSULT MONEY.
23  AND I BELIEVE HIS SISTER AT ONE POINT DID AS WELL.
24            MEDCONSULT FROM, WHAT I SAW WAS -- HAD A
25  BANK ACCOUNT IN LEBANON AT HIS BROTHER-IN-LAW'S BANK,
26  WHICH HIS BROTHER-IN-LAW WAS THE MANAGER OF BOND BANK.
27            IT WAS ALL, LIKE, TIED TOGETHER IN MY MIND
28  THAT HIS FAMILY IS ASKING FOR THE MONEY FROM LEBANON,

1    AND I WOULD SEND IT EVERY MONTH.

2        Q      BASED ON YOUR EXPERIENCE WORKING WITH

3    UWAYDAH, DID YOU SEE THAT THE PREMISE OF THE SO-CALLED

4    SETTLEMENT AGREEMENT WAS UNUSUAL IN ALL YOUR OTHER

5    HISTORY WITH UWAYDAH?

6        A      NO.  IT WAS JUST -- IT WAS NORMAL FOR HIM

7    TO SAY THAT HE OWED SOMEONE MONEY IN ORDER TO NOT PAY

8    SOMEONE ELSE MONEY AS TO HIDE IT.

9        Q      AND IS THAT WHAT YOU BELIEVE WAS HAPPENING

10   WITH MEDCONSULT?

11       A      YES.

12       Q      AND ARE YOU FAMILIAR WITH A COMPANY CALLED

13   CONNEMARA?

14       A      I'VE HEARD OF THE NAME, BUT I BELIEVE IT

15   WAS SOMETHING -- I WASN'T PERSONALLY INVOLVED VERY MUCH

16   THAT I CAN REMEMBER.

17       Q      OKAY.  DID YOU EVER SEE OR COME TO

18   UNDERSTAND UWAYDAH PUTTING PROPERTIES IN REAL ESTATE

19   HOLDING COMPANIES?

20       A      THE COMPANIES WERE JUST COMPANIES.  I

21   DON'T KNOW THAT I THOUGHT THEY WERE REAL ESTATE HOLDING

22   COMPANIES.  THEY WERE JUST COMPANIES CREATED TO HAVE

23   THE PROPERTY NOT IN PAUL'S NAME, NOT IN UWAYDAH'S NAME

24   BUT IN A COMPANY NAME THAT COULDN'T BE TRACED BACK TO

25   UWAYDAH.

26       Q      OKAY.  AND WAS THAT DONE AT UWAYDAH'S

27   DIRECTION?

28       A      YES.

```
1         Q      DID YOU EVER LIVE ON ANY OF THESE
2    PROPERTIES THAT I MENTIONED?
3         A      NO.
4         Q      DID YOU EVER DO WORK AT ANY OF THESE
5    PROPERTIES?
6         A      I WOULD MEET UWAYDAH OCCASIONALLY, BUT I
7    DIDN'T HAVE AN OFFICE AT ANY OF THEM.
8         Q      WHERE WOULD YOU MEET UWAYDAH?
9         A      I MET HIM AT BEVERLY GROVE PLACE A LOT.
10   AND I MET HIM -- I HELPED HIM OUT WITH GALLEON.  I
11   DON'T REMEMBER WHAT.  BUT HE HAD A RENTER IN THERE, I
12   THINK, AND HE HAD -- HE LIVED MOSTLY WITH SOMEONE AT
13   5005, 5007.  THAT WAS WHERE HIS HOME WAS.  AND I WOULD
14   MEET HIM THERE OFTEN AS WELL.
15        Q      SO DID YOU -- YOU ACTUALLY HAD KNOWLEDGE
16   THAT UWAYDAH WAS UTILIZING ONE OR MORE OF THESE
17   PROPERTIES FOR HIS OWN PERSONAL BENEFIT?
18        A      YES.
19        Q      WHAT ABOUT FOR THE BENEFIT OF OTHERS THAT
20   WERE CLOSE TO HIM?
21        A      WELL, HE HAD, LIKE, THE BILLING OPERATION
22   FOR SOMETHING.  IT MIGHT HAVE BEEN GSP OR ANOTHER
23   COMPANY OUT OF THE 5509 OCEAN FRONT WALK PROPERTY.
24               I BELIEVE AT ONE POINT HE HAD HECTOR
25   LIVING THERE.  HECTOR WAS HIS DRIVER.  I THINK HE MIGHT
26   HAVE HAD HECTOR LIVING THERE FOR A LITTLE WHILE.  AND
27   BEVERLY GROVE PLACE, HE HAD -- HE WAS THERE MOST OF THE
28   TIME.  I DON'T KNOW IF ANYONE ELSE LIVED THERE.   AND
```

1   LIKE I SAID BEFORE, 5005 WAS HIS HOME.

2        Q      5509 OR 5007?

3        A      5007.

4        Q      ALL RIGHT.  WHAT ABOUT -- DO YOU KNOW A

5   PERSON NAMED AMBER WOODLEY?

6        A      YES.

7        Q      HOW DO YOU KNOW HER?

8        A      I KNOW HER -- INITIALLY HE HIRED HER AS A

9   RECEPTIONIST.  BUT SHE WAS ALSO DATING HIM FOR SOME

10  TIME DURING THE TIME I WAS THERE.

11       Q      OKAY.  DID YOU KNOW -- DO YOU KNOW IF SHE

12  EVER LIVED AT ANY OF THESE PROPERTIES?

13       A      I THINK I'VE JUST HEARD RECENTLY THAT SHE

14  LIVED IN ONE OF THEM.  BUT I DON'T BELIEVE SHE LIVED AT

15  ANY OF THEM WHEN I WAS STILL AROUND.

16       Q      OKAY.  DID YOU STOP WORKING WITH UWAYDAH

17  AT SOME POINT IN TIME?

18       A      YES.  I LEFT IN JUNE, 2010.

19       Q      WHAT CAUSED YOU TO LEAVE IN JUNE OF 2010?

20       A      I WAS SLOWLY ON MY WAY OUT AS IT WAS.  WE

21  WERE KIND OF HITTING HEADS ABOUT THINGS, BANK ACCOUNTS.

22  I DON'T REMEMBER SPECIFICALLY WHAT.

23              BUT I ULTIMATELY QUIT THE DAY THAT KAREN

24  THOMPSON CAME OVER FROM SANTA MONICA POLICE DEPARTMENT

25  AND SAID THAT THEY WERE INVESTIGATING THE MURDER OF

26  JULIANNA REDDING.

27              SO AT THAT POINT I JUST SAID ENOUGH IS

28  ENOUGH, AND I LITERALLY -- SHELLY, MYSELF AND MY

1    HUSBAND, WE JUST STOPPED IMMEDIATELY, AND THAT WAS IT.

2         Q      AT THE TIME YOU LEFT, WAS THERE -- DID YOU

3    GIVE PROFFER STATEMENTS TO THE PEOPLE OF THE STATE OF

4    CALIFORNIA, THE DISTRICT ATTORNEY'S OFFICE?  ALAN

5    JACKSON WAS ONE OF THE PROSECUTORS?

6         A      YES.

7         Q      AND DID YOU DIRECT INVESTIGATORS TO A

8    STORAGE UNIT IN SANTA MONICA AT SOME POINT IN TIME?

9         A      I DON'T REMEMBER HOW IT CAME ABOUT, BUT

10   YES.  THEY -- I HAD KNOWLEDGE OF THE STORAGE UNIT IN --

11   I THINK IT WAS IN MARINA DEL REY.  BUT SHELLY HAD MORE

12   ACCESS TO THAT.  I THINK SHELLY HAD A KEY, AND I DON'T

13   REMEMBER HAVING A KEY.

14        Q      AT SOME POINT IN TIME AFTER YOU PROFFERED

15   AND HAD KIND OF -- DID YOU MAKE IT KNOWN TO UWAYDAH

16   THAT YOU WERE NO LONGER AVAILABLE TO HELP HIM?

17        A      YES.

18        Q      DID YOU COME INTO CONTACT WITH ONE OF

19   UWAYDAH'S LAWYERS NAMED BENJAMIN GLUCK?

20        A      YES.

21        Q      AND OVER THE COURSE OF NEXT YEAR OR SO DID

22   YOU -- WERE YOU IN CLOSE CONTACT AND NEGOTIATIONS WITH

23   BENJAMIN GLUCK WITH REGARDS TO THE BANK ACCOUNTS, THE

24   BUSINESS ENTITIES, AND OTHER ASSETS THAT YOU WERE

25   CONNECTED TO FOR UWAYDAH?

26        A      I WAS.  INITIALLY IT WAS ANOTHER LAWYER

27   FIRM, I BELIEVE, OR ANOTHER LAWYER.

28             I BECAME MORE IN CONTACT WITH BENJAMIN

1    GLUCK AFTER UWAYDAH WAS SUING ME WITH DIFFERENT

2    COMPANIES.  BUT IT WAS KIND OF EARLY ON GLUCK STARTED

3    TO TRY TO NEGOTIATE TO GET THINGS OF UWAYDAH'S.

4              I DIDN'T HAVE A LOT, BUT IT WAS JUST -- HE

5    WAS TRYING TO, OF COURSE, GET WHATEVER HE COULD THAT HE

6    THOUGHT I HAD POSSESSION OF.

7         Q    ULTIMATELY, DID -- WERE YOU SUED BY --

8    WERE YOU SUED MULTIPLE TIMES BY UWAYDAH-CONTROLLED

9    ENTITIES?

10        A    YES.  I THINK FIVE TO EIGHT TIMES, I

11   BELIEVE.

12        Q    YOU'VE BEEN SUED SINCE 2010?

13        A    YES.

14        Q    IS ONE OF THOSE LAWSUITS A LAWSUIT

15   FRONTLINE MEDICAL VS. MARISA SHERMBECK?

16        A    YES.

17        Q    AND IN THAT LAWSUIT WAS BENJAMIN GLUCK THE

18   ATTORNEY FOR FRONTLINE?

19        A    I THINK SO.

20        Q    AND WAS THAT -- IF YOU REMEMBER, WAS THAT

21   CIVIL COMPLAINT THAT WAS FILED AGAINST YOU VERIFIED BY

22   PAUL TURLEY?

23        A    I DON'T REMEMBER.

24        Q    IF YOU COULD, GIVE US JUST IN GENERAL WHAT

25   WAS THE ALLEGATIONS THAT WERE MADE AGAINST YOU IN THAT

26   CIVIL LAWSUIT?

27        A    THE FIRST THREE LAWSUITS KIND OF ALL

28   ROLLED TOGETHER IN MY MIND BECAUSE THE FRONTLINE CASE,

```
1    I THINK HE SUED FOR MONEY THAT I SUPPOSEDLY EMBEZZLED

2    OR STOLE.

3            AND THEN I HAD -- HE ALSO SUED FROM A

4    DIFFERENT COMPANY SAYING I STOLE SOME MEDICAL EQUIPMENT

5    OR SOMETHING LIKE THAT.

6            AND THEN, AGAIN, THE THIRD COMPANY I THINK

7    WAS JUST ABOUT MONEY.

8       Q    OKAY.  NOW, WERE THE FACTUAL CLAIMS THAT

9    WERE MADE IN THOSE THREE LAWSUITS YOU'RE TALKING ABOUT

10   FROM THAT ERA, 2011 OR SO --

11           IS THAT RIGHT?

12      A    IT WAS 2010/2011.

13      Q    WERE THE FACTUAL BASIS OF THOSE CLAIMS

14   THAT YOU HAD EMBEZZLED IN PARTICULAR WAYS, WERE THEY

15   TRUE?

16      A    NO.

17      Q    DID, IN FACT, AFTER YOU LEFT UWAYDAH'S

18   ORGANIZATION, WAS THERE A DISPUTE OVER A PARTICULAR

19   AMOUNT OF MONEY THAT WAS RETAINED BY YOU AT THAT TIME?

20      A    YES.

21      Q    AND DID YOU ULTIMATELY SETTLE WITH UWAYDAH

22   OR UWAYDAH ENTITIES WITH REGARD TO THAT AMOUNT?

23      A    YES.  INITIALLY I HAD TO FILED BANKRUPTCY

24   BECAUSE UWAYDAH WOULDN'T STOP SUING ME, AND I COULDN'T

25   AFFORD TO DEFEND MYSELF ANY LONGER.

26           HE THEN SUED ME IN BANKRUPTCY COURT, WHICH

27   THEN INVOLVED BEN GLUCK.  AND HE SPEARHEADED THE

28   SETTLEMENT, WHICH ENDED UP BEING A HIGHER NUMBER THAN
```

1    WHAT IT SHOULD HAVE BEEN.  I JUST NEEDED TO GET UWAYDAH

2    TO LEAVE ME ALONE.

3         Q     DO YOU CURRENTLY HAVE ANY LAWSUITS PENDING

4    AGAINST YOU FROM ANY UWAYDAH-CONTROLLED ENTITIES?

5         A     NOT THAT I KNOW OF.

6         Q     DID YOU ACTUALLY -- DID YOU, IN FACT, GET

7    SUED --

8               AFTER YOU PROFFERED WITH THE PEOPLE IN

9    2017, YOU PROFFERED AGAIN WITH THE PEOPLE.

10              CORRECT?

11        A     YES.

12        Q     DID YOU GET SUED AFTER THAT PROFFER BASED

13   ON SOMETHING THAT YOU SAID DURING THE PROFFER?

14        A     I THINK THE -- YES.  I GOT SUED IN

15   2019/2020, AND I THINK THE PREMISE OF THE CASE WAS

16   REGARDING THE SETTLEMENT THAT I HAD MADE WITH THEM BACK

17   IN 2014, 2012 TO 2014.

18              BUT I BELIEVE THEY REFERENCED SOMETHING

19   THAT I HAD SAID IN MY PROFFER.

20        Q     WERE YOU AWARE --

21              NOW, WERE YOU SUBPOENAED TO TESTIFY IN A

22   CIVIL CASE WHEREIN NOW YEARS LATER FRONTLINE WAS SUING

23   BENJAMIN GLUCK?

24        A     YES.

25        Q     AND WHO SUBPOENAED YOU?

26        A     BEN GLUCK.

27        Q     AND WERE YOU ADDED BY YOUR COUNSEL, AMY

28   JACKS, IN DEALING WITH THAT SUBPOENA?

```
 1          A       YES.

 2          Q       DID YOU HONOR THE SUBPOENA AND SHOW UP TO

 3    COURT?

 4          A       I DID.

 5          Q       DID YOU TESTIFY IN THAT PROCEEDING?

 6          A       I DID.

 7          Q       AND WERE YOU ACCOMPANIED BY AMY JACKS,

 8    YOUR LAWYER, DURING THAT TESTIMONY?

 9          A       YES.

10          Q       DID -- WERE YOU ASKED DURING THAT

11    TESTIMONY IN THAT CIVIL PROCEEDING ABOUT THE FACTS

12    UNDERLYING THE FRONTLINE VS. MARISA SHERMBECK LAWSUIT

13    FROM 2011/2012?

14          A       YES.

15          Q       DO YOU KNOW WHAT RELEVANCE, IF ANY, THAT

16    LAWSUIT HAD TO THE BENJAMIN GLUCK LAWSUIT LAST YEAR?

17          A       I THINK THEY WERE JUST TRYING TO DISCREDIT

18    MY TESTIMONY OR TO MAKE ME -- OR TO MAKE ME FALTER, AND

19    BY FALTERING, RUIN MY PLEA AGREEMENT WITH THE DA'S

20    OFFICE.  I WASN'T SURE.

21          Q       DID DAVID BROWNE OR GEORGE SHOHET --

22                  YOU KNOW THOSE PEOPLE?

23          A       I KNOW WHO THEY ARE, YES.

24          Q       WHO ARE THEY TO YOU?

25          A       SHOHET IS ONE OF UWAYDAH'S ATTORNEYS.  SO

26    IS BROWNE, BUT I DIDN'T HAVE MUCH KNOWLEDGE OF BROWNE.

27          Q       DID EITHER OF THOSE LAWYERS ASK TO SPEAK

28    WITH YOU OR MAKE ANY EFFORT TO SPEAK WITH YOU BEFORE
```

1    YOUR TESTIMONY?

2          A    NO.

3          Q    DID THEY EVER OFFER TO SHOW YOU ANY

4    DOCUMENTS ABOUT YOUR PREVIOUS LAWSUIT FRONTLINE VS.

5    MARISA SHERMBECK?

6          A    I DON'T THINK SO.

7          Q    WHEN YOU TESTIFIED, WERE YOU SHOWN -- WERE

8    YOU CONFRONTED WITH DOCUMENTS THAT SHOWED THAT -- WELL,

9    LET ME ASK YOU THIS WAY.

10          DID YOU BECOME AWARE THAT PAUL TURLEY ALSO

11   HAD ENTERED A FACTUAL PLEA IN THIS CASE AND ENTERED A

12   COOPERATION AGREEMENT WITH THE PEOPLE?

13         A    YES, I WAS AWARE OF IT.

14         Q    WERE YOU AWARE OF THE SPECIFIC STATEMENTS

15   HE MADE TO THIS COURT IN HIS FACTUAL STATEMENT PLEA?

16         A    YES.

17         Q    AND HOW ARE YOU AWARE OF THAT?

18         A    BECAUSE IT RELATED TO ME.  THERE WAS ONE

19   STATEMENT THAT PAUL HAD BASICALLY SUPPORTED MY STANCE

20   THAT I DID NOT USE UWAYDAH'S CREDIT CARD OR MONIES TO

21   BUY PERSONAL ITEMS, SUCH AS JEWELRY AND TRIPS OR CHILD

22   SUPPORT, AS THEY -- AS THEY ALLEGED IN THEIR LAWSUIT.

23         Q    AND DID YOU AGREE WITH THAT FACTUAL

24   STATEMENT THAT HE MADE IN THIS COURT?

25         A    YES.

26         Q    IN THE CIVIL TRIAL GLUCK VS. FRONTLINE OR

27   FRONTLINE VS. GLUCK, WERE YOU EVER CONFRONTED WITH ANY

28   DOCUMENTATION THAT WOULD SHOW THAT THAT STATEMENT BY

```
 1    PAUL TURLEY WAS NOT TRUE?

 2         A     NO.

 3         Q     WERE YOU AWARE OF A HEARING THAT WAS

 4    PROCEEDING IN THE WORKERS' COMP APPEALS BOARD IN

 5    SEPTEMBER AND THE FOLLOWING WINTER OF THIS LAST YEAR

 6    REGARDING THE PROSECUTION OF LIENS IN THAT SYSTEM?

 7         A     YES.

 8         Q     HOW WERE YOU AWARE OF THAT LAWSUIT?

 9         A     UP UNTIL RECENTLY I WAS RECEIVING MAILINGS

10    BECAUSE MY NAME WAS STILL ASSOCIATED WITH GOLDEN STATE

11    PHARMACEUTICALS.  SO THERE WERE SOME MAILINGS NOTIFYING

12    ME OF CERTAIN HEARINGS AND SUCH.

13         Q     THEN WERE YOU EVER ASKED TO TESTIFY IN

14    THOSE PROCEEDINGS?

15         A     I DON'T BELIEVE SO.  I DON'T REMEMBER

16    RECEIVING ANYTHING SPECIFIC TO THAT.

17         Q     BASED ON YOUR EXPERIENCE WORKING WITH

18    FRONTLINE AND MUNIR UWAYDAH FOR THAT MANY YEARS, DO YOU

19    HAVE A GENERAL UNDERSTANDING OF THE IMPORTANCE OF THAT

20    LIEN SYSTEM TO UWAYDAH'S ORGANIZATION?

21         A     YES.

22         Q     CAN YOU DESCRIBE THAT FOR US?

23         A     WHEN AN INSURANCE COMPANY PAYS A BILL,

24    THEY DON'T USUALLY PAY 100 PERCENT.  AND WORK COMP -- I

25    DON'T KNOW THE SPECIFICS, BUT I DO KNOW THAT THE

26    MAJORITY OF THE CLAIM THAT IS UNPAID GOES TO A LIEN

27    COLLECTOR.  AND THEN THAT IS DEALT WITH IN THAT COURT,

28    YOU KNOW, THAT PROCESS.
```

1          BUT I WASN'T -- I'M NOT SURE OF THE EXACT

2    PROCESS, BUT I KNOW THAT THE REMAINDER OF ALL OF THE

3    INVOICES THAT WEREN'T PAID OR BILLINGS THAT WEREN'T

4    PAID WOULD GO INTO THE WORK COMP APPEALS BOARD SO THAT

5    THEY COULD POTENTIALLY COLLECT MORE.

6          Q     HOW IMPORTANT WAS THAT LIEN SYSTEM TO

7    UWAYDAH BASED ON YOUR EXPERIENCE WORKING WITH HIM?

8          A     IT WAS A BIG CHUNK OF MONEY.  SO IT COULD

9    HAVE BEEN MILLIONS OF DOLLARS.  SO IT WAS VERY

10   IMPORTANT TO HIM TO HAVE THAT COLLECTED.

11         Q     AND DID YOU SEE UWAYDAH DO THINGS WITH

12   REGARDS TO FORMING ENTITIES TO HELP COLLECT ON LIENS

13   THAT WERE GENERATED FROM FRONTLINE?

14         A     I DON'T REMEMBER AT THIS TIME OF ANY

15   COMPANIES.  THAT MIGHT HAVE BEEN AS I WAS ON MY WAY

16   OUT.  BUT I CAN'T THINK OF ANY COMPANY.

17         Q     BUT AS YOU SIT HERE TODAY, DO YOU HAVE

18   KNOWLEDGE AS TO HOW MUCH MONEY MIGHT BE AT STAKE IN

19   FRONTLINE'S LITIGATION IN THE WORKERS' COMP APPEAL

20   BOARD?

21         A     I THINK I JUST KIND OF HEARD THAT IT WAS

22   MILLIONS, BUT I DON'T KNOW AN EXACT NUMBER.

23         MR. MATHAI:  THANK YOU.

24             NOTHING FURTHER AT THIS TIME.

25         THE COURT:  THANK YOU.

26             I HEARD MR. TURLEY'S NAME A FEW TIMES.  DO

27   YOU HAVE ANY CROSS-EXAMINATION?

28         MR. MOEST:  A LITTLE BIT.

```
 1          THE COURT:  ALL RIGHT.  GO AHEAD.

 2

 3                    CROSS-EXAMINATION

 4   BY MR. MOEST:

 5        Q      YOU TESTIFIED ABOUT A SETTLEMENT YOU MADE

 6   IN A BANKRUPTCY CASE.

 7        A      SORRY?

 8        Q      YOU SAID THERE WAS A SETTLEMENT YOU MADE

 9   IN A BANKRUPTCY CASE.

10        A      YES.

11        Q      WHAT WAS THE NATURE OF THE CLAIM IN

12   BANKRUPTCY AGAINST YOU?

13        A      I HAD LISTED UWAYDAH AND ALL OF HIS

14   COMPANIES, PAUL TURLEY, ALL THE ASSOCIATED PEOPLE AS

15   POTENTIAL CREDITORS BECAUSE I KNOW FROM EXPERIENCE WITH

16   UWAYDAH THAT HE WOULD USE ANYONE AND ANY COMPANY TO SUE

17   ME.  SO I LISTED THEM IN THE BANKRUPTCY IN THE EVENT

18   THAT I WOULD GET SUED.

19             AND THERE WAS -- WHEN I LEFT WORKING FOR

20   THE DOCTOR, THERE WAS SOME COMPANIES THAT WERE IN MY

21   NAME, BANK ACCOUNTS THAT WERE IN MY NAME THAT MY

22   CRIMINAL ATTORNEY TOLD ME THAT IF I WERE TO TURN THOSE

23   OVER TO UWAYDAH THAT I WOULD BE ARRESTED IMMEDIATELY

24   PER THE DA'S OFFICE.  SO HE ULTIMATELY TOLD ME TO KEEP

25   THOSE FUNDS, WHICH I DID.

26             AND SINCE UWAYDAH CONTINUED TO SUE ME FOR

27   THOSE FUNDS, I SETTLED WITH HIM VIA BENJAMIN GLUCK

28   BEING VERY PERSUASIVE, KNOWING THAT UWAYDAH WOULD NEVER
```

1   LET ME GO.  SO I SETTLED TO PAY HIM A SMALL MONTHLY FEE

2   A MONTHLY AMOUNT.

3        Q      DID YOU USE THE MONEY IN THOSE ACCOUNTS TO

4   PAY FOR YOUR OWN LAWYERS?

5        A      I DID.

6        Q      DO YOU KNOW HOW MUCH YOU PAID YOUR LAWYERS

7   OUT OF THAT MONEY?

8        A      I DON'T REMEMBER THE NUMBER AS I SIT HERE.

9        Q      WOULD IT HAVE BEEN THOUSANDS OF DOLLARS?

10        A      HUNDREDS.  PROBABLY OVER A 100,000 AT

11   LEAST.

12        Q      AND DID YOU USE THAT MONEY FOR ANYTHING

13   ELSE OTHER THAN TO RETURN THE MONEY EVENTUALLY IN

14   PAYMENTS TO UWAYDAH'S INTERESTS?

15        A      I USED THE MONEY THAT I HAD AS LIVING

16   EXPENSES.  SHELLY ROSE KELLY RECEIVED SOME OF THE

17   MONEY.  SO YES, I SPENT THE MONEY.

18        Q      AND SHELLY ROSE KELLY, WHO IS THAT?

19        A      SHE WAS INITIALLY -- I THINK STARTED AS MY

20   ASSISTANT BUT THEN BECAME ONE OF UWAYDAH'S ASSISTANTS.

21        Q      AND DO YOU KNOW WHETHER SHE USED A

22   FRONTLINE CREDIT CARD FOR HER OWN PERSONAL EXPENSES?

23        A      I DON'T THINK SHE HAD A FRONTLINE CREDIT

24   CARD.

25        Q      DO YOU KNOW WHETHER SHE EMBEZZLED ANY

26   MONEY FROM FRONTLINE OR FROM ANY OTHER ENTITY

27   CONTROLLED BY UWAYDAH?

28        A      NOT THAT I CAN THINK OF.

1        Q       DO YOU KNOW WHETHER SHE'S ADMITTED

2   EMBEZZLEMENT IN ANY KIND OF A CIVIL PROCEEDING?

3        A       NOT THAT I KNOW OF.

4        MR. MOEST:  NOTHING FURTHER, YOUR HONOR.

5        THE COURT:  THANK YOU.

6             REDIRECT.

7

8                  REDIRECT EXAMINATION

9   BY MR. MATHAI:

10       Q       JUST A QUICK FOLLOW-UP.

11            OVER THE COURSE OF YOUR COOPERATION

12   AGREEMENT WITH THE PEOPLE, DID YOU KEEP THE PEOPLE

13   APPRISED OF ANY NEW INFORMATION, LIKE LAWSUITS AGAINST

14   YOU OR OTHER INFORMATION YOU WOULD HEAR, WOULD YOU

15   CONTACT US THROUGH YOUR ATTORNEY, AMY JACKS?

16       A       YES.

17       MR. MATHAI:  THANK YOU.

18            NOTHING FURTHER.

19       THE COURT:  ANYTHING FURTHER?

20       MR. MOEST:  NO.

21       THE COURT:  THANK YOU FOR BEING HERE.  YOU MAY

22   STEP DOWN.

23

24            (THE WITNESS LEAVES THE STAND.)

25

26       THE COURT:  DO YOU HAVE ANOTHER WITNESS?

27       MR. MATHAI:  YES.

28            PEOPLE CALL SHANNON DEVANE.

1               SHANNON DEVANE,

2        CALLED BY THE PEOPLE, AS A WITNESS,

3         WAS SWORN AND TESTIFIED AS FOLLOWS:

4

5        THE CLERK:  YOU DO SOLEMNLY STATE THAT THE

6   TESTIMONY YOU ARE ABOUT TO GIVE IN THE CAUSE NOW

7   PENDING BEFORE THIS COURT SHALL BE THE TRUTH, THE WHOLE

8   TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU, GOD?

9        THE WITNESS:  I DO.

10       THE CLERK:  PLEASE, STEP FORWARD AND BE SEATED AT

11  THE WITNESS STAND.

12             PLEASE ADJUST THE MICROPHONE COMFORTABLY

13  IN FRONT OF YOU.  SPEAKING INTO THE MICROPHONE, PLEASE,

14  STATE AND THEN SPELL YOUR FULL NAME FOR THE RECORD.

15       THE WITNESS:  SHANNON DEE MOORE DEVANE,

16  S-H-A-N-N-O-N, MIDDLE NAME IS, D-E-E, HYPHEN, MOORE,

17  M-O-O-R-E, LAST NAME DEVANE, D-E-V-A-N-E.

18       THE COURT:  THANK YOU.

19             YOU MAY PROCEED.

20       MR. MATHAI:  THANK YOU.

21

22                   DIRECT EXAMINATION

23  BY MR. MATHAI:

24       Q     MS. DEVANE, YOU WORKED FOR A PERSON NAMED

25  MUNIR UWAYDAH IN THE PAST?

26       A     YES.

27       Q     HOW LONG AGO WAS IT THAT YOU FIRST MET HIM

28  AND STARTED WORKING WITH HIM?

```
1          A      WELL, I MET HIM IN APPROXIMATELY 2002.
2    AND I STARTED WORKING WITH HIM IN APPROXIMATELY 2004.
3          Q      AND HOW LONG DID YOU WORK WITH HIM
4    OVERALL?
5          A      I WORKED WITH HIM OFF AND ON UNTIL 2019.
6          Q      AND IS IT FAIR TO SAY THAT IN THOSE YEARS
7    YOU BECAME A CLOSE ASSOCIATE WITH HIM AND A CONFIDANTE?
8          A      WITH DR. UWAYDAH?
9          Q      YES.
10         A      YES.
11         Q      DID YOU ASSIST HIM IN ALL TYPES OF
12   DIFFERENT THINGS THAT NEEDED TO BE DONE FOR VARIOUS
13   BUSINESS ENTITIES THAT HE CONTROLLED?
14         A      YES.
15         Q      DID -- CAN YOU TELL US SOME OF THE --
16                DID YOU PUT YOUR NAME ON SOME BUSINESS
17   ENTITIES THAT WERE ACTUALLY OWNED AND CONTROLLED BY
18   HIM?
19         A      YES.
20         Q      DID YOU DO THAT AT HIS DIRECTION?
21         A      YES.
22         Q      AND DID YOU DO THAT MULTIPLE OCCASIONS FOR
23   MULTIPLE DIFFERENT COMPANIES?
24         A      YES.
25         Q      CAN YOU JUST TELL US WHAT COMPANIES YOU
26   PARTICIPATED WITH HIM IN THAT WAY?
27         A      THERE WAS A COMPANY CALLED ACCOUNTS
28   RECEIVABLE ACQUISITIONS, WHICH OWNED ACCOUNTS
```

1    RECEIVABLE LIMITED.  SO IT WAS CALLED ARLTD.

2              THERE WAS A CAL REDWOOD.  IT WAS LIKE AN

3    MRI COMPANY.  NO, I'M SORRY.  DME COMPANY.

4              AND THEN THERE WAS MEDICAL SOFTWARE

5    MANAGEMENT.

6              BLUE OAK ASSET MANAGEMENT.

7         Q    ARE THOSE SOME OF THE MORE SIGNIFICANT

8    ENTITIES THAT YOU LENDED YOUR NAME TO?

9         A    YES.

10        Q    AND WITH REGARDS TO ALL OF THOSE ENTITIES,

11   WERE THEY ALL OWNED AND CONTROLLED BY UWAYDAH?

12        A    YES.

13        Q    WERE SOME OF THOSE ENTITIES FOCUSED ON

14   MANAGING AND COLLECTING ON LIENS IN THE WORKERS

15   COMPENSATION APPEALS BOARD?

16        A    YES.

17        Q    OKAY.  WHAT'S THE SIGNIFICANCE OF LIENS IN

18   THE UWAYDAH ORGANIZATION?

19        A    LIKE WHY IS A LIEN DONE OR --

20        Q    YEAH.  WELL, WHAT'S THE VALUE IN HAVING

21   LIENS TO UWAYDAH?

22        A    THE VALUE IS IS THAT THE CLINICS AND

23   HIMSELF PRIMARILY ALSO TREATED -- WE WERE LIKE ON THE

24   APPLICANT'S SIDE, NOT THE DEFENSE.  SO A LOT OF THE

25   CLAIMS WERE DENIED CLAIMS.  SO WE WOULD HAVE TO PUT

26   LIENS ON THE CASES AND WAIT FOR THE CASES TO SETTLED.

27              AND THEN ONCE THE CASES SETTLED, WE HAVE

28   THESE LIENS WHERE THEY WOULD GO TO WORK COMP APPEALS

1    BOARD.  AND DIFFERENT COMPANIES WOULD GO THERE.  HE

2    WOULD HIRE THE PEOPLE TO GO THERE TO COLLECT AND GET

3    PAID ON THESE MEDICAL LIENS.

4         Q     AND BASED ON YOUR YEARS OF EXPERIENCE

5    WORKING WITH UWAYDAH, WAS -- DID YOU COME TO KNOW THAT

6    THERE WAS A LOT OF VALUE IN THE LIENS THAT UWAYDAH WAS

7    PURSUING OR INTERESTED IN?

8         A     YES.

9         Q     AND HOW MUCH VALUE WAS THERE?

10        A     I DON'T KNOW EXACTLY HOW MUCH MONEY THERE

11   WAS, LIKE, IN THE CLINICS BECAUSE I WASN'T REALLY PART

12   OF THAT WITH FIRSTLINE AND BLUE OAK, LIKE, EXACTLY HOW

13   MUCH WAS OUT THERE.

14             BUT WITH ACCOUNTS RECEIVABLE, I WAS -- THE

15   LIENS WERE FOR SURGERIES DONE AT MISSION COMMUNITY

16   HOSPITAL.  AND I ASSISTED WITH DR. UWAYDAH.  AND THERE

17   WAS, LIKE, OVER THREE-AND-A-HALF MILLION DOLLARS IN

18   RECEIVABLES THAT HAD CAME IN.

19        Q     OKAY.  AND IN YOUR -- DID YOU AT SOME

20   POINT IN TIME IN YOUR TENURE WITH WORKING WITH

21   DR. UWAYDAH, WERE YOU CHARGED CRIMINALLY?

22        A     YES.

23        Q     WHERE WERE YOU CHARGED?

24        A     I WAS CHARGED IN RIVERSIDE COUNTY, STATE.

25   I WAS CHARGED IN SAN DIEGO COUNTY, STATE.  AND I WAS

26   CHARGED IN SAN DIEGO, FEDERAL.

27        Q     AND WHAT TIME PERIOD DID THOSE CHARGES

28   COME AT YOU?

```
 1          A       SAN DIEGO STATE AND FEDERAL WAS IN 2018.
 2     AND RIVERSIDE, THE INDICTMENT CAME DOWN IN 2019.
 3          Q       AND IN THOSE PROSECUTIONS AGAINST YOU WERE
 4     YOU REPRESENTED BY A LAWYER NAMED ANTHONY COLOMBO?
 5          A       YES.
 6          Q       ARE YOU STILL REPRESENTED BY HIM?
 7          A       YES.
 8          Q       AND IS HE AWARE THAT YOU'RE TESTIFYING
 9     HERE IN THIS COURT TODAY?
10          A       YES.
11          Q       OKAY.  AND SO YOU'RE TESTIFYING WITH HIS
12     KNOWLEDGE AND HIS BLESSING?
13          A       YES.
14          Q       DID -- IN ANY OF THOSE PROSECUTIONS, DID
15     YOU COOPERATE WITH THE PROSECUTORS IN THOSE CASES?
16          A       YES.
17          Q       IN WHICH ONES?
18          A       ALL OF THEM.
19          Q       AND HOW DID YOU COOPERATE?
20          A       WITH THE SAN DIEGO FEDERAL AND THE SAN
21     DIEGO STATE, IT WAS KIND OF CONJOINED.  BUT I DID WORK
22     UNDER THE DIRECTION OF THE FBI AGENTS.  I HAD TO GATHER
23     INFORMATION FOR THEM.  I HAD RECORDINGS -- I RECORDED
24     DR. UWAYDAH DIRECTLY ON WHATSAPP PHONE CALLS.
25          Q       DID YOU SUPPLY THOSE RECORDINGS TO THE FBI
26     AGENT?
27          A       YEAH.  EVERYTHING HAD TO BE TURNED IN TO
28     THEM.
```

1    Q    DID YOU AT SOME POINT IN TIME IN 2019 SIT

2  DOWN WITH PROSECUTORS HERE IN LOS ANGELES COUNTY,

3  INCLUDING MYSELF, AND COOPERATE OR EXTEND YOUR

4  COOPERATION BY TALKING TO US?

5    A    YES.

6    Q    AND DID YOU SHARE THOSE PHONE RECORDINGS

7  WITH US AS PART OF THAT COOPERATION?

8    A    YES.  I BELIEVE THROUGH THE -- LIKE THE

9  SAN DIEGO AND STUFF EVERYTHING WAS SHARED WITH YOU.

10  YES.

11    Q    OKAY.  AND LIKEWISE WITH THE PROSECUTION

12  IN RIVERSIDE?

13    A    YES.

14    Q    DID YOU EVENTUALLY PLEAD GUILTY IN ANY OF

15  THOSE CASES?

16    A    I PLED GUILTY IN ALL OF THEM.

17    Q    OKAY.  DID YOU RECEIVE -- HAVE YOU BEEN

18  SENTENCED IN ANY OF THOSE CASES?

19    A    ALL OF THEM.

20    Q    WHAT SENTENCE DID YOU RECEIVE?

21    A    IN SAN DIEGO STATE, JUST WENT ALONG WITH

22  WHATEVER THE FEDERAL SENTENCED ME.  SO I WAS SENTENCED

23  TO THREE YEARS OF FORMAL PROBATION AND 250 HOURS OF

24  COMMUNITY SERVICE.

25         AND THEN IN RIVERSIDE STATE I WAS

26  SENTENCED TO -- IT JUST HAPPENED.  I THINK IT'S THREE

27  YEARS ALSO PROBATION.

28    Q    OKAY.  AND IS THAT PARTLY BASED ON YOUR

```
 1    COOPERATION?

 2         A       YES.

 3         Q       IN YOUR EXPERIENCE OVER MANY YEARS WITH

 4    UWAYDAH, DID YOU COME TO KNOW OF AN ENTITY KNOWN AS

 5    MEDCONSULT?

 6         A       WHILE I WAS WORKING WITH HIM, NO.

 7         Q       DID YOU AT SOME POINT IN TIME LATER COME

 8    TO UNDERSTAND MEDCONSULT?

 9         A       YES.

10         Q       TELL US HOW THAT HAPPENED.

11         A       I WAS WORKING AT MY GRANDFATHER'S SHOP,

12    AND I GOT SERVED PAPERWORK ON A LAWSUIT.  AND IT SAID

13    MEDCONSULT VS. MUNIR UWAYDAH.  AND I WAS LISTED IN

14    THERE WITH OTHER -- SOME OTHER CO-DEFENDANT.  AND THEN

15    SOME OTHER PEOPLE WERE LISTED THERE.

16         Q       OKAY.  DID YOU NOTICE ANYTHING SIGNIFICANT

17    ABOUT WHO WAS REPRESENTING MUNIR UWAYDAH IN THAT

18    LAWSUIT?

19         A       YES.

20         Q       WHAT DID YOU NOTICE?

21         A       IT WAS GEORGE SHOHET.  IT WAS AN ATTORNEY

22    THAT ON THE SERVICE LIST SAID ATTORNEY FOR DR. MUNIR

23    UWAYDAH.

24         Q       AND DO YOU KNOW HIM?

25         A       I DON'T KNOW HIM PERSONALLY.  LIKE, I

26    HAVEN'T SPOKEN TO HIM.  BUT I HAVE BEEN CROSS-EXAMINED

27    IN THIS COURTROOM BY HIM.

28         Q       OKAY.  WHEN HE WAS REPRESENTING ANOTHER
```

414

1    DEFENDANT?

2         A     YES.

3         Q     WHAT ABOUT CONNEMARA?  ARE YOU FAMILIAR

4    WITH A COMPANY CALLED CONNEMARA?

5         A     I'M NOT FAMILIAR WITH THAT COMPANY.

6         Q     ARE YOU FAMILIAR WITH A PERSON NAMED AMBER

7    WOODLEY?

8         A     YES.

9         Q     HOW DO YOU KNOW HER?

10        A     AMBER WOODLEY ALSO WORKED FOR DR. UWAYDAH.

11   SHE WAS OVER ALL OF -- LIKE, CONTROLLED HEALTH

12   MANAGEMENT, THE INTAKE COMPANY.  SHE WAS OVER SOME OF

13   THE BANKING.  SO A LOT OF THE CHECKS FOR DIFFERENT

14   ENTITIES, RENTS, WERE PAID THROUGH HER.  SHE DID WIRES

15   TO, I THINK, LIKE, ESTONIA BANKING, THINGS LIKE THAT.

16        Q     SO DO YOU ASSOCIATE HER WITH MUNIR

17   UWAYDAH?

18        A     YES.  THEY ACTUALLY DATED FOR A WHILE AS

19   WELL.  UH-HUH.

20        Q     OKAY.  WERE YOU AWARE OF -- WERE YOU AWARE

21   OF WHERE SHE LIVES?

22        A     NOT CURRENTLY.  BUT BEFORE SHE LIVED AT

23   DOCTOR -- ONE OF DR. UWAYDAH'S HOMES IN MARINA DEL REY.

24        Q     IF I -- ARE YOU FAMILIAR WITH AN ADDRESS

25   OF 5509 OCEAN FRONT WALK IN MARINA DEL REY?

26        A     YEAH.  THERE WERE TWO ENTITIES.  THERE WAS

27   5007 AND THEN 5009.

28        Q     OKAY.  5509?

1        A       YEAH.

2        Q       OKAY.  AND DID AMBER LIVE AT ONE OF THOSE

3    LOCATIONS?

4        A       YEAH.  SHE LIVED AT THE ONE THIS WAY.  I

5    THINK IT WAS THE 5009 ONE.

6        Q       OKAY.

7        A       UH-HUH.

8        Q       AND HOW DO YOU KNOW THAT?

9        A       I WENT THERE.  I HAD TO PICK UP THINGS

10   FROM HER FROM THERE.

11              AT ONE POINT HECTOR WAS LIVING ON ONE OF

12   THE FLOORS, AND I HAD TO GET HECTOR TO MOVE BECAUSE

13   AMBER DIDN'T WANT HECTOR LIVING THERE.

14       MR. MATHAI:  YOUR HONOR, AT THIS TIME MAY I MARK

15   A TWO-PAGE DOCUMENT STAPLED IN THE TOP LEFT -- OR

16   ACTUALLY, ON THE TOP RIGHT.

17              AND IT HAS -- EACH PAGE HAS A PICTURE ON

18   IT.

19              MAY I MARK THIS AS PEOPLE'S --

20       THE COURT:  8.

21       MR. MATHAI:  -- PEOPLE'S 8.

22              AND I'M OFFERING THIS FOR THE PICTURE.

23   AND I'LL REDACT THE IDENTIFYING INFORMATION ON IT.

24

25              (MARKED FOR IDENTIFICATION PEOPLE'S

26              EXHIBIT 8, TWO PAGES, PHOTOGRAPHS.)

27

28       THE COURT:  OKAY.  YOU WANT TO SHOW IT TO

1   COUNSEL.

2         MR. MATHAI:  ALL RIGHT.

3         Q      DO YOU RECOGNIZE THE PERSON DEPICTED IN

4   THIS PHOTOGRAPH ON EACH PAGE?

5         A      THAT'S AMBER.

6         Q      WOULD YOU HAVE PERSONAL CONTACT WITH HER

7   AT SOME POINT IN TIME?

8         A      YEAH.  THROUGH WORK WE -- WE DEALT WITH

9   EACH OTHER, YES.

10         Q      AND HOW WELL DO YOU KNOW HER?  ARE YOU

11   FRIENDS?

12         A      NO.

13         Q      YOU SAID THAT YOU HAVE BEEN IN THE HOUSE

14   AT 5509 OCEAN FRONT WALK, AND YOU SAW HER THERE?

15         A      YES.

16         Q      WHEN WAS THAT?

17         A      I THINK IT WAS APPROXIMATELY, LIKE, AROUND

18   TWO -- LIKE, I WENT THROUGH A FEW DIFFERENT TIMES.

19   BUT, LIKE, ONE TIME IN PARTICULAR WAS AROUND 2012.

20         Q      OKAY.  AND DO YOU ASSOCIATE THAT HOUSE

21   WITH MUNIR UWAYDAH IN ANY WAY?

22         A      THOSE WERE HIS PROPERTIES.

23         Q      HOW DO YOU KNOW THAT?

24         A      WELL, UWAYDAH TALKED TO ME ABOUT IT.  AND

25   AT ONE POINT HE WANTED ME TO LOOK INTO AIRBNB'ING AND

26   HAVING A HOST AND SEE HOW MUCH THE HOST WOULD CHARGE TO

27   RENT OUT THOSE UNITS BECAUSE HE WAS KIND OF HAVING A

28   HEADACHE, HE SAID, WITH AMBER TRYING TO COLLECT RENTS

1  AND THINGS LIKE THAT FROM PEOPLE THAT WERE STAYING IN

2  SOME OF THE UNITS.

3      Q      OKAY.  THAT WAS IN 2012?

4      A      THAT WAS AFTER 2012.  THAT WAS CLOSER,

5  LIKE, 2017 WHEN HE ASKED ME TO LOOK INTO THE AIRBNB.

6      Q      OKAY.  DID HE EVER TELL YOU WHEN HE ASKED

7  YOU TO DO THAT, DID HE EVER TELL YOU THAT THE PROPERTY

8  WAS ACTUALLY OWNED BY A COMPANY CALLED MEDCONSULT?

9      A      NO.

10     Q      DID HE EVER TELL YOU THAT IT WAS ACTUALLY

11 OWNED BY A COMPANY THAT HE HAD NOTHING TO DO WITH

12 CALLED CONNEMARA?

13     A      NO.

14     Q      LET ME ASK YOU ABOUT A FEW OTHER

15 PROPERTIES.

16            ARE YOU FAMILIAR WITH THESE ADDRESSES?

17            5007 OCEAN FRONT WALK MARINA DEL REY.

18     A      YEAH.

19     Q      IS THAT ONE OF THE ONES THAT YOU HAD BEEN

20 TO?

21     A      I WENT THERE, YES.

22     Q      IS THAT A UWAYDAH-OWNED PROPERTY?

23     A      YES.  THERE'S TWO LEVELS, TOO.  THERE'S A

24 BOTTOM ONE AND A TOP ONE.

25     Q      OKAY.  WHAT ABOUT 1316 BEVERLY GROVE

26 PLACE?

27     A      YEAH.  THAT'S THE -- THE BEVERLY HILLS

28 HOUSE, YES.

```
 1        Q      HOW DO YOU KNOW THAT PLACE?

 2        A      I WENT THERE.  I DELIVERED BIRDS FOR HIM

 3   THERE.

 4        Q      34 GALLEON STREET IN MARINA DEL REY.

 5        A      THAT ONE, THE NAME IS FAMILIAR.  I THINK

 6   IT WAS SET OFF.  IT WASN'T RIGHT ON THE OCEAN.  I THINK

 7   IT WAS LIKE A UNIT SET OFF FROM THERE.  I NEVER WENT

 8   THERE, THOUGH.  BUT I KNOW OF IT.

 9        Q      OKAY.  YOU SAID THAT -- YOU MENTIONED THE

10   NAME HECTOR.  WHO IS HECTOR?

11        A      HECTOR WAS SOMEBODY THAT WORKED WITH

12   DR. UWAYDAH FOR A LONG TIME.  HE AT FIRST WAS JUST A

13   DRIVER.  HE TOOK CARE OF DR. UWAYDAH'S DOGS.  HE ALSO

14   LIVED IN ONE OF THE HOUSES THERE IN MARINA DEL REY WITH

15   HIS WIFE AND CHILDREN.

16        Q      I WANT TO ASK YOU ABOUT THAT.  WHEN DID HE

17   LIVE THERE IN THE MARINA DEL REY HOUSE?

18        A      I DON'T KNOW THE EXACT DATES.  I JUST

19   REMEMBER DR. UWAYDAH ASKING ME TO HAVE HECTOR MOVE OUT

20   AND FIND ANOTHER PLACE.

21        Q      AND WHEN WAS THAT?

22        A      I DON'T KNOW THE EXACT TIME, BUT UWAYDAH

23   WASN'T LIVING HERE.  I KNOW THAT HE WAS ALREADY IN

24   LEBANON.

25        Q      WELL, WAS IT BEFORE OR AFTER YOU WERE

26   INDICTED IN, SAY, FOR EXAMPLE, RIVERSIDE COUNTY?

27        A      OH, BEFORE ANY OF THE INDICTMENTS.

28        Q      OKAY.  AND THAT WAS IN -- WHAT?  -- 2018?
```

```
1           A       2018 SAN DIEGO, 2019 RIVERSIDE FOR ME.

2           Q       OKAY.  AND DID YOU ACTUALLY ASK HECTOR TO

3    MOVE OUT AT UWAYDAH'S REQUEST?

4           A       YES, I DID.

5           Q       AND DID HE?

6           A       HE DID.

7           Q       AND DO YOU KNOW --

8           A       HE MOVED INTO AN APARTMENT.

9           Q       DO YOU KNOW IF ANYONE ELSE MOVED IN THERE

10   AFTER HE MOVED OUT?

11          A       I DON'T KNOW.  I KNOW THAT AMBER LIVED

12   THERE, BUT I DON'T KNOW -- I THINK SHE WAS AT THE TOP,

13   AND HE WAS MAYBE AT THE BOTTOM OR SOMETHING.

14          Q       SO BOTH HECTOR AND AMBER LIVED IN THE SAME

15   PROPERTY, AND YOU BELIEVE THAT WAS 5509 OCEAN FRONT

16   WALK?

17          A       YES.

18          Q       YOU SAID THAT YOU WERE CHARGED BY SAN

19   DIEGO IN THE STATE COURT.  THAT'S SAN DIEGO DA'S

20   OFFICE?

21          A       YES.

22          Q       WAS -- DO YOU KNOW PAUL TURLEY?

23          A       YES.

24          Q       DO YOU SEE HIM IN THIS COURTROOM TODAY?

25          A       YES.

26          Q       CAN YOU TELL US WHERE HE'S SITTING AND

27   WHAT HE'S WEARING, PLEASE?

28          A       HE'S RIGHT THERE SMILING WITH GLASSES AND
```

```
 1    A TIE, LIGHT BLUE SHIRT.

 2         THE COURT:  INDICATING MR. TURLEY.

 3         Q      BY MR. MATHAI:  WAS PAUL TURLEY CHARGED

 4    ALONG WITH YOU IN THE SAN DIEGO STATE PROSECUTION?

 5         A      YES.

 6         Q      DID YOU HAVE OCCASION TO SEE HIM IN COURT

 7    WHEN YOU WENT TO COURT IN SAN DIEGO ON THAT CASE?

 8         A      YES.

 9         Q      AT SOME POINT IN TIME DID YOU BECOME AWARE

10    THAT PAUL TURLEY HAD PLED GUILTY HERE IN THE LOS

11    ANGELES COUNTY CASE AT THE END OF 2018?

12         A      I KNEW AS SOON AS HE -- I KNEW --

13                AS SOON AS IT CAME OUT I KNEW.

14         Q      HOW DID YOU HEAR ABOUT IT?

15         A      DR. UWAYDAH TOLD ME FIRST.

16         Q      AND WERE YOU -- AT THAT TIME WHEN PAUL

17    TURLEY PLED, WERE YOU STILL HAVING REGULAR CONVERSATION

18    WITH DR. UWAYDAH?

19         A      YES.  AND THEY WERE RECORDED.  I WAS

20    ALREADY WORKING WITH THE FEDERAL AGENTS.

21         Q      AND SO AT THE TIME OF HIS FACTUAL

22    STATEMENT AND PLEA IN THIS COURT, YOU WERE DISCUSSING

23    THAT AND RECORDING IT, THOSE CONVERSATIONS, WITH

24    DR. UWAYDAH?

25         A      I DON'T KNOW -- I DON'T REMEMBER EXACTLY

26    WHAT I DISCUSSED WITH DR. UWAYDAH AS FAR AS THAT.  I

27    JUST KNOW THAT HE WAS REALLY UPSET THAT HE HAD PLED AND

28    DID A FACTUAL STATEMENT.
```

1      Q      OKAY.  DID YOU EVER TELL DR. UWAYDAH IN

2  ANY OF THOSE RECORDED PHONE CALLS ABOUT CONVERSATIONS

3  YOU HAD WITH PAUL TURLEY WHEN YOU WENT TO COURT WITH

4  HIM IN SAN DIEGO?

5      A      I BELIEVE WE SPOKE ABOUT HIM BECAUSE AT

6  ONE POINT WE WERE TRYING TO FIND PAUL ANOTHER ATTORNEY

7  TO REPRESENT HIM IN SAN DIEGO.

8      Q      AND WHY WERE YOU DOING THAT?  OR WHY WAS

9  THAT BEING DONE?

10      A      BECAUSE DR. UWAYDAH WANTED HIM

11  REPRESENTED.  SO I HAD ASKED MY ATTORNEY ANTHONY IF HE

12  KNEW OF ANYBODY THAT COULD REPRESENT PAUL.  AND THEN HE

13  REFERRED -- I DON'T KNOW IF SHE'S A COLLEAGUE OR JUST

14  SOMEBODY IN HER BUILDING, TO PAUL TO REPRESENT HIM.

15      Q      WHAT ABOUT IN THE CASE HERE IN LOS

16  ANGELES?  DID YOU TALK WITH MUNIR UWAYDAH ABOUT PAUL'S

17  REPRESENTATION?

18      A      I MEAN, THROUGHOUT -- THROUGHOUT THE

19  HEARINGS I TALKED TO DR. UWAYDAH VERY OFTEN AFTER

20  HEARINGS REGARDING WHAT WAS HAPPENING, THE MOTIONS,

21  THINGS LIKE THAT, YES.

22      Q      IS IT FAIR TO SAY THAT DR. UWAYDAH WAS

23  CONTROLLING OR ATTEMPTING TO CONTROL HOW THE LITIGATION

24  WAS OCCURRING IN THE LOS ANGELES CASE?

25      MR. MOEST:  OBJECTION, YOUR HONOR.  THAT'S A

26  PRETTY BIG CONCLUSION.

27      THE COURT:  OVERRULED.  I'M GOING TO ALLOW IT.

28          YOU MAY ANSWER.

1        THE WITNESS:  YES.  HE SPOKE WITH BENJAMIN GLUCK

2   ON -- LIKE ALMOST EVERY DAY, AND THEY WERE STRATEGIZING

3   AND THINGS LIKE THAT.

4              AND I EVEN AT ONE POINT HAD TO HELP -- I

5   HAD SENT DR. UWAYDAH -- I HELPED WITH, LIKE, THERE WAS

6   A MAYHEM CHARGE WITH A BUNCH OF PATIENTS THAT I HAD TO

7   PREPARE LISTS AND THINGS LIKE THAT TO GIVE TO

8   DR. UWAYDAH.  AND HE GAVE IT TO GLUCK, AND I THINK IT

9   WAS PRESENTED.

10       Q      OKAY.  AND DID YOU DISCUSS IN YOUR

11  CONVERSATIONS WITH DR. UWAYDAH THE -- WINSTON MCKESSON,

12  A LAWYER HERE IN L.A.

13       A      YES.

14       Q      AND WHAT CONTEXT DID YOU DISCUSS HIM?

15       A      WELL, MR. MCKESSON WAS REPRESENTING PETER

16  NELSON.  AND THEN AT ONE POINT IN MY RIVERSIDE -- THE

17  CASE THAT I WAS INDICTED, I WAS -- HAD A CO-DEFENDANT

18  BY THE NAME OF JANEK HUNT.  AND MCKESSON WAS

19  REPRESENTING HIM AS WELL.

20       Q      OKAY.  DID YOU TALK TO MUNIR UWAYDAH ABOUT

21  A CONVERSATION YOU HAD WITH PAUL TURLEY IN SAN DIEGO?

22  DID YOU -- DO YOU RECALL A CONVERSATION WHERE YOU

23  REPORTED TO DR. UWAYDAH SOMETHING ABOUT WHAT WAS SAID

24  IN SAN DIEGO BY PAUL TURLEY?

25       A      I'M SURE I DID.  THERE WAS A LOT OF

26  RECORDINGS THAT I DON'T KNOW -- THERE WAS

27  CONVERSATIONS.  I DON'T KNOW WHICH ONE YOU'RE

28  PERTAINING TO.

```
 1         Q        SPECIFICALLY, WAS THERE EVER A
 2   CONVERSATION WITH PAUL TURLEY IN SAN DIEGO WHEREIN PAUL
 3   TURLEY EXPRESSED A DESIRE TO SPEAK WITH MUNIR UWAYDAH?
 4         A        I DON'T RECALL.  I DON'T --
 5         Q        OKAY.  GIVE ME ONE MOMENT.
 6                  WELL, I DESIRE TO REFRESH HER MEMORY, BUT
 7   I DON'T HAVE THE PROPER PAPERS.
 8                  SO I HAVE NOTHING FURTHER.
 9         THE COURT:  THANK YOU.
10                  CROSS-EXAMINATION.
11         MR. MOEST:  I HAVE NO CROSS.
12         THE COURT:  ALL RIGHT.  YOU'RE EXCUSED.  THANK
13   YOU FOR BEING HERE.  YOU MAY STEP DOWN.
14
15                  (THE WITNESS LEAVES THE STAND.)
16
17         THE COURT:  DO YOU HAVE ANY OTHER WITNESSES
18   TODAY?
19         MR. MATHAI:  CAN I JUST LOOK IN THE HALLWAY?
20         THE COURT:  SURE.
21         MR. MOEST:  YOUR HONOR, MAY I RUN TO THE RESTROOM
22   REAL QUICK.
23         THE COURT:  YOU MAY.
24
25                  (RECESS TAKEN.)
26
27         THE COURT:  BACK ON THE RECORD.
28                  THE PARTIES ARE PRESENT.
```