GEORGE GASCÓN, DISTRICT ATTORNEY
COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA
Dayan Mathai, Assistant Head Deputy District
Attorney (Pro Hac Vice to be filed)
California Bar No. 199621
Email: dmathai@da.lacounty.gov
211 W. Temple Street
Los Angeles CA 90012
Telephone: (213) 257-2321

GEORGE GASCÓN, DISTRICT ATTORNEY
COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA
Karen Nishita, Deputy District Attorney (Pro Hac
Vice to be filed)
California Bar No. 169695
Email: knishita@da.lacounty.gov
211 W. Temple Street
Los Angeles, CA 90012
Telephone: (213) 257-2375

Brian D. Shapiro, Esq.
Nevada Bar No. 5772
Law Office of Brian D. Shapiro, LLC
510 S. 8th Street
Email: brian@brianshapirolaw.com
510 S. 8th Street
Las Vegas, NV 89101
Telephone (702) 386-8600

Real Party in Interest District Attorney of Los Angeles County

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>CONNEMARA HOLDINGS, INC,<br><br>Debtor. | Case No.: 24-12212-GS<br><br>CHAPTER 11<br><br>**MOTION TO DISMISS PURSUANT TO 11 U.S.C. §1112(b), OR IN THE ALTERNATIVE, MOTION TO ABSTAIN PURSUANT TO 28 U.S.C. §1334(c)(1) and 11 U.S.C §305(a)**<br><br>Hearing Date: July 12, 2024<br><br>Hearing Time: 9:30 a.m. |

The District Attorney of Los Angeles County, a real party in interest in the above-captioned Chapter 11 case, hereby submits this motion for entry of an order: (a) dismissing the Alleged Bankruptcy Case, pursuant to 11 U.S.C. §1112(b); or alternatively, (b) abstaining from hearing the Alleged Bankruptcy Case, pursuant to 28 U.S.C. §1334(c)(1) and 11 U.S.C. §305(a), respectively.  This Motion is based on the following Memorandum of Points and Authorities,

attached Declarations and Exhibits, all papers and pleadings filed in the case, and any arguments of counsel offered at the hearing on the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Munir Uwaydah ("Uwaydah") is a named criminal defendant charged in Los Angeles County with Conspiracy to Commit Insurance Fraud, Money Laundering, Illegal Patient Referrals, Fraudulent Surgeries, Aggravated Mayhem, and various other crimes and allegations. It is alleged that the conspiracy began in 2004 with the formation of Frontline Medical Associates ("Frontline") by Uwaydah and a business partner, Paul Turley ("Turley").  In 2010, while still being investigated for these crimes, Uwaydah fled Southern California for Lebanon. In 2015, the Los Angeles Grand Jury indicted Uwaydah, Turley, and 13 others in a complex fraud ring which alleged acts of medical billing fraud, surgical fraud, pharmaceutical fraud, and real estate fraud.

The Los Angeles County District Attorney's Office ("LADA") alleged, as part of the state criminal action, a sentencing enhancement pursuant to California Penal Code, §186.11.  In addition to the sentencing enhancement, that penal code section also contains a provision that enables the Superior Court in California to "freeze and seize" assets, including real property, in order to preserve the property for use as a source of restitution for the victims of white-collar fraud.  As stated by the California Supreme Court in *People v. Semaan*, 42 Cal.4th 79, 86 (Cal. 2007), **"Section 186.11…implements the State Constitution's declaration 'that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer.'"** (quoting Cal. Const. art. 1, §28, subd. (b).) (Emphasis added)

Connemara Holdings ("Connemara"), its purported parent company, Medconsult SAL ("Medconsult"), and the property it claims to own at 5509 Ocean Front Walk ("The Property") in Marina Del Rey, California, have been the subject(s) of this Los Angeles prosecution since 2015. Significantly, The Property is the only asset claimed by Connemara in its bankruptcy filing.

*Specifically, the prosecution alleges, and has presented sworn testimony in multiple criminal hearings, that Connemara and Medconsult are controlled by Uwaydah, and were created to perpetuate the very fraud he is charged with in the Los Angeles prosecution.*  In fact,

the LADA alleges that the criminal conspiracy charged in its case is ongoing, and that Uwaydah is perpetuating fraud through his veiled control of various entities, and their lawyers, while he remains in Lebanon.  As will be set forth below, Uwaydah and various co-conspirators are taking actions to thwart the LADA's efforts to preserve and levy assets of the criminal organization for victim restitution.  These actions include the filing of the Alleged Bankruptcy in this case.

In order to understand the lengths that Uwaydah and co-conspirators have gone, and will go, to achieve their goals, a brief history of the criminal organization is presented in this Motion. That history will expose Connemara and Medconsult's actions regarding The Property as actions done in bad faith, and clearly with the intent to thwart the LADA's effort to preserve and levy The Property pursuant to California law.  Based on the facts and arguments set forth herein, the LADA asks this Court to exercise its power to dismiss the bankruptcy case, with prejudice.

## II.    FACTUAL BACKGROUND

### *A Criminal Organization*

Uwaydah is an orthopedic surgeon who was licensed to practice medicine in California.[1] In November, 2004, he and Turley, a chiropractor, started a medical corporation called Frontline Medical Associates.  Over the next six years, Frontline grew to include over a dozen medical clinics all over Southern California.  Frontline served mostly patients whose bills were to be paid entirely by insurance companies under California's Worker's Compensation Insurance laws. Once the patient was approved for the insurance, Uwaydah would bill the insurance companies for services never rendered, and he would self-refer patients to his pharmacy, surgery center, or MRI company without telling either the patient or the insurance companies that he had a financial interest in those service entities.  ***He was able to hide his self-interest by placing those companies in the names of other people.***  The insurance companies, suspecting that billing fraud was occurring, often would not have the resources to investigate the tens of thousands of bills they were receiving from Uwaydah-controlled companies.  Any protest the insurance companies made would be litigated as a lien in the Worker's Compensation Appeals Board ("WCAB"), a costly alternative for the insurance companies that often results in settlements that benefit

---

[1] Uwaydah's medical license was revoked by the California Medical Board on July 14, 2010 for, among other things, improperly allowing his Physician Assistant, Peter Nelson (charged in Case No. BA455469) to perform surgeries on his patients under general anesthesia while Uwaydah was out of the operating room.

doctors who bill fraudulently.[2]

Uwaydah desired to control the insurance billing for his patients no matter what medical services they received.  So, in addition to billing for their medical consultations at Frontline, he endeavored to bill for their pharmaceutical prescriptions, their orthopedic surgery, their MRI screening, and a multitude of other services.  He accomplished this by creating companies, in the names of co-conspirators, that purported to provide patients with these services, but he never informed the California Secretary of State, the California Franchise Tax Board, the California Medical Board, or any insurance companies that he was controlling the operation of these companies and their medical billings.  ***Hiding his ownership of these companies, and his control over the billing and profits, became a major aspect of Uwaydah's criminal organization.***  He employed dozens of co-conspirators to help him in this subterfuge, and he retained a cadre of lawyers to represent and protect ***his*** interests in these companies.

The criminal enterprise is vast, involving dozens of business entities and bank accounts all over the world which are controlled by Uwaydah.  Like other organized crime enterprises, the Uwaydah criminal organization uses lawyers and accountants to hide the leader's involvement in the criminal acts.  To maximize the proceeds from his criminal empire, Uwaydah hides his involvement with the various entities by having some of his lawyers create false filings with state regulatory agencies, file false lawsuits in the names of straw plaintiffs, and negotiate for him without using his name or connecting him to the objective being sought.

### *Many Names, but One Owner*

In 2005, Shelly Rosekelly ("Rosekelly"), a junior high teacher, answered a classified ad to be Uwaydah's personal assistant.  Rosekelly worked with another of Uwaydah's personal assistants, Marisa Nelson ("Nelson"), out of one of Uwaydah's houses.  Rosekelly worked closely with Uwaydah for several years, the depth of her involvement in his organization grew, and she became part of his "inner circle."  In sworn testimony before the Los Angeles County Grand Jury in February 2015, Rosekelly explained that members of the inner circle were used to hide Uwaydah's ownership and control of the various companies he used to bill insurance

---

[2] According to the California Department of Industrial Relations ("DIR"), the state agency that administers and oversees the WCAB, Uwaydah-controlled entities are claiming more than $500 Million Dollars in liens in the WCAB system.  The DIR's anti-fraud division is in ongoing litigation with Uwaydah's lawyers, including George Shohet, over the validity of those liens.  The DIR alleges that the liens are the product of fraud and is seeking to invalidate the liens.

providers, or to hide his assets.  Members of the inner circle would put their name as the owner or lead officer of the company or put their name as the signer of the bank accounts for companies owned by Uwaydah, or do both.  Rosekelly testified regarding this scheme:

> Q: Did you notice over the course of time an organizational structure with regard to all these organizations and people associated with Dr. Uwaydah that were related to those organizations?
>
> A: *Well, I noticed that, you know, Dr. Uwaydah was doing most, if not all, of the decision making but other people's names were appearing on the documentation for ownership.*
>
> Q: Okay.  And did you ever have conversations with either Munir Uwaydah or Marisa or anybody about the intent of that fact, that his name was [not] on it?
>
> A: *I came to understand that he had a judgment against him from General Electric dating years back that was a case that he had a judgment against him in Ohio, and he was essentially hiding out trying not to pay that judgment.*
>
> Q: Okay.  And you discussed this with him?
>
> A: *I overheard discussions related to it and **would need to get his signature on various documents that were coming from attorneys that he had to sign related to it.*** (Ex. 1, Grand Jury Tr. 1895:1-21, Feb. 2015.)

Rosekelly was shown Grand Jury Ex. 80 (Ex. 2, Grand Jury Ex. 80) which listed 24 entities registered with the State of California.  Rosekelly explained the relationship between these entities and Uwaydah:

> Q: And the 24 entities that are listed in this document and shaded in blue, did you—who was the true owner of those entities?
>
> A: *Dr. Uwaydah.*
>
> Q: And did his name appear, other than on Frontline Medical and South Bay Surgical, did his name appear on any of these entities?
>
> A: *No, it did not.*
>
> Q: And was that, according to your experience with him and these organizations, was that intentional?
>
> A: *Yes.*
>
> Q: What was the purpose of him not having his name on that?

A: *Well, to hide assets from the judgment as well as to make sure that there was no, you know, kind of, umm, umm, conflict of interest between companies.*

A: *Yes.* (Ex. 2, Grand Jury Ex. 80; Ex. 1, Grand Jury Tr. 1896:25 – 1897:27, Feb. 2015.)

In essence, Rosekelly described one enterprise, under Uwaydah's control, hidden behind the façade of multiple, distinct companies. These distinct companies were often described as "related entities" by Uwaydah lawyers in documents filed in various courts, but they were in effect shell companies, or alter egos, designed to mask Uwaydah's assets and control. In further testimony before the Los Angeles Grand Jury in August 2015, Rosekelly made clear that there was a method at play in the creation of these various Uwaydah entities:

Q: Okay. Now, did he ever tell you why he wanted to create companies in the form of limited liability companies or LLC's?

A: *Well, I came to understand that when you form an LLC, you have to say when you create it who the owner is in order to get a tax i.d., but then on the Secretary of State filings, which are public filings, you list Manager, a Manager, maybe some officers that are not owners, so it's easier to kind of obfuscate who is behind, you know, an organization. That way because people often are requesting your Secretary of State filings and not requesting through the IRS who the owner is.*

Q: Okay.

A: *And it was also very fast to create an LLC. You could create the filing and it was done and then you had to do paperwork. I think corporations were more time consuming and there was more public information available.*

Q: So it was clear to you in your time working there that these—there was a purpose behind what was happening from the filing, Secretary of State filing?

A: *Yes.* **And he did have attorneys advising him on how to create different entities as well.** (Ex. 3, Grand Jury Tr. 651:24 – 652:19, Aug. 2015.)

### *An Army of Lawyers*

As the testimony cited above suggests, Uwaydah employed many lawyers to assist him in creating and sustaining the façade that others owned the many companies that he in fact had ownership and control over. In a statement to District Attorney Investigator Tim McCrillis

("DAI McCrillis") on August 8, 2014, Rosekelly described how her understanding of Uwaydah's criminal enterprise was in many respects shaped by the fact that he retained so many lawyers to assist him in what ultimately led to fraudulent billings:

> A:  *It was over time, and he always had these — **this army of attorneys**.  And they, you know, they would be  — he would be working with attorneys on how to structure these things.  So you know —*
>
> Q:  To protect…
>
> A:  *— a naive person who's — who doesn't — you know, I didn't suspect anything in — at first.  So it was like, you know, he's a businessman, and he's doing things maybe that I don't —*
>
> Q:  Well yeah.
>
> A:  *I don't find particularly ethically —*
>
> Q:  You thought he has lawyers.
>
> A:  *— ethical, but they appeared to be, uh, legal because he has lawyers structuring them.  And in my head lawyers don't do anything illegal.  So that was what I thought.* (Ex. 4, Rosekelly Interview Tr. 36:7-19, Aug. 8, 2014.)

Rosekelly's presumption that "these are attorneys, [s]o it must be legal" (Ex. 5, Rosekelly Proffer Tr. 150:14-15, June 30, 2010.) was overcome with the realization that the attorneys must have been motivated by money: "It's money, I — I guess is what it is."  *Id.* at 149:27. In fact, it is clear that Uwaydah spent a considerable amount of money on a large number of lawyers to represent him and his interests.  (Ex. 6, Uwaydah Payments to Attorneys.)  Rosekelly described Uwaydah as always having "sort of a team of attorneys advising him" on virtually everything he was doing.  (Ex. 7, Rosekelly Proffer Tr. 15:22-24, Jul. 15, 2010.)

### The Co-Mingling of Money Between Businesses

An analysis of the bank accounts associated with the various LLC's and corporations that Uwaydah openly discussed with his lawyers further evidenced that these entities were merely alter egos of Uwaydah, and not independent business entities. According to Rosekelly, Uwaydah also did not want his name on any bank accounts associated with the many companies that he owned.  Rather, he would have the various LLC managers or corporate officers placed on the

paperwork "so that they could operate those bank accounts at his direction."  (Ex. 3, Rosekelly
GJ Tr. 636:18-24, Aug. 2015).  In this scheme, Nelson played a large role, as her name was on
most of the accounts.  (*Id.* at 637:1-6.)  In fact, Rosekelly testified that even a company called
"Marisa Schermbeck, DBA Schermbeck Mgmt." was an Uwaydah-controlled organization with
assets owned wholly by Uwaydah.  (*Id.* at 649:1-28.)[3]

      Rosekelly detailed that Nelson and Uwaydah would have meetings at least once a week
wherein they would discuss "how much money was in what account and what accounts needed
influx of cash and what amounts it needed to be transferred out…"  (*Id.* at 701:14-18.)
Rosekelly added that Nelson would "never act—she never was transferring anything without his
(Uwaydah's) specific direction."  (*Id.* at 703:22-23.)  This co-mingling of funds between bank
accounts, at the direction of one exclusive owner of all the LLC's, shatters the notion that these
entities can be considered separate legal entities.  Rather, they are clearly shell companies, or
alter egos, that were created to avoid the tracing of Uwaydah's money by law enforcement, tax-
collecting agencies, and insurance companies.  As Rosekelly explained in her testimony
regarding the transfers of money between the accounts:

> Q: And this is money being moved from one Uwaydah company to another
>     Uwaydah company most of the time; is that fair to say?
>
> A: *Well, not really.*
>
> Q: Okay.
>
> A: *Because he only would move money between affiliated companies, so like*
>     *Frontline and South Bay could move money in between one another, but*
>     *everything else would go into Marisa's management account and then go from*
>     *there to wherever else it was supposed to go.*
>
> Q: So why was that done?
>
> A: *Because the companies were not affiliated and some of them it would not have*
>     *been proper for them to be affiliated such as Frontline, for example, and*
>     *Golden State Pharmaceuticals, so one or the other can't be transferring money*
>     *because that would be an obvious traceable kickback.  I mean it could be when*
>     *you do that.*

---

[3] Investigators discovered that this entity had $22,765,808.22 going in and out of one account between June 07,
2006 and June 30, 2010. (Ex. 2, Grand Jury Exhibit 80.)

Q: And how are you aware that that's –that was the reason why they were using Marisa's company to fund money to other Uwaydah companies that –to avoid—

A: *I would hear the conversations, you know, saying that Frontline can't send money here or this money can't send it there, but get it there, so send it to Schermbeck Management and then send it to that company, or more often, you know, to Lebanon or wherever else he was wiring money.* (*Id.* at 702:17-703:14.)

Forensic analysis of the relevant bank accounts between June 2006 and June 2010 confirms Rosekelly's sworn testimony. Jane Ngo ("Ngo"), a Certified Public Accountant and Supervising Investigative Auditor for the Los Angeles County District Attorney's Office Bureau of Investigation ("BOI"), testified before the Grand Jury regarding the business bank accounts represented on Exhibit 80. (Ex. 2, Grand Jury Ex. 80.) This is the same exhibit which Rosekelly had identified as containing the names of Uwaydah-controlled businesses. Ngo testified that she analyzed bank statements, checks, and wire transfers from the 24 bank accounts listed in blue background in Exhibit 80. Her analysis focused on the flow of money in and out of each of these accounts, the disbursement of payments to certain co-conspirators, and the amount of international transfers that were transferred out of these 24 accounts between June 2006 and June 2010. (Ex. 1, Grand Jury Tr. 1815:15-18 - 16:20, Feb. 2015.) Ngo concluded that, within that 4-year time frame, $184,861,639.50 was deposited into those 24 accounts. Ngo created a spreadsheet, Grand Jury Exhibit 81 (Ex. 8, Money-Flow Spreadsheet), to show the flow of money between these 24 Uwaydah-controlled businesses. She testified to the Grand Jury regarding the flow of money:

Q: Okay. And then by looking at this—these four pages of this exhibit, can you tell the flow of money between all these 24 accounts and which accounts that, for a lack of a better term, [fund] the other accounts?

A: *Yes. I mean most [of] the activity ran through the Marisa Schermbeck DBA Schermbeck Management account, so, and at the time there were approximately 46 million [dollars] that ran through this account, in and out of this – by the same accounts.*

Q: Okay. So that amount of money flowed within these 24 accounts, these [sic] family of accounts?

A: *Yes.*

Q: So was there additional money that flowed outside of these accounts to other entities?

A: *Yes.* (Ex. 1, Grand Jury Tr. 1825:13-27, Feb. 2015.)

In addition to the flow of funds between these 24 businesses, Ngo testified that she identified payments going from these 24 business accounts to the *personal accounts* of particular co-conspirators.  Ngo also testified that millions of dollars from these accounts were wired to various countries overseas, including Estonia, Germany, and Lebanon.  (Ex. 9, Grand Jury Ex. 83.)

### *Uwaydah Money Paying for Co-Conspirators' Lawyers and Lawsuits*

The lengthy investigation into the Uwaydah criminal organization revealed that, in addition to hiding his true ownership of dozens of businesses, Uwaydah would routinely hide his involvement and pecuniary interests in lawsuits which ultimately protected his interests.  That Uwaydah is extremely litigious is evidenced not only by the number of attorneys he retained, but by a chart showing civil lawsuits filed in L.A. County between 2003-2017 involving Uwaydah or one of his "companies."  (Ex. 10, Uwaydah Civil Lawsuit Table.)  As the chart shows, many of the 103 lawsuits involve lawsuits where one Uwaydah company sues another Uwaydah company. But even when the lawsuit was brought in the name of a company seemingly owned by another individual, the evidence shows that Uwaydah was the driving force behind the suit.  To the point, Uwaydah funds would pay for lawyers to pursue lawsuits which ultimately benefitted Uwaydah, not the named clients.  One particular lawsuit exemplifies Uwaydah's behavior:

1. *ARA vs. AR LTD (Case No. BC441301)*

This lawsuit, filed by Uwaydah lawyers immediately after Nelson cooperated with law enforcement in June 2010, sought declaratory relief to determine that AR LTD was owned by an individual named "Ali Ghandour," and not Nelson, as Secretary of State documents showed. (Ex. 11, ARA v. ARLTD Compl.) AR LTD was worth a lot of money to Uwaydah, and the timing of the lawsuit makes it clear that Uwaydah sought to get the company out of Nelson's name since she had cooperated with law enforcement.  Nelson responded to the lawsuit by filing

a Declaration, stating that the control and direction for both companies came from Uwaydah, and she had no knowledge of anyone named "Ali Ghandour," and she had never met or communicated with anyone by that name.  (Ex. 12, Marisa Nelson Decl. in ARA v. AR LTD.)[4] In fact, in proffer sessions in June and July 2017, Nelson stated that she believes that "Ali Ghandour" is a fictional character whose name Uwaydah would often use on companies or bank accounts.  (Ex. 13, Nelson Proffer Tr. 20:8-22:15, Jun. 1, 2017.); (Ex. 14, Bernstein Dep. Tr. 300:8-15, Mar. 16, 2015.)

### *Connemara and Medconsult are Uwaydah-Controlled Entities*

In 2010, Uwaydah fled Southern California for Lebanon, a country that does not have an extradition treaty with the United States.  Despite his absence, Uwaydah is still overseeing and controlling various entities in the United States, and Southern California in particular, in order to perpetuate ongoing fraudulent activity.  Since 2010, criminal cases have been filed in state courts in L.A. County, Riverside County, and San Diego County in connection to the ongoing criminal conspiracy.  In addition, a federal case in the Southern District of California was filed connected to the fraud conspiracy.

More than a dozen individuals have been convicted in these Uwaydah-connected conspiracies, and almost 100 fraudulent shell companies have been identified by law enforcement.  Between 2017 and 2019, some of Uwaydah's inner circle have come forward and cooperated with prosecutors in the various jurisdictions.  These cooperators include Uwaydah's former business partner, Turley, and Uwaydah's personal assistants, Nelson and Shannon Devane ("Devane").  Each of them gave proffer statements, and eventually plead guilty to their involvement in the criminal conspiracy.  During their pleas, they each gave factual statements under oath which supported their guilty pleas.  (Ex. 15, Factual Plea Statements)

These former co-conspirators of Uwaydah have all affirmed under oath that they believe, based on years of working closely with Uwaydah, that he controls Connemara and/or Medconsult.  Turley testified under oath on May 3, 2024 as follows:

> Q: Okay. So whose idea was it to transfer the properties to holding companies?
>
> A: Munir Uwaydah's.
>
> Q: Okay. And had you voiced—prior to that, had you voiced to him a concern

---

[4] The lawsuit was dismissed almost immediately after the filing of this Declaration

that your name was on these four properties that we've been talking about?

A: I had voiced my concern from almost the beginning because I wanted nothing—I didn't want my name on them.

Q: Okay. What was your concern exactly?

A: I didn't—I didn't have ownership, like we've discussed. I didn't have any control. You know, it was, I mean, a drag on my credit essentially. I just wanted my hands—I didn't want to be—I've never been involved in it, but I just wanted it free and clear.

Q: Okay. So you said Uwaydah came up with the idea to put the properties in the holding companies. But who controlled the holding companies?

A: Well, I didn't. So he did.

Q: Okay. But whose name was on the holding companies?

A: My name.

Q: So you took the properties in which your name showed up on title, and instead you put the properties as being held by a holding company. But you were the owner or President or—on paper the controlling agent of these holding companies, correct?

A: Yes.

…

Q: Okay. And 5509 Ocean Front Walk, did you transfer that from your name to being held by Connemara, a holding company, which you were the President of?

A: I recognize that, yes.

Q: Okay. So on paper, if anyone looked into Connemara, they would see that you were associated with it as a President or a manager. But in reality it was Munir Uwaydah that exercised control over Connemara.

A: Yes.

Q: And that was true at the time you transferred that property, 5509 Ocean Front Walk, into Connemara as an owner?

A: Yes. (Ex. 16, Turley Testimony Tr. 61: 4-28; 62: 15-28, May 3. 2024.)

Gluck, who served as Uwaydah's main attorney for many years, testified before Judge

Fidler on the issue of ownership and control of Medconsult.[5]  On May 3, 2024 he gave the following sworn testimony:

> Q: …In your experience of representing Dr. Uwaydah, did you observe him to have controlling interest and ownership interest in entities, business entities, wherein other people's names actually appeared on the Secretary Of State documents and other legal documents as owners or principals?
>
> A: Yes.
>
> Q: Is one of those entities—well, I want to ask you about a couple of those entities today. Well, are you familiar with a business entity called Medconsult S.A.L., …, and then the abbreviation S-A-L?
>
> A: Yes.
>
> Q: How are you familiar with that entity?
>
> A: It came up a number of times in my representation. And it was listed on a spreadsheet of entities that Dr. Uwaydah caused to be sent to me during the representation, which happens to be an exhibit in the bench trial.
>
> Q: Okay. …based on that spreadsheet and your interactions with Munir Uwaydah, did you form a conclusion as to who controlled Medconsult, S.A.L.?
>
> A: Yes.
>
> Q: And who is that?
>
> A: Along with all of the entities on the spreadsheet, my conclusion was that they were all controlled by Munir Uwaydah. (Ex. 17, Gluck Testimony Tr. 71: 3-28; 72: 1-2, May 3. 2024.)

Gluck also testified that Uwaydah directed him to find legal counsel for Medconsult, and to find a property manager to manage various properties that had been purchased in Turley's name, including The Property.  According to that property manager, Michael Froehlich, he managed the properties for many years, between 2015 and 2023, and there was very little cash flow coming from The Property.  (Nishita Declaration, par. 5., June 13, 2024.)

**Connemara and Medconsult's claims on The Property and other Assets**

Given the evidence of Uwaydah's control over Connemara and Medconsult, and given

---

[5] Uwaydah, through Frontline, sued Gluck, which resulted in a waiver of Uwaydah's attorney-client privilege with his former lawyer.  Gluck testified in the civil trial and his testimony regarding Medconsult was consistent with what he testified to before Judge Fidler.

the history of how the criminal organization operates, it was no surprise that Connemara and Medconsult filed Verified Claim Petitions with regard to The Property. (Ex. 18, Verified Claim Petitions.) However, neither entity asked the Court to litigate their claim or render a judgement on the merits of their claimed interest in The Property. Two of Uwaydah's lawyers, George Shohet ("Shohet") and David Browne ("Browne"), represented Medconsult and various entities that Medconsult claimed to own, including Connemara, Notre Dame Properties, Wicklow Holdings, and 5007 Holdings. Instead of asking the Court to hold a hearing on the Verified Claim Petitions that they had filed, both Shohet and Browne filed peremptory challenges to disqualify Judge Fidler, pursuant to California Civil Code §170.6. (Ex. 19, Peremptory Challenges.) The multiple efforts to disqualify Judge Fidler were denied, both by the trial court and the California Appellate Court.

Despite having actual notice of the Court orders pursuant to §186.11, and filing Verified Claim Petitions pursuant to that same section, both Browne and Shohet have made claims in other courts that their client has no avenue in the law to assert their claim of ownership and have redress. Also, despite actual notice of the Court's orders, it is alleged that Browne and Shohet willfully violated the Court's orders. These issues are expounded further in the Argument section, below.

In 2024, the LADA pushed for Medconsult's Verified Claim to be heard so that Turley could testify at the hearing before he was to be sentenced on May 9, 2024. The hearing was set for April 26th, and a few days before Shohet asked for a continuance because he stated he had a death in his family and had to travel back east for the funeral. The matter was continued to May 2nd. On April 29th, the prosecutors called Shohet and informed him that Turley, Nelson, Devane, and Gluck would be testifying regarding their knowledge that Uwaydah owns and controls Medconsult, and by extension, Connemara. Shohet then claimed for the first time that he would not be available for the hearing on Friday, May 3rd, because he had to meet with an expert on a civil case for one of his colleagues. Furthermore, he told the prosecutors that he was not feeling well and may ask to continue Thursday's hearing. He also added that he had a hiking vacation planned for the next week.

The next day, these scheduling issues were presented to Judge Fidler, but Shohet did not file a Motion to Continue, or any declarations with regard to his claimed scheduling conflicts. The Judge noted that the testimony was intended to be completed before Turley was sentenced,

14

so no continuance would be granted.  The Judge also noted that if Shohet was planning to meet with an expert on Friday, he was likely well enough to begin the hearing on Thursday.  On May 2nd, the day the hearing was to begin, Shohet filed a Motion to Withdraw Medconsult's Verified Claim, and simultaneously notified the Court and the prosecutors that Connemara had just filed the Alleged Bankruptcy.  Shohet then tried to argue that Judge Fidler was barred from continuing with any hearing regarding The Property.

## III.    ARGUMENT

### A.  <u>The Bankruptcy Case Must be Dismissed Because it Was Filed in Bad Faith.</u>

"It is well established law in the Ninth Circuit, as well as in various other circuits, that lack of 'good faith,' **or existence of 'bad faith' in commencing** and/or prosecuting **a bankruptcy case, constitutes 'cause' for … dismissing the bankruptcy case pursuant to Section 1112(b)"** (Emphasis added).  *In re Walter*, 108 B.R. 244, 247 (Bankr. C.D. Cal. 1989). Bad faith is manifested in many ways, including when the debtor only has one asset, no employees, little or no cash flow, no available sources of income to sustain a plan of reorganization, and when the debtor has engaged in improper forum shopping.  (*Id.)* (*citing In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986)).

In *In re Walter, supra,* the Bankruptcy Court recognized that not all pertinent factors need to be present to sustain a finding of bad faith.  *Id*.  In that case, the debtors had a single real estate asset, were not running any business, and had no employees, among other factors.  Significantly, the Court found that one factor pointing to bad faith was that the debtors admittedly filed their bankruptcy petition for the sole purpose of utilizing the "automatic stay" of Title 11 in lieu of the "preliminary injunction" the state court refused to grant, to prevent a state court proceeding to go forward.  *Id.* at 248.  *See also St. Paul Self Storage Ltd. P'ship v. Port Auth. (In re St. Paul Self Storage Ltd. P'ship)*, 185 B.R. 580, 583 (B.A.P. 9th Cir. 1995) (finding debtor filed its bankruptcy petition in bad faith and as "an improper attempt to gain a more convenient forum for its litigation against Appellee.")

Here, Shohet has admitted to this Court that the bankruptcy was filed out of frustration that "we (Connemara and Medconsult) [are] not going to get anywhere in Los Angeles," and that they have been "stymied" in the criminal proceedings. (Ex. 20, Nev. Bankr. Tr., 25:19-23, May 30, 2024.)  In fact, Shohet said, "We withdrew the Medconsult [Verified] claim when it became

apparent to us we were not going to get a fair day in court on the claim." (*Id.*, at 23:11-13.)  He concluded his argument by stating, "In bankruptcy, by contrast, we would have the opportunity to adjudicate these creditor claims and move the property that would be – you know, a completion where it could be liquidated and the creditors could be paid off." (*Id.*, at 25:24-26:3.)

1. **By withdrawing the Verified Claim on the day that it was to be adjudicated, and filing the bankruptcy on the same day, Connemara and Medconsult are engaged in improper forum shopping.**

Shohet's admission that Medconsult's Verified Claim Petition was withdrawn out of frustration with the state criminal court proceedings, and out of a desire to utilize the bankruptcy court proceedings instead, is a blatant admission of forum shopping.  This admission is only corroborated by the fact that the withdrawal of the verified claim and the bankruptcy were both filed on the same morning, the very morning that the Verified Claim Hearing was to begin.

Courts may consider factors such as the timing of the filing, and analyze whether the filing is merely a litigation tactic used to gain advantage in the battle over an asset. *St. Paul Self Storage Ltd. P'ship*, 185 B.R. at 583. Here, Connemara and Medconsult were frustrated with how their claim(s) to The Property would be received by Judge Fidler.  They had filed multiple peremptory challenges on Judge Fidler, all of which were denied by the trial court, as well as the Appellate Court.  When the hearing was set to go forward, Shohet proffered several reasons to delay the hearing. Clearly, a delay in the hearing would have likely prevented Turley from being a witness at the Verified Claim hearing, since he would no longer be legally bound by his Cooperation Agreement.[6]  When Judge Fidler did not find good cause to continue the hearing, Shohet withdrew Medconsult's claim, filed notice of the bankruptcy, and argued that Turley could not testify because of the automatic stay.  These circumstances all point to the fact that the bankruptcy was filed in bad faith, as a litigation tactic, and as improper forum shopping.

2. **Connemara's principal, and its lawyer, and its parent company are alleged wrongdoers in the state criminal proceedings.**

Bad faith can also be present when the debtor(s), or its principal(s), are themselves engaged in wrongdoing currently, or in prior proceedings.  *In Re Can-Alta Props., Ltd.*, 87 B.R. 89, 91 (B.A.P. 9th Cir. 1988).  Here, Medconsult, its principal, Adib Kassir ("Kassir"), and its

---

[6] Turley has presented arguments to Judge Fidler that a certain clause in the written Cooperation Agreement binds him to continue to cooperate after he is sentenced.  However, Judge Fidler has indicated that he is skeptical that the Court would retain jurisdiction over Turley and the Cooperation Agreement after sentencing is completed.

lawyers, Shohet and Browne, have been cited to appear before Judge Fidler for an Order to Show Cause in re Contempt Hearing.[7]  They are each alleged to have violated Judge Fidler's orders pertaining to another real estate asset that was frozen pursuant to §186.11.  Specifically, it is asserted that the alleged contemners, with actual notice of the Court's orders, did willfully violate the Court's TRO and the Court's order enjoining them from "[i]nterfering in any way with the Receiver's performance of his duties and responsibilities and exercise of his powers." (Ex. 21, OSC Affidavits.)

To put the allegations simply, Medconsult, Kassir, Shohet, and Browne, with full knowledge of Judge Fidler's orders pursuant to §186.11, engaged in efforts to transfer and sell one of the preserved properties which was under the legal control of the court-appointed Receiver, Jim Skorheim.  The property in question, 1316 Beverly Grove Place, in Beverly Hills, was another property that had been fraudulently purchased by Turley, and fraudulently transferred to one of Uwaydah's business entities, Notre Dame Properties.[8]  Notre Dame violated the court's order and transferred the property to a company called MDRCA, a company which the prosecution asserts is yet another Uwaydah-controlled business entity.  Significantly, while the OSC Hearing was pending, and while a foreclosure by one of the secured creditors was imminent, Shohet filed for bankruptcy on behalf of MDRCA.  (Ex. 22, MDRCA Bankruptcy Filing, Dec. 2023.)

### B.  The Bankruptcy Case Must Be Dismissed Because Connemara and Medconsult Forfeited Any Claim to The Property When They Withdrew.

California Penal Code §186.11 is a comprehensive statute that provides a means of restitution in fraud cases in accordance with the rights of victims enshrined in the California Constitution.  It is important to understand that the power of the Court is over any property that was in the control of Turley, or "***property that has been transferred by that person to a third party***, ***subsequent to the commission of any criminal act alleged pursuant to subdivision (a), other than in a bona fide purchase***…" Cal. Penal Code § 186.11 (d)(1).  The statute provides protection to bona fide third-party purchasers by establishing a Verified Claim process that enables them to assert their rights and their interest in the property.

---

[7] Medconsult sought to dismiss the contempt charges and was denied.  That denial is now being reviewed by the California Appellate Court.

[8] Shohet is also counsel and agent-for-service for Notre Dame Properties. (Ex. 23, Sec. of State Filing, Feb. 2022)

*People v. Semaan*, 42 Cal.4th 79, 87 (2007), is a California Supreme Court case that held that the burden of proving an interest in a property falls on the party submitting the verified claim under 186.11.  In *Semaan*, the defendants were ordered to pay $1,632,418.61 in restitution. *Id*. at 83.  The Superior Court approved a petition under 186.11 to preserve a list of assets identified as being under defendants' control for payment of restitution.  (*Id*.)  Among the assets were bank accounts in the names of Marie Semaan and Elham Cherfan, both of whom appeared to reside in Lebanon and were sisters-in-law of defendant Semaan.  (*Id.)*  Both women submitted verified claims to prevent funds in a bank account allegedly belonging to them from being distributed to the victims as restitution.  (*Id*.)

The Superior Court conduced an evidentiary hearing to determine who owned the bank account, however both women failed to appear at the hearing or submit a sworn declaration. (*Id*.) at 83-84.  Although both third parties asserted the money in the account was their property by calling an accounting expert to verify the money was not the proceeds of criminal activity and presenting some evidence that they controlled the account, the Superior Court determined neither third party presented sufficient evidence that they owned the money in the account.  (*Id*. at 84-85.) The Supreme Court of California upheld the trial court's ruling.  (*Id*. at 86.)  With the State Constitution's protections for victim's restitution in mind, the California Supreme Court reasoned that the language of §186.11 indicated the verified claimant had the burden to show a property interest, and without a showing by the third party, it is accepted that the defendant, not the third party, controls the property.  (*Id*. at 87.)

The California Supreme Court wrote "[t]he People's showing that the defendant controls assets gives rise to the presumption that he or she owns them and, thus, places on anyone who would prove the contrary the burden of producing evidence to that effect." (*Id*.)  Because the third party did not present substantial evidence that they, and not the defendant, controlled the assets, the California Supreme Court upheld the trial court's original ruling that neither third party controlled the bank account.  (*Id*. at 88.)

Here, Connemara withdrew their Verified Claim to The Property, so the Court has the power to act against The Property since Connemara has not met their burden of production. Shohet, in oral arguments on May 30, 2024 falsely insinuated that Connemara does not have rights in the Verified Claim process, and they could not even challenge the judge for bias.  As

shown above, Shohet and Brown filed peremptory challenges pursuant to CA Civil Code of Procedure §170.6 on multiple occasions, including on their Verified Claim Petitions.

**C. In the Alternative, This Court Should Abstain and Allow the State Court to Proceed with Restitution Pursuant to §186.11.**

As an alternative to dismissal, this Court should abstain from exercising jurisdiction over the Alleged Bankruptcy Case under 28 U.S.C. §1334(c)(1) or 11 U.S.C. §305.

**1. This Court Should Abstain In the Interest of Justice or Comity With California State Court Pursuant to 28 U.S.C. §1334(c)(1).**

28 U.S.C. §1334(c)(1) states:

> *Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.*

Pursuant to this section, this Court may abstain, in the interests of justice or comity with State courts, from hearing this matter. The evidence in this case shows that the debtor is engaged in a blatant forum-shopping effort, and the filing in bankruptcy court was done as a litigation tactic. In deciding whether to abstain, the Court should consider the following factors (from a list of 12) set forth in *Christensen v. Tucson Estates (In re Tucson Estates)*, 912 F.2d 1162, 1167 (9th Cir. 1990):

> (2) the extent to which state law issues predominate over bankruptcy issues, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, and (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties.

Here, the issue of criminal restitution is a constitutional priority under the California Constitution, and therefore the application of the laws which enable California courts to enforce restitution to victims of crime should be given great deference. A hearing was scheduled in state court, and the debtor had an opportunity to contest the seizing and potential liquidation of the property. Also, the debtor had an opportunity to preserve any interest they had in the property. Instead of litigating the issues and advancing any interest they may have in The Property, the debtor withdrew its claim to the property. Therefore, in the interest of comity and in the interest of justice, this Court should not entertain their attempt to litigate the issue(s) in a different forum.

19

**2.** **This Court Should Abstain Because the Interests of Creditors Would be Better Served by Such Suspension Pursuant to 11 U.S.C. §305.**

Abstention is appropriate when "the interests of creditors and the debtor would be better served by" this relief.  11 U.S.C. §305.  Section 305(a) provides:

> (a) *The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—*
> > *(1) the interests of creditors and the debtor would be better served by such dismissal or suspension;*

Per this statute, the court should abstain with respect to the entire bankruptcy case rather than a particular proceeding.  *In re Owen-Johnson*, 115 B.R. 254, 257 (Bankr. S.D. Cal. 1990).

Abstention is appropriate under §305(a) where liquidation proceedings, such as a receivership, are pending. *In re Newport Offshore Ltd.*, 219 B.R. 341, 354-55 (Bankr. D.R.I. 1998) ("[Section] 305 provides that a bankruptcy court may dismiss a bankruptcy case or suspend proceedings within it in appropriate circumstances, which may include the pendency of state court receivership proceedings that appropriately serve the interests of involved parties.") (*See also (In re Marsch)*, 36 F.3d 825, 827 (9th Cir. 1994)) (affirming bankruptcy court's dismissal of petition when the debtor filed a Chapter 11 petition to prevent a state court from entering a restitution judgment against her).

Here, the interests of creditors would be better served if the Court abstains under §305(a). The state court has appointed a Receiver who has been working closely with the bona fide creditors and the LADA to sell the property pursuant to the Court's order.  The Property is located in California, as are the creditors that have been working with the LADA and Receiver. Connemara's bankruptcy filing disrupts the process that was underway to protect the secured creditors as well as the crime victims of the massive fraud that occurred in this case.

**IV.    Conclusion**

Based on the facts above, the People of the State of California respectfully ask this Court to dismiss Connemara's Bankruptcy Petition or, in the alternative, to abstain from hearing it.

Dated: June 13, 2024                    Respectfully Submitted:

<u>*DAYAN V. MATHAI, ESQ.*</u>
DAYAN V. MATHAI
Deputy District Attorney
Los Angeles County District Attorney's Office

20

## INDEX OF RESPONDENT'S APPENDIX OF EXHIBITS

| Ex No. | Description | Page No.+ Line Nos. |
|---|---|---|
| 1 | Grand Jury Transcript (Feb. 2015) – Shelly Rosekelly / Jane Ngo | 1895: 1-21, 1896: 25 - 1897: 27 1825: 13-27 1815: 15-28 1816: 1-20 98:8-10, 471:2 - 473:16, 473:14-16 |
| 2 | List of Uwaydah's Bank Accounts (Grand Jury Exhibit 80) | N/A |
| 3 | Grand Jury Transcript (Aug. 2015) - Shelly Rosekelly | 651: 24 - 652: 19, 636: 18-24, 637: 1-6, 649: 1-28, 701: 13-18, 703: 22-23, 702: 17- 703: 14 |
| 4 | Interview Transcript (Aug. 2014) - Shelly Rosekelly | 36: 7-19, |
| 5 | Proffer Transcript (June 2010) – Shelly Rosekelly | 149: 27 150: 14-15 |
| 6 | List of Uwaydah Payments to Attorneys | N/A |
| 7 | Proffer Transcript (Jul. 2010)- Shelly Rosekelly | 15: 22-24 |
| 8 | Spreadsheet of Money Flow between Uwaydah-controlled businesses (Grand Jury Exhibit 81) | N/A |
| 9 | List of Wire Transfers to Overseas Accounts (Grand Jury Exhibit 83) | N/A |
| 10 | Uwaydah Civil Lawsuit Table (2003-2017) | N/A |
| 11 | ARA v ARLTD Compl. | N/A |
| 12 | Marisa Nelson Decl. in ARA v. AR LTD (Jul. 2010) | N/A |
| 13 | Proffer Transcript (Jun. 2017) - Marisa Nelson | 20:8 - 22:15 |

| 14 | Deposition Transcript (Mar. 2015) - Robert Bernstein | 300: 8-15 |
| 15 | Factual Statements - Paul Turley / Maria Turley / Paul Nelson | N/A |
| 16 | Court Transcript (May 2024) - Paul Turley | 61: 4-28; 62: 15-28 |
| 17 | Court Transcript (May 2024) - Benjamin Gluck | 71: 3-28; 72: 1-2 |
| 18 | Verified Claims + Verified Claim withdrawals - Medconsult / Connemara | NA |
| 19 | Peremptory Challenges (Feb. 2021, Nov. 2022) - George Shohet and David Brown | N/A |
| 20 | Bankruptcy Proceeding Transcript (May 2024) | 25:19-28 26: 1-3, 23:11-13 |
| 21 | People's Affidavit In Support of OSC re TRO Violation | N/A |
| 22 | Bankruptcy Filing for MDRCA (Dec. 2023) | N/A |
| 23 | Notre Dame Secretary of State Filing | N/A |