# EXHIBIT 11

1 | FENTON & NELSON, LLP
HENRY R. FENTON (State Bar No. 45130)
2 | BENJAMIN J. FENTON (State Bar No. 243214)
NICHOLAS D. JURKOWITZ (State Bar No. 261283)
3 | 11835 West Olympic Boulevard, Suite 925
Los Angeles, California 90064
4 | Telephone: (310) 444-5244
Facsimile: (310) 444-5280

5 | Attorneys for Plaintiff
Accounts Receivable Acquisitions
6

7 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF LOS ANGELES,**
8

9

10 | ACCOUNTS RECEIVABLE                )    Case No.:
ACQUISITIONS, a California Limited  )
11 | Liability Company.                 )
                                    )    COMPLAINT FOR:
12 |                   Plaintiffs.     )
                                    )    1. CONSTRUCTIVE TRUST;
13 |        vs.                        )    2. DECLARATORY RELIEF
                                    )
14 | ACCOUNTS RECEIVABLE LTD           )
LIABILITY COMPANY . a California    )
15 | Limited Liability Company: MARISA )
SCHERMBECK, an individual.         )
16 |                                    )
                  Defendants.       )
17 |                                    )

18

19 | Plaintiff alleges:

20 | <u>**FACTS COMMON TO ALL CAUSES OF ACTION**</u>

21 |        1.      Plaintiff Accounts Receivable Acquisitions, LLC ("ARA") is a limited liability

22 | company doing business in the State of California.

23 |        2.      Defendant Accounts Receivable LTD Liability Company ("AR LTD") is a limited

24 | liability company doing business in the State of California.

25 |        3.      Defendant Marissa Schermbeck is an individual residing in the State of California.

26 |        4.      Ali Ghandour is the owner of ARA

27

28

1

**COMPLAINT FOR CONSTRUCTIVE TRUST AND DECL. RELIEF**

5.      In or about 2003, Mr. Ghandour formed ARA in order to contract with various

hospitals throughout Southern California to purchase accounts receivables from hospitals for

Workers' Compensation and personal injury surgeries performed at the contracted hospitals.

6.      ARA would pay various hospitals in Southern California for Workers'

Compensation and personal injury case receivables such that ARA would obtain the right to bill for

and collect payment for these cases.

7.      After the formation of ARA, ARA appointed defendant Marissa Schermbeck to act

as the manager of ARA operations. Ms. Schermbeck issued checks and collected payments on

behalf of ARA. Ms. Schermbeck also maintained the accounts and records of ARA.

8.      On or about March 12, 2008, Mr. Ghandour authorized Ms. Schermbeck to form a

new successor company to ARA. The reason for this was that Ms. Schermbeck had represented to

him that it would facilitate operation of the business if a new entity was formed which would be

owned and operated by ARA. The new company which Ms. Schermbeck formed was Accounts

Receivable LTD ("AR LTD"). Mr. Ghandour authorized Ms. Schermbeck to act as the manager of

AR LTD. The owner of AR LTD is ARA which is owned by Mr. Ghandour.

9.      After its formation, AR LTD entered into the same contract with a hospital in

Southern California as was previously entered into by ARA. At that time, the contract between

ARA and that same hospital was terminated.

10.      In addition, when AR LTD was formed on or about March 12, 2008 all of the start-

up capital necessary to form AR LTD, which consisted of over three hundred thousand dollars

($300,000.00) was paid from ARA's accounts. This was because Mr. Ghandour intended AR LTD

to be owned by ARA.

11.      Mr. Ghandour has always taken a hands-off approach to the operation of the ARA-

AR LTD business, leaving basic management and day-to-day operations to Ms. Schermbeck. In

COMPLAINT FOR CONSTRUCTIVE TRUST AND DECL. RELIEF

1   exchange, Ms. Schermbeck has forwarded monies to ARA or on behalf of ARA. Mr. Ghandour has

2   recently learned that, apparently, Ms. Schermbeck had, without his knowledge or approval, listed

3   herself as the owner of AR LTD, even though ARA has always been the true owner of the ARA-AR

4   LTD business. Ms. Schermbeck was never authorized by Mr. Ghandour or anyone else to list

5   herself as owner of AR LTD. It is unclear whether Ms. Schermbeck's listing of herself as the owner

6   of AR LTD was an inadvertent mistake on her behalf or an intentional act.

7
8       12.   In addition, throughout the life of AR LTD, Ms. Schermbeck has repeatedly sent

9   wire transfers from AR LTD accounts to ARA's account in Lebanon as well as accounts in

10  Germany related to ARA.

11      13.   Beginning on or about June 16, 2010, Ms. Schermbeck has repeatedly refused to

12  disclose to Mr. Ghandour additional information regarding ARA-AR LTD to establish Mr.

13  Ghandour's ownership of AR LTD. The situation has become hugely problematic because there are

14
15  outstanding contracts and accounts with hospitals that require immediate attention. Apparently, Ms.

16  Schermbeck is no longer fulfilling AR LTD's obligations to hospitals under contracts, nor enforcing

17  AR-LTD's rights under those contracts.

18      14.   For example, AR LTD is currently in litigation with San Fernando Community

19  Hospital, Inc. ("SFCH") over terms of its agreement with SFCH to purchase cases for its accounts

20  receivable, Case No. BC438708. However, beginning on or about June 16, 2010, ARA and Mr.

21  Ghandour have lost all contact with Ms. Schermbeck and have been unable to direct the lawsuit.

22
23                          **FIRST CAUSE OF ACTION**

24                          **(For Constructive Trust)**

25      15.   Plaintiffs repeat, reallege, and incorporate herein by this reference each and every

26  allegation contained in paragraphs 1 through 14, inclusive, as though set forth in full herein.

27      16.   There exists, in the present case, particular property or an interest in property; e.g.

28

**COMPLAINT FOR CONSTRUCTIVE TRUST AND DECL. RELIEF**

1   the controlling interest and ownership over AR LTD.

2   17.    The true owner of AR LTD is ARA.  As such, ARA is entitled to all rights related to

3   the control of AR LTD.  ARA has the right to claim control and seek control over all interests

4   related to AR LTD.

5   18.    There is a genuine dispute over who is the true owner of AR LTD.  Prior to the

6   formation of AR LTD, Ms. Schermbeck had been the manager and employee of ARA, which is

7   owned by Ali Ghandour.  As previously noted, Mr. Ghandour's express intention and instructions to

8   Ms. Schermbeck had always been that AR LTD was merely to be an extension of ARA, and AR

9   LTD was to be owned by ARA.

10  19.    Defendant Schermbeck started AR LTD in or about 2008. Mr. Ghandour appointed

11  Ms. Schermbeck as the manager of AR LTD.

12  20.    Defendant Schermbeck's creation and acquisition of AR LTD, and its subsequent

13  property interests, was wrongful, in that Ms. Schermbeck apparently listed herself as the owner of

14  AR LTD, contrary to Mr. Ghandour's express instructions and intentions. MU

15  21.    If the property interest in AR LTD is not returned to its rightful owner, which is

16  ARA, then Defendant Schermbeck would be unjustly enriched at the expense of ARA.

17  Consequently, ARA is entitled to the implementation of a constructive trust, transferring all

18  property interests in AR LTD to ARA.

### SECOND CAUSE OF ACTION

#### (Declaratory Relief)

22.    Plaintiff repeats, realleges, and incorporates herein by this reference each and every

allegation contained in paragraphs 1 through 21, inclusive, as though set forth in full herein.

23.    Plaintiff seeks declaratory relief.  An actual controversy exists between ARA and AR

LTD and Ms. Schermbeck, as to whether AR LTD is controlled by Ms. Schermbeck or by ARA.

4

COMPLAINT FOR CONSTRUCTIVE TRUST AND DECL. RELIEF

1   24. There is a genuine dispute over who is the true owner of AR LTD. Prior to the

2   formation of AR LTD, Ms. Schermbeck had been the manager and employee of ARA, which is

3   owned by Ali Ghandour. Around 2008, Ms. Schermbeck had represented to Mr. Ghandour that it

4   would facilitate operation of the business if she created a separate entity (which would be AR LTD),

5   which would be owned and operated by ARA. As far as ARA and Mr. Ghandour knew, Ms.

6   Schermbeck had formed AR LTD for those express purposes.

7   25. Mr. Ghandour has always taken a hands-off approach to the operation of the ARA-

8   AR LTD business, leaving the basic management and day-to-day operations to Schermbeck. In

9   exchange, Schermbeck has forwarded the monies to Mr. Ghandour and/or ARA. However, Mr.

10  Ghandour very recently learned that, apparently, Schermbeck had, without his knowledge or

11  approval, listed herself as the owner of AR LTD, even though Mr. Ghandour has always been the

12  true owner of the ARA-AR LTD business.

13  *none*

14  26. The situation has become hugely problematic because there are many outstanding

15  contracts and accounts with hospitals that require immediate attention. As far as Mr. Ghandour can

16  tell, Schermbeck has simply taken a "holding position" state, neither fulfilling AR LTD's

17  obligations to the hospitals under the contracts, nor enforcing AR LTD's rights under those same

18  contracts.

19  27. Unless and until this Court provides declaratory relief, the situation regarding the

20  true owner of AR LTD will remain a source of active controversy, to the mutual detriment of Mr.

21  Ghandour, ARA, the hospitals, and, most likely, even to AR LTD and Schermbeck.

22  28. Plaintiff seeks an order declaring it the true owner of AR LTD, entitled to full

23  operation and control over the business affairs and other matters of AR LTD, and declaring that

24  Schermbeck wrongfully acquired title and property rights of AR LTD.

25  ///

---

5

**COMPLAINT FOR CONSTRUCTIVE TRUST AND DECL. RELIEF**

## PRAYER

Wherefore, Plaintiff prays, as follows:

1. For an order by the Court that Defendants return the property interest and ownership of AR LTD back to its rightful owner, ARA.

2. That this Court declare that Marisa Schermbeck wrongfully acquired title to AR LTD and that the true owner of AR LTD is ARA and not Defendant Schermbeck.

DATED: July 8, 2010

FENTON & NELSON. LLP

By: _____
BENJAMIN FENTON
Attorney for Plaintiff
Accounts Receivable Acquisition

6

**COMPLAINT FOR CONSTRUCTIVE TRUST AND DECL. RELIEF**

# EXHIBIT 12

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUL 22 2010

John A. Clarke, Executive Officer/Clk

By
RAUL SANCHEZ        Dept

1  Marisa Nelson
   In Pro Per
2  239 Vista Del Parque
   Redondo Beach, CA 90277
3  (310) 947-5760
4

5

6              SUPERIOR COURT FOR THE STATE OF CALIFORNIA

7                   FOR THE COUNTY OF LOS ANGELES,

8

9  ACCOUNTS RECEIVABLE          )  Case No.: BC441301
   ACQUISITIONS, a California   )
10 Limited Liability Company ,  )  DECLARATION OF MARISA NELSON IN
                                )  OPPOSITION TO COMPLAINT FOR
11          Plaintiffs,         )  CONSTRUCTIVE TRUST AND
                                )  DECLARATORY RELIEF
12     vs.                      )
13 ACCOUNTS RECEIVABLE LTD      )
   LIABILITY COMPANY, a California )  DATE: July 29, 2010
14 Limited Liability Company;   )  TIME: 8:30 am
   MARISA SCHERMBECK, an        )  DEPT: 85
15 individual,                  )
16          Defendants.
17
18 _____
19
20
21
22 I, Marisa Nelson, aka Marisa Schermbeck, declare:
23
24     1.   The following statements are true and correct based
25 upon my own personal knowledge and, if called to testify on the
26 matters contained herein, I could and would competently so
27 testify.
28

                                   1

2.    In 2008 I was employed as an executive administrative assistant to Munir Uwaydah, M.D.

3.    On or about March 12, 2008, I formed AR LTD at the request of Munir Uwaydah M.D.  I formed this company with my name and my social security number at his request.  I was also told by Dr. Uwaydah to list myself as the manager.  Prior to March 12, 2008, Munir Uwaydah, M.D., appointed me as the manger of ARA (Accounts Receivable Acquisitions, LLC).

4.    I have no knowledge of anyone named Ali Ghandour.  I have never met, spoken to, corresponded with, emailed, text messaged, or otherwise communicated with anyone named Ali Ghandour.

5.    No start up funds for AR LTD were received from ARA or Ali Ghandour, all funds were received through Munir Uwaydah, M.D.

6.    All direction for the operation of both companies has ALWAYS come directly from Munir Uwaydah, M.D.

7.    Any and all money transfers were made at the direction of Munir Uwaydah, M.D.  Such transfers were made to similarly

named accounts in Lebanon and in Germany, which I was told

belonged to either Munir Uwaydah or his mother, Farihan Renno-

Uwaydah.

8.   On or about June 24, 2010, I met with Benjamin Fenton,

Attorney at Law, where both he and Munir Uwaydah requested that

I sign a declaration stating that Ali Ghandour and ARA were the

true owners of AR LTD.  I informed Mr. Fenton and Dr. Uwaydah

that I could not do so because I do not know any person named

Ali Ghandour and all of the information in the declaration was

false.  I was subsequently served with this complaint when Mr.

Fenton was attempting to obtain an ex-parte TRO.

9.   The moving papers and declaration of Ali Ghandour in

support of the Constructive Trust and the Declaratory Relief

contain the same information which I already informed Mr. Fenton

was false.

10.   To my knowledge, AR LTD has no current agreements or

contracts.

11.   To my knowledge, all AR LTD bank accounts have been

frozen pursuant to a court order as a result of a criminal

investigation currently being conducted by the Los Angeles

County District Attorney's Office.

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct.


Date: July 19, 2010

Marisa Nelson

4

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am a resident of the aforesaid county and I am over the age of eighteen years.  My address is 239 Vista Del Parque, Redondo Beach, California, 90277.

On July 21, 2010, I served a copy of the attached **DECLARATION OF MARISA NELSON IN OPPOSITION TO COMPLAINT FOR CONSTRUCTIVE TRUST AND DECLARATORY RELIEF** upon the following parties, such parties being all that are required to be served:

**VIA U.S. FACIMILE (310) 444-5280**

FENTON & NELSON, LLP
Henry R. Fenton
Benjamin Fenton
Nicholas D. Jurkowitz
11835 West Olympic Blvd., Suite 925
Los Angeles, CA 90064

I declare under the penalty of perjury under the laws of the state of California that the forgoing is true and correct to the best of my knowledge and belief.

Executed on July 21, 2010, at Redondo Beach, California.

_Marisa Nelson_
Marisa Nelson

# EXHIBIT 13

1

1                      STATEMENT OF

2                      **MARISA NELSON**

3    Taken at Hall of Records, 320 W. Temple St., Los Angeles.

4    Case Name:      P v. Uwaydah
     Case Number:    2010-F-2096
5

6                   APPEARANCES BY

7                     Dayan Mathai
                Deputy District Attorney
8    Los Angeles County District Attorney's Office
                 Major Crimes Division
9                211 West Temple Street
               Los Angeles, California 90012
10

11                   John Nantroup
              Head Deputy District Attorney
     Los Angeles County District Attorney's Office
12               Major Crimes Division
                 211 West Temple Street
13             Los Angeles, California 90012

14                   Tim McCrillis
                 Senior Investigator
     Los Angeles County District Attorney's Office
                 Major Crimes Division
16               211 West Temple Street
               Los Angeles, California  90012

17
                     Amy E. Jacks
18                  Attorney at Law
              Law Office of Amy E. Jacks
19             315 East 8th Street, #801
               Los Angeles, California  90014
20

21

22

23

24

25                   **REPORTED BY:**

26                   Sara A. Mahan
                Stenographic Reporter
27   Los Angeles County District Attorney's Office
              Stenographic Reporters Unit
                   CSR #10647

1    It was just known.

2         Now, it was known because Uwaydah would talk to her,

3    independently.  And, then, talk to me, independently.  But,

4    he didn't ever tell me "Oh, we're changing the MRI's."  But,

5    I put two-and-two together.  When you have an MRI company

6    that -- and, you see a couple e-mails back and forth about

7    bad MRI's, or whatever, you can assume.

8         Q.    Well, okay.  So, that's a good example of what I'm

9    talking about -- e-mails regarding the MRI's.  What did you

10   see?  And, I -- and, I -- listen.  There's hundreds of

11   patients a day.  Okay.  And, this is over the course of

12   several years.  I don't expect that you can tell me --

13   there's, probably, many ways things were done.  I'm just

14   looking for examples of things that you saw happen.   E-mails

15   that direct -- that you saw happen.  And, that's what I'm

16   looking for.  Something that you could say "Well, I remember

17   something like this.  This -- this happened on a few

18   occasions.  Uh, this happened on a few occasions" -- if it

19   did or it didn't.  But, I just need you to -- you know, what

20   was it that you, personally, witnessed?  And, how that you

21   knew what was going on.  And, why was it that, if everybody's

22   at the table talking, everybody understood what their job

23   was?

24         You know, I mean, it seemed like there was -- it

25   seemed to be a common understanding of what the role was.

26         A.    Right.  But, again, he didn't keep us all together.

27   He kept us separate on purpose.

28         Q.    No, no.

21

1          A.    So -- so -- but, Maria I'm fuzzy on.  I know that

2     she was Director of Surgery.  I don't know what he told her

3     and didn't tell her.  But, I do know that that was the time

4     where the surgeries were amped-up and he was buying

5     receivables from -- from the facilities.  And -- and, that

6     was, obvious -- uh, it was known that it had a lot of

7     surgeries that are authorized so you can paid on those, and,

8     get paid for the facility billing -- which is hundreds of

9     thousands of dollars.

10          Uhm, with Paul Turley, I mean, I had more direct

11     knowledge as to what he was doing, in terms of capping and

12     opening companies and -- and -- and buying cars.  And which

13     is maybe not relevant, in this case.  But, I mean, he was

14     the -- very similar to me, as Uwaydah says it, you just go do

15     it.  Uhm, but, I know that he was constantly asking for cash

16     for the attorneys, and -- and, sending me lists and having

17     Esther do the lists.  And, then, she would e-mail them to me.

18     And, uh -- so, I'm more clear on Paul Turley.  But, with

19     Maria Turley, it's a little more of an assumption than it is

20     a direct knowledge, until I can go back and kind of try to go

21     through the timeline in my e-mails -- which I've been trying

22     to do, and see what communications there were, at that

23     timeframe.  Because, then, it's like, "Oh, yeah, I remember

24     that."  But, right now --

25          Q.    No, I'm not trying to put words in your mouth.

26          A.    Right.

27          Q.    I'm just trying to jog your memory and ask -- and

28     I'm trying to alert you to the kind of detail I'm looking

22

1    questioning the -- the purpose of things, for your benefit?

2        A.    Right.  I think I knew, essentially, I wasn't what I

3    was signing.  Uh, at the time, I -- I'm assuming that I knew

4    it was not signing away his life or anything, you know.  It

5    was something that had to do with AR, Ltd. or ARA.

6        Q.    Okay.

7        A.    And -- and, I was aware of that.  So, he would just

8    say, "Well, you have to do it for the company.  We have to

9    get this taken care of."  So, I just didn't question it.

10       Q.    BY MR. MC CRILLIS:  In your mind, uh, who was Ali

11   Ghandor?  Was -- was he a doctor, supposedly?  Or what was

12   his role?

13       A.    I have no idea.  I -- uh, in my mind, he's just a

14   name.  Like it was just a name.  Because Uwaydah couldn't own

     ARA.

16       Q.    BY MR. MATHAI:  And, why couldn't Uwaydah own ARA?

17       A.    Because ARA was -- I don't remember the early

18   formation.  ARA morphed into AR, Ltd.  Well, it was ARA to

19   another ARA variation.  Then, AR, Ltd.  And, I think it may

20   have changed one last time.  It was, as it sounds, a accounts

21   receivable acquisition company.  So, as you'll find later on

22   in the years, he had this company to where he was doing

23   surgeries at a hospital.  The company would buy the

24   receivables, for pennies on the dollar, to the hospital.

25   And, then, collect from the insurance companies.

26       Q.    Right.

27       A.    So, that's the basis of accounts receivable

     acquisitions, I think.  But, early on, it wasn't doing such a

# EXHIBIT 14

**CONFIDENTIAL**
ROBERT M. BERNSTEIN, VOL. II    A9018F9    MARCH 16, 2015

```
 1                UNITED STATES BANKRUPTCY COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                   LOS ANGELES DIVISION

 4

 5    In re:                        )
                                    )
 6    MARISA NELSON AND PETER NELSON )   CASE NO.:
                                    )   2:12-bk-15672-TD
 7              Debtors,            )   Chapter 7
      _____)
 8                                  )
      MARISA NELSON,                )   ADV. NO.
 9                                  )   2:14-ap-01100-TD
                    Plaintiff,      )
10                                  )
                                    )
11         vs.                      )
                                    )
12    ROBERT M. BERNSTEIN;          )
      RYAN D. SABA; ROSEN * SABA,   )
13    LLP; and DOES 1-10, inclusive,)
                                    )
14              Defendants.         )
      _____)

15                  CONFIDENTIAL

16                 DEPOSITION OF:

17         ROBERT M. BERNSTEIN, VOLUME II

18             (PAGES 263 - 491)

19         MANHATTAN BEACH, CALIFORNIA

20             MARCH 16, 2015

21    ATKINSON-BAKER, INC.
      COURT REPORTERS
22    (800) 288-3376
      www.depo.com

23

24    REPORTED BY:  RACHEL L. QUINONES, CSR NO. 13307

25    FILE NO.:    A9018F9
```

Page 263

**CONFIDENTIAL**
ROBERT M. BERNSTEIN, VOL. II    A9018F9    MARCH 16, 2015

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

In re:                              )
                                    )
MARISA NELSON AND PETER NELSON ) CASE NO.:
                 ) 2:12-bk-15672-TD
        Debtors,       ) Chapter 7
_____)
                                    )
MARISA NELSON,              ) ADV. NO.
                 ) 2:14-ap-01100-TD
        Plaintiff,     )
                       )
   vs.                 )
                       )
ROBERT M. BERNSTEIN;        )
RYAN D. SABA; ROSEN * SABA, )
LLP; and DOES 1-10, inclusive, )
                       )
        Defendants.    )
_____)

        Deposition of ROBERT M. BERNSTEIN, VOLUME II,
taken on behalf of Debtors/Plaintiff, before
Rachel L. Quinones, Certified Shorthand Reporter #13307
for the State of California, commencing on Monday,
March 16, 2015, at 9:08 a.m., at Rovens Lamb, LLP,
1500 Rosecrans Avenue, Suite 418, Manhattan Beach,
California.

                                        Page 264

APPEARANCES

FOR DEBTORS/PLAINTIFF:

ROVENS LAMB, LLP
BY: DOUGLAS J. ROVENS, Esq.
1500 Rosecrans Avenue, Suite 418
Manhattan Beach, California 90266
(310) 536-7830

LAW OFFICES OF ALAN F. BROIDY, APC
BY: ALAN F. BROIDY, Esq.
1925 Century Park East, 17th Floor
Los Angeles, California 90067
(310) 286-6601

FOR DEFENDANTS:
NEMECEK & COLE
BY: D. WAYNE JEFFRIES, Esq.
15260 Ventura Boulevard, Suite 920
Sherman Oaks, California 91403
(818) 788-9500
LAW OFFICE OF STEPHEN R. RYKOFF
BY: STEPHEN R. RYKOFF, Esq.
11355 W. Olympic Boulevard, Suite 100
Los Angeles, California 90064
(310) 979-0325

                                        Page 265

INDEX
WITNESS: Robert M. Bernstein
EXAMINATION                          PAGE
By Mr. Rovens                        269

EXHIBITS

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| 55 | One-Page E-mail Correspondence Bates-Stamped RS 0019 (Previously Marked) | 431 |
| 61 | One-Page E-mail Correspondence Bates-Stamped RS 0060 (Previously Marked) | 458 |
| 63 | One-Page E-mail Correspondence Bates-Stamped RS 0052 (Previously Marked) | 469 |
| 84 | E-mail Correspondence with Attachments, Bates-Stamped RMB-RDS 012 through RMB-RDS 022 (Previously Marked) | 438 |
| 65 | One-Page E-mail Correspondence Bates-Stamped RB 00622 (Previously Marked) | 455 |
| 70 | E-mail Correspondence with Attachments, Bates-Stamped RMB-RDS 001 through RMB-RDS 009 (Previously Marked) | 452 |
| 72 | Two-Page E-mail Correspondence, Bates-Stamped RB 001090 through RB 001091 | 471 |
| 73 | One-Page E-mail Correspondence Bates-Stamped RB 0084 (Previously Marked) | 476 |
| 92 | Declaration of Robert M. Berstein | 269 |

                                        Page 266

EXHIBITS (Continued)

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| 93 | One-Page E-mail Correspondence, Bates-Stamped RB 00538 | 308 |
| 94 | Attorney/Client Trust, Marisa Nelson Account Activity | 322 |
| 95 | Packet of Checks and Statements from Attorney/Client Trust Account | 350 |
| 96 | Letter from Mr. Berstein, Bates-Stamped RB 00311 | 352 |
| 97 | One-Page E-mail Correspondence, Bates-Stamped Plaintiff 001758 | 356 |
| 98 | One-Page E-mail Correspondence, Bates-Stamped RB 001234 | 367 |
| 99 | One-Page E-mail Correspondence, Bates-Stamped RB 00548 | 379 |
| 100 | One-Page E-mail Correspondence, Bates-Stamped RB 00554 | 384 |
| 101 | E-mail Correspondence, Bates-Stamped RB 001224 through RB 001230 | 389 |
| 102 | E-mail Correspondence, Bates-Stamped RB 00549 through RB 00551 | 396 |
| 103 | One-Page E-mail Correspondence, Bates-Stamped RB 00556 | 397 |
| 104 | E-mail Correspondence, Bates-Stamped RB 001193 through RB 001195 | 406 |
| 105 | E-mail Correspondence with Attachments, Bates-Stamped RMB-RDS 594 through RMB-RDS 611 | 413 |

                                        Page 267

2 (Pages 264 to 267)

CONFIDENTIAL

ROBERT M. BERNSTEIN, VOL. II    A9018F9    MARCH 16, 2015

BY MR. ROVENS:

Q   Okay.  And you had a number of discussions with Jackson where he told you that; correct?

A   More than one, yes.

Q   And again, when he told you if she transferred any assets of the businesses, is that different than cash?

A   Transferring ownership in the businesses.

Q   Okay.  Now you remember him saying if she transferred ownership?

A   Yes.

Q   Okay.  Ownership and assets or just now ownership?

A   No, we talked about cash, and we talked about ownership interest in the businesses.

Q   And so you recall under oath here today Jackson telling you if Ms. Nelson transfers any ownership interest in her businesses to Uwaydah or any of his designees, that she -- well, what did he tell you about that?  She would be subject to arrest or prosecution, or something else?

A   He did not use that language, no.

Q   Okay.  So what did he say the penalty would be, so to speak, if she were to transfer any ownership interest in businesses that you understood she owned to

Page 296

Uwaydah or his designees?

A   Again, Marisa had been in a multi-year, complex fraud --

Q   I'm just asking what he said about that subject.

A   Okay.  He said if Marisa continues to commit further overt acts in furtherance of the conspiracy, she would no longer be considered having ended working with the conspiracy, she would still be a member of the conspiracy, and they would not be interested in working with her further as a cooperating witness.

Q   Okay.  So he didn't say anything to you about her being subject to immediate arrest or prosecution, but that they would end the cooperation?

A   No, that's not what I just said.  She would still be -- she already had criminal liability, which she had now disavowed, saying I'm no longer a member of this conspiracy.  If she continued to be a part of the conspiracy and commit overt acts, she would still be responsible for not only her own actions, but those of all other coconspirators, whether she knew about them or not.

Q   Okay.  And did Jackson say anything about, and, by the way, if she does anything like that, we're going to arrest her and charge her?

Page 297

A   Well, that's implied, that she's under criminal --

MR. RYKOFF:  But did he say it is the question?

THE WITNESS:  No, he did not.

BY MR. ROVENS:

Q   Okay.  He didn't say it.

And did you, during any discussions with Jackson, advise him that certain of these companies were solely owned by Ms. Nelson?

A   I know it did come up at one point because --

MR. JEFFRIES:  Please, please, listen to the question and see if you can answer the question, rather than when it came up and what happened and --

THE WITNESS:  Can you ask the question again?

MR. ROVENS:  Yeah.

BY MR. ROVENS:

Q   Do you recall ever discussing with Jackson that Ms. Nelson was the legal owner and sole owner of certain companies?

A   Yes.

Q   And when did that happen?

A   I can't give you an exact date.  Sometime in July and/or August.

Q   And either in July or August, when you discussed or told Jackson that Marisa Nelson was the

Page 298

legal owner of certain companies, did he tell you that she can't transfer her ownership interest in those companies to Uwaydah or any of his designees?  Did he consider that to be a breach of the cooperation agreement?

A   He told me what I already told you.  Do you want me to restate it again?

Q   Well, I'm trying to pinpoint the time.  You told me you had a number of conversations with him.  At one time you said assets of the businesses, and then you said no, it was assets and ownership.  So now I'm trying to pinpoint in time what was said with respect to transferring ownership in the companies, that's the time I'm trying to pinpoint.

A   Okay.  First, you misstated what I said, but I don't know the time.  As I told you, July or August we specifically discussed it.

Q   Okay.  And how did it come up that Ms. Nelson was the legal and sole owner of certain of these businesses?

A   It came up in two ways.

Q   And tell me about them.

A   Number one was Marisa had -- Dr. Uwaydah had begun his first lawsuit against Marisa.  The Fentons had sued her claiming that she was not the legal owner of

Page 299

10 (Pages 296 to 299)

**CONFIDENTIAL**

**ROBERT M. BERNSTEIN, VOL. II    A9018F9    MARCH 16, 2015**

AR, Limited. So we discussed that with Alan Jackson.

Q    And what did you say to Jackson about that?

A    Actually, Marisa and I discussed directly with him.

Q    Okay. And tell me, as best as you can remember, what was discussed about that subject with him.

A    Marisa was outraged that they were already filing a lawsuit against her, that she is the true legal owner of AR, Limited; the person that was suing her by the name of Aly Ghandour was not a real person, a fictitious name that Uwaydah often uses in relation to lawsuits or he lists company names under, and that she wanted to fight the lawsuit and wanted to know if Alan Jackson could be of any assistance to her.

Q    And during that discussion, did Jackson say to you and Marisa that she should not transfer her ownership interest in AR, Limited to Uwaydah or any of his group?

A    Yes.

Q    And when he told you that, did he also at that time tell you that if, in fact, she did transfer her interest in AR, Limited to Uwaydah or any of his designees or group, that he would consider that to be a violation of her cooperation agreement?

Page 300

A    Well, he used the language I used previously.

Q    But that's when it was said?

A    No, it had been said prior to that.

Q    With respect to AR, Limited?

A    That was specifically about AR, Limited and then GSP.

Q    And when you say "and then GSP," did you also talk about GSP during that meeting?

A    Not that meeting, one shortly thereafter.

Q    And was that a meeting with you, Jackson, and Marisa?

A    I believe that was myself and just Jackson.

Q    Was that on the phone or in person?

A    On the phone.

Q    And tell me, as best you recall, what was said between you and Jackson regarding Golden State Pharmaceuticals in that telephone conversation.

A    At this point, we had been made aware that somebody was suing Marisa, Berkshire Hathaway Insurance was suing GSP and Marisa, and since Alan had already warned my client and myself not to transfer or settle -- you know, to transfer any assets of any sort with regard to the business, I ran it by him, that if Marisa chooses to settle this lawsuit outstanding with GSP, would he consider that to be an overt act or a continuation of

Page 301

the conspiracy, meaning I ran it by him so we wouldn't do anything that would overturn the court that he had set down guidelines.

Q    And what did he say to you?

A    He said, "Well, can you tell me exactly what it was," and I explained it to him.

Q    You explained the settlement?

A    No. I explained that a law firm said they were prepared to file a lawsuit for -- I forget how much money -- it was over a million dollars for fraudulent prescriptions that had been billed by GSP through Berkshire Hathaway Insurance, and that they wanted to know if Marisa would enter into a settlement to basically disclaim -- I think that was the language -- disclaiming these fraudulent things. And I asked Alan, "If Marisa enters into an agreement, would you consider that to be a violation of our agreement?"

Q    And he told you he needed more information?

A    Right.

Q    And did you provide him with more information?

A    I did.

Q    At a later time?

A    Yes.

Q    And what did you provide him with?

A    I don't remember if I gave him the details or

Page 302

if he spoke -- I referred him to somebody he had already spoken to, a gentleman by the name of Gordon Gord, who was the investigator for Berkshire Hathaway, and Alan spoke to him to understand it more because it was more within his area than mine.

Q    And did you provide anything to Jackson in writing relating to the GSP settlement discussion?

A    I don't believe so.

Q    So you didn't send him a draft of the settlement agreement or anything like that?

A    No.

Q    So you've told me now specifically about your discussions with Jackson about GSP, about AR, Limited specifically, and I think, generally, prior to that, you testified as to him telling you, essentially, if she transfers any of her businesses to Uwaydah or his designees, that could be trouble. I know those are not your words, but just trying to make sure we cover all the times you spoke with him about this.

Do you recall any other discussions with Jackson where the subject of transferring Marisa's ownership interest in any of the businesses was discussed?

A    Other than what I've already told you about?

Q    Yes, other than what you've told me about.

Page 303

11 (Pages 300 to 303)

# EXHIBIT 15

FILED
Superior Court of California
County of Los Angeles

DEC 03 2018

Sherri R. Carter, Executive Officer/Clerk
By _____ W. _____ Deputy
Wendy Warren

## I.

## FACTUAL STATEMENT OF PAUL TURLEY
### BA455469-BA455470-BA455473

1. _PT_  Beginning in October 2018, without any promises of leniency or other consideration, I made proffer statements with the Los Angeles County District Attorney's Office over the course of two months.

2. _PT_  All Statements made during these proffer sessions were made in the presence of my attorney, Louis Sepe.

3. _PT_  All statements made during these proffer sessions were truthful and based upon my personal knowledge which was acquired over many years through my personal participation, my personal observations, and my interaction and personal conversations with co-conspirators.

4. _PT_  During these sessions I have continued to refresh my recollection of events by reviewing documents and correspondence in my possession.  I have also provided corroborating documentation to the Los Angeles County District Attorney's Office.

5. _PT_  Prior to giving my proffered statement to the Los Angeles District Attorney's Office, I consulted with my attorney Louis Sepe, and I knowingly, expressly and willingly waive my Attorney-Client Privilege and Work-Product protection and consent to the disclosure of all material related to my representation by the law firm of Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg (& Rhow), Benjamin Gluck and any Partner, Associate or Attorney working with or in association with the aforementioned Law Firm. Furthermore, I waive any Attorney-Client Privilege by virtue of individual or joint representation or based upon any actual or alleged ownership, membership, status as shareholder, board member, office holder, manager or designated representative agent, incorporator, shareholder, or any other capacity with any entity or related entity or subsidiary, actual or alleged, known or unknown, including any entities which are referenced in the current criminal prosecution and/or associated litigation, associated with Munir Uwaydah. Additionally, to the extent that I can assert or waive Attorney-Client Privilege for any entity as described above, I hereby waive that privilege on behalf of such entities. I have signed a written waiver to reflect the aforementioned.

6. _PT_  I worked directly with Munir Uwaydah, M.D. as a named partner of Frontline Medical Associates from 2004 to 2015. It was my intention at the formation to be a partner with Dr. Uwaydah in the ownership and profits of the business.

7. _PT_  As formed, we were supposed to share in the profits of the business and Uwaydah was to receive and keep his professional fees for surgeries performed.

8. _PT_  However, it soon became apparent that although I was listed as a partner with 49 percent ownership in the business, I was not in fact a partner. For the first year of operation I received no salary or compensation. I had no authority or control over the

business. All decisions were made by Dr. Uwaydah who maintained absolute control over all aspects of the business.

9. _PT_ I never received a portion of the profits, nor did I receive any actual shares or dividends. Rather, I received a regular paycheck as if I was merely a salaried employee. My salary, as with all other aspects of Frontline's finances, was controlled exclusively by Munir Uwaydah.

10. _PT_ Frontline was not a corporation or partnership. It was simply Dr. Uwaydah's business. Frontline did not have a true Board of Directors, or Officers. Nor did Frontline have annual board meetings. Various names were placed on Secretary of State filings to give the impression that Frontline was a valid medical corporation, but these filings were false.

11. _PT_ In 2011, at Uwaydah's direction, attorney Steven Gardner knowingly had me falsely backdate Frontline Secretary of State documents out of concern that law enforcement or insurance companies would question the validity of the corporation.

12. _PT_ Originally, Frontline was intended to be a defense oriented medical facility that would cater to businesses or insurance firms that had injured workers. That business model did not work out and the business evolved into a patient/applicant centered operation.

13. _PT_ The operational model was to recruit to patients through capping and maximize billing for patient services regardless of patient needs. There were certain aspects of services that were very profitable, particularly prescription medications and surgeries.

14. _PT_ Maximizing the value of the patient included profiting from every aspect of patient care, including pharmaceuticals, MRI's, therapy and other services. This was accomplished by "referring" patients to seemingly separate companies that performed these services. However, these referrals were made to businesses that were in fact owned and controlled by Dr. Uwaydah without disclosing his ownership in the companies.

15. _PT_ Uwaydah owned and controlled many companies and properties even though other individuals were listed as the owners or they were supposedly corporations with managing board members. This was all done intentionally so that Uwaydah could hide his ownership and his control from creditors, insurance investigators, government agencies, and law enforcement. He exercised absolute control over all of these entities. These companies included, among others, Firstline, Golden State Pharmaceuticals, Fusion, U.S. Health, Controlled Health Management, California MRI, Accounts Receivable Acquisitions, Sentinel Health Medical, LA Health Partners, Greenline Medical Management, Empyrean, Blue Oak, and La Jolla.

16. _PT_ Uwaydah controlled purported owners, co-conspirators and others by various means including, but not limited to, manipulation, loyalty, financial incentives, fraudulent "promissory notes," litigation, and threats

17. 𝒫𝒯    Although I managed the daily operations of the San Fernando medical clinic, I had no actual authority over Frontline and had to ask Uwaydah for permission to do anything related to the company, including receive money to pay cappers. My value to Uwaydah was that I had connections to lawyers that would refer clients for a fee.

18. 𝒫𝒯    I paid various lawyers, either directly, or through intermediaries called "cappers," for illegal patient referrals to Frontline. Defendants Tony Folgar and Yolanda Groscost were "cappers" that I directly paid for illegal referrals. I knew Jeff Stevens to be a capper who was being paid cash by Marisa Nelson. I have also identified several law firms, lawyers, and their intermediaries that knowingly engaged with me in the crime of capping. With all of these individuals and firms, mutual effort would be made to conceal the payments because all parties knew the conduct was illegal. Payments would often be made in cash, in secret, and without any paper trail. We would refer to our conduct as "marketing" to mask its true illegal nature. Defendants Tatiana Arnold, Kelly Park, and Wendee Luke knew and/or facilitated this illegal scheme.

19. 𝒫𝒯    Emphasis was placed on recruiting patients that would ultimately receive surgery because it was very lucrative. Bonuses were paid to cappers for surgical patients.

20. 𝒫𝒯    Attorneys were encouraged not to settle cases until surgery was performed on the patients. Dr. Uwaydah also tried to set up set up a process with applicant attorneys to forward money to patients, purportedly an advance of the settlement, as an incentive to have surgery.

21. 𝒫𝒯    Jeff Stevens was a capper for attorneys Dennis Fusi and Arthur Hampton. Marisa Nelson was paying Jeff Stevens' his capping fee. The primary goal for both Tony Folgar and Jeff Stevens was to get patients into surgery.

22. 𝒫𝒯    Kelly Park gave me $10,000.00 in cash in an envelope for me to pay cappers.

23. 𝒫𝒯    Once a patient was recruited they would be seen by a doctor or physician assistant. The patient would be prescribed medications and directed to further diagnostics or therapies with the goal of ultimately billing for surgery on the patient.

24. 𝒫𝒯    An important aspect of maximizing the value of the patient was prescription medication. The treating physicians were not given prescription pads and were not supposed to give the patients a prescription to get filled at a pharmacy of their choice. Instead, prescribed medication was limited to a formulary, and the medication would be provided by Frontline or a Uwaydah owned/controlled pharmacy and mailed to the patient.

25. 𝒫𝒯    Uwaydah determined what the formulary was and all the patients basically got the same prescriptions, regardless of their ailment.

26. 𝒫𝒯    Physicians and PA's working for Frontline were told that they must prescribe from the pre-printed prescription formulary which listed the most profitable medications, and they must not deviate. If the treating physician or PA did not prescribe all the

medications that could be justified, then it would be added on to the patients' prescriptions without the knowledge of the treating physician.

27. \_\_\_\_ Dr. Mills and Colivas complained about the prescription formulary because they would never prescribe certain combination of medications because they conflicted and would be dangerous taken together.

28. \_\_\_\_ Letty Lemus was Frontline's Office Manager. She also controlled the pharmaceuticals at Frontline, and was involved in the pharmacy and the prescription formulary.

29. \_\_\_\_ Kelly Park and her sister Kim Park were in charge of the pharmaceutical billing, which they did at a house in Somis, that also served as a dog kennel. When I was at the house to pick up a dog, I saw Kelly and Kim Park and Ronnie Case there, and I also saw numerous patient files there.

30. \_\_\_\_ There was a fire in the large garage behind the San Fernando Frontline office which stored a lot of Frontline's medical records. I saw Kelly Park at the fire scene and she told me that she was in the room looking at files and left the heater on. Documents, including patient files, were destroyed or damaged in the fire. Uwaydah also told me that Kelly had caused the fire by leaving the heater on.

31. \_\_\_\_ Uwaydah instructed that Frontline patients be prescribed compound medications because they were very expensive and profitable.

32. \_\_\_\_ There were certain industry procedures that were expected before surgery could be recommended. Patients were moved towards surgery through a process that included diagnostics, referrals for a surgical consult, and ultimately a recommendation for surgery.

33. \_\_\_\_ In order to justify surgeries to insurance companies, Susan Moreno and Peter Nelson reviewed patient files that were not recommended for a surgical consult by the treating physician. They would then recommend a surgical consultation by an orthopedic surgeon.

34. \_\_\_\_ Peter Nelson, not Uwaydah, would then do the surgical consultations which would result in a recommendation for surgery. Peter Nelson would do 90% of the surgical consultations, but Uwaydah's name was placed on all of the reports, and Frontline billed the insurance companies as if Uwaydah did the consultations.

35. \_\_\_\_ Uwaydah would rarely see a patient unless Uwaydah needed to convince the patient to have surgery despite the patient's reluctance.

36. \_\_\_\_ Alterations were being made to surgical reports and MRIs in order to justify authorization for surgeries, which were very lucrative, particularly spinal fusions. After Susan Moreno stopped doing the reports, Uwaydah asked me to do some surgical reports for spine cases. Uwaydah told me to put an x-ray report into a patient chart that didn't belong to that patient in order to justify authorization for the surgery.

37. The owners of the MRI company at San Fernando complained about a changed MRI report. When I discussed the complaints with Dr. Uwaydah, he told me that Susan Moreno receives a bonus for getting the authorizations for surgery and she would be blamed, not us.

38. Uwaydah subsequently purchased the MRI company from the complaining owner. Jeff Stevens was the straw purchaser of the MRI company on behalf of Dr. Uwaydah.

39. I knew and went along with modifying diagnoses of patients in order to maximize profits. We would maximize profits by getting the patients in the door, prescribing them as much pharmaceuticals as we could, and then move them towards surgery. The goal was to order and prescribe everything that we could possibly profit from.

40. Kelly Park got involved in all aspects of the business. She openly criticized me and the San Fernando office for not getting more surgeries approved. She referred to the San Fernando office as a "cancer" on the business for this failure. She succeeded in convincing Dr. Uwaydah to move the headquarters to Long Beach for that reason.

41. Based on my conversations with Uwaydah and Peter Nelson, it was Peter Nelson who was doing all of the shoulder and knee surgeries, not Uwaydah. Uwaydah told me that he would do the spinal surgeries, procedures near nerves, or procedures requiring surgical hardware.

42. At South Bay Surgical, it was known that while Uwaydah conducted numerous meetings there, Peter Nelson was doing the surgeries.

43. Peter Nelson conducted "surgeries" without Uwaydah's participation or presence in the operating room. Kelly Park, Tatiana Arnold, Letty Lemus, Marisa Nelson and Shelly Rosekelly knew that Peter Nelson was the one doing surgeries.

44. Firstline was formed to replace Frontline. Firstline received the patients and continued to operate in the same manner as Frontline. Dr. Uwaydah's name was taken off the company and Dr. Johnson's was put on it instead. Eventually, my name was removed from Firstline as well.

45. Uwaydah attempted to gain control over the Ventura County Business Bank to facilitate access to credit and the movement of funds.

46. To accomplish this, Uwaydah transferred funds to purportedly independent investors to be invested in the bank on his behalf. Fraudulent documents were prepared attesting to their funds, their independence and lack of connection to the other investors. Tatiana Arnold, Kelly Park, Ronnie Case, Jeff Stevens, Mark Ieole and participated in this process and were proxy investors for Uwaydah.

47. I participated as a purported investor also, and invested over a million dollars of my own money. I did this to assist Uwaydah in this fraudulent scheme, and only because Uwaydah promised to buy the shares back from me.

48. Uwaydah fled the United States to Lebanon in June of 2010 after Kelly Park was arrested for the murder of Uwaydah's former girlfriend, Juliana Redding. He later told me that he believed that Kelly Park committed the murder but that he was not personally concerned. He told me that he was worried about the ongoing fraud investigation. In the Fall of 2010, I traveled to Lebanon to confer with Uwaydah and to discuss how we were going to keep the Frontline business operating without Uwaydah's presence, and without his name being connected to the business.

49. After Uwaydah fled the country, he had all the servers moved to Estonia in order to prevent law enforcement from finding anything. Part of the organization is in Estonia where Wendee Luke runs the day to day operations.

50. In 2011, after a search warrant was executed at my home, Uwaydah flew me out to Lebanon again. This time, he suggested that I travel to Macedonia to run a medical transcription service that he owns, but is not in his name. Previously, Kelly Park and Ronnie Case were assisting Uwaydah in running this business.

51. Benjamin Gluck came to Macedonia to meet with me at Uwaydah's direction. to discuss his representation of both me and Frontline after the search warrant was executed on my home. We also went over capping lists and attorneys that were being paid off. I did not retain Gluck or his firm, these arrangements were all made by Uwaydah.

52. In 2011, when I went to Lebanon, Uwaydah told me that we had close to a billion dollars in receivables from Frontline and Firstline.

53. After Marisa Nelson left the organization, Tatiana Arnold took control of the books and handled the money and finances of the organization.

54. Tatiana Arnold told me that she was sending millions of dollars overseas.

55. Uwaydah purchased and controlled real estate properties and cars that were placed in my name, using my credit. This was done with my permission, but on some occasions, it was done without my knowledge or permission. My name was placed on the Somis property and on at least one car without my knowledge or consent.

56. Uwaydah's name is on none of the companies he owns. To my knowledge, Dr. Uwaydah was a named owner of only Frontline and Southbay Surgical. His other businesses listed false owners or fictitious boards of directors. Even though these entities were not in his name and he was not listed as an owner, or board member, he nevertheless controlled all aspects of these entities, including any litigation these companies were/are involved in. This includes the lawsuits against Marisa Nelson, Peter Nelson, and Shelly Rose Kelly, filed by attorney Benjamin Gluck and others.

57. Uwaydah used lawyers to set up companies, draft contracts, create fraudulent documents and file lawsuits that facilitated the fraudulent activities. Uwaydah was their client, giving them direction and paying their bills even though others, such as myself, were listed as owners or officers of the corporations.

58. All of the lawsuits were Uwaydah lawsuits. I was named in three or four lawsuits due to my association with Uwaydah and at no time did an attorney speak to me regarding these lawsuits, asking me what I wished to do. I never sought out or retained these lawyers. This was all arranged by Uwaydah and they received their direction from him.

59. Tatiana Arnold knew that Uwaydah was the true owner of the Beverly Grove property when she was supposedly representing me in a lawsuit involving that property.

60. Tatiana Arnold never actually represented me in any personal or private matter.

61. Attorneys Richard Green, Harry Nelson and Bo Thoreen did not represent me in an individual or personal capacity as was written in their signed declaration provided to Benjamin Gluck and filed in court for purposes of the evidentiary hearing. I did not seek them out and they took no direction from me. These legal representations were all of Dr. Uwaydah and his interests.

62. Dr. Uwaydah's control extends to the current criminal defense in this case. He has paid millions of dollars for the attorneys for the defendants, including myself. Dr. Uwaydah has informed me that during these criminal proceedings, until recently, he has spoken with my attorney Benjamin Gluck on a daily basis. He clearly has been given more information about my defense and strategy than I have been. Dr. Uwaydah has told me that he has been giving direction to Gluck on how to conduct my defense. Benjamin Gluck did not tell me that he was having these conversations with Dr. Uwaydah.

63. An attorney from Lebanon named Victor is paying almost all of the attorneys for the co-defendants on this case, on behalf of Uwaydah and with Uwaydah's money.

64. While I was in jail, Uwaydah often sent money to pay my bills. Hector Sandoval would deliver up to $5,000.00 cash for my wife or kids.

65. Prior to the arrests in this case, Hector Sandavol was a helper to Uwaydah who ran errands and made deliveries. It has come to my attention that Dr. Uwaydah now has Hector Sandoval listed as the current CEO of Frontline.

66. When I was released from custody after 25 months, Benjamin Gluck told me not to communicate with Dr. Uwaydah. I followed his instructions until recently when Dr. Uwaydah quit paying Benjamin Gluck and his firm.

67. Currently, Uwaydah wants me to call him every day. He also currently speaks to Kelly Park, Ronnie Case, Shannon Moore and Letty Lemus.

68. Dr. Uwaydah told me that he would think ahead and do things in order to discredit anyone who could potentially become a witness against him, his co-conspirators, or his organization.

69.    The reason and whole point Uwaydah sued Marisa Nelson was to discredit her as a witness against Uwaydah and his organization. Uwaydah even talked to me about securing certain concessions from Marisa Nelson or Shelly Rosekelly.

70.    The Frontline lawsuit against Marisa and Peter Nelson alleging, among other things, that they used a company credit card to pay for things without Uwaydah's approval was fraudulent and untrue.

71.    Uwaydah told me that Susan Moreno had given a proffered statement and that he paid for Susan Moreno's attorney. In January or February of 2015, when Maria and I went to Lebanon to discuss with Uwaydah the letter we received from the DA's Office regarding a grand jury, he had a copy of Susan Moreno's hard drive and had us look through thousands of her emails to find anything that could incriminate her. We went through her emails with the specific intent to find things that would discredit her. Uwaydah and I had already discussed how Susan would be discredited as a witness.

72.    Before I received the grand jury letter from the DA's Office, Uwaydah told me that Benjamin Gluck told him that Susan Moreno testified about surgeries in the grand jury. Uwaydah also told me that Gluck told him that Shelly Rosekelly also testified at the grand jury.

73.    Uwaydah told me that Kelly Park, Ronnie Case, and Jeff Stevens got the same DA's Office's grand jury letter that I had received.

74.    Benjamin Gluck claimed to represent me when the bank accounts were frozen and the storage container was seized, but this was not really true. I did not hire him. I had hired my own attorney because my personal bank account was frozen. I believe that Uwaydah made arrangements for Gluck to handle those issues for his secretly controlled companies which included Frontline/Firstline.

75.    I was not aware of the storage unit, otherwise known as "Location 13," or its contents. I was never asked about my connection, if any, to the documents stored in Location 13 by anyone, including my attorney Benjamin Gluck.

I declare under penalty of perjury in accordance with the laws of the State of California that the aforementioned is true.

Dated: 12/3/18

Paul Turley

Louis Sepe, Counsel for Paul Turley

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

JUL 2 2 2020

S. AYAD

SUPERIOR COURT OF CALIFORNIA

COUNTY OF RIVERSIDE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) Case No. RIF1990022 |
| *Plaintiff,* | ) SUPPLEMENTAL PLEA FORM AND ) FACTUAL BASIS OF SHANNON ) DEVANE |
| *v.* | ) |
| SHANNON DEVANE, *et al.,* | ) |
| *Defendants.* | ) |

As a part of my plea bargain with the People in the above-entitled matter, I, SHANNON

DEVANE, hereby declare that:

**Initials**          **Factual Statements**

_SD_

1)  The following entities are owned or controlled by Munir Uwaydah, and are

all in fact part of the same criminal organization (hereinafter "the

Organization"):

1. Blue Oak Medical Group, A Medical Corporation
   a. EAMS No.: 11282448
   b. UAN: Blue Oak Medical Los Angeles
2. Blue Oak Asset Management, Inc.
3. La Jolla Orthopedic & Pain Management Center, Inc. (billed by La Jolla, Inc.)
   a. EAMS No.: 12827402
4. U.S Health & Orthopedics dba Firstline Health, Inc.
   a. EAMS No.: 8902005
   b. UAN: Firstline Health Los Angeles
5. Firstline Health dba U.S. Health and Orthopedics
6. Frontline Medical Associates, Inc.
   a. EAMS No.: 8842224
   b. UAN: Frontline Medical Assoc Los Angeles
7. Accounts Receivable Acquisitions, LLC
   a. EAMS No.: 8919945
   b. UAN: Accounts Receivable Acq Los Angeles
8. Accounts Receivable Limited, Inc. (aka Accounts Receivable LTD)

1
SUPPLEMENTAL PLEA FORM – FACTUAL BASIS OF SHANNON DEVANE

9. Controlled Health Management, Inc.
    a. EAMS No.: 9012738
    b. UAN: Controlled Health Mgmt Los Angeles
10. California Clinics, Inc.
11. Medical Software & Management, Inc.
12. Parkside Solutions, LLC
13. Walnut Capital, LLC
14. Orthopedic Devices, LLC
15. Medical Technology & Management, LLC
16. Ventura Collection & Management, LLC
17. MedConsult SAL
18. Medical Outsourcing AKA MEDIKAL AUTSORSING DOOEL Skopje.
19. I-Capital US, Inc.
20. Zunical Medical Group
21. Cal Redwood Collections, LLC
22. Notre Dame Properties, LTD
23. 5007 Holdings LLC
24. Vanguard Support Services, LTD

2) Beginning no later than September 1, 2015 and at least until September 1, 2018, Blue Oak Medical Group operated numerous clinics in Southern California including Riverside County.

3) The Organization was operated by Munir Uwaydah, through myself, Matthew Rifat, and Janek Hunt.

4) The Organization existed for one purpose: to commit workers' compensation insurance fraud.

5) I ran day-to-day operations for Blue Oak Medical Group beginning no later than September 1, 2015 and at least until September 1, 2018

6) Beginning not earlier than August 2017, I became aware that the Organization had submitted fraudulent bills to insurance companies, specifically for medications manufactured by Fusion Pharmaceuticals, LLC, California Pharmaceuticals, LLC, and Talca Pharmaceuticals, Inc. (the Pharmacies). Munir Uwaydah controlled the Pharmacies behind the scenes.

7) The Organization was set up to prevent medical providers from seeing the actual bills and reports that were sent to insurance companies.

2

SUPPLEMENTAL PLEA FORM – FACTUAL BASIS OF SHANNON DEVANE

8) For example, not earlier than August 2017, I became aware that Fanatrex billing was fraudulent because the Organization continued to submit bills including Fanatrex after the Pharmacies ran out of ingredients to make it.

9) Janek Hunt managed Medical Technology Management (MTM), an Estonian company. MTM is another component of the Organization.

10) Jackie Riddle does not exist; it is an AKA of Wendee Luke.

11) Amber Woodley, who reported directly to Munir Uwaydah, managed Controlled Health Management Inc. (CHM). CHM handled document intake and some cashflow for the Organization. Amber Woodley also managed Uwaydah's personal properties, handled Blue Oak Medical Group payroll, and ordered supplies for the Organization.

12) On one occasion I forged Dr. Robin Chorn's signature on a medication order form.

DATED: 6/23/20

SHANNON DEVANE
Defendant

ANTHONY COLOMBO
Attorney for Shannon Devane

3
SUPPLEMENTAL PLEA FORM – FACTUAL BASIS OF SHANNON DEVANE

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JUN 10 2021

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
Wendy Warren

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF LOS ANGELES**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) Case No. BA455469 |
| | ) |
| *Plaintiff,* | ) **FACTUAL BASIS PLEA STATEMENT OF** |
| | ) **DEFENDANT MARIA TURLEY** |
| vs. | ) |
| | ) |
| MARIA TURLEY, | ) |
| | ) |
| *Defendant.* | ) |

*As a part of my plea bargain with the People in the above-entitled matter, I, Maria Turley, hereby declare the following to supplement the factual basis established in the grand jury transcripts and investigative reports:*

1. _MT_ After consulting with my attorney, Vicki Podberesky, I knowingly, expressly and willingly waive any Attorney-Client Privilege to any documents and evidence seized during search warrants executed on my home at 12009 Wood Ranch Road, Granada Hills CA, on or about May 25, 2011 and on or about September 13, 2015.

2. _MT_ I am married to Paul Turley. I was a primary school teacher until 2002 when I became a fulltime mother focused on taking care of my youngest child, Timothy, who was diagnosed with autism. In or around November 2004, my husband and Dr. Uwaydah started working together. In late 2004, I started working part time for them. I organized the closing of Millenium and assisted in its merger into a new business entity, Frontline Medical Associates. I took direction from Lupe LNU and Lettie Lemus, who is a defendant in this case. I worked at Frontline until June 2010, when Kelly Park was arrested for the murder of Juliana Redding.

3. _MT_ When I began working at Frontline I did not have a title. I helped to coordinate the office paperwork and to make sure that all offices worked in the same manner. My understanding was that the chain of command was Dr. Uwaydah to Paul and then Paul gave me direction. In or about 2009, I was given the title of Director of Surgery even though I didn't have any training in this field. Frontline Medical Associates was controlled by Dr. Uwaydah and Paul did not have any independent authority to make decisions. My duties as Director of Surgery included managing and coordinating the offices, reviewing all AME reports and overseeing the surgical referrals which were part of the approval process by the insurance companies..

- 1 -

MARIA TURLEY FACTUAL PLEA STATEMENT

4. *[signature]* I worked there for many years and represented myself as an employee but I never received a paycheck from Frontline Medical Associates or any of Dr. Uwaydah's other entities.

5. *[signature]* At Frontline, prescription medications were handled by Leticia Lemus. An extremely large volume of these medications were returned by the post office and the medications were placed in a black bin in the office or given to Leticia Lemus, Kelly Park or Edgar Baltazar.

6. *[signature]* Frontline spine surgeries were done at Mission Community Hospital in San Fernando while all other surgeries were done at South Bay Surgical and Spine in Long Beach, a company that was owned and controlled by Dr. Uwaydah. Peter Nelson was his Physician's Assistant and assisted Dr. Uwaydah with surgeries. However, I heard other employees saying that Peter Nelson also performed surgeries without Dr. Uwaydah being present in the O.R.

7. *[signature]* On November 26, 2004, I opened a joint bank account with Dr. Uwaydah and Paul Turley at First Federal Bank, listing all three of us as owners and signers on this account.

8. *[signature]* At the direction of Dr. Uwaydah, I sent two outgoing wires to Germany: on June 23, 2006, I sent an outgoing wire (from my personal First Financial Credit Union checking account with Paul Turley ending in 6559-08) to Holger Blank for $1,222.00, and on December 28, 2006, I sent an outgoing wire (from my personal First Financial Credit Union account ending in 6559-50) to Varster Pferdezucht GMBH for $120,000.00 for a horse purchased for Dr. Uwaydah. Neither Paul or I had an interest in the horse. This was a purchase solely for Dr. Uwaydah, using Dr Uwaydah's money.

9. *[signature]* Dr. Uwaydah did not want to put his name on anything. At Dr. Uwaydah's direction, and using Dr. Uwaydah's money, Paul Turley purchased numerous properties under his name. Dr. Uwaydah ultimately used and controlled these properties for his own benefit. These properties included; 1) 1316 Beverly Grove Place, Beverly Hills CA 90210; 2) 5007 Ocean Front Walk 1-3, Marina del Rey, CA 90292; 3) 5509 Ocean Front Walk, Marina del Rey, CA 90292; and 4) 34 Galleon Street, Marina del Rey, CA 90292. Between June 24, 2008 to November 2009, I received monthly checks from Frontline's Citibank Account x-2823 and from LA Health Partners Medical Group's First Federal Bank of California Account No. x-1697, in amounts between $28,287.00 to $34,697.00, signed by Marisa Schermbeck Nelson or Paul Turley, for the purpose of paying the monthly mortgages on these properties.

10. *[signature]* On September 16, 2009, I sent an email to Susan Moreno, regarding a patient named Carlos Ledesma. At Paul's direction, I asked Susan to edit and to change the rebuttal medical report of the patient's examination by changing the range of motions and the discussion to make it look like we were sending the insurance company a new report. It was common practice for Paul to request changes to the reports. After the reports were edited, I sent the edited reports to the surgical person in San Fernando. My understanding is that these edited reports were then sent out to insurance companies, in order to get authorization.

- 2 -

MARIA TURLEY FACTUAL PLEA STATEMENT

11. Jeff Stevens was a capper who worked with a lot of applicant attorneys who sent their clients to Frontline. However, these attorneys stopped sending their clients to Frontline after Kelly Park was arrested. Jeff Stevens also had real estate dealings with Dr. Uwaydah.

12. Tatiana Arnold was one of Dr. Uwaydah's personal attorneys. She allowed Frontline's Utilization Review, payroll, and legal departments to run out of her main law office.

13. At Dr. Uwaydah's direction, Paul Turley and I became investors in Ventura County Business Bank. However, a portion of the funds that we invested belonged to Dr. Uwaydah. We put in $1.2 million with the majority of it being Dr. Uwaydah's money. A portion of it was our own money. On February 5, 2010, Marisa Schermbeck Nelson transferred $400,000.00 from an Accounts Receivable LTD account to my personal joint account #1226559-16 at First Financial Credit Union. On February 16, 2010, I wired $200,000.00 to Pacific Bank for this investment under Paul Turley's name from that same personal joint account.

14. After Kelly Park's arrest for the murder of Juliana Redding on June 17, 2010, Paul told me that a number of Dr. Uwaydah's assets were moved under the names of Wendee Luke and her family members, including her father Terry Luke. I believed it to be true. Consequently, I conveyed this to Gordon Oard.

15. After Dr. Uwaydah fled the country in June 2010, he continued to operate Firstline Health Inc. through Wendee Luke and Tatiana Arnold.

16. Terry Luke set up the Firstline Heath bank accounts at Banco Popular.

17. Between January 1, 2014 to February 28, 2015, I traveled 2-3 times to Beirut, Lebanon to meet with Dr. Uwaydah. On February 5, 2015, at Dr. Uwaydah's direction, I signed three quitclaim deeds for the following properties: 1) 1316 Beverly Grove Place, Beverly Hills, CA 90210 to Notre Dame Properties Ltd. where Paul Turley was Agent for Service of Process; 2) 34 Galleon Street, Marina del Rey, CA 90292 to Wicklow Holdings, Inc., where Paul Turley was the President, Secretary, Treasurer and Director; and 3) 5509 Ocean Front Walk, Marina del Rey, CA 90292 to Connemara Holdings Inc., where Paul Turley was the President, Secretary, Treasurer and Director. Dr. Uwaydah was the true owner of Notre Dame Properties, Wicklow Holdings, and Connemara Holdings, and he solely controlled them.

18. On November 2, 2011, in an interview with Berkshire Hathaway Insurance Company, I disclosed my knowledge of the following Dr. Uwaydah entities and Dr. Uwaydah associates:

    a. ADG Marketing (oversaw Frontline medical treatment by several applicant attorneys);

- 3 -

MARIA TURLEY FACTUAL PLEA STATEMENT

b. Empyrean Management (used by Frontline as a payroll company);
c. GR Medical Management (handled Frontline's billing and collections);
d. Shannon Moore (Dr. Uwaydah's assistant at Sentinel, Frontline & South Bay Surgical and Spine.);
e. Tom Mayer (Dr. Uwaydah's CPA);
f. Holger Blank (Dr. Uwaydah's business partner in Europe-in real estate and horses);
g. Henry Fenton (Dr. Uwaydah's past attorney but they had a falling out after Kelly's arrest);
h. Benjamin Gluck (Dr. Uwaydah's current attorney for the entities and individuals);
i. Sonya Rodriguez (scheduled surgeries for Frontline, Firstline & for Dr. Uwaydah);
j. Susan Moreno (wrote reports for Frontline & Dr. Uwaydah);
k. Tom Colivas (Frontline PA);
l. Esther Ros (Frontline office manager, patient intake coordinator, Utilization Review manager & assistant to Paul Turley);
m. Dennis Fusi (Attorney who referred patients);
n. Robert Slater (Attorney who referred patients);
o. Barry Appel (Attorney who referred patients);
p. Sean O'Keefe (Attorney who referred patients);
q. David Berns (Attorney who referred patients);
r. David Lamonica (Attorney who referred patients);
s. Goldflam & Barth (Attorneys who referred patients)

19. Between June 8, 2005 to June 13, 2005, I wired Escrow LA, Inc. a total of $144,967.66 from my personal joint First Financial Credit Union Account 1226559-08. The purpose of these wires was to pay the mortgage for the properties Paul bought and put in his name at Dr. Uwaydah's direction but were actually owned and controlled by Dr. Uwaydah: 1) 1316 Beverly Grove; 2) 5007 Ocean Front Walk; 3) 5509 Ocean Front Walk and 4) 34 Galleon Street. The funds that I wired from this personal joint account were reimbursed to me from Dr. Uwaydah entity funds.

20. Between February 7, 2006 to May 17, 2006 and on July 9, 2007, I wired Beverly Hills Escrow and Beverly Hills Escrow Trust a total of $1,152,898.92, from my personal joint account First Financial Credit Union Accounts 1226559-08 and 1226559-50. The purpose of these wires was to pay the mortgage for the properties Paul bought and put in his name at Dr. Uwaydah's direction but were actually owned and controlled by Dr. Uwaydah: 1) 1316 Beverly Grove; 2) 5007 Ocean Front Walk; 3) 5509 Ocean Front Walk and 4) 34 Galleon Street. The funds that I wired from this personal joint account were reimbursed to me from Dr. Uwaydah entity funds.

DATED: 6 / 10 / 2021

Maria Turley
Defendant

Vicki Podberesky
Attorney for Defendant Maria Turley

- 4 -

MARIA TURLEY FACTUAL PLEA STATEMENT

7.25-17

# I.
# FACTUAL STATEMENT

1._____    Beginning in May 2017, without any promises of leniency or other consideration, I made proffer statements with the Los Angeles County District Attorney's Office over the course of several days.

2._____    All statements made during these proffer sessions were made in the presence of my attorney, Amy Jacks.

3._____    All statements made during these proffer sessions were truthful and based upon my personal knowledge which was acquired over many years through my personal participation, my personal observations, and my interaction with co-conspirators.

4._____    During these sessions I have continued to refresh my recollection of events by reviewing documents and correspondence in my possession. I have also provided corroborating documentation to the Los Angeles County District Attorney's Office.

5._____    I worked directly with Munir Uwaydah, MD as a personal assistant from 2000 through June 2010.

6._____    Uwaydah owned and controlled many companies and properties even though other individuals were listed as the owners. This was all done intentionally so that Uwaydah could hide his ownership and his control from creditors, insurance investigators and the government agencies. He exercised absolute control over all over all of these entities.

7._____    Uwaydah purchased and controlled real estate property that was placed in Paul Turley's name, using Paul Turley's credit.

8._____    Uwaydah used lawyers to set up companies, draft contracts and file lawsuits that facilitated the fraudulent activities. Uwaydah was their client, giving them direction and paying their bills even though others were listed as owners or officers of the corporations.

9._____    Uwaydah controlled purported owners, co-conspirators and others by various means including, but not limited to, manipulation, loyalty, financial incentives, fraudulent "promissory notes," litigation, and threats.

10._____    Between 2003 and 2010, Uwaydah directed me to put my name as owner, officer, or manager of various corporations, or limited liability companies, even though he was the true owner and controlled these entities. Uwaydah solely controlled the



operation of these entities, including the flow of money in and out of these entities' bank accounts. These entities include, but are not limited to, Golden State Pharmaceuticals (GSP), Springboard, Orthopedic Devices, Gestuet Eichenhain, Accounts Receivable LTD, and Marisa Schermbeck dba Schermbeck Management.

11. _____ In addition to putting my name as owner of companies that actually belonged to Uwaydah, at his direction I allowed myself to be designated as the owner or authorized signer on dozens of bank accounts associated with various Uwaydah entities, including those already mentioned. Until June 2010, I moved money in and out of these various accounts at the direction of Uwaydah and no one else.

12. _____ Uwaydah exercised absolute control over the income from these various entities. Uwaydah used the income as his own. His personal expenses as well as expenses for Frontline or other entities were paid from whatever account had funds in it at the time without regard to which accounts belonged to which companies or which companies' bills were being paid. Uwaydah directed that funds be transferred between these entities and their bank accounts without any distinction of separate assets. However, when it came to funds from Golden State Pharmaceuticals, money was first moved into Schermbeck management before it was moved to Frontline because Uwaydah did not want to reveal his direct ownership of the pharmacy.

13. _____ Although Frontline Medical Associates was incorporated in November 2004 listing Munir Uwaydah as a 51 percent owner, and Paul Turley as a 49 percent owner, based on my observations and experience with the company, and the movement of funds in which I participated, Uwaydah actually owned 100 percent of the company. To my knowledge Paul Turley never received any distribution of shares in the income of the company. Turley was paid a salary like any other employee. On occasion, he had to plead that Uwaydah allow him to receive his salary.

14. _____ Although Paul Turley managed the daily operations of the San Fernando medical clinic, he had no actual authority over Frontline and had to ask Uwaydah for permission to do anything related to the company, including receive money to pay cappers. His value to Uwaydah was that he had connections to lawyers that would refer clients for a fee.

15. _____ Uwaydah and Paul Turley paid various lawyers for illegal referrals to Frontline. Defendant Jeff Stevens, among others, was a "capper" who was paid to bring in patients from various law firms. I participated in making such payments. Defendants Maria Turley, Tatiana Arnold, Kelly Park and Wendee Luke knew and/or facilitated this illegal scheme which was referred to as "marketing."

16. _____ There was a fee hierarchy for these referrals with greater fees paid for surgical candidates.

17. _____ Uwaydah exerted pressure to maximize billings for each patient and to obtain surgical authorizations from insurers. Uwaydah would ensure employee compliance through various means communicated through managers such as myself, Paul Turley and Maria Turley.

18. _____ An emphasis was put on surgical authorizations. Approximately 90 % of the capped potential surgical patients were placed on a surgical track and were authorized.

19. _____ At South Bay Surgical and Spine Institute Peter Nelson and the rest of the staff would typically wait until Uwaydah pulled into the parking lot, then the "surgeries" would begin. Peter Nelson was always the person in the operating room. I personally witnessed Uwaydah being out of the operating room for hours at a time while Peter Nelson performed "surgeries."

20. _____ At Mission Hospital, and other area hospitals, Uwaydah frequently conducted business and met with myself and other defendants while Peter Nelson continued "surgeries" without Uwaydah's participation or presence in the operating room.

21. _____ It was common knowledge that Peter Nelson's activity in the operating room was the basis of a controversy with the medical board over the practice. This practice of surgery was considered to be happening without Uwaydah's personal presence and Uwaydah circulated an opinion letter to support his claim that the practice was allowed.

22. _____ I assisted in preparing operative reports for Uwaydah at his direction. He personally wrote the report and I inserted the codes. Those reports always claimed that he performed the surgeries.

23. _____ It was well known within the organization that, my husband, Peter Nelson was in the operating room for hours by himself without Dr. Uwaydah physically being in the room. He spent long hours operating on up to 10 patients a day. Staff would joke that he should become a doctor and receive more pay.

24. _____ Billings were routinely submitted to insurance companies reflecting that Uwaydah performed the surgery, and that a physician's assistant was utilized as well. Peter Nelson received a salary for his work but he was also promised a portion of the payments from the insurers for a physician's assistant when the bills were paid. These were referred to as receivables.

25._____ All of Uwaydah's inner circle, including all the charged defendants and others, knew that Uwaydah was the true owner of Golden State Pharmaceuticals. Uwaydah articulated that he wanted maximum pharmaceutical billing for each patient, in spite of their particular medical needs or concerns. Uwaydah created a list of prescription medications and insisted that each patient seen at Frontline be prescribed all medications on the list or at least a certain dollar amount. If the treating doctor failed to prescribed all of the listed medications, another employee would do so. Letty Lemus and others participated in this behavior. Lemus and others would often sign Dr. Johnson's name on prescription sheets. The billing reflected that each patient was essentially prescribed the same medications.

26._____ Prescriptions would often be returned to the clinic or pharmacy, and these medications would be relabeled with different patient names and the insurance company would be re-billed for the same medication. Discrepancies between the amount of pharmaceuticals purchased by GSP, and the amount billed occured. At Uwaydah's instruction, I and others adjusted the numbers so that regulating agencies would not become aware of the discrepancy. Paul Turley, Maria Turley, Kelly Park, Tatiana Arnold, Letty Lemus, Jeff Stevens, Wendee Luke and others participated in the various fraudulent practices related to pharmaceuticals.

27._____ Pharmaceutical billing became a lucrative part of the overall scheme. However, Uwaydah directed that Turley not be informed of how much it was making because he believed that Turley would want a larger salary.

28._____ Other documents were forged to further the facilitate the frauds. They were commonly sent to defendant Kelly Park to accomplish this task. The forgeries were referred to as "moorparking." These documents included forged patient arbitration agreements.

29._____ Uwaydah attempted to gain control over the Ventura County Business Bank to facilitate access to credit and the movement of funds.

30._____ To accomplish this, Uwaydah transferred funds to purportedly independent investors to be invested in the bank on his behalf. Fraudulent documents were prepared attesting to their funds, their independence and lack of connection to the other investors. Tatiana Arnold participated in this process and was a proxy investor for Uwaydah herself.

31._____ Kelly Park and Ronnie case were arrested for the murder of Juliana Redding and Uwaydah fled the country. I was left with my name on various companies and bank accounts. I was aware of the implications as to my culpability in the frauds. During this time, I attempted to distance myself from the organization and to be



indemnified by Uwaydah for any claims against companies in my name. Shelly Rosekelly and I employed criminal defense attorney Robert Bernstein.

32. _____ I subsequently proffered statements to the District Attorney's office and investigators.

33. _____ Attorneys representing Uwaydah attempted to return control of the entities and bank accounts under my name to Uwaydah's control by filing fraudulent successive lawsuits under the names of different companies, each of which were actually owned and controlled by Uwaydah.

34. _____ During this time, I was contacted through my attorney by attorney Benjamin Gluck, who was representing Uwaydah, He attempted to obtain a declaration that the property seized by the police was actually the property of Frontline Medical so he could challenge the seizure of the computers and the storage locker by the authorities.

35. _____ Attorney Benjamin Gluck also attempted to negotiate the return of control of the entities and bank accounts under my name to Uwaydah's control. These negotiations ultimately never concluded because I was advised that the return of these assets would further facilitate the frauds perpetrated by Uwaydah.

36. _____ I was then sued again by Uwaydah's lawyers, including Benjamin Gluck.

37. _____ I ultimately filed for bankruptcy. I was convinced by Benjamin Gluck to sue my former criminal defense attorney for malpractice for advising me not to transfer the items back to Uwaydah's control as part of a settlement with Uwaydah. The proceeds of that suit were to go to any debt owed to Uwaydah. He also persuaded me to waive my attorney client privilege with my criminal defense attorney and my civil attorney to facilitate that suit.

38. _____ During the bankruptcy action Benjamin Gluck and other attorney's representing Uwaydah's interests facilitated the return of the entities to Uwaydah's control through the bankruptcy trustee.

39. _____ As part of that settlement, they also secured Peter Nelson's agreement to cooperate in the defense of any action against Uwaydah brought by the medical board.

40. _____ During that same period, Attorney Benjamin Gluck asked me to sign a declaration that the storage locker that was rented for Uwaydah was actually rented on behalf of Frontline and related entities and that the material there belonged to the entities as well. This was not true and I corrected the declaration to reflect the fact that it

was actually rented on behalf of Uwaydah and that all the material there was his. Attorney Benjamin Gluck then argued, in an email exchange that my edits "needlessly and inaccurately confuse things."

```
 1   RETURN DATE:  7/27/18

 2   DEPARTMENT 106

 3

 4

 5

 6

 7

 8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

 9               FOR THE COUNTY OF LOS ANGELES

10   DEPARTMENT NO. 106           HON. LARRY PAUL FIDLER, JUDGE

11

12   THE PEOPLE OF THE STATE OF CALIFORNIA,   )
                                              )
13                        PLAINTIFF,          )
                                              )
14        VS.                                 ) NO. BA455469-04
                                              )
15   MARISSA SCHERMBECK NELSON,               ) GUILTY PLEA
       T/N MARISA SCHERMBECK NELSON,          )
16                                            )
                             DEFENDANT.       )
17   _____)

18

19        LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 26, 2017

20                      10:51 A.M.

21

22      UPON THE ABOVE DATE, THE DEFENDANT BEING PRESENT IN

23   COURT AND REPRESENTED BY COUNSEL, AMY JACKS, ATTORNEY

24   AT LAW; THE PEOPLE BEING REPRESENTED BY DAYAN MATHAI

25   AND KENNES MA, DEPUTY DISTRICT ATTORNEYS OF LOS ANGELES

26   COUNTY, THE FOLLOWING PROCEEDINGS WERE HELD:

27        (DIANNA K. CRITTENDEN, C.S.R. NO. 8998,

28         OFFICIAL REPORTER.)
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1

```
 1        THE COURT:  THE DEFENDANT, MARISA NELSON, IS PRESENT
 2   WITH HER COUNSEL.  THE DISTRICT ATTORNEY IS PRESENT.
 3           MY CLERK HAS INFORMED ME THAT YOU INTEND TO TAKE A
 4   PLEA FROM THIS DEFENDANT, WHICH IS FINE, AND YOU HAVE AN
 5   AGREEMENT BETWEEN THE PEOPLE AND THE DEFENDANT AND ALSO
 6   APPARENTLY A FACTUAL STATEMENT THAT'S GOING TO BE TAKEN THAT
 7   YOU DON'T WANT TO BE KNOWN TO BE PUBLIC.  WHAT'S THE BASIS
 8   FOR THAT?
 9        MR. MATHAI:  NO, THE FACTUAL STATEMENT WILL BE TAKEN,
10   AND IT WILL BE ON THE RECORD.  WE'RE JUST NOT -- NOT FILING
11   A DOCUMENT THAT HAS THE FACTUAL STATEMENT ON PAPER.  WE'RE
12   JUST -- IT WILL BE PART OF THE RECORD ON THE TRANSCRIPT, BUT
13   THERE IS NO -- THE ACTUAL FACTUAL STATEMENT WILL NOT BE
14   FILED WITH THE COURT.
15        THE COURT:  SO I ASSUME THAT THE FACTUAL STATEMENT IS
16   GOING TO BE DISCOVERABLE.
17        MR. MATHAI:  IT WILL BE INSOFAR AS IT'S IN THE
18   TRANSCRIPT.
19        THE COURT:  I ASSUME YOU ARE GOING TO TELL THE DEFENSE
20   ABOUT IT, ARE YOU NOT?
21        MR. MATHAI:  THE DEFENSE WILL KNOW ABOUT IT, I'M SURE.
22   WE HAVE A COURT APPEARANCE ON THE 4TH, AND MS. NELSON WILL
23   NOT BE THERE ON THAT DAY AFTER TODAY'S PLEA, AND I THINK
24   BASED ON THE DYNAMICS OF THE CASE, I THINK IF THEY DON'T
25   KNOW ALREADY, THEY WILL KNOW.
26        THE COURT:  WELL, I THINK YOU HAVE AN OBLIGATION TO TURN
27   IT OVER.
28        MR. MATHAI:  OF COURSE, YOUR HONOR.  THAT, THAT I
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1   THOUGHT MAYBE YOU MEANT, LIKE, RIGHT AWAY.

 2       THE COURT:  NO.

 3       MR. MATHAI:  THIS WILL BE PUBLIC AND IT WILL BE

 4   DISCOVERED.  THE TRANSCRIPT WILL BE A PUBLIC DOCUMENT.  THE

 5   PROFFER SESSIONS WHICH MS. NELSON HAS ENGAGED WITH IN THE

 6   RECENT WEEKS WITH US WILL BE DISCOVERED, AND THE DEFENSE

 7   WILL KNOW.

 8           I'M SORRY, I MISUNDERSTOOD THE COURT'S QUESTION.  I

 9   THOUGHT YOU MEANT, LIKE, WILL I BE GOING OUT TODAY AND

10   CALLING THEM AND TELLING THEM ABOUT TODAY.  NO.

11       THE COURT:  NO.  NO.  IT DOESN'T HAVE TO BE TODAY.

12       MR. MATHAI:  NO, THEY WILL KNOW, OF COURSE.  EVERYTHING

13   WILL BE DISCOVERED ON THE BASIS OF -- I MEAN, THE PROFFER

14   SESSIONS WILL ALL BE DISCOVERED.

15       THE COURT:  SO YOU WANT TO FILE THE AGREEMENT THEN?

16       MR. MATHAI:  YES, I DO.  AND IT'S OUR INTENTION THAT

17   THIS PLEA BE UNDER OATH, AND I CAN EXPLAIN, I CAN GO THROUGH

18   IT WITH THE DEFENDANT IF THE COURT WISHES.

19       THE COURT:  ALL RIGHT.  DO YOU WANT THE DEFENDANT PLACED

20   UNDER OATH THEN?

21       MR. MATHAI:  YES, PLEASE.

22       THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

23           YOU DO SOLEMNLY SWEAR THAT THE TESTIMONY YOU MAY

24   GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL BE THE

25   TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH SO HELP

26   YOU GOD.

27       THE DEFENDANT:  YES.

28       THE COURT:  THANK YOU.
```

```
 1      THE CLERK:  PLEASE STATE AND SPELL YOUR FIRST AND LAST

 2  NAME FOR THE RECORD.

 3      THE DEFENDANT:  MARISA A. NELSON.  M-A-R-I-S-A,

 4  N-E-L-S-O-N.

 5      THE COURT:  ALL RIGHT.  THANK YOU.

 6          YOU MAY PROCEED.

 7      MR. MATHAI:  THANK YOU.

 8          GOOD MORNING, MS. NELSON.  GOOD MORNING.

 9      THE DEFENDANT:  GOOD MORNING.

10      MR. MATHAI:  OKAY.  YOU HEARD THE BRIEF COMMENTS BETWEEN

11  THE COURT AND I THIS MORNING, AND YOU UNDERSTAND THAT YOU'RE

12  HERE -- IT'S OUR UNDERSTANDING THAT YOU'RE HERE THIS MORNING

13  TO ENTER A PLEA THAT I WOULD WANT TO GO OVER WITH YOU AND

14  MAKE SURE THAT WE ALL UNDERSTAND WHAT IT IS YOU WANT TO DO

15  TODAY.

16          I UNDERSTAND THAT YOU WISH TO CHANGE YOUR PLEA THIS

17  MORNING AND ENTER A PLEA OF GUILTY TO COUNT 1 OF THE

18  COMPLAINT, WHICH IS CASE NUMBER BA455469, AND ENTER A PLEA

19  OF GUILTY TO THAT CHARGE AND ADMIT THE SPECIAL ALLEGATION

20  UNDER PENAL CODE SECTION 12022.6, SUBDIVISION (A)(4), AND

21  THE TERM FOR A MAXIMUM TERM OF FIVE YEARS ON THE CONSPIRACY,

22  WHICH IS THE MAXIMUM, AND FOUR YEARS ON THE SPECIAL

23  ENHANCEMENTS FOR A TOTAL OF NINE YEARS THAT YOU WILL BE

24  PLEADING TO TODAY, AND THAT YOU WILL NOT BE SENTENCED --

25          IN AN AGREEMENT WITH THE PEOPLE, YOU'VE AGREED TO

26  PLEAD TO THAT COUNT AND THAT SPECIAL ENHANCEMENT, AND THE

27  AGREEMENT WITH THE PEOPLE IS THAT UPON YOUR PLEA, THE

28  SENTENCING WILL BE PUT OVER FOR A PERIOD OF TIME, AND THAT
```

1  YOU WILL COOPERATE FULLY AND TRUTHFULLY WITH THE PROSECUTION

2  IN THIS CASE AS A WITNESS IN ANY HEARINGS AND TRIALS AND ALL

3  MATTERS THAT YOU'RE CALLED UPON IN THE PROSECUTION OF THE

4  REMAINING DEFENDANTS IN YOUR CASE AND THE OTHER TWO CASES,

5  AND ALSO ANY OTHER DEFENDANTS THAT ARE COCONSPIRATORS THAT

6  MAY BE PROSECUTED THAT ARE RELATED TO YOUR CASE.

7       IS THAT YOUR UNDERSTANDING OF OUR AGREEMENT?

8     THE DEFENDANT:  YES.

9     MR. MATHAI:  AND WE HAVE FILED TODAY A DOCUMENT ENTITLED

10 "AGREEMENT BETWEEN THE PEOPLE OF THE STATE OF CALIFORNIA AND

11 MARISA NELSON."  IT'S A 12-PAGE DOCUMENT.  HAVE YOU -- AND

12 THIS DOCUMENT WAS FILED BY US, BUT IT WAS CREATED IN WORKING

13 TOGETHER WITH YOUR ATTORNEY.

14      IS THAT YOUR UNDERSTANDING?

15    THE DEFENDANT:  YES.

16    MR. MATHAI:  AND THIS DOCUMENT, HAVE YOU HAD A CHANCE TO

17 GO OVER THIS DOCUMENT, THE "AGREEMENT BETWEEN THE PEOPLE OF

18 THE STATE OF CALIFORNIA AND MARISA NELSON," HAVE YOU GONE

19 OVER THIS DOCUMENT WITH YOUR ATTORNEY PRIOR TO COMING INTO

20 COURT THIS MORNING?

21    THE DEFENDANT:  YES.

22    MR. MATHAI:  AND I NOTICE THAT ON THIS 12-PAGE DOCUMENT

23 THERE'S SEVERAL -- STARTING ON PAGE 3, THERE ARE PARAGRAPHS,

24 NUMBERED PARAGRAPHS THAT EXPLAIN VARIOUS ASPECTS OF YOUR

25 PLEA TODAY, INCLUDING OBLIGATIONS, YOUR OBLIGATIONS, THE

26 PEOPLE'S OBLIGATIONS, NATURE OF THE OFFENSE, WAIVER OF

27 CONSTITUTIONAL RIGHTS, AND CONSEQUENCES OF THE CONVICTION,

28 WAIVER OF APPEAL OF CONVICTION, EFFECTIVE DATE OF AGREEMENT,

1    AND NO ADDITIONAL AGREEMENTS AND THE PLEA PORTIONS.  THESE

2    ARE NUMBERED PARAGRAPHS.

3          AND DID YOU GO OVER EACH OF THESE NUMBERED

4    PARAGRAPHS ON THESE PAGES AND PLACE YOUR INITIALS NEXT TO

5    EACH PARAGRAPH ON THIS DOCUMENT?

6        THE DEFENDANT:  YES.

7        MR. MATHAI:  AND DID YOU DO SO BECAUSE -- TO INDICATE TO

8    THIS COURT THAT YOU HAD READ EACH OF THOSE PARAGRAPHS,

9    INCLUDING YOUR OBLIGATIONS AND THE CONSEQUENCES OF YOUR PLEA

10   TODAY, AND THAT YOU HAVE READ THOSE AND THAT YOU UNDERSTAND

11   THOSE PARAGRAPHS AND THAT YOU ARE IN AGREEMENT WITH WHAT IS

12   SAID IN THOSE PARAGRAPHS IN THAT YOU WISH TO INITIAL THOSE

13   TELLING THE COURT THAT YOU WISH TO GO FORWARD WITH THIS PLEA

14   WITH ALL OF THOSE ADVISEMENTS IN YOUR MIND?

15       THE DEFENDANT:  YES.

16       MR. MATHAI:  OKAY.

17       THE COURT:  I SHOULD TELL YOU, I AM GOING TO WANT YOU TO

18   TAKE A WAIVER ON THE RECORD.

19       MR. MATHAI:  YES.

20       THE COURT:  ALL RIGHT.

21       MR. MATHAI:  AND I'M GOING TO GO OVER SOME OF THESE,

22   THESE CONSEQUENCES OF YOUR PLEA WITH YOU ON THE RECORD, AND

23   THE JUDGE IS ASKING AND WE ARE ASKING THAT YOU ANSWER THESE

24   QUESTIONS.

25          YOU HAVE CERTAIN RIGHTS THAT ARE RELATED TO YOUR

26   CASE.  I AM GOING TO GO OVER THOSE RIGHTS WITH YOU NOW.

27          YOU HAVE A RIGHT TO HAVE IN YOUR CASE A PRELIMINARY

28   HEARING.  AT A PRELIMINARY HEARING, THE JUDGE OR MAGISTRATE

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1   WOULD HEAR EVIDENCE AGAINST YOU AND DETERMINE IF THERE'S
 2   SUFFICIENT EVIDENCE TO HOLD YOU OVER TO ANSWER AT TRIAL.
 3   AND AT THAT HEARING YOU WOULD HAVE THE RIGHT TO CONFRONT AND
 4   CROSS-EXAMINE WITNESSES, SUBPOENA WITNESSES ON YOUR BEHALF,
 5   PRESENT EVIDENCE OF AN AFFIRMATIVE DEFENSE, IF ANY, AND YOU
 6   WOULD HAVE THAT RIGHT.
 7           DO YOU UNDERSTAND YOUR RIGHT TO A PRELIMINARY
 8   HEARING IN THIS CASE?
 9       THE DEFENDANT:  YES.
10       MR. MATHAI:  DO YOU WAIVE AND GIVE UP THAT RIGHT IN
11   ORDER TO ENTER YOUR PLEA OF GUILTY TODAY?
12       THE DEFENDANT:  YES.
13       MR. MATHAI:  YOU ALSO HAVE A RIGHT OF A TRIAL, EITHER A
14   COURT TRIAL OR A JURY TRIAL.  A COURT TRIAL YOU WOULD HAVE
15   IF BOTH SIDES, BOTH YOU AND THE PEOPLE, AGREE TO IT.  AT
16   THAT TRIAL, YOU HAVE CERTAIN RIGHTS.
17           YOU HAVE THE RIGHT TO CONFRONT AND CROSS-EXAMINE
18   WITNESSES.  YOU HAVE THE RIGHT TO SUBPOENA WITNESSES TO
19   COURT ON YOUR OWN BEHALF.  SUBPOENAS ARE COURT ORDERS.  THEY
20   ARE ISSUED FREE OF CHARGE TO YOU.
21           YOU HAVE THE RIGHT TO REMAIN SILENT.  I SHOULD
22   MENTION YOU ALSO HAVE THAT RIGHT AT A PRELIMINARY HEARING.
23   YOU HAVE THE RIGHT TO REMAIN SILENT, WHICH MEANS YOU DON'T
24   HAVE TO SAY ANYTHING THAT MIGHT TEND TO INCRIMINATE YOU.
25           BY ENTERING A PLEA OF GUILTY OR NO CONTEST, BUT IN
26   THIS CASE GUILTY, YOU ARE WAIVING THAT RIGHT BECAUSE YOU ARE
27   USING YOUR OWN WORDS TO INCRIMINATE YOURSELF.
28           DO YOU UNDERSTAND EACH OF THOSE RIGHTS THAT I'VE
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
1   JUST ARTICULATED TO YOU?
2        THE DEFENDANT:  YES.
3        MR. MATHAI:  DO YOU WAIVE AND GIVE UP EACH OF THOSE
4   RIGHTS AS THEY PERTAIN TO A COURT TRIAL OR A JURY TRIAL IN
5   THIS CASE?
6        THE DEFENDANT:  YES.
7        MR. MATHAI:  I FAILED TO MENTION YOUR RIGHT TO REMAIN
8   SILENT AT THE PRELIMINARY HEARING.  DO YOU UNDERSTAND YOU
9   HAVE THAT RIGHT AT THE PRELIMINARY HEARING ALSO?
10       THE DEFENDANT:  YES.
11       MR. MATHAI:  AND YOU WAIVE AND GIVE UP THAT RIGHT IN
12  ORDER TO -- AT A PRELIMINARY HEARING IN ORDER TO PLEAD
13  TODAY?
14       THE DEFENDANT:  YES.
15       MR. MATHAI:  OKAY.  ALL RIGHT.
16           YOU HAVE -- THERE ARE CONSEQUENCES TO YOUR PLEA.
17  THEY ARE SPELLED OUT IN DETAIL IN THIS FILED DOCUMENT,
18  AGREEMENT.  THE MAIN ONE -- I WANT TO HIGHLIGHT JUST A
19  COUPLE WITH YOU HERE ON THE RECORD.
20           ONE OF THE CONSEQUENCES THAT IS IF YOU ARE
21  SENTENCED IN THIS CASE BECAUSE OF A BREACH IN THE AGREEMENT,
22  THAT YOU WILL BE SENTENCED TO A TERM OF NINE YEARS IN
23  CUSTODY.
24           DO YOU UNDERSTAND THAT?
25       THE DEFENDANT:  YES.
26       MR. MATHAI:  THERE WILL BE RESTITUTION INCLUDED IN YOUR
27  SENTENCING, AND THE COURT WILL HAVE DISCRETION TO FINE YOU
28  BETWEEN $200 AND $10,000 TO THE VICTIM'S RESTITUTION FUND.
```

1          DO YOU UNDERSTAND THAT?

2      THE DEFENDANT:  YES.

3      MR. MATHAI:  IF YOU ARE CONVICTED AND SENTENCED PURSUANT

4  TO THIS AGREEMENT, THE CONVICTION CAN BE USED AGAINST YOU TO

5  INCREASE THE PENALTY IN ANY OF THOSE FUTURE FELONY

6  PROSECUTIONS THAT YOU MAY HAVE.

7          DO YOU UNDERSTAND THAT?

8      THE DEFENDANT:  YES.

9      THE COURT:  YOU KNOW, YOU DIDN'T INITIAL THAT IN THE

10  WRITTEN AGREEMENT, NUMBER 31, IT'S NOT INITIALED.

11     MS. JACKS:  WE ACTUALLY HAVE THREE COPIES.  ON MINE IT'S

12  INITIALED.  MAYBE WE OVERLOOKED THAT ONE.  SORRY.

13     THE COURT:  IT'S ALL RIGHT.

14     MS. JACKS:  DO YOU WANT US TO DO IT NOW?

15     THE BAILIFF:  I'LL GET IT.

16     MS. JACKS:  THANKS.

17     THE COURT:  THANK YOU.

18     MS. JACKS:  SORRY ABOUT THAT.

19     THE COURT:  IT'S OKAY.

20         YOU MAY PROCEED.

21     MR. MATHAI:  THANK YOU.

22         AND PARAGRAPH 33 EXPLAINS TO YOU THAT WITH AN

23  EXCEPTION OF AN APPEAL BASED ON A GUILTY -- OR THAT THESE

24  PLEAS AND ADMISSIONS WERE INVOLUNTARY, BY ENTERING A PLEA

25  TODAY, YOU ARE WAIVING AND GIVING UP ANY RIGHT TO APPEAL THE

26  CONVICTIONS TO THE OFFENSE TO WHICH YOU ARE PLEADING GUILTY.

27         DO YOU UNDERSTAND?

28     THE DEFENDANT:  YES.

1     MR. MATHAI:  AND AGREE?

2     THE DEFENDANT:  YES.

3     MR. MATHAI:  OKAY.  AND I'VE ONLY GONE OVER A FEW OF THE

4   CONSEQUENCES AND I'VE GONE OVER ALL THE CRITICAL RIGHTS THAT

5   YOU HAVE, BUT DO YOU AGREE THAT THIS AGREEMENT THAT WE'VE

6   FILED IS THE ENTIRETY OF OUR AGREEMENT BETWEEN YOU AND THE

7   PEOPLE AS SET FORTH IN THIS FILED AGREEMENT.

8          DO YOU AGREE TO THAT?

9     THE DEFENDANT:  YES.

10     MR. MATHAI:  OKAY.  NOW, YOU'VE HEARD OUR COMMENTS TODAY

11   THAT THE -- THIS PLEA, YOU'RE ENTERING A PLEA AND THE

12   SENTENCING IS GOING TO BE PUT OVER.  LET ME JUST ADD IF FOR

13   ANY REASON YOU ARE SENTENCED IN THIS CASE AND IT'S EITHER A

14   YEAR OR YEARS FROM NOW, THERE MAY BE A CHANCE THAT YOU WILL

15   NOT BE SENTENCED BEFORE THIS JUDGE.

16          DO YOU AGREE THAT YOU COULD BE SENTENCED BEFORE

17   ANOTHER JUDGE, ALTHOUGH JUDGE FIDLER IS THE ONE THAT'S

18   ACCEPTING YOUR PLEA TODAY?

19     THE DEFENDANT:  YES.

20     MR. MATHAI:  AND THE SENTENCING WILL BE PUT OVER, AND,

21   AS I SAID, YOU'VE AGREED TO COOPERATE WITH THE PEOPLE AND

22   THE PROSECUTION OF THE REMAINING DEFENDANTS AND OTHER

23   DEFENDANTS THAT MAY COME BEFORE THIS COURT.

24          I WANT TO KNOW, GO OVER WITH YOU SOME FACTUAL --

25   SOME FACTUAL STATEMENTS THAT PERTAIN TO YOUR STATEMENTS THAT

26   YOU HAVE MADE AND THAT ARE PART OF OUR AGREEMENT.  I WANT TO

27   GO OVER THOSE WITH YOU ON THE RECORD.

28          FIRST OF ALL, LET ME SAY, I HAVE -- I AM GOING TO

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1   READ TO YOU SOME FACTUAL STATEMENTS.  THESE FACTUAL
 2   STATEMENTS I'M READING FROM IS FROM A DOCUMENT THAT IS NOT
 3   FILED WITH THE COURT BUT HAS BEEN PREPARED IN COORDINATION
 4   BETWEEN THE PROSECUTORS IN THIS CASE AND YOUR ATTORNEY, AMY
 5   JACKS; IS THAT YOUR UNDERSTANDING?
 6        THE DEFENDANT:  YES.
 7        MR. MATHAI:  AND IT IS YOUR UNDERSTANDING THAT MS. JACKS
 8   WORKED CLOSELY WITH OUR OFFICE TO GET THE LANGUAGE OF THIS
 9   FACTUAL STATEMENT ACCURATE AND COMPLETE.
10        IS THAT -- IS THAT WHAT YOU UNDERSTAND?
11        THE DEFENDANT:  YES.
12        MR. MATHAI:  HAVE YOU HAD A CHANCE -- BEFORE THIS MOMENT
13   NOW IN COURT, HAVE YOU HAD A CHANCE TO GO OVER THE ACTUAL
14   STATEMENTS THAT I'M GOING TO READ TO YOU NOW, HAVE YOU HAD A
15   CHANCE TO GO OVER THOSE WITH YOUR ATTORNEY TO MAKE SURE THAT
16   THESE STATEMENTS ARE COMPLETE AND ACCURATE?
17        THE DEFENDANT:  YES.
18        MR. MATHAI:  AND WITH THAT BEING SAID, IS IT YOUR DESIRE
19   TO GO FORWARD AND GIVE A FACTUAL STATEMENT TO THIS COURT AS
20   TO THE BASIS OF YOUR PLEA?
21        THE DEFENDANT:  YES.
22        MS. JACKS:  ACTUALLY, I THINK THE FACTUAL STATEMENT IS A
23   SUMMARY OF THE PROFFERING INFORMATION.
24        MR. MATHAI:  YES.  THANK YOU, MS. JACKS.
25        IT'S ACTUALLY -- THE PURPOSE OF THIS IS TO
26   SUMMARIZE STATEMENTS THAT YOU'VE MADE OVER THE COURSE OF
27   SEVERAL DAYS TO THE DISTRICT ATTORNEY'S OFFICE IN PROFFER
28   SESSIONS; IS THAT CORRECT?
```

1      THE DEFENDANT:  YES.

2      MR. MATHAI:  I AM GOING TO READ THESE TO YOU NOW, AND I

3   AM GOING TO READ THESE PARAGRAPHS TO YOU, AND THEN I AM

4   GOING TO ASK YOU IF YOU AGREE WITH WHAT IS STATED IN EACH OF

5   THESE PARAGRAPHS.

6          (READING:)

7              1.  BEGINNING IN MAY, 2007 -- I'M

8          SORRY -- 2017, WITHOUT ANY PROMISES OF

9          LENIENCY OR OTHER CONSIDERATION, I MADE

10         PROFFER STATEMENTS WITH THE LOS ANGELES

11         COUNTY DISTRICT ATTORNEY'S OFFICE OVER

12         THE COURSE OF SEVERAL DAYS.

13         IS THAT TRUE?

14     THE DEFENDANT:  YES.

15     MR. MATHAI:  NUMBER 2.

16         (READING:)

17             ALL STATEMENTS MADE DURING THESE

18         PROFFER SESSIONS WERE MADE IN THE

19         PRESENCE OF MY ATTORNEY, AMY JACKS.

20             IS THAT TRUE?

21     THE DEFENDANT:  YES.

22     MR. MATHAI:  (READING:)

23             3.  ALL STATEMENTS MADE DURING

24         THESE PROFFER SESSIONS WERE TRUTHFUL AND

25         BASED UPON MY PERSONAL KNOWLEDGE WHICH

26         WAS ACQUIRED OVER MANY YEARS THROUGH MY

27         PERSONAL PARTICIPATION, MY PERSONAL

28         OBSERVATIONS, AND MY INTERACTION WITH

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
1              COCONSPIRATORS.

2                   IS THAT TRUE?

3         THE DEFENDANT:  YES.

4         MR. MATHAI:  NUMBER 4.

5              (READING:)

6                   DURING THESE SESSIONS, I HAVE

7              CONTINUED TO REFRESH MY RECOLLECTION OF

8              EVENTS BY REVIEWING DOCUMENTS AND

9              CORRESPONDENCE IN MY POSSESSION.  I'VE

10             ALSO PROVIDED CORROBORATING DOCUMENTATION

11             TO THE LOS ANGELES COUNTY DISTRICT

12             ATTORNEY'S OFFICE.

13                  IS THAT TRUE?

14        THE DEFENDANT:  YES.

15        MR. MATHAI:  (READING:)

16                  5.  I WORKED DIRECTLY WITH MUNIR

17             UWAYDAH, M.D., AS A PERSONAL ASSISTANT

18             FROM 2000 TO JUNE 2010.

19                  IS THAT TRUE?

20        THE DEFENDANT:  YES.

21        MR. MATHAI:  (READING:)

22                  6.  UWAYDAH OWNED AND CONTROLLED

23             MANY COMPANIES AND PROPERTIES EVEN THOUGH

24             OTHER INDIVIDUALS WERE LISTED AS THE

25             OWNERS.  THIS WAS ALL DONE INTENTIONALLY

26             SO THAT UWAYDAH COULD HIDE HIS OWNERSHIP

27             AND HIS CONTROL FROM CREDITORS, INSURANCE

28             INVESTIGATORS, AND THE GOVERNMENT
```

```
 1            AGENCIES.  HE EXERCISED ABSOLUTE CONTROL
 2            OVER ALL OF THESE ENTITIES.
 3                 IS THAT TRUE?
 4      THE DEFENDANT:  YES.
 5      MR. MATHAI:  (READING:)
 6            7.  UWAYDAH PURCHASED AND
 7            CONTROLLED REAL ESTATE PROPERTY THAT WAS
 8            PLACED IN PAUL TURLEY'S NAME USING PAUL
 9            TURLEY'S CREDIT.
10                 IS THAT TRUE?
11      THE DEFENDANT:  YES.
12      MR. MATHAI:  (READING:)
13            8.  UWAYDAH USED LAWYERS TO SET UP
14            COMPANIES, DRAFT CONTRACTS, AND FILE
15            LAWSUITS TO FACILITATE THE FRAUDULENT
16            ACTIVITY.  UWAYDAH WAS THEIR CLIENT
17            GIVING THEM DIRECTION AND PAYING THEIR
18            BILLS EVEN THOUGH OTHERS WERE LISTED AS
19            OWNERS OR OFFICERS OF THE CORPORATION.
20                 IS THAT TRUE?
21      THE DEFENDANT:  YES.
22      MR. MATHAI:  (READING:)
23            9.  UWAYDAH CONTROLLED PURPORTED
24            OWNERS, COCONSPIRATORS, AND OTHERS BY
25            VARIOUS MEANS, INCLUDING, BUT NOT LIMITED
26            TO, MANIPULATION, LOYALTY, FINANCIAL
27            INCENTIVES, FRAUDULENT PROMISSORY NOTES,
28            LITIGATION, AND THREATS.
```

```
1              IS THAT TRUE?
2        THE DEFENDANT:  YES.
3        MR. MATHAI:  (READING:)
4              10.  BETWEEN 2003 AND 2010, UWAYDAH
5           DIRECTED ME TO PUT MY NAME AS OWNER,
6           OFFICER, OR MANAGER OF VARIOUS
7           CORPORATION OR LIMITED LIABILITY
8           COMPANIES EVEN THOUGH HE WAS THE TRUE
9           OWNER AND CONTROLLED THESE ENTITIES.
10          UWAYDAH SOLELY CONTROLLED THE OPERATION
11          OF THESE ENTITIES, INCLUDING THE FLOW OF
12          MONEY IN AND OUT OF THESE ENTITIES' BANK
13          ACCOUNTS.  THESE ENTITIES INCLUDE, BUT
14          ARE NOT LIMITED TO, GOLDEN STATE
15          PHARMACEUTICALS, SPRING BOARD, ORTHOPEDIC
16          DEVICES, GESTUET EICHENHAIN -- THAT'S
17          SPELLED G-E-S-T-U-E-T, NEXT WORD
18          E-I-C-H-E-N-H-A-I-N -- ACCOUNTS
19          RECEIVABLE, LTD, AND MARISA SCHERMBECK,
20          DOING BUSINESS AS SCHERMBECK MANAGEMENT.
21             IS THAT TRUE?
22       THE DEFENDANT: YES.
23       MR. MATHAI:  (READING:)
24             11.  IN ADDITION TO PUTTING MY NAME
25          AS OWNER OF COMPANIES THAT ACTUALLY
26          BELONG TO UWAYDAH, AT HIS DIRECTION I
27          ALLOWED MYSELF TO BE DESIGNATED AS THE
28          OWNER OR AUTHORIZED SIGNER ON DOZENS OF
```

```
 1              BANK ACCOUNTS ASSOCIATED WITH VARIOUS

 2              UWAYDAH ENTITIES, INCLUDING THOSE ALREADY

 3              MENTIONED.  UNTIL JUNE 2010, I MOVED

 4              MONEY IN AND OUT OF THESE VARIOUS

 5              ACCOUNTS AT THE DIRECTION OF UWAYDAH AND

 6              NO ONE ELSE.

 7                   IS THAT TRUE?

 8         THE DEFENDANT:  YES.

 9         MR. MATHAI:  (READING:)

10              12.  UWAYDAH EXERCISED ABSOLUTE

11              CONTROL OVER THE INCOME FROM THESE

12              VARIOUS ENTITIES.  UWAYDAH USED THE

13              INCOME AS HIS OWN.  HIS PERSONAL EXPENSES

14              AS WELL AS EXPENSES FOR FRONTLINE OR

15              OTHER ENTITIES WERE PAID FROM WHATEVER

16              ACCOUNTS HAD FUNDS IN IT AT THE TIME

17              WITHOUT REGARD TO WHICH ACCOUNTS BELONG

18              TO WHICH COMPANIES OR WHICH COMPANIES

19              BILLS WERE BEING PAID.  UWAYDAH DIRECTED

20              THAT FUNDS BE TRANSFERRED BETWEEN THESE

21              ENTITIES AND THEIR BANK ACCOUNTS WITHOUT

22              ANY DISTINCTION OF SEPARATE ASSETS.

23              HOWEVER, WHEN IT CAME TO FUNDS FROM

24              GOLDEN STATE PHARMACEUTICALS, MONEY WAS

25              FIRST MOVED INTO SCHERMBECK MANAGEMENT

26              BEFORE IT WAS MOVED TO FRONTLINE BECAUSE

27              UWAYDAH DID NOT WANT TO REVEAL HIS DIRECT

28              OWNERSHIP OF THE PHARMACY.
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
1              IS THAT TRUE?
2        THE DEFENDANT:  YES.
3        MR. MATHAI:  (READING:)
4              13.  ALTHOUGH FRONTLINE MEDICAL
5              ASSOCIATES WAS INCORPORATED IN
6              NOVEMBER 2004 LISTING AMIR UWAYDAH AS
7              51 PERCENT OWNER AND PAUL TURLEY AS
8              49 PERCENT OWNER, BASED ON MY
9              OBSERVATIONS AND EXPERIENCE WITH THE
10             COMPANY AND THE MOVEMENT OF FUNDS IN
11             WHICH I PARTICIPATED, UWAYDAH ACTUALLY
12             OWNED 100 PERCENT OF THE COMPANY.  TO MY
13             KNOWLEDGE, PAUL TURLEY NEVER RECEIVED ANY
14             DISTRIBUTION OF SHARES IN INCOME OF THE
15             COMPANY.  TURLEY WAS PAID A SALARY LIKE
16             ANY OTHER EMPLOYEE.  ON OCCASION, HE HAD
17             TO PLEAD THAT UWAYDAH ALLOW HIM TO
18             RECEIVE HIS SALARY.
19             IS THAT TRUE?
20       THE DEFENDANT:  YES.
21       MR. MATHAI:  (READING:)
22             14.  ALTHOUGH PAUL TURLEY MANAGED
23             THE DAILY OPERATIONS OF THE SAN FERNANDO
24             MEDICAL CLINIC, HE HAD NO ACTUAL
25             AUTHORITY OVER FRONTLINE AND HAD TO ASK
26             UWAYDAH FOR PERMISSION TO DO ANYTHING
27             RELATED TO THE COMPANY, INCLUDING
28             RECEIVED MONEY TO PAY CAPPERS.  HIS VALUE
```

```
 1              TO UWAYDAH WAS THAT HE HAD CONNECTIONS TO
 2              LAWYERS THAT WOULD REFER CLIENTS FOR A
 3              FEE.
 4                   IS THAT TRUE?
 5         THE DEFENDANT:  YES.
 6         MR. MATHAI:  (READING:)
 7              15.  UWAYDAH AND PAUL TURLEY PAID
 8              VARIOUS LAWYERS FOR ILLEGAL REFERRALS TO
 9              FRONTLINE.  DEFENDANT JEFF STEVENS, AMONG
10              OTHERS, WAS A CAPPER WHO WAS PAID TO
11              BRING IN PATIENTS FROM VARIOUS LAW FIRMS.
12              I PARTICIPATED IN MAKING SUCH PAYMENTS.
13              DEFENDANTS MARIA TURLEY, TATIANA ARNOLD,
14              KELLY PARK, AND WENDY LUKE KNEW OF AND/OR
15              FACILITATED THIS ILLEGAL SCHEME WHICH WAS
16              REFERRED TO AS, QUOTE, END QUOTE,
17              "MARKETING."
18                   IS THAT TRUE?
19         THE DEFENDANT:  YES.
20         MR. MATHAI:  (READING:)
21              16.  THERE WAS A FEE HIERARCHY FOR
22              THESE REFERRALS WITH GREATER FEES PAID
23              FOR SURGICAL CANDIDATES.
24                   IS THAT TRUE?
25         THE DEFENDANT:  YES.
26         MR. MATHAI:  (READING:)
27              17.  UWAYDAH EXERTED PRESSURE TO
28              MAXIMIZE BILLINGS FOR EACH PATIENT AND
```

```
1              OBTAIN SURGICAL AUTHORIZATIONS FROM

2              INSURERS.  UWAYDAH WOULD ENSURE EMPLOYEE

3              COMPLIANCE THROUGH VARIOUS MEANS

4              COMMUNICATED THROUGH MANAGERS, SUCH AS

5              MYSELF, PAUL TURLEY, AND MARIA TURLEY.

6                   IS THAT TRUE?

7         THE DEFENDANT: YES.

8         MR. MATHAI: (READING:)

9              18.  AN EMPHASIS WAS PUT ON

10             SURGICAL AUTHORIZATIONS.  APPROXIMATELY,

11             90 PERCENT OF THE CAP POTENTIAL SURGICAL

12             PATIENTS WERE PLACED ON A SURGICAL TRACK

13             AND WERE AUTHORIZED.

14                  IS THAT TRUE?

15        THE DEFENDANT: YES.

16        MR. MATHAI: (READING:)

17             19.  AT SOUTH BAY SURGICAL AND

18             SPINE INSTITUTE, PETER NELSON AND THE

19             REST OF THE STAFF WOULD TYPICALLY WAIT

20             UNTIL UWAYDAH PULLED INTO THE PARKING

21             LOT, THEN THE, QUOTE, UNQUOTE,

22             "SURGERIES" WOULD BEGIN.  PETER NELSON

23             WAS ALWAYS THE PERSON IN THE OPERATING

24             ROOM.  I PERSONALLY WITNESSED UWAYDAH

25             BEING OUT OF THE OPERATING ROOM FOR HOURS

26             AT A TIME WHILE PETER NELSON PERFORMED,

27             QUOTE, UNQUOTE, "SURGERIES."

28                  IS THAT TRUE?
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1       THE DEFENDANT:  YES.

 2       MR. MATHAI:  (READING:)

 3               20.  AT MISSION HOSPITAL AND OTHER

 4           AREA HOSPITALS, UWAYDAH FREQUENTLY

 5           CONDUCTED BUSINESS AND MET WITH MYSELF

 6           AND OTHER DEFENDANTS WHILE PETER NELSON

 7           CONTINUED, QUOTE, UNQUOTE, "SURGERIES"

 8           WITHOUT UWAYDAH'S PARTICIPATION OR

 9           PRESENCE IN THE OPERATING ROOM.

10               IS THAT TRUE?

11       THE DEFENDANT:  YES.

12       MR. MATHAI:  (READING:)

13               21.  IT WAS COMMON KNOWLEDGE THAT

14           PETER NELSON'S ACTIVITY IN THE OPERATING

15           ROOM WAS THE BASIS OF A CONTROVERSY WITH

16           THE MEDICAL BOARD OVER THE PRACTICE.

17           THIS PRACTICE OF SURGERY WAS CONSIDERED

18           TO BE HAPPENING WITHOUT UWAYDAH'S

19           PERSONAL PRESENCE AND UWAYDAH CIRCULATED

20           AN OPINION LETTER TO SUPPORT HIS CLAIM

21           THAT THE PRACTICE WAS ALLOWED.

22               IS THAT TRUE?

23       THE DEFENDANT:  YES.

24       MR. MATHAI:  (READING:)

25               22.  I ASSISTED IN PREPARING

26           OPERATIVE REPORTS FOR UWAYDAH AT HIS

27           DIRECTION.  HE PERSONALLY WROTE THE

28           REPORT, AND I INSERTED THE CODES.  THOSE
```

```
1              REPORTS ALWAYS CLAIM THAT HE PERFORMED
2              THE SURGERIES.
3                   IS THAT TRUE?
4      THE DEFENDANT:  YES.
5      MR. MATHAI:  (READING:)
6                   23.  IT WAS WELL KNOWN WITHIN THE
7              ORGANIZATION THAT MY HUSBAND, PETER
8              NELSON, WAS IN THE OPERATING ROOM FOR
9              HOURS BY HIMSELF WITHOUT DR. UWAYDAH
10             PHYSICALLY BEING IN THE ROOM.  HE SPENT
11             LONG HOURS OPERATING ON UP TO TEN
12             PATIENTS A DAY.  STAFF WOULD JOKE THAT HE
13             SHOULD BECOME A DOCTOR AND RECEIVE MORE
14             PAY.
15                  IS THAT TRUE?
16     THE DEFENDANT:  YES.
17     MR. MATHAI:  (READING:)
18                  24.  BILLINGS WERE ROUTINELY
19             SUBMITTED TO INSURANCE COMPANIES
20             REFLECTING THAT UWAYDAH PERFORMED THE
21             SURGERY AND THAT A PHYSICIAN'S ASSISTANT
22             WAS UTILIZED AS WELL.  PETER NELSON
23             RECEIVED THE SALARY FOR HIS WORK, BUT HE
24             WAS ALSO PROMISED A PORTION OF THE
25             PAYMENTS FROM THE INSURERS FOR A
26             PHYSICIAN'S ASSISTANT WHEN THE BILLS WERE
27             PAID.  THESE WERE REFERRED TO AS
28             RECEIVABLES.
```

```
 1              IS THAT TRUE?
 2         THE DEFENDANT:  YES.
 3         MR. MATHAI:  (READING:)
 4              25.  ALL OF UWAYDAH'S INNER CIRCLE,
 5         INCLUDING ALL THE CHARGED DEFENDANTS AND
 6         OTHERS, KNEW THAT UWAYDAH WAS THE TRUE
 7         OWNER OF GOLDEN STATE PHARMACEUTICALS.
 8         UWAYDAH ARTICULATED THAT HE WANTED A
 9         MAXIMUM PHARMACEUTICAL BILLING FOR EACH
10         PATIENT IN SPITE OF THEIR PARTICULAR
11         MEDICAL NEEDS OR CONCERNS.  UWAYDAH
12         CREATED A LIST OF PRESCRIPTION
13         MEDICATIONS AND INSISTED THAT EACH
14         PATIENT SEEN AT FRONTLINE BE PRESCRIBED
15         ALL MEDICATIONS ON THE LIST OR AT LEAST A
16         CERTAIN DOLLAR AMOUNT.  IF THE TREATING
17         DOCTOR FAILED TO PRESCRIBE ALL OF THE
18         LISTED MEDICATIONS, ANOTHER EMPLOYEE
19         WOULD DO SO.  LETI LEMUS AND OTHERS
20         PARTICIPATED IN THIS BEHAVIOR.  LEMUS AND
21         OTHERS WOULD OFTEN SIGN DR. JOHNSON'S
22         NAME ON PRESCRIPTION SHEETS.  THE BILLING
23         REFLECTED THAT EACH PATIENT WAS
24         ESSENTIALLY PRESCRIBED THE SAME
25         MEDICATION.
26              IS THAT TRUE?
27         THE DEFENDANT:  YES.
28         MR. MATHAI:  (READING:)
```

```
1              26.  PRESCRIPTIONS WOULD OFTEN BE

2         RETURNED TO THE CLINIC OR PHARMACY AND

3         THESE MEDICATIONS WOULD BE RELABELED WITH

4         DIFFERENT PATIENT NAMES AND THE INSURANCE

5         COMPANY WOULD BE RE-BILLED FOR THE SAME

6         MEDICATION.  DISCREPANCIES BETWEEN THE

7         AMOUNT OF PHARMACEUTICALS PURCHASED BY

8         GSP AND THE AMOUNT BILLED OCCURRED.  AT

9         UWAYDAH'S INSTRUCTION, I AND OTHERS

10        ADJUSTED THE NUMBERS SO THAT REGULATING

11        AGENCIES WOULD NOT BECOME AWARE OF THE

12        DISCREPANCY.  PAUL TURLEY, MARIA TURLEY,

13        KELLY PARK, TATIANA ARNOLD, LETI LEMUS,

14        JEFF STEVENS, WENDY LUKE, AND OTHERS

15        PARTICIPATED IN THE VARIOUS FRAUDULENT

16        PRACTICES RELATED TO PHARMACEUTICALS.

17             IS THAT TRUE?

18   THE DEFENDANT:  YES.

19   MR. MATHAI:  (READING:)

20             27.  PHARMACEUTICAL BILLING BECAME

21        A LUCRATIVE PART OF THE OVERALL SCHEME.

22        HOWEVER, UWAYDAH DIRECTED THAT TURLEY NOT

23        BE INFORMED OF HOW MUCH HE WAS MAKING

24        BECAUSE HE BELIEVED THAT TURLEY WOULD

25        WANT A LARGER SALARY.

26             IS THAT TRUE?

27   THE DEFENDANT:  YES.

28   MR. MATHAI:  (READING:)
```

```
 1              28.   OTHER DOCUMENTS WERE FORGED TO
 2         FURTHER FACILITATE THE FRAUDS.   THEY WERE
 3         COMMONLY SENT TO DEFENDANT KELLY PARK TO
 4         ACCOMPLISH THIS TASK.   THE FORGERIES WERE
 5         REFERRED TO AS, QUOTE, UNQUOTE,
 6         "MOORPARKING," M-O-O-R-P-A-R-K-I-N-G.
 7         THESE DOCUMENTS INCLUDED FORGED PATIENT
 8         ARBITRATION AGREEMENTS.
 9              IS THAT TRUE?
10    THE DEFENDANT:  YES.
11    MR. MATHAI:  (READING:)
12              29.   UWAYDAH ATTEMPTED TO GAIN
13         CONTROL OVER THE VENTURA COUNTY BUSINESS
14         BANK TO FACILITATE ACCESS TO CREDIT AND
15         THE MOVEMENT OF FUNDS.
16              IS THAT TRUE?
17    THE DEFENDANT:  YES.
18    MR. MATHAI:  (READING:)
19              30.   TO ACCOMPLISH THIS, UWAYDAH
20         TRANSFERRED FUNDS TO PURPORTEDLY
21         INDEPENDENT INVESTORS TO BE INVESTED IN
22         THE BANK ON HIS BEHALF.   FRAUDULENT
23         DOCUMENTS WERE PREPARED ATTESTING TO
24         THEIR FUNDS, THEIR INDEPENDENT AND LACK
25         OF CONNECTION TO THE OTHER INVESTORS.
26         TATIANA ARNOLD PARTICIPATED IN THIS
27         PROCESS AND WAS A PROXY INVESTOR FOR
28         UWAYDAH HERSELF.
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
1              IS THAT TRUE?

2         THE DEFENDANT:  YES.

3         MR. MATHAI:  (READING:)

4              31.  KELLY PARK AND RONNIE CASE

5         WERE ARRESTED FOR THE MURDER OF JULIANA

6         REDDING AND UWAYDAH FLED THE COUNTRY.  I

7         WAS LEFT WITH MY NAME ON VARIOUS

8         COMPANIES AND BANK ACCOUNTS.  I WAS AWARE

9         OF THE IMPLICATIONS AS TO MY CULPABILITY

10        IN THE FRAUDS.  DURING THIS TIME I

11        ATTEMPTED TO DISTANCE MYSELF FROM THE

12        ORGANIZATION AND TO BE INDEMNIFIED BY

13        UWAYDAH FOR ANY CLAIMS AGAINST COMPANIES

14        IN MY NAME.  SHELLIE ROSE KELLY AND I

15        EMPLOYED CRIMINAL DEFENSE ATTORNEY ROBERT

16        BERNSTEIN.

17             IS THAT TRUE?

18        THE DEFENDANT:  YES.

19        MR. MATHAI:  (READING:)

20             32.  I SUBSEQUENTLY PROFFERED

21        STATEMENTS TO THE DISTRICT ATTORNEY'S

22        OFFICE AND INVESTIGATORS.

23             IS THAT TRUE?

24        THE DEFENDANT:  YES.

25        MR. MATHAI:  (READING:)

26             33.  ATTORNEYS REPRESENTING UWAYDAH

27        ATTEMPTED TO RETURN CONTROL OVER ENTITIES

28        AND BANK ACCOUNTS UNDER MY NAME TO
```

```
 1          UWAYDAH'S CONTROL BY FILING FRAUDULENT

 2          SUCCESSIVE LAWSUITS UNDER THE NAMES OF

 3          DIFFERENT COMPANIES, EACH OF WHICH WERE

 4          ACTUALLY OWNED AND CONTROLLED BY UWAYDAH.

 5              IS THAT TRUE?

 6     THE DEFENDANT:  YES.

 7     MR. MATHAI:  (READING:)

 8          34.  DURING THIS TIME, I WAS

 9          CONTACTED THROUGH MY ATTORNEY BY ATTORNEY

10          BENJAMIN GLUCK, WHO IS REPRESENTING

11          UWAYDAH.  HE ATTEMPTED TO OBTAIN A

12          DECLARATION THAT THE PROPERTY SEIZED BY

13          THE POLICE WAS ACTUALLY THE PROPERTY OF

14          FRONTLINE MEDICAL SO HE COULD CHALLENGE

15          THE SEIZURE OF THE COMPUTERS AND THE

16          STORAGE LOCKER BY THE AUTHORITIES.

17              IS THAT TRUE?

18     THE DEFENDANT:  YES.

19     MR. MATHAI:  (READING:)

20          35.  ATTORNEY BENJAMIN GLUCK ALSO

21          ATTEMPTED TO NEGOTIATE THE RETURN OF

22          CONTROL OF THE ENTITIES AND BANK ACCOUNTS

23          UNDER MY NAME TO UWAYDAH'S CONTROL.

24          THESE NEGOTIATIONS ULTIMATELY NEVER

25          CONCLUDED BECAUSE I WAS ADVISED THAT THE

26          RETURN OF THESE ASSETS WOULD FURTHER

27          FACILITATE THE FRAUDS PERPETRATED BY

28          UWAYDAH.
```

```
 1              IS THAT TRUE?
 2         THE DEFENDANT:  YES.
 3         MR. MATHAI:  (READING:)
 4              36.  I WAS THEN SUED AGAIN BY
 5         UWAYDAH'S LAWYERS, INCLUDING BENJAMIN
 6         GLUCK.
 7              IS THAT TRUE?
 8         THE DEFENDANT:  YES.
 9         MR. MATHAI:  (READING:)
10              37.  I ULTIMATELY FILED FOR
11         BANKRUPTCY.  I WAS CONVINCED BY BENJAMIN
12         GLUCK TO SUE MY FORMER CRIMINAL DEFENSE
13         ATTORNEY FOR MAL PRACTICE FOR ADVISING ME
14         NOT TO TRANSFER THE ITEMS BACK TO
15         UWAYDAH'S CONTROL AS PART OF A SETTLEMENT
16         WITH UWAYDAH.  THE PROCEEDS OF THAT SUIT
17         WERE TO GO TO ANY DEBT OWED TO UWAYDAH.
18         HE ALSO PERSUADED ME TO WAIVE MY
19         ATTORNEY-CLIENT PRIVILEGE WITH MY
20         CRIMINAL DEFENSE ATTORNEY AND MY CIVIL
21         ATTORNEY TO FACILITATE THAT LAWSUIT.
22              IS THAT TRUE?
23         THE DEFENDANT:  YES.
24         MR. MATHAI:  (READING:)
25              38.  DURING THE BANKRUPTCY ACTION,
26         BENJAMIN GLUCK AND OTHER ATTORNEYS
27         REPRESENTING UWAYDAH'S INTEREST
28         FACILITATED THE RETURN OF THE ENTITIES TO
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1          UWAYDAH'S CONTROL THROUGH THE BANKRUPTCY
 2          TRUSTEE.
 3               IS THAT TRUE?
 4     THE DEFENDANT:  YES.
 5     MR. MATHAI:  (READING:)
 6          39.  AS PART OF THAT SETTLEMENT,
 7          THEY ALSO SECURED PETER NELSON'S
 8          AGREEMENT TO COOPERATE IN THE DEFENSE OF
 9          ANY ACTION AGAINST UWAYDAH BROUGHT BY THE
10          MEDICAL BOARD.
11               IS THAT TRUE?
12     THE DEFENDANT:  YES.
13     MR. MATHAI:  (READING:)
14          40.  DURING THAT SAME PERIOD,
15          ATTORNEY BENJAMIN GLUCK ASKED ME TO SIGN
16          A DECLARATION THAT THE STORAGE LOCKER
17          THAT WAS RENTED FOR UWAYDAH WAS ACTUALLY
18          RENTED ON BEHALF OF FRONTLINE AND RELATED
19          ENTITIES AND THAT THE MATERIAL THERE
20          BELONGED TO THE ENTITIES AS WELL.  THIS
21          WAS NOT TRUE, AND I CORRECTED THE
22          DECLARATION TO REFLECT THE FACT THAT IT
23          WAS ACTUALLY RENTED ON BEHALF OF UWAYDAH
24          AND THAT ALL THE MATERIAL THERE WAS HIS.
25          ATTORNEY BENJAMIN GLUCK THEN ARGUED IN AN
26          E-MAIL EXCHANGE THAT MY EDITS, QUOTE,
27          "NEEDLESSLY AND INACCURATELY CONFUSED
28          THINGS," END QUOTE.
```

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
1              IS THAT TRUE?
2        THE DEFENDANT:  YES.
3        MR. MATHAI:  AND, MS. NELSON, ARE EACH OF THESE
4    STATEMENTS, THESE 41 PARAGRAPHS THAT I HAVE NOW READ TO
5    YOU -- I AM SORRY -- 40 PARAGRAPHS THAT I HAVE NOW READ TO
6    YOU ON THE RECORD, ARE EACH OF THEM COMPLETE AND ACCURATE
7    STATEMENTS WHICH REFLECT STATEMENTS THAT YOU GAVE TO THE
8    DISTRICT ATTORNEY'S OFFICE IN VARIOUS PROFFER SESSIONS IN
9    THE LAST FEW WEEKS?
10       THE DEFENDANT:  YES.
11       MR. MATHAI:  LET ME ASK YOU, MA'AM, DO YOU -- HAVE,
12   WELL, GONE OVER YOUR CONSTITUTIONAL RIGHTS THAT ARE RELATED
13   TO YOUR CRIMINAL CASE AND TO THIS PLEA?  I'VE GONE OVER SOME
14   OF THE SIGNIFICANT CONSEQUENCES OF YOUR PLEA.  I'VE GONE
15   OVER A FACTUAL SUMMARY OF PROFFER STATEMENTS YOU HAVE MADE
16   TO OUR OFFICE THAT ARE NOW PART OF THE RECORD OF THIS PLEA.
17   DO YOU UNDERSTAND EACH OF THOSE MATTERS AND WISH TO MOVE
18   FORWARD BY ENTERING INTO A PLEA THIS MORNING?
19       THE DEFENDANT:  YES.
20       MR. MATHAI:  DO YOU UNDERSTAND THAT YOU ARE GOING TO BE
21   ENTERING A PLEA OF GUILTY, AND THAT A PLEA OF GUILTY IS
22   TREATED BY THIS COURT -- THAT A PLEA OF GUILTY IS JUST THAT,
23   AND THAT BASED ON THIS PLEA, THAT BASED ON YOUR WORDS TODAY,
24   THAT THE COURT WILL ACCEPT YOUR PLEA.
25           DO YOU UNDERSTAND THAT?
26       THE DEFENDANT:  YES.
27       MR. MATHAI:  HAS ANYONE MADE ANY PROMISES TO YOU OTHER
28   THAN WHAT WE STATED HERE IN OPEN COURT AND WHAT'S
```

```
 1   MEMORIALIZED IN THIS 12-PAGE AGREEMENT, HAS ANYONE MADE ANY
 2   PROMISES OTHER THAN THAT TO GET YOU TO PLEAD GUILTY TO THE
 3   CHARGE OF CONSPIRACY AND ADMIT THE SPECIAL ALLEGATION TODAY?
 4       THE DEFENDANT:  NO.
 5       MR. MATHAI:  HAS ANYONE USED ANY FORCE OR VIOLENCE ON
 6   YOU OR ANYONE CLOSE TO YOU IN ORDER TO CONVINCE YOU TO ENTER
 7   THIS PLEA OF GUILTY AND MAKE THESE ADMISSIONS TODAY?
 8       THE DEFENDANT:  NO.
 9       MR. MATHAI:  ARE YOU PLEADING FREELY AND VOLUNTARILY AND
10   BECAUSE YOU BELIEVE IT IS IN YOUR BEST INTEREST TO DO SO?
11       THE DEFENDANT:  YES.
12       MR. MATHAI:  DO YOU HAVE ANY QUESTIONS AT THIS TIME?
13       THE DEFENDANT:  NO.
14       MR. MATHAI:  MAY I TAKE --
15       THE COURT:  DID YOU READ, UNDERSTAND, INITIAL, AND SIGN
16   THE AGREEMENT BETWEEN YOURSELF AND THE PEOPLE OF THE STATE
17   OF CALIFORNIA?
18       THE DEFENDANT:  YES.
19       THE COURT:  DID YOU DO SO WITH MS. JACKS' ASSISTANCE?
20       THE DEFENDANT:  YES.
21       THE COURT:  ALL RIGHT.  YOU MAY PROCEED TO TAKE THE
22   PLEA.
23       MR. MATHAI:  THANK YOU.
24         MARISA NELSON, IS THAT YOUR TRUE AND CORRECT NAME?
25       THE DEFENDANT:  YES.
26       MR. MATHAI:  AND YOUR TRUE AND CORRECT DATE OF BIRTH,
27   11/29/76?
28       THE DEFENDANT:  YES.
```

1      MR. MATHAI:  IN CASE NUMBER BA455469, THE -- I BELIEVE

2  THE LATEST COURT VERSION IS ENTITLED "THIRD AMENDMENT FELONY

3  COMPLAINT" FILED ON JULY 12TH, 2017, HOW DO YOU PLEAD TO

4  COUNT 1 OF THAT COMPLAINT WHICH CHARGES THAT ON OR BETWEEN

5  NOVEMBER 15TH, 2004, AND MARCH 16TH, 2017, IN THE COUNTY OF

6  LOS ANGELES YOU DID COMMIT THE CRIME OF CONSPIRACY TO COMMIT

7  INSURANCE FRAUD, IN VIOLATION OF PENAL CODE SECTION 550,

8  SUBDIVISION (A)(6) OF THE PENAL CODE, A FELONY, HOW DO YOU

9  PLEAD TO THAT CHARGE?

10      THE DEFENDANT:  GUILTY.

11      MR. MATHAI:  AND TO THE ALLEGATION ATTACHED TO THAT

12  CHARGE PURSUANT TO PENAL CODE SECTION 12022 -- I'M SORRY --

13  PENAL CODE SECTION 12022.6, SUBDIVISION (A)(4), THAT AS TO

14  THAT COUNT AND IN THE COMMISSION OF THAT OFFENSE AND WITH

15  THE INTENDED USE CLAIM YOU DID TAKE, DAMAGE, AND DESTROY

16  PROPERTY OF A VALUE EXCEEDING $3.2 MILLION WITHIN THE

17  MEANING OF THAT PENAL CODE SECTION, DO YOU ADMIT THAT

18  ALLEGATION?

19      THE DEFENDANT:  YES.

20      MR. MATHAI:  COUNSEL, DO YOU JOIN IN THE PLEA AND IN THE

21  WAIVERS AND STIPULATE TO A FACTUAL BASIS BASED ON THE FILED

22  REPORTS BY THE D.A. INVESTIGATORS IN THIS CASE?

23      MS. JACKS:  YES, I DO.

24      THE COURT:  THE COURT FINDS THAT THE WAIVERS AND THE

25  PLEA ARE FREELY AND VOLUNTARILY MADE UNDERSTANDING THE

26  NATURE AND CONSEQUENCES OF THEM.  THERE IS A FACTUAL BASIS

27  CONTAINED BOTH IN THE REPORTS AS WELL AS THE AGREEMENT FILED

28  TODAY AND AS WELL AS THE UPDATES I WAS RECEIVING WHILE THE

1   CASE WAS UNDER INVESTIGATION.  I DO ACCEPT THE PLEA.  DO YOU

2   WANT TO CONTINUE THE SENTENCING TO WHAT DATE?

3       MS. JACKS:  I THINK THE DATE THAT YOUR CLERK SUGGESTED

4   WAS JULY 27TH OF NEXT YEAR, 2018.

5       THE COURT:  ALL RIGHT.  IS THAT AGREEABLE TO YOU, MA'AM?

6       THE DEFENDANT:  YES.

7       THE COURT:  ALL RIGHT.  I WILL SAY AND I'M SOMEWHAT

8   CONCERNED IN THE AGREEMENT, UNLESS I AM EITHER MISREADING

9   IT, YOU HAVE SET UP A POTENTIAL DISQUALIFICATION OF

10  MR. GLUCK FROM REPRESENTING OTHER PEOPLE IN THIS CASE.

11      MR. MATHAI:  WELL, I WILL TELL THE COURT THAT WE HAVE

12  BEEN IN, I THINK, SIX OR SEVEN SESSIONS WITH MS. NELSON.  WE

13  HAVE RECEIVED INFORMATION, SOME OF WHICH IS, WAS THE COURT

14  JUST HEARD RECITED, AND MS. NELSON AGREED WITH THAT

15  INFORMATION.

16          I DID -- I DID TELL THE COURT -- WE DID TELL THE

17  COURT, I THINK MR. NANTROUP RELAYED TO THE COURT, THAT THERE

18  WERE SOME ISSUES OF CONFLICT THAT WE WERE AWARE OF BEFORE.

19  THOSE ISSUES HAVE BEEN HEIGHTENED BASED ON THESE PROFFER

20  SESSIONS, AND THE PEOPLE ARE PREPARING TO FILE WITH EITHER,

21  PROBABLY TOMORROW, A MOTION -- IT'S ACTUALLY ENTITLED

22  "PETITION FOR A COURT INQUIRY."

23      THE COURT:  A COURT WHAT?

24      MR. MATHAI:  A COURT INQUIRY AS TO CONFLICT OF INTEREST

25  ISSUES, AND THE COURT WILL SEE IT'S RATHER LENGTHY AND THERE

26  IS A LOT OF ATTACHMENTS BECAUSE IT COVERS A VERY LONG PERIOD

27  OF TIME FROM 2000 -- REALLY FROM 2010 TO NOW, EVEN GOES INTO

28  SOME OF THE HISTORY BEFORE.

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

1          SO I APOLOGIZE FOR THE LENGTH OF IT, BUT WE HAVE

2     DOCUMENTED SOME OF THESE THINGS AND FROM VARIOUS SOURCES,

3     AND THE MOTION IS PETITIONING THE COURT TO MAKE AN INQUIRY

4     INTO THESE MATTERS.

5          THE COURT:  WE WILL GET TO THAT WHEN WE GET TO THAT.

6          MR. MATHAI:  ALL RIGHT.

7          THE COURT:  THANK YOU.

8          MS. JACKS:  THANK YOU.

9          THE CLERK:  CAN I INQUIRE OF MS. NELSON IS SHE ON BAIL

10    OR O.R.?

11         MR. MATHAI:  SHE --

12         MS. JACKS:  WE REQUEST SHE BE RELEASED O.R. BASED ON HER

13    PLEA TODAY.

14         THE COURT:  ANY OBJECTION?

15         MR. MATHAI:  NO.

16         THE COURT:  ALL RIGHT.  JUST SEE THAT THE PROPER

17    DOCUMENTS ARE FILLED OUT.

18         MS. JACKS:  THANK YOU.

19         THE COURT:  ALL RIGHT.  YOU'RE WELCOME.

20         THE CLERK:  BAIL IS EXONERATED?

21         THE COURT:  YES, BAIL IS EXONERATED UPON THE SIGNING OF

22    THE AGREEMENT.

23

24          (THE MATTER WAS CONTINUED TO

25           JULY 27, 2018, FOR

26           FURTHER PROCEEDINGS.)

27

28

NOT TO BE REPRODUCED PER GOVERNMENT CODE 69954(D)

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF LOS ANGELES

 3    DEPARTMENT NO. 106            HON. LARRY PAUL FIDLER, JUDGE

 4

 5    THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                            )
 6                            PLAINTIFF,    )
                                            )
 7         VS.                              )  NO. BA455469-04
                                            )
 8    MARISSA SCHERMBECK NELSON,            )  REPORTER'S
       T/N MARISA SCHERMBECK NELSON,        )  CERTIFICATE
 9                                          )
                              DEFENDANT.    )
10    _____)

11

12    STATE OF CALIFORNIA    )
                             )  SS
      COUNTY OF LOS ANGELES  )
13

14        I, DIANNA K. CRITTENDEN, CSR NO. 8998, OFFICIAL REPORTER

15    OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE

16    COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING

17    IS A FULL, TRUE AND CORRECT TRANSCRIPT OF ALL THE

18    ADMONITIONS GIVEN AND WAIVERS AND ADMISSIONS TAKEN AT THE

19    TIME OF THE PLEA IN THE ABOVE-ENTITLED CAUSE.

20        DATED THIS 16TH DAY OF AUGUST, 2017.

21

22

23    _____, CSR #8998
                            OFFICIAL REPORTER
24

25

26

27

28
```

# EXHIBIT 16

1

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    FOR THE COUNTY OF LOS ANGELES

 3

 4    DEPARTMENT 106              HON. LARRY P. FIDLER, JUDGE

 5                                -OOO-

 6    THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                             )
 7                    PLAINTIFF,             )
                                             ) NO. BA455469
 8            VS.                            )
                                             )
 9                                           )
                                             )
10    PAUL TURLEY,                           )
                                             )
11                    DEFENDANT.             )
      _____)

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                    FRIDAY, MAY 3, 2024

15

16

17    APPEARANCES:

18    FOR THE PEOPLE:      LOS ANGELES DISTRICT ATTORNEY
                           BY:  DAYAN MATHAI, DEPUTY
19                              KAREN NISHITA, DEPUTY
                           211 WEST TEMPLE, SUITE 200
20                         LOS ANGELES, CALIFORNIA 90012

21    FOR THE DEFENDANT:   LAW OFFICE OF ROBERT C. MOEST
                           BY:  ROBERT C. MOEST
22                         2530 WILSHIRE BOULEVARD
                           SANTA MONICA, CALIFORNIA 90403
23

24

25

26

27    VOLUME 1                  TRACI THOMAS, CSR 9620
      PAGES 1/83-300, INCL.    OFFICIAL REPORTER
28
```

2

```
 1                    M A S T E R   I N D E X

 2                         VOLUME 1

 3

 4                          SESSIONS

 5                                               PAGE
 6           FRIDAY, MAY 3, 2024
               A.M. SESSION                        6
 7             P.M. SESSION                        33

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

3

MASTER INDEX

VOLUME 1


CHRONOLOGICAL INDEX OF WITNESSES

                                                            PAGE

**TURLEY, PAUL, (CALLED BY THE PEOPLE)**
  DIRECT EXAMINATION BY MR. MATHAI              28
  DIRECT EXAMINATION (RESUMED) BY MR. MATHAI    33

**GLUCK, BENJAMIN, (CALLED BY THE PEOPLE)**
  DIRECT EXAMINATION BY MR. MATHAI              69

4

1                    M A S T E R    I N D E X

2                         VOLUME 1

3

4            ALPHABETICAL INDEX OF WITNESSES

5                                              PAGE

6    **GLUCK, BENJAMIN, (CALLED BY THE PEOPLE)**
      DIRECT EXAMINATION BY MR. MATHAI            69

7

8    **TURLEY, PAUL, (CALLED BY THE PEOPLE)**
      DIRECT EXAMINATION BY MR. MATHAI            28

9     DIRECT EXAMINATION (RESUMED) BY MR. MATHAI  33

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    A    I WANTED THE PROPERTIES OUT OF MY NAME, SO

2    THEY WERE -- I AGREED, YOU KNOW, TO TRANSFER --

3    TRANSFER THE PROPERTIES TO THESE HOLDING COMPANIES.

4    Q    OKAY.  SO WHOSE IDEA WAS IT TO TRANSFER

5    THE PROPERTIES TO HOLDING COMPANIES?

6    A    MUNIR UWAYDAH'S.

7    Q    OKAY.  AND HAD YOU VOICED -- PRIOR TO

8    THAT, HAD YOU VOICED TO HIM A CONCERN THAT YOUR NAME

9    WAS ON THESE FOUR PROPERTIES THAT WE'VE BEEN TALKING

10   ABOUT?

11   A    I HAD VOICED MY CONCERN FROM ALMOST THE

12   BEGINNING BECAUSE I WANTED NOTHING -- I DIDN'T WANT MY

13   NAME ON THEM.

14   Q    OKAY.  WHAT WAS YOUR CONCERN EXACTLY?

15   A    I DIDN'T -- I DIDN'T HAVE OWNERSHIP, LIKE

16   WE'VE DISCUSSED.  I DIDN'T HAVE ANY CONTROL.  YOU KNOW,

17   IT WAS, I MEAN, A DRAG ON MY CREDIT ESSENTIALLY.  I

18   JUST WANTED MY HANDS -- I DIDN'T WANT TO BE -- I'VE

19   NEVER BEEN INVOLVED IN IT, BUT I JUST WANTED IT FREE

20   AND CLEAR.

21   Q    OKAY.  SO YOU SAID UWAYDAH CAME UP WITH

22   THE IDEA TO PUT THE PROPERTIES IN THE HOLDING

23   COMPANIES.  BUT WHO CONTROLLED THE HOLDING COMPANIES?

24   A    WELL, I DIDN'T.  SO HE DID.

25   Q    OKAY.  BUT WHOSE NAME WAS ON THE HOLDING

26   COMPANIES?

27   A    MY NAME.

28   Q    SO YOU TOOK THE PROPERTIES IN WHICH YOUR

1      NAME SHOWED UP ON TITLE, AND INSTEAD YOU PUT THE

2      PROPERTIES AS BEING HELD BY A HOLDING COMPANY.  BUT YOU

3      WERE THE OWNER OR PRESIDENT OR -- ON PAPER THE

4      CONTROLLING AGENT OF THESE HOLDING COMPANIES.

5              CORRECT?

6        A     YES.

7        Q     SO WHEN WE TALKED ABOUT -- SPECIFICALLY

8      WE'RE TALKING, AGAIN, ABOUT 5007, LLC.  THAT WAS A

9      HOLDING COMPANY THAT YOU PUT THE PROPERTY 5007 OCEAN

10     FRONT WALK INTO.

11             CORRECT?

12       A    I DON'T REMEMBER THAT NAME SPECIFICALLY.

13     BUT IF MY NAME IS ON THE PAPERWORK, THEN YES, THEN I

14     DID DO THAT.

15       Q    OKAY.  AND 5509 OCEAN FRONT WALK, DID YOU

16     TRANSFER THAT FROM YOUR NAME TO BEING HELD BY

17     CONNEMARA, A HOLDING COMPANY, WHICH YOU WERE THE

18     PRESIDENT OF?

19       A    I RECOGNIZE THAT, YES.

20       Q    OKAY.  SO ON PAPER, IF ANYONE LOOKED INTO

21     CONNEMARA, THEY WOULD SEE THAT YOU WERE ASSOCIATED WITH

22     IT AS A PRESIDENT OR A MANAGER.  BUT IN REALITY IT WAS

23     MUNIR UWAYDAH THAT EXERCISED CONTROL OVER CONNEMARA.

24       A    YES.

25       Q    AND THAT WAS TRUE AT THE TIME YOU

26     TRANSFERRED THAT PROPERTY, 5509 OCEAN FRONT WALK, INTO

27     CONNEMARA AS A OWNER?

28       A    YES.

# EXHIBIT 17

1

```
 1                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                      FOR THE COUNTY OF LOS ANGELES

 3

 4     DEPARTMENT 106              HON. LARRY P. FIDLER, JUDGE

 5                                 -OOo-

 6     THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                              )
 7                      PLAINTIFF,            )
                                             ) NO. BA455469
 8              VS.                            )
                                             )
 9                                            )
                                             )
10     PAUL TURLEY,                           )
                                             )
11                      DEFENDANT.            )
       _____)
12

13                  REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                       FRIDAY, MAY 3, 2024

15

16

17     APPEARANCES:

18     FOR THE PEOPLE:      LOS ANGELES DISTRICT ATTORNEY
                            BY:  DAYAN MATHAI, DEPUTY
19                               KAREN NISHITA, DEPUTY
                            211 WEST TEMPLE, SUITE 200
20                          LOS ANGELES, CALIFORNIA 90012

21     FOR THE DEFENDANT:   LAW OFFICE OF ROBERT C. MOEST
                            BY:  ROBERT C. MOEST
22                          2530 WILSHIRE BOULEVARD
                            SANTA MONICA, CALIFORNIA 90403
23

24

25

26

27     VOLUME 1                  TRACI THOMAS, CSR 9620
       PAGES 1/83-300, INCL.    OFFICIAL REPORTER
28
```

4

```
 1                    M A S T E R   I N D E X

 2                        VOLUME 1

 3

 4            ALPHABETICAL INDEX OF WITNESSES

 5                                              PAGE

 6   GLUCK, BENJAMIN, (CALLED BY THE PEOPLE)
       DIRECT EXAMINATION BY MR. MATHAI          69
 7

 8   TURLEY, PAUL, (CALLED BY THE PEOPLE)
       DIRECT EXAMINATION BY MR. MATHAI          28
 9     DIRECT EXAMINATION (RESUMED) BY MR. MATHAI 33

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
```

1          Q      OKAY.  AND SO THAT'S WHY I WANT TO ASK YOU

2     SOME QUESTIONS ON THAT SAME SUBJECT HERE.

3                IN YOUR EXPERIENCE OF REPRESENTING

4     DR. UWAYDAH, DID YOU OBSERVE HIM TO HAVE CONTROLLING

5     INTEREST AND OWNERSHIP INTEREST IN ENTITIES, BUSINESS

6     ENTITIES, WHEREIN OTHER PEOPLE'S NAMES ACTUALLY

7     APPEARED ON THE SECRETARY OF STATE DOCUMENTS AND OTHER

8     LEGAL DOCUMENTS AS OWNERS OR PRINCIPALS?

9          A      YES.

10         Q      IS ONE OF THOSE ENTITIES --

11                WELL, I WANT TO ASK YOU ABOUT A COUPLE OF

12    THOSE ENTITIES TODAY.  WELL, ARE YOU FAMILIAR WITH A

13    BUSINESS ENTITY CALLED MEDCONSULT S.A.L.,

14    M-E-D-C-O-N-S-U-L-T, AND THEN THE ABBREVIATION S-A-L?

15         A      YES.

16         Q      HOW ARE YOU FAMILIAR WITH THAT ENTITY?

17         A      IT CAME UP A NUMBER OF TIMES IN MY

18    REPRESENTATION.  AND IT WAS LISTED ON A SPREADSHEET OF

19    ENTITIES THAT DR. UWAYDAH CAUSED TO BE SENT TO ME

20    DURING THE REPRESENTATION, WHICH HAPPENS TO BE AN

21    EXHIBIT IN THE BENCH TRIAL.

22         Q      OKAY.  AND DID YOU -- BASED ON THAT

23    SPREADSHEET AND YOUR INTERACTIONS WITH MUNIR UWAYDAH,

24    DID YOU FORM A CONCLUSION AS TO WHO CONTROLLED

25    MEDCONSULT, S.A.L.?

26         A      YES.

27         Q      AND WHO IS THAT?

28         A      ALONG WITH ALL OF THE ENTITIES ON THE

```
 1      SPREADSHEET, MY CONCLUSION WAS THAT THEY WERE ALL

 2      CONTROLLED BY MUNIR UWAYDAH.

 3          Q      AND DID YOU SEE HIM ACTUALLY EXERCISE ANY

 4      CONTROL OVER MEDCONSULT?

 5          A      DID I SEE HIM?

 6          Q      DID YOU OBSERVE ANY CONTROLLING BEHAVIOR

 7      THAT HE HAD OVER MEDCONSULT?

 8          A      AS I TESTIFIED DURING THE BENCH TRIAL,

 9      THERE WAS AT LEAST ONE TRANSACTION WHERE MEDCONSULT

10      GAVE UP ITS RIGHTS FOR SOMETHING THAT WOULD MAKE --

11      MEDCONSULT GAVE UP ITS RIGHTS IN ORDER TO BENEFIT MUNIR

12      UWAYDAH PERSONALLY IN A WAY THAT WAS CONSISTENT WITH MY

13      CONCLUSION.

14          Q      OKAY.  DID MUNIR UWAYDAH EVER ASK YOU TO

15      DO ANYTHING, ASK YOU TO DO ANYTHING AS HIS COUNSEL,

16      THAT WOULD BENEFIT MEDCONSULT?

17          A      I BELIEVE HE ASKED ME TO FIND COUNSEL FOR

18      THEM, FOR MEDCONSULT.

19          Q      DID YOU DO SO?

20          A      YES.

21          Q      OKAY.  AND WHO WAS THAT COUNSEL?

22          A      I -- IT WAS THE LAW FIRM OF HALPERN,

23      HALPERN MAY.  THE NAME CHANGED A FEW TIMES.  IT WAS

24      AARON MAY AND GRANT GELBERG.

25          Q      AND WAS THAT -- CAN YOU GIVE US A GENERAL

26      TIME FRAME WHERE HE ASKED YOU TO DO THAT?

27          A      I BELIEVE THAT WAS PROBABLY FAIRLY SHORTLY

28      AFTER THE INDICTMENT WAS UNSEALED AT THE END OF 2015.
```